**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **BRANDON JOHNSON,** | |
| **Plaintiff,** | **Case No. 2:17-cv-02644-JAR-GEB** |
| **v.** | |
| **CHEROKEE COUNTY BOARD OF COUNTY COMMISSIONERS and DAVID M. GROVES,** | |
| **Defendants.** | |

**MEMORANDUM IN SUPPORT OF JOINT MOTION
FOR SUMMARY JUDGMENT OF DEFENDANTS BOARD OF COUNTY
COMMISSIONERS OF CHEROKEE COUNTY AND DAVID M. GROVES**

Defendants Board of County Commissioners of Cherokee County ("BOCC") and David M. Groves ("Sheriff Groves") (collectively "Defendants"), by and through undersigned counsel and pursuant to Fed. R. Civ. P. 56 and Local Rules 7.1, 7.6, 56.1, hereby submit the following Memorandum in Support of their Joint Motion for Summary Judgment.

Respectfully submitted,

**Case Linden P.C.**

s/Kevin D. Case
Kevin D. Case, MO 41491; KS 14570
Jennifer G. Ahlbrandt, MO 67434; KS 26980
2600 Grand Boulevard, Suite 300
Kansas City, MO  64108
Tel:  (816) 979-1500
Fax:  (816) 979-1501
kevin.case@caselinden.com
jennifer.ahlbrandt@caselinden.com
Attorneys for Defendants

**Table of Contents**

Page

I.   **Nature of the Case** ...................................................................................... 1

II.  **Statement of Uncontroverted Material Facts[1]** ........................................ 2

    A.   **The parties** ........................................................................................ 2

        1.   Plaintiff Brandon Johnson ......................................................... 2
        2.   Defendant Board of County Commissioners of Cherokee County ..................... 2
            2.1.   BOCC facilitates funding of the annual operating budget ..................... 2
            2.2.   BOCC sets the annual operating budget ................................. 2
            2.3.   BOCC cannot override Sheriff Groves' decisions ................................ 2
            2.4.   BOCC does not need to approve pay raises ................................ 2
        3.   Defendant Sheriff David M. Groves ......................................... 3
            3.1.   Sheriff Groves' compensations ......................................... 3
            3.2.   Sheriff Groves is the final policy maker and decision maker ................ 3
            3.3.   Sheriff Groves hires and fires ................................ 3
            3.4.   Sheriff Groves determines pay raises ................................ 3
            3.5.   Policies and procedures of Cherokee County Sheriff's Department ........ 3
                3.5.1.   Cherokee County does not tolerate discrimination ................... 3
                3.5.2.   Incidents of discrimination shall be reported ........................... 3
                3.5.3.   Retaliation is prohibited ................................ 3
            3.6.   Sheriff Groves has employed no less than thirty deputies ................ 3
                3.6.1.   Undersheriff Terry Clugston ................................ 3
                3.6.2.   Chief Deputy Shane Gibson ................................ 3
                3.6.3.   Deputy Beau Hamlin ................................ 3
                3.6.4.   Former Chief Investigator Doug Wydick ................................ 3
                3.6.5.   Former Deputy Mike Potter ................................ 3
                3.6.6.   Former Deputy Dean Kidd ................................ 3
                3.6.7.   Former Deputy Brian Kerns ................................ 3
                3.6.8.   Former Deputy Tina (Blockburger) Rosenberg ........................ 3
                3.6.9.   Organizational chart ................................ 4
        4.   Jason Daniels ................................ 4

    B.   **Events predating Plaintiff's employment** ........................................ 4

        5.+   Prior incident between Kerns and Kidd ................................ 4

    C.   **Plaintiff's application for employment** ........................................ 5

        6.   Plaintiff applies with Cherokee County Sheriff's Department ............... 5
            6.1.+   Employment with the Parsons Police Department No. 1 ................ 5
            6.2.   Employment with the Erie Police Department ........................ 5
            6.3.   Employment with the Coffeyville Police Department ................ 5

---

[1] Defendants utilize the "+" symbol where a section of the Statement of Uncontroverted Material Facts includes related subparts not expressly addressed in this Table of Contents for purposes of conciseness.

        6.4.     Employment with the Parsons Police Department No. 2 ...................... 5

        6.5.     Employment with the Altamont Police Department .............................. 6

        6.6.     Employment with the Wilson Police Department ................................ 6

7.     Plaintiff is hired by Sheriff Groves ................................................... 6

8.     Job description of Patrol Deputy ...................................................... 6

**D.     Plaintiff's performance while employed ...............................................6**

9.     Plaintiff begins working as part-time deputy ..................................... 6

10.     Plaintiff begins working as full-time deputy ..................................... 6

11.+     February 5, 2014: Plaintiff issued performance review No. 1 ............. 6

12.     June 21, 2014: Plaintiff not responding to alarm call ......................... 7

13.+     July 1, 2014: Plaintiff issued performance review No. 2 ................... 7

14.     July 24, 2014: Plaintiff notified of overdue Case No. 1..................... 8

15.+     August 29, 2014: Complaint regarding Plaintiff driving recklessly .................. 8

16.+     November 25, 2014: Plaintiff complains about 12 hour schedule ...................... 9

17.     February 19, 2015: Plaintiff notified of overdue Case No. 2 ............. 9

18.+     May 30, 2015:  Complaint about Plaintiff  leads to discovery of missing video .. 9

19.     June 8, 2015: Plaintiff declines to participate in funeral procession.................. 10

20.+     June 21, 2015: Plaintiff fails to respond to a theft call  .................... 10

21.     Sheriff Groves receives complaints regarding Plaintiff  ................... 10

22.+     Plaintiff develops a reputation for showing poor initiative  .............. 10

**E.     Plaintiff's termination ....................................................................12**

23.     June 25, 2014: Plaintiff is terminated by Sheriff Groves  .................. 12

**F.     Plaintiff's post-termination discoveries ...........................................12**

24.+     Hamlin calls Wydick's  black dog a "nigger"  ................................. 12

25.+     Plaintiff researches the term "white privilege"  ............................... 12

**G.     Plaintiff's charge of discrimination ................................................13**

26.     December 18, 2015: Plaintiff files his charge of discrimination ...................... 13

**H.     Internal investigation of Cherokee County Sheriff's Department ................13**

27.+     Cherokee County Sheriff's Department conducts an investigation .................. 13

28.     January 19, 2016: Kidd is terminated based on investigation results ............... 13

**I.     Plaintiff's pending lawsuit includes allegations not mentioned in his charge of discrimination ..................................................................................14**

29.     November 6, 2017: Plaintiff files suit ............................................ 14

<u>Plaintiff alleges that Defendants failed to promote him in 2014.</u>

30.+     January 2, 2014: Plaintiff sits for investigator test No. 1 .................. 14

31.+     October 21, 2014: Plaintiff sits for investigator test No. 2  .............. 14

Plaintiff alleges that Defendants denied him equipment in 2014.
32.+    2014: Plaintiff allegedly denied emergency lighting equipment ...................... 14

Plaintiff alleges that Defendants denied him training in 2014.
33.+    2014: Plaintiff allegedly denied training .......................................... 15

Plaintiff alleges that Defendants delayed his pay raise in 2015.
34.+    2015: Hourly rate for all patrol deputies is raised to $14.00 per hour .............. 15
35.     Kidd began working in March; hourly rate increased in December, 2014 ........ 15
36.     Hamlin began working in June; hourly rate increased in March, 2015 ............. 15
37.+    Plaintiff began working in August; hourly rate increased in April, 2015 .......... 15

Plaintiff alleges that Defendants subjected him to a hostile work environment.
38.+    Gibson curses at Plaintiff about a funeral procession ........................................ 16
39.     Kidd allegedly calls Plaintiff "boy" and says "pick up trash after white folk" .. 16
40.     Kidd displays an offensive YouTube video titled "Racist Mario" ................... 16

Plaintiff alleges that Defendants retaliated against him for engaging in protected
opposition to discrimination.
41.+    Plaintiff allegedly speaks to Kerns ................................................................ 16
42.+    Plaintiff allegedly "tries to speak" with Gibson ............................................. 17
43.+    Plaintiff allegedly asks Potter for advice ....................................................... 17
44.+    Plaintiff allegedly asks Wydick for advice ..................................................... 17
45.+    Plaintiff allegedly complains to Sheriff Groves ............................................. 17
46.     Plaintiff does not make any more complaints to employees ........................... 18
47.+    Plaintiff allegedly speaks to non-employee Daniels as a "friend" ................. 18
48.     Plaintiff does not communicate with Sheriff Groves ...................................... 18

III.    **Questions Presented** .......................................................................................**18**

IV.    **Standard of Review** ........................................................................................**19**

V.    **Argument and Authorities** ...............................................................................**19**

    A.    **Summary judgment should be granted in Defendants' favor on Plaintiff's
      claim for hostile work environment racial harassment (Count I), as no
      reasonable jury could find that Plaintiff's allegations amount to a "steady
      barrage of opprobrious racial comments." ...................................................20**

    B.    **Summary judgment should be granted in Defendants' favor on Plaintiff's
      claim for race discrimination (Count I), as: (1) Plaintiff cannot demonstrate
      that any delay in his pay raise was due to his race; and (2) Plaintiff's claims
      for delay in pay raise, failure to promote, denial of equipment, and denial of
      training are time barred. ...............................................................................25**

        1.    The timing of Plaintiff's pay raise was based on his month of hire. ................. 25

2.      Plaintiff's claims for delay in pay raise, failure to promote, denial of equipment, and denial of training are timed barred. ............................................................ 26

C.      **Summary judgment should be granted in Defendants' favor on Plaintiff's claim for retaliation (Count II), as no causal connection exists between any protected activity and Plaintiff's termination. ................................................29**

1.      Sheriff Groves did not learn of the alleged racial components of Plaintiff's complaints made by Plaintiff to Deputy Kerns until after the commencement of litigation. ........................................................................................................ 30

2.      Plaintiff did not engage in protected opposition to discrimination when he "tried to talk" to Chief Deputy Gibson, or when he asked for general advice from Deputy Potter and Chief Investigator Wydick. ................................................. 30

3.      Plaintiff did not engage in protected opposition to discrimination when he complained to non-employee, Daniels. ........................................................... 32

4.      Plaintiff cannot establish a causal connection between his alleged complaint to Sheriff Groves and his termination. .............................................................. 33

D.      **If Plaintiff is truly asserting a claim for workers' compensation retaliation (Count II), Defendants are entitled to summary judgment on that claim, as no such cause of action was pleaded or available to Plaintiff. ......................39**

E.      **Summary judgment should be granted in Defendants' favor on Plaintiff's claims for violation of 42 U.S.C. § 1981 (Count III) and 42 U.S.C. § 1983 (Counts IV and V), as Plaintiff has failed to meet the two-year statute of limitations. ..................................................................................................39**

VI.     **Conclusion** .............................................................................................................**41**

VII.    **Index of Exhibits** ..............................................................................................

Exhibit 1      Deposition of Plaintiff Brandon Johnson
Exhibit 2      Deposition of Defendant Sheriff David M. Groves
Exhibit 3      Deposition of Chief Deputy Shane Gibson
Exhibit 4      Deposition of Former Deputy Francis Piepho.
Exhibit 5      Deposition of Former Deputy Nicholas Hartman.
Exhibit 6      Deposition of Former Deputy Tina Rosenberg
Exhibit 7      Deposition of Deputy Brian Kerns
Exhibit 8      Deposition of Undersheriff Terry Clugston
Exhibit 9      Plaintiff's Employment Documentation
Exhibit 10     Deputy Brian Kerns' Employment Documentation
Exhibit 11     Former Deputy Dean Kidds' Employment Documentation
Exhibit 12     Investigator Beau Hamlin's Employment Documentation
Exhibit 13     Internal Investigation Report
Exhibit 14     Cherokee County Sheriff's Officer Law Enforcement Policies and Procedures
Exhibit 15     Affidavit of Defendant Sheriff David M. Groves

Exhibit 16         Deposition of Jason Daniels

**Certificate of Service**  ....................................................................................................**42**

## Table of Authorities

Page

*Adcox v. Brennan*, 15-cv-9258-JWL, 2017 WL 2405326 (D. Kan. June 2, 2017). .......................... 22, 23

*Baker v. Board of Regents of the State of Kan.*, 991 F.2d 628 (10th Cir. 1993). ................................... 40

*Beck v. City of Muskogee Police Dept.*, 195 F.3d 551 (10th Cir. 1999). ................................................. 40

*Board of County Com'rs of Count of Lincoln v. Nielander*, 275 Kan. 257 (2003). ............................. 19

*Bolden v. PRC Inc.*, 43 F.3d 545 (10th Cir. 1994). ................................................................................ 20

*Boyice v. United Parcel Service, Inc.*, No. 96-3072, 1996 WL 421950 (10th Cir. July 26, 1996). ......... 40

*Delaware State College v. Ricks*, 449 U.S. 250, 101 S. Ct. 498, 66 L.Ed.2d 431 (1980). ...................... 40

*Downs v. Jostens, Inc.*, 23 F. Supp.3d 1332 (D. Kan. 2014). ......................................................... 30, 34

*Edwards v. Boeing Co.*, No. 92-3276, 1993 WL 214566 (10th Cir. June 18, 1993). ............................. 40

*Harris v. Forklift Sys., Inc.*, 510  U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). ............................. 20

*Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187 (10th Cir. 2008). ..................................................... 31

*Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220 (10th Cir. 2000). ............................29, 30, 34

*Loum v. Houston's Restaurants, Inc.*, 985 F.Supp. 1315 (D. Kan. 1997). .................................20, 21, 24

*Miller v. Maddox*, 51 F.Supp.2d 1176 (D. Kan. 1999). ........................................................................ 25

*Montes v. Vail Clinic, Inc.*, 497 F.3d 1160 (10th Cir. 2007). ................................................................ 29

*Moore-Stovall v. Shinseki*, 969 F.Supp.2d 1309 (D. Kan. 2013). .......................................................... 29

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). .... 26, 27

*Nordike v. Verizon Business, Inc.*, No. 12-2686-JAR, 2014 WL 4749185 (D. Kan. Sept. 24, 2014). .... 31

*Suarez v. American Stevedoring, Inc.*, No. 06-CV-6721 (KAM)(RER), 2010 WL 825943 (E.D.N.Y. Mar. 4, 2010). ....................................................................................................................................... 23

*Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211 (10th Cir. 1998). .......................20, 21, 25

*Villamar v. Lincare, Inc..,* No. 13-2220-JAR, 2014 WL 4059712, at *1 (D. Kan. Aug. 14, 2014), *aff'd* 624 Fed. Appx. 658 (10th Cir. 2015). ................................................................................. 19

*Vore v. Indiana Bell Tel. Co.,* 32 F.3d 1161, 1162 (7th Cir. 1994). ....................................................... 21

*Wemimo v. Personal Mkt'ing Co.,* No. 97-2544-JWL, 1998 WL 709605 (D. Kan. Sept. 28, 1998).. 21, 24

## Statutes – Federal

42 U.S.C. § 1981 ..................................................................................................................39, 40, 41

42 U.S.C. § 1983 ..................................................................................................................39, 40, 41

42 U.S.C. § 2000e-3(a) .............................................................................................................. 29, 39

## Statutes – State

K.S.A. § 60-513(a)(4) ....................................................................................................................... 40

K.S.A. § 12-105b .............................................................................................................................. 39

## Rules

Fed. R. Civ. P. 56 ................................................................................................................................ i

Local Rule 7.1 ..................................................................................................................................... i

Local Rule 7.6 ..................................................................................................................................... i

Local Rule 56.1 ................................................................................................................................... i

## Other

EEOC Enforcement Guidance of Retaliation and Related Issues, Notice No. 915.004 (Aug. 25, 2016), available at: https://www1.eeoc.gov//laws/guidance/retaliation-guidance.cfm?renderforprint=1#a._Expansive ........................................................................... 32

I.      **Nature of the Case.**

This is a civil action for damages stemming from Plaintiff's employment and subsequent

termination by Sheriff Groves.  Plaintiff brings claims against the BOCC for hostile work

environment racial harassment (Count I), race discrimination (Count I), retaliation (Count II),

and possibly workers compensation retaliation (Count II), in violation of Title VII.  Plaintiff

further brings claims against both Defendants for violation of 42 U.S.C. § 1981 (Count III), and

violation of 42 U.S.C. § 1983 (Counts IV and V).  Defendants move for summary judgment on

the entirety of Plaintiff's claims.


II.     **Statement of Uncontroverted Material Facts.**

A.      **The parties.**

1.      According to Plaintiff Brandon Johnson ("Plaintiff"), he is of mixed race;
        his ancestry is both African-American and Caucasian. [ECF Doc. 1,
        Complaint, ¶ 15.]

2.      Defendant Board of County Commissioners of Cherokee County
        ("BOCC") does not have oversight of the Sheriff as far as hiring, firing,
        discipline, or the like; such decisions are at the sole discretion of Sheriff
        Groves. [Ex. 2, Groves, 40:2 – 6.]

        2.1.    The BOCC facilitates the funding of the annual operating budget
                for Cherokee County Sheriff's Department. [Ex. 2, Groves, 40:2 –
                6.]

        2.2.    The BOCC sets the annual operating budget for Cherokee County
                Sheriff's Department. [Ex. 2, Groves, 41:18 – 25.]

        2.3.    Sheriff Groves has the sole discretion to determine how to employ
                the annual operating budget; the BOCC does not have the power to
                override his decisions. [Ex. 2, Groves, 44:3 – 19.]

        2.4.    The BOCC does not need to approve pay raises as long as Sheriff
                Groves operates within the parameters of the annual operating
                budget. [Ex. 2, Groves, 41:18 – 25.]

1

3.    Defendant Sheriff David M. Groves ("Sheriff Groves") is the duly-elected Sheriff of Cherokee County. [Ex. 2, Groves, 39:7-25.]

3.1.    At election, Sheriff Groves was paid approximately $35,000 per year; he is now paid just under $57,000 per year. [Ex. 2, Groves, 49:17 – 25.]

3.2.    Sheriff Groves is the final policy maker and decisionmaker at the Cherokee County Sheriff's Department. [Ex. 2, Groves, 41:7 – 9.]

3.3.    Sheriff Groves determines who to hire and who to fire at the Cherokee County Sheriff's Department. [Ex. 2, Groves, 41:10 – 11.]

3.4.    Sheriff Groves determines who gets pay raises and who does not at the Cherokee County Sheriff's Department. [Ex. 2, Groves, 41:15-17.]

3.5.    On January 12, 2009, Sheriff Groves approved Cherokee County Sheriff's Officer Law Enforcement Policy No. 27. [Ex. 14, Policy, 001119 – 001122; I&A[2] in Ex. 2, Groves, 72:10 – 23.]

Policy No. 27 provides that:

3.5.1.    the Cherokee County Sheriff's Department does not tolerate any form of harassment "including harassment because of, or by inappropriately emphasizing an individual's race, national origin, religion, disability, pregnancy, age, military status, gender, or sex." [Ex. 14, Policy, 001119; I&A in Ex. 2, Groves, 72:10 – 23.]

3.5.2.    "[a]ny employee who believes that he or she is being harassed or discriminated against shall report the incident(s) as soon as possible so that steps may be taken to protect the employee from further harassment or discrimination and so that appropriate investigative and disciplinary measures may be initiated." [Ex. 14, Policy, 001121; I&A in Ex. 2, Groves, 72:10 – 23.]

3.5.3.    "[r]etaliation against any employee for filing a harassment and/or discrimination complaint or for assisting, testifying, or participating in the investigation of such a complaint" is prohibited. [Ex. 14, Policy, 001122; I&A in Ex. 2, Groves, 72:10 – 23.]

---

[2] Identified and Authenticated.

3.6.   Between his election and the date of Plaintiff's termination, Sheriff Groves employed no less than thirty (30) individuals as Deputies for the Cherokee County Sheriff's Department. [Ex. 14, Policy, 001453; I&A in Ex. 2, Groves, 72:10 – 23.]

3.6.1.   Terry Clugston ("Clugston") is the Undersheriff for the Cherokee County Sheriff's Department. [Ex.8, Clugston, 7:3 – 6.]

3.6.2.   Shane Gibson ("Gibson") is the Chief Deputy for the Cherokee County Sheriff's Department and was Plaintiff's direct supervisor. [ECF Doc. 1, Complaint, ¶ 16; ECF Doc. 3, Answer, ¶ 16.]

3.6.3.   Beau Hamlin ("Hamlin") was a Deputy for the Cherokee County Sheriff's Department; he was later promoted to detective. [Ex. 2, Groves, 216:14 – 217:6; Ex. 12, Hamlin File, 002078 and 002085; I&A in Ex. 15, Affidavit, ¶ 3.]

3.6.4.   Doug Wydick ("Wydick") was the former Chief Investigator for the Cherokee County Sheriff's Department. [Ex. 1, Plaintiff, 172:6 – 8.]

3.6.5.   Mike Potter ("Potter") was a former Deputy for the Cherokee County Sheriff's Department. [Ex. 2, Groves, 22:4 – 6.]

3.6.6   Dean Kidd ("Kidd") was a former Deputy for the Cherokee County Sheriff's Department. [Ex. 2, Groves, 195:12 – 14.]

3.6.7.   Brian Kerns ("Kerns"), an African American male, was a former Deputy for the Cherokee County Sheriff's Department who began working on February 1, 2010; he resigned on December 30, 2014 and was re-hired on June 23, 2015; he now works part-time. [Ex. 7, Kerns, 13:15 – 14:15, 20:24 – 21:7, and 21:15 – 21; Ex. 10, Kerns' File, 001439, 001448, 001460, and 001509; I&A in Ex. 15, Affidavit, ¶¶ 2 – 3.]

3.6.8.   Tina (Blockburger) Rosenberg ("Rosenberg") was a School Resources Officer for the Cherokee County Sheriff's Department; during the summer, she worked part-time as a Patrol Deputy. [Ex. 6, Rosenberg, 16:21 – 25 and 27:7 - 20.]

3.6.9. A true and accurate copy of the organizational chart is attached hereto as Ex. 14, Policy, 001082; I&A in Ex. 2, Groves, 72:10 – 23.]

4. Jason Daniels ("Daniels") is the Chief of Police for Columbus, Kansas; he is not an employee of Cherokee County Sheriff's Department. [Ex. 1, Plaintiff, 185:9 – 15 and 186:3 – 7; Ex. 2, Groves, 210:1 – 20.]

**B.    Events predating Plaintiff's employment.**

5. Prior to Plaintiff being hired, there was a tasing incident between Deputy Brian Kerns and Deputy Dean Kidd. [Ex. 7, Kerns, 54:22 – 55:17; Ex. 13, Internal Investigation, 000268 – 000274; I&A in Ex. 2, Groves, 220:4 – 10.]

5.1.    Kidd was making jokes and saying something about grape kool-aid and watermelon. [Ex. 7, Kerns, 55:5 – 17; Ex. 13, Internal Investigation, 000272; I&A in Ex. 2, Groves, 220:4 – 10.]

5.2.    Kerns was becoming irritated; he told Kidd to stop or he would tase him. [Ex. 7, Kerns, 55:5 – 17; Ex. 13, Internal Investigation, 000272; I&A in Ex. 2, Groves, 220:4 – 10.]

5.3.    Kidd continued making comments and Kerns dry-tased Kidd. [Ex. 7, Kerns, 55:5 – 17 and 112:2 – 113:13; Ex. 13, Internal Investigation, 000272; I&A in Ex. 2, Groves, 220:4 – 10.]

5.3.1. A dry-tase is a less severe tase whereby the cartridge is removed prior to the tasing. [Ex. 7, Kerns, 112:2 – 113:3.]

5.4.    Kerns and Kidd have not had any other incidents since that date; they remain friends. [Ex. 7, Kerns, 107:25 – 108:16; Ex. 13, Internal Investigation, 000269 and 000272; I&A in Ex. 2, Groves, 220:4 – 10.]

5.5.    Kerns did not want Kidd disciplined or fired for his behavior. [Ex. 10, Kerns' Docs., 001479 – 001480; I&A in Ex. 3, Gibson, 62:22 – 64:24; Ex. 7, Kerns, 113:17 – 114:11.]

5.6.    Plaintiff was not present for the tasing incident. [Ex. 7, Kerns, 109:4 – 8.]

5.7.    Deputy Nicholas Hartman ("Hartman") was present for the tasing incident. [Ex. 5, Hartman, 24:1 – 25:5; Ex. 7, Kerns, 56:7 – 13.]

5.8.    Hartman is unaware as to whether or not anyone knew about the tasing incident. [Ex. 5, Hartman, 30:11 – 17.]

5.9.    Hartman did not report the tasing incident because he thought Kidd and Kerns had a close-knit relationship and it was two friends joking back and forth. [Ex. 5, Hartman, 30:18 -31:3.]

5.10.    According to Sheriff Groves and Chief Deputy Gibson, they did not learn of the tasing incident until receipt of Plaintiff's charge of discrimination. [Ex. 2, Groves, 206:19 – 207:7; Ex. 3, Gibson, 62:8 – 21.]

**C.    Plaintiff's application for employment.**

6.    On August 17, 2012, Plaintiff applied for employment with the Cherokee County Sheriff's Department. [Ex. 9, Plaintiff's File, DEFT 000105 – 000108; I&A in Ex. 2, Groves, 102:18 – 103:1; Ex. 15, Affidavit, ¶ 2.]

<u>Plaintiff's prior employment history.</u>

6.1.    On July 29, 2002, Plaintiff was hired as a Patrol Officer by the Parsons Police Department; he resigned on July 27, 2005. [Ex. 9, Plaintiff's File, DEFT 000123 – 0000126; I&A in Ex. 15, Affidavit, ¶ 2.]

6.1.1.    Plaintiff was offered the opportunity to resign from the Parsons Police Department to avoid potential disciplinary or adverse employment or legal action. [Ex. 9, Plaintiff's File, DEFT 000125; I&A in Ex. 15, Affidavit, ¶ 2.]

6.1.2.    According to Plaintiff, he "resigned due to a racial situation that was there with a Corporal Fausnaught." [Ex. 1, Plaintiff, 57:13-16.]

6.2.    On September 3, 2005, Plaintiff was hired as a Patrol Officer by the Erie Police Department; he resigned on April 14, 2006. [Ex. 9, Plaintiff's File, DEFT 000127 – 000132; I&A in Ex. 15, Affidavit, ¶ 2.]

6.3.    On August 3, 2006, Plaintiff was hired as a Patrol Officer by the Coffeyville Police Department; he resigned on August 19, 2007. [Ex. 9, Plaintiff's File, DEFT 000134 – 000137; I&A in Ex. 15, Affidavit, ¶ 2.]

6.4.    On August 21, 2007, Plaintiff was hired as a Patrol Officer by the Parsons Police Department; he resigned on March 9, 2009. [Ex. 9,

Plaintiff's File, DEFT 000138 – 000146; I&A in Ex. 15, Affidavit, ¶ 2.]

6.5. On October 18, 2011, Plaintiff was hired as a Patrol Officer by the Altamont Police Department. [Ex. 9, Plaintiff's File, DEFT 000147 – 000148; I&A in Ex. 15, Affidavit, ¶ 2.]

6.6. In or around early 2012, Plaintiff was hired as a Deputy by the Wilson County Sheriff's Office; he was employed there for approximately five weeks. [Ex. 1, Plaintiff, 73:12 – 74:4 and 78:6 – 13.]

7. On March 28, 2013, Sheriff Groves hired Plaintiff as a part-time Deputy. [Ex. 9, Plaintiff's File, DEFT 000150; I&A in Ex. 2, Groves, 117:10 – 18; Ex. 15, Affidavit, ¶ 2.]

8. The Patrol Deputy job description applied to Plaintiff. [Ex. 9, Plaintiff's File, DEFT 000037; I&A in Ex. 2, Groves, 188:16 – 189:25; Ex. 15, Affidavit, ¶ 2.]

**D.   Plaintiff's performance while employed.**

9. On May 1, 2013, Plaintiff began working as a part-time Deputy. [Ex. 9, Plaintiff's File, DEFT 000022; I&A in Ex. 15, Affidavit, ¶ 2.]

10. On August 13, 2013, Sheriff Groves moved Plaintiff to a full-time Deputy position. [Ex. 9, Plaintiff's File, DEFT 000017 and 000020; I&A in Ex. 2, Groves, 115:14 – 12; Ex. 15, Affidavit, ¶ 2.]

<u>Plaintiff's first written performance review: no complaints by Plaintiff.</u>

11. On February 5, 2014, Plaintiff was issued his first written performance review. [Ex. 9, Plaintiff's File, DEFT 000027 – 000029; I&A in Ex. 15, Affidavit, ¶ 2.]

11.1. At the time of the review, Plaintiff did not make any complaints about his work, co-workers, or work environment. [Ex. 1, Plaintiff, 206:15 – 208:4; Ex. 9, Plaintiff's File, DEFT 000028 – 000029; I&A in Ex. 15, Affidavit, ¶ 2.]

The review stated that:

11.2. Plaintiff's "paper service completion had been below average but is recently improving," [Ex. 9, Plaintiff's File, DEFT 000027; I&A in Ex. 15, Affidavit, ¶ 2.]

6

11.3.   Plaintiff "had multiple opportunities for additional work that were not sought out." [Ex. 9, Plaintiff's File, DEFT 000027; I&A in Ex. 15, Affidavit, ¶ 2.]

11.4.   Plaintiff "has a difficult time accepting constructive criticism. He should understand when given advice or suggestions, they are given in order to better our agency as a whole." [Ex. 9, Plaintiff's File, DEFT 000028; I&A in Ex. 15, Affidavit, ¶ 2.]

11.5.   Plaintiff "can seem to be excessive in asking for equipment, assignment changes, etc. …" [Ex. 9, Plaintiff's File, DEFT 000028; I&A in Ex. 15, Affidavit, ¶ 2.]

12.   On June 21, 2014, dispatch reported to Sheriff Groves that Plaintiff was responding to an alarm call; Sheriff Groves had just driven past Plaintiff who was not responding to an alarm call. [Ex. 2, Groves, 164:11 – 165:8; Ex. 9, Plaintiff's File, DEFT 000041; I&A in Ex. 2, Groves, 157:16 – 159:16; Ex. 15, Affidavit, ¶ 2.]

<u>Plaintiff's second written performance review: no complaints by Plaintiff.</u>

13.   On July 1, 2014, Plaintiff was issued his second written performance review. [Ex. 9, Plaintiff's File, DEFT 000030 – 000031; I&A in Ex. 2, Groves, 137:5 – 18; Ex. 15, Affidavit, ¶ 2.]

13.1.   At the time of the review, Plaintiff did not make any complaints about his work, co-workers, or work environment. [Ex. 1, Plaintiff, 208:23 – 209:22; Ex. 9, Plaintiff's File, DEFT 000030 – 000031; I&A in Ex. 2, Groves, 137:5 – 18; Ex. 15, Affidavit, ¶ 2.]

13.2.   The review rated Plaintiff's performance as "below average" for reliability and dependability. [Ex. 9, Plaintiff's File, DEFT 000030; I&A in Ex. 2, Groves, 137:5 – 18; Ex. 15, Affidavit, ¶ 2.]

13.3.   The review rated Plaintiff's performance as "below average" for working relationships. [Ex. 9, Plaintiff's File, DEFT 000031; I&A in Ex. 2, Groves, 137:5 – 18; Ex. 15, Affidavit, ¶ 2.]

The review stated:

13.4.   Plaintiff "is not willing to work extra shifts / events when opportunities arise and was reluctant to assist in providing coverage during the Baxter Springs tornado response." [Ex. 9, Plaintiff's File, DEFT 000030; I&A in Ex. 2, Groves, 137:5 – 18; Ex. 15, Affidavit, ¶ 2.]

13.5.   Plaintiff "should recognize the importance of teamwork, which includes helping co-workers when they need time off or pitching in when an event occurs requiring all hands on deck." [Ex. 9, Plaintiff's File, DEFT 000031; I&A in Ex. 2, Groves, 137:5 – 18; Ex. 15, Affidavit, ¶ 2.]

13.6.   Plaintiff "struggles with creating strong relationships with co-workers, which does not go towards creating an overall positive work environment."  [Ex. 9, Plaintiff's File, DEFT  000031; I&A in Ex. 2, Groves, 137:5 – 18; Ex. 15, Affidavit, ¶ 2.]

13.7.   Plaintiff "needs to work on his relationships with other Sheriff's Officer personnel in each division."  [Ex. 9, Plaintiff's File, 000031; I&A in Ex. 2, Groves, 137:5 – 18; Ex. 15, Affidavit, ¶ 2.]

14.   On July 24, 2014, Chief Deputy Gibson emailed Plaintiff to advise that case no. 14-0631 was overdue. [Ex. 9, Plaintiff's File, 001772; I&A in Ex. 3, Gibson, 16:1 – 10.]

<u>An unsolicited complaint regarding Plaintiff's dangerous conduct: reprimand.</u>

15.   On August 29, 2014, the Cherokee County Sheriff's Department received a complaint about a Deputy driving without a due regard for safety while running with lights and sirens through Crestline Junction. [Ex. 9, Plaintiff's File, DEFT 000032; I&A in Ex. 2, Groves, 154:8 – 17; Ex. 15, Affidavit, ¶ 2.]

15.1.   After reviewing Plaintiff's car camera video, it was confirmed that on August 29, 2014, at approximately 11:17 A.M., Plaintiff passed two cars on a hill, in a no passing zone, traveling at over 100 mph; there was an oncoming car just past the crest of the hill.  [Ex. 9, Plaintiff's File, DEFT 000032; I&A in Ex. 2, Groves, 154:8 – 17; Ex. 15, Affidavit, ¶ 2.]

15.2.   After reviewing Plaintiff's car camera video, it was confirmed that on August 29, 2014, at approximately 11:20 A.M., Plaintiff entered the Crestline Junction intersection, with his view obstructed, traveling at 55 mph. [Ex. 9, Plaintiff's File, DEFT 000032; I&A in Ex. 2, Groves, 154:8 – 17; Ex. 15, Affidavit, ¶ 2.]

15.3.   On September 5, 2014, Plaintiff was issued a written reprimand for his violation of the Rules of Conduct Policy and the Agency Vehicle Driving Policy. [Ex. 9, Plaintiff's File, DEFT 000032; I&A in Ex. 2, Groves, 154:8 – 17; Ex. 15, Affidavit, ¶ 2.]

15.4.   Prior to September 5, 2014, Plaintiff had been issued more than one verbal warning that he was driving too fast. [Ex. 3, Gibson, 89:2 – 9.]

Insubordinate behavior: Plaintiff ignores the verbal instructions of his superior.

16.   On November 25, 2014, Chief Deputy Gibson called a meeting at the Cherokee County Sheriff's Department; he provided each Deputy with a copy of a new 12 hour work schedule, which was necessary for coverage due to a staff shortage. [Ex. 9, Plaintiff's File, DEFT 000035; I&A in Ex. 2, Groves, 157:16 – 159:16; Ex. 15, Affidavit, ¶ 2.]

16.1.   During the meeting, Plaintiff stated the various reasons the 12 hour schedule was inconvenient for him. [Ex. 9, Plaintiff's File, DEFT 000035; I&A in Ex. 2, Groves, 157:16 – 159:16; Ex. 15, Affidavit, ¶ 2.]

16.2.   Plaintiff prematurely departed the meeting against the verbal instructions of Corporal Justin Noel; he appeared extremely agitated. [Ex. 2, Groves, 172:21 – 173:2; Ex. 9, Plaintiff's File, DEFT 000035; I&A in Ex. 2, Groves, 157:16 – 159:16; Ex. 15, Affidavit, ¶ 2.]

16.3.   Sheriff Groves considered Plaintiff's departure an act of insubordination. [Ex. 2, Groves, 171:7 – 11.]

17.   On February 19, 2015, Chief Deputy Gibson emailed Plaintiff to advise that case no. 14-1242 was overdue. [Ex. 9, Plaintiff's File, 001769; I&A in Ex. 3, Gibson, 16:1 – 10.]

A second unsolicited complaint regarding Plaintiff: missing video discovered.

18.   On May 30, 2015, the Cherokee County Sheriff's Department received a complaint from the Chief of Police of Oswego, Kansas regarding Plaintiff. [Ex. 2, Groves, 163:21 – 164:10; Ex. 9, Plaintiff's File, DEFT 000034 and DEFT 000041; I&A in Ex. 2, Groves, 157:16 – 159:16; Ex. 15, Affidavit, ¶ 2.]

18.1.   On June 1, 2015, Sheriff Groves requested that Chief Deputy Gibson locate a video of the incident from May 30, 2015. [Ex. 9, Plaintiff's File, DEFT 000034; I&A in Ex. 15, Affidavit, ¶ 2.]

18.2.   On June 1, 2015, Chief Deputy Gibson reviewed Plaintiff's car camera video and body camera video; he was unable to locate a video of the incident from May 30, 2015. [Ex. 9, Plaintiff's File, DEFT 000034; I&A in Ex. 15, Affidavit, ¶ 2.]

18.3.   On June 4, 2015, Chief Deputy Gibson again tried to locate a video of the incident from May 30, 2015; he found the incident from May 30, 2015 had not been recorded. [Ex. 9, Plaintiff's File, DEFT 000034; I&A in Ex. 15, Affidavit, ¶ 2.]

18.4.   Plaintiff had not reported any problems with either his car camera or his body camera. [Ex. 9, Plaintiff's File, DEFT 000034; I&A in Ex. 15, Affidavit, ¶ 2.]

18.5.   On June 10, 2015, Chief Deputy Gibson located a body camera video of a car stop by Plaintiff on May 24, 2015; the stop had not been recorded on Plaintiff's car camera video. [Ex. 9, Plaintiff's File, DEFT 000034; I&A in Ex. 15, Affidavit, ¶ 2.]

19.   On June 8, 2015, Sheriff Groves requested that Plaintiff participate in the funeral procession for a family member of an employee of Cherokee County Sheriff's Department; Plaintiff indicated he did not want to attend. [Ex. 1, Plaintiff, 238:16 - 21; Ex. 9, Plaintiff's File, 000252; I&A in Ex. 15, Affidavit, ¶ 2.]

Plaintiff fails to respond to a theft call; is witnessed watching YouTube videos.

20.   On June 21, 2015, at approximately 1:15 P.M., Plaintiff was dispatched to a theft call; he failed to respond. [Ex. 2, Groves, 159:1-16; Ex. 9, Plaintiff's File, DEFT 000033 and DEFT 000215 – 000216; I&A in Ex. 15, Affidavit, ¶ 2.]

20.1.   At approximately 1:30 P.M., Plaintiff was seen by Sergeant Stephen Harper ("Sergeant Harper") watching YouTube videos at the Cherokee County Sheriff's Department. [Ex. 9, Plaintiff's File, DEFT 000033; I&A in Ex. 15, Affidavit, ¶ 2.]

Sheriff Groves receives verbal complaints from Plaintiff's co-workers.

21.   During Plaintiff's employment, Sheriff Groves received verbal complaints that Plaintiff would go to the northwest, non-populated part of Cherokee County towards the end of his shift (near where Plaintiff lived in Labette County), to avoid responding to dispatch calls that would have potentially kept him over his shift-time. [Ex. 2, Groves, 145:10 – 146:14 and 148:16 – 149:13.]

Plaintiff develops a reputation amongst his co-workers of showing poor initiative.

22.   During Plaintiff's employment, he developed a reputation of showing poor initiative. [Ex. 4, Piepho, 39:14 – 40:2; Ex. 5, Hartman, 36:1 – 7.]

22.1.   According to Former Deputy Frank Piepho ("Deputy Piepho"), Plaintiff was "not the most proactive; fairly lazy and looked for ways to avoid doing paperwork." [Ex. 4, Piepho, 39:14 – 40:2.]

22.2.   According to Former Deputy Nicholas Hartman ("Deputy Hartman"), "a lot of people would say that … they thought [Plaintiff] might be lazy or -- or trying to pawn off work onto other deputies." [Ex. 5, Harman, 36:1 – 7.]

22.3.   According to Kerns, "[w]hen [Plaintiff] first began to work in the Department, I thought he did a good job and carried his share of the work.  Over time, however, he began to shirk some of his responsibilities and did not carry his load.  It became common knowledge among other Deputies that [Plaintiff] would try to avoid responding to calls, or to complete paperwork, which meant that other Deputies had to take up his slack.

I understand that [Plaintiff] is alleging that he was discriminated against by Cherokee County because of his race.  I understand that he is alleging that he was not promoted into the property crimes Detective position because of his race, but my race (which I believe is the same as his) did not prevent me from being promoted.

I understand that he is also alleging he was terminated from employment due to race discrimination.  Based on my knowledge of his work performance, I do not disagree with the decision to terminate [Plaintiff's] employment as a Deputy.  Based upon what I observed, his work performance is what resulted in his termination from employment with the Sheriff's Department, not discrimination due to his race." [Ex. 10, Kerns' File, 001480; I&A in Ex. 3, Gibson, 62:22 – 64:24; Ex. 7, Kerns, 113:17 – 114:11.]

22.4.   Plaintiff refused to take a police report after Daniels called Cherokee County Sheriff's Department reporting his vehicle had been backed into. [Ex. 2, Groves, 161:1 –21; Ex. 9, Plaintiff's File, DEFT 000041; I&A in Ex. 2, Groves, 157:16 – 159:16; Ex. 15, Affidavit, ¶ 2.]

22.5.   Plaintiff was directed to serve an individual with a PFA (protection from abuse) at the courthouse on a specific date and time; Plaintiff failed to do so. [Ex. 2, Groves, 161:22 – 162:10; Ex. 9, Plaintiff's File, DEFT 000041; I&A in Ex. 2, Groves, 157:16 – 159:16; Ex. 15, Affidavit, ¶ 2.]

22.6.   Plaintiff responded to an injury accident on Kansas Highway 7 and failed to take a report. [Ex. 2, Groves, 162:11 – 22; Ex. 9, Plaintiff's File, DEFT 000041; I&A in Ex. 2, Groves, 157:16 – 159:16; Ex. 15, Affidavit, ¶ 2.]

22.7.   Cherokee County Sheriff's Department received a complaint from an employee at the gas station in Weir, Kansas, that Plaintiff was spending a lot of time just hanging out in the store. [Ex. 2, Groves, 162:22 – 163:2; Ex. 9, Plaintiff's File, DEFT 000041; I&A in Ex. 2, Groves, 157:16 – 159:16; Ex. 15, Affidavit, ¶ 2.]

22.8.   Plaintiff was asked to do a neighborhood canvas arising out of a homicide in Cherokee County; Plaintiff complained about doing it. [Ex. 2, Groves, 163:4 – 12; Ex. 9, Plaintiff's File, DEFT 000041; I&A in Ex. 2, Groves, 157:16 – 159:16; Ex. 15, Affidavit, ¶ 2.]

22.9.   Plaintiff spent too much time in the office on Facebook looking at videos. [Ex. 2, Groves, 163:3 – 4; Ex. 9, Plaintiff's File, DEFT 000041; I&A in Ex. 2, Groves, 157:16 – 159:16; Ex. 15, Affidavit, ¶ 2.]

**E.      Plaintiff's termination.**

23.     On June 25, 2015, Plaintiff was terminated by Sheriff Groves. [Ex. 2, Groves, 41:7 – 11; Ex. 9, Plaintiff's File, DEFT 000192 – 000195; I&A in Ex. 2, Groves, 192:9 – 20; Ex. 15, Affidavit, ¶ 2.]

**F.      Plaintiff's post-termination discoveries.**

24.     According to Plaintiff, Deputy Hamlin called Doug Wydick's black dog a "nigger."  [Ex. 1, Plaintiff, 95:4 – 97:6.]

24.1.   Plaintiff did not witness this; he was told about the event by Former Deputy Rosenberg. [Ex. 1, Plaintiff, 95:22 – 97:17; Ex. 6, Rosenberg, 83:8 – 18.]

24.2.   Plaintiff learned of this event after his termination from the Cherokee County Sheriff's Department. [Ex. 6, Rosenberg, 83:20 – 84:16.]

25.     According to Plaintiff, his co-workers would use the term "white privilege."  [Ex. 1, Plaintiff, 97:18 – 22.]

25.1.   Plaintiff states that he did not understand what this term meant while he was employed by the Cherokee County Sheriff's Department.  [Ex. 1, Plaintiff, 97:18 – 22.]

25.2.   Plaintiff states that he "found out later what it actually meant" after reading about it on the internet. [Ex. 1, Plaintiff, 97:25 – 98:16.]

25.3.   Plaintiff states that he then concluded that the term had been used during his employment in an offensive manner.  [Ex. 1, Plaintiff, 98:17 – 99:1.]

**G.    Plaintiff's charge of discrimination.**

26.     On December 18, 2015, Plaintiff dually-filed his charge of discrimination with the Kansas Human Rights Commission and the U.S. Equal Employment Opportunity Commission. [ECF Doc. 1, Complaint, ¶¶ 7 – 8; ECF Doc. 3, Answer, ¶¶ 7 – 8.]

**H.    Internal investigation of Cherokee County Sheriff's Department.**

27.     Upon receipt of Plaintiff's charge of discrimination, the Cherokee County Sheriff's Department conducted an internal investigation into the allegations included in the same. [Ex. 2, Groves, 207:4 – 7; Ex. 13, Internal Investigation, 000268 – 000274.]

27.1.   The internal investigation revealed that a tasing incident did occur between Deputy Dean Kidd and Deputy Brian Kerns prior to Plaintiff's employment with the Cherokee County Sheriff's Department. [Ex. 13, Internal Investigation, 000274.]

27.2.   The internal investigation revealed that Deputy Dean Kidd did display an inappropriate video in front of Plaintiff. [Ex. 13, Internal Investigation, 000274; I&A in Ex. 2, Groves, 220:4 – 10.]

27.3.   The internal investigation could not validate Plaintiff's allegation that Deputy Kidd called him a "boy" and told him to "pick up trash after the white folk[.]" [Ex. 13, Internal Investigation, 000274; I&A in Ex. 2, Groves, 220:4 – 10.]

27.4.   The internal investigation could not validate Plaintiff's allegation that Deputy Kidd increased his anger and racially discrimination behavior towards Plaintiff after Kidd applied for a part-time job with the Columbus Police Department. [Ex. 13, Internal Investigation, 000274; I&A in Ex. 2, Groves, 220:4 – 10.]

28.     On January 19, 2016, Deputy Kidd was terminated based on the findings of Cherokee County Sheriff's Department's internal investigation. [Ex. 2, Groves, 243:17 – 244:2; Ex. 11, Kidds' File, 001766 – 001768; I&A in Ex. 15, Affidavit, ¶ 2.]

**I.      Plaintiff's pending lawsuit includes allegations not mentioned in his charge of discrimination.**

29.      Plaintiff filed his pending Complaint with the U.S. District Court for the District of Kansas, Case No. 2:17-cv-02644-JAR-GEB, on November 6, 2017. [ECF Doc. 1, Complaint.]

Plaintiff alleges that Defendants failed to promote him in 2014.

30.      On January 2, 2014, Plaintiff sat for the Cherokee County Sheriff's Department Investigator Test for the first time in conjunction with an opening for Detective posted in December, 2013. [Ex. 9, Plaintiff's File, DEFT 000169 – 000177 and 001795; I&A in Ex. 4, Piepho, 47:3 - 19; Ex. 15, Affidavit, ¶ 2.]

   30.1.    Plaintiff was not hired for the position. [Ex. 2, Groves, 237:3 – 18 (Sheriff Groves advising that Kidd was hired for the first Detective position for 6 months; not rehired.); Ex. 8, Clugston, 23:3 – 12.]

   30.2.    Dean Kidd was hired for the position. [Ex. 2, Groves, 237:3 – 18; Ex. 8, Clugston, 23:3 – 12.]

31.      On October 21, 2014, Plaintiff sat for the Cherokee County Sheriff's Department Investigator Test for the second time in conjunction with an opening for Detective posted on October 17, 2014. [Ex. 9, Plaintiff's File, DEFT 000178 – 000186 and 001478; I&A in Ex. 3, Gibson, 62:22 – 64:24; Ex. 15, Affidavit, ¶ 2.]

   31.1.    Plaintiff was not hired for the position. [Ex. 1, Plaintiff, 246:2 – 12 (Plaintiff recalling having asked: "Why didn't I get it?"); Ex. 8, Clugston, 25:12 – 18.]

   31.2.    Beau Hamlin was hired for the position on December 2, 2014. [Ex. 2, Groves, 217:2 – 7; Ex. 8, Clugston, 25:12 – 20; Ex. 12, Hamlin's File, 002079; I&A in Ex. 15, Affidavit, ¶ 3.]

Plaintiff alleges that Defendants denied him equipment in 2014.

32.      According to Plaintiff, he was denied emergency lighting equipment in 2014. [Ex. 1, Plaintiff, 217:4 – 219:14.]

   32.1.    Plaintiff states that Deputy Justin Noel's request for emergency lighting equipment was granted in 2014. [Ex. 1, Plaintiff, 219:21 – 220:22.]

Plaintiff alleges that Defendants denied him training in 2014.

33.    According to Plaintiff, he was denied the opportunity to attend training in
       2014. [Ex. 1, Plaintiff, 221:3 – 222:1.]

       33.1.   Plaintiff states that the training was approved for other officers. [Ex.
               1, Plaintiff, 221:17 – 20.]

Plaintiff alleges that Defendants delayed his pay raise.

34.    For 2015, the hourly rate for all patrol deputies was moved to $14.00 per
       hour. [Ex. 2, Groves, 120:6 – 21.]

       34.1.   The pay increase did not occur across the board at the same time for
               all patrol deputies; it was done in chronological order based on
               month of hire. [Ex. 2, Groves, 120:22 – 125:13.]

       34.2.   The first pay increase was effectuated in December, 2014.  [Ex. 1,
               Plaintiff, 196:7 – 13; Ex. 11, Kidds' File, 001471; I&A in Ex. 15,
               Affidavit, ¶ 3.]

35.    Former Deputy Dean Kidd began working full-time in the month of March;
       his hourly rate was increased in December, 2014. [Ex. 11, Kidds' File,
       001471 and 001485; I&A in Ex. 15, Affidavit, ¶ 3.]

36.    Deputy Beau Hamlin began working full-time in the month of June; his
       hourly rate was increased in March, 2015. [Ex. 12, Hamlin's File, 002078
       and 002085; I&A in Ex. 15, Affidavit, ¶ 3.]

37.    Plaintiff began working full-time in the month of August; his hourly rate
       was increased from $12.20 per hour to $14.00 per hour in April, 2015. [Ex.
       9, Plaintiff's File, DEFT 000007, DEFT 000017, and DEFT 000020; I&A
       in Ex. 2, Groves, 115:14 – 12; Ex. 15, Affidavit, ¶ 2]

       37.1.   According to Plaintiff, he should have received the pay increase
               when Sheriff Groves "began to give them." [Ex. 1, Plaintiff, 195:21
               – 196:13.]

       37.2.   Plaintiff received his December, 2014 paycheck on December 17,
               2014. [Ex. 9, Plaintiff's File, 001439; I&A in Ex. 3, Gibson, 62:22
               – 64:24.]

Plaintiff alleges that Defendants subjected him to a hostile work environment.

38.     According to Plaintiff, he went to Chief Deputy Gibson after receiving the June 8, 2015 email regarding the funeral procession to ask whether participation was mandatory. [Ex. 1, Plaintiff, 238:10 – 239:4.]

      38.1.    Plaintiff states he said "hello" and Gibson responded with "what the fuck do you want?" [Ex. 1, Plaintiff, 238:10 – 239:4.]

      38.2.    Plaintiff states he then asked Gibson whether participation in the funeral procession was mandatory. [Ex. 1, Plaintiff, 238:10 – 239:4.]

      38.3.    Plaintiff states that in response, Gibson asked "do you work patrol?"  [Ex. 1, Plaintiff, 238:10 – 239:4.]

      38.4.    Plaintiff states that when he said "yeah, I work patrol," Gibson stated "go F-ing do it" and told Plaintiff to get out of his office. [Ex. 1, Plaintiff, 238:10 – 239:4.]

      38.5.    Plaintiff states he turned around to walk away when he saw a chair go flying. [Ex. 1, Plaintiff, 239:5 – 16.]

      38.6.    Plaintiff states that Gibson then got in his face, pointed to the door, and said "Get the fuck out and go patrol." [Ex. 1, Plaintiff, 239:5 – 16.]

      38.7.    Gibson does not recall this exchange. [Ex. 3, Gibson, 133:24 – 134:3.]

39.     According to Plaintiff, Deputy Kidd called him a "boy," and said he "needed to pick up trash after the white folk[.]" [Ex. 1, Plaintiff, 183:4 – 7.]

40.     According to Plaintiff, Deputy Kidd played an offensive YouTube video titled "Racist Mario" in front of him. [ECF Doc. 1, Complaint, ¶ 24; Ex. 13, Internal Investigation, 000268 – 000274; I&A in Ex. 2, Groves, 220:4 – 10.]

<u>Plaintiff alleges that Defendants retaliated against him for engaging in protected opposition to discrimination.</u>

41.     According to Plaintiff, he spoke with Deputy Kerns about "racial jokes" and being treated differently because of his race. [Ex. 1, Plaintiff, 142:17 – 19 and 146:13 – 20.]

      41.1.    Plaintiff cannot recall when he spoke to Kerns. [Ex. 1, Plaintiff, 160:22 – 161:3.]

41.2.   According to Kerns, he never informed Sheriff Groves of any statements made by Plaintiff to Kerns. [Ex. 7, Kerns, 51:17 – 20.]

42.   According to Plaintiff, he *tried* to speak with Chief Deputy Gibson about race discrimination, but was unsuccessful in doing so. [Ex. 1, Plaintiff, 164:18 – 167:14.]

42.1.   Plaintiff states he asked whether Gibson had a moment to speak with him and Gibson responded with something akin to "what?" or "what the fuck do you want?". [Ex. 1, Plaintiff, 166:16 – 167:4.]

42.2.   Plaintiff states he knew the attempt was failing after Gibson's response and departed Gibson's office thereafter. [Ex. 1, Plaintiff, 167:8 – 14.]

42.3.   Plaintiff cannot recall when his attempted conversation with Chief Deputy Gibson occurred. [Ex. 1, Plaintiff, 164:25 – 165:2.]

43.   According to Plaintiff, he asked Deputy Potter in 2014 what to do about problems he was having in the office. [Ex. 1, Plaintiff, 168:12 – 23 and 170:11 – 171:2.]

43.1.   Plaintiff did not describe to Potter what he perceived the problems in the office to be. [Ex. 1, Plaintiff, 171:3 – 6.]

44.   According to Plaintiff, he asked Chief Investigator Wydick what to do about problems he having with employees. [Ex. 1, Plaintiff, 172:10 – 24.]

44.1.   Plaintiff asked this question in general form; he did not go into detail. [Ex. 1, Plaintiff, 172:10 – 24 and 174:2 – 24.]

45.   According to Plaintiff, he complained to Sheriff Groves regarding race discrimination sometime between December, 2014 and January, 2015. [Ex. 1, Plaintiff, 178:9 – 179:1.]

45.1.   Plaintiff states he told Sheriff Groves that Deputy Kidd had called him a "boy" and said he "needed to pick up trash after the white folk[.]" [Ex. 1, Plaintiff, 182:1 – 183:7.]

45.2.   Plaintiff states he told Sheriff Groves that Kidd "won't stop with the jokes" and apparently had an issue with his race. [Ex. 1, Plaintiff, 183:10 – 20.]

45.3.   Plaintiff states he told Sheriff Groves about a tasing incident that had occurred between Kerns and Kidd prior to his employment. [Ex. 1, Plaintiff, 141:6 – 17.]

45.4.   Plaintiff cannot recall telling Sheriff Groves anything else. [Ex. 1, Plaintiff, 183:18 – 184:12.]

46.   According to Plaintiff, he did not make any subsequent complaints of race discrimination to any employees of Cherokee County Sheriff's Department after speaking with Sheriff Groves. [Ex. 1, Plaintiff, 186:14 – 22.]

47.   According to Plaintiff, he spoke to non-employee Daniels as "a friend" about his mistreatment in the workplace. [Ex. 1, Plaintiff, 186:3 – 13.]

47.1.   Sheriff Groves did not learn the specifics of Plaintiff's conversation with Daniels until after the commencement of this lawsuit. [Ex. 2, Groves, 210:1 – 211:5.]

47.2.   According to Daniels, he visited with Sheriff Groves in 2014 about Dean Kidd's efforts to seek employment with the City of Columbus because Daniels was unhappy that Kidd had attempted to usurp the City's process when he contacted the chair of the personnel committee to ask why he had not been offered a job. [Ex. 16, Daniels, 14:11– 28:4.]

48.   According to Plaintiff, he did not have any communication with Sheriff Groves between the time of his complaint and the date of his termination. [Ex. 1, Plaintiff, 194:14 – 20.]


III.   **Questions Presented.**

A.   **Should summary judgment be granted in Defendants' favor on Plaintiff's claim for hostile work environment racial harassment (Count I), where no reasonable jury could find that Plaintiff's allegations amount to a "steady barrage of opprobrious racial comments"?**

B.   **Should summary judgment be granted in Defendants' favor on Plaintiff's claim for race discrimination (Count I), where: (1) Plaintiff cannot demonstrate that any delay in his pay raise was due to his race; and (2) Plaintiff's claim for delay in pay raise, failure to promote, denial of equipment, and denial of training are time barred?**

C.   **Should summary judgment be granted in Defendants' favor on Plaintiff's claim for retaliation (Count II), where no causal connection exists between any protected activity and Plaintiff's termination?**

**D.**     **If Plaintiff's is truly asserting a claim for workers' compensation retaliation (Count II), should summary judgment be granted in Defendants' favor where no such cause of action was pleaded or available to Plaintiff?**

**E.**     **Should summary judgment be granted in Defendants' favor on Plaintiff's claims for violation of 42 U.S.C. § 1981 (Count III) and 42 U.S.C. § 1983 (Counts IV and V), where Plaintiff has failed to meet the two-year statute of limitations?**

## IV.     Standard of Review.

This court's review of a motion for summary judgment in the context of race discrimination, hostile work environment, retaliation in employment claim is well-known.[3]

## V.     Arguments and Authorities.

As a preliminary matter, Defendants note that the BOCC merely facilitates the funding of, and sets, the annual operating budget for Cherokee County Sheriff's Department. [SOF, ¶¶ 2.1 – 2.2.]  Sheriff Groves has the sole discretion to determine how to employ that budget and the BOCC cannot override his decisions. [SOF, ¶ 2.3.]  As an example, the BOCC does not need to approve pay raises for Cherokee County Sheriff's Department employees as long as Sheriff Groves operates within the parameters of the annual operating budget. [SOF, ¶ 2.4.]

Because the BOCC does not have oversight regarding hiring, firing, discipline, or the like at Cherokee County Sheriff's Department (such decisions are the sole discretion of Sheriff Groves) [SOF, ¶ 2.], the BOCC cannot be held liable for any of Plaintiff's asserted claims.[4] Summary judgment should be granted in favor of BOCC and against Plaintiff based on the same.

---

[3] *Villamar v. Lincare, Inc.,* No. 13-2220-JAR, 2014 WL 4059712, at *1 (D. Kan. Aug. 14, 2014), *aff'd* 624 Fed. Appx. 658 (10th Cir. 2015).
[4] *Board of County Com'rs of County of Lincoln v. Nielander,* 275 Kan. 257 (2003) (holding that the Sheriff, and not the Board, has the authority to appoint, promote, or dismiss Deputies; holding that the Sheriff is not required to obtain advance approval for purchases within the limits of the approved budget).

**A.     Plaintiff's claim for hostile work environment racial harassment (Count I), is subject to summary judgment as it fails to demonstrate a "steady barrage of opprobrious racial comments."**

In Count I, Plaintiff seeks to recover against Defendant BOCC for hostile work

environment racial harassment under Title VII.

> To make out a claim of hostile work environment racial harassment, plaintiff must demonstrate: (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus.  General harassment if not racial … is not actionable.  The plaintiff must show "more than a few isolated incidents of racial enmity."  Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments.[5]

> In evaluating the front prong of a hostile work environment claim, we look at all the circumstances including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[6]

In support of his claim, Plaintiff makes six allegations.  We address each of those in turn.

First, Plaintiff asserts that Gibson "directed foul language and threats" at him and

"mistreated and discriminated against him" because of his race.[7]  In support, Plaintiff points to

an isolated interaction between the two after Sheriff Groves sent an email out on June 8, 2015,

requesting that Plaintiff participate in the funeral procession of a sister of a patrol deputy in the

Sheriff's Department.  [SOF, ¶¶ 19 and 38.]  According to Plaintiff, he went to Gibson after

receiving the email to ask whether participation was mandatory. [SOF, ¶ 38.]  Gibson responded

with "what the fuck do you want?" [SOF, ¶ 38.1.]  Plaintiff then asked whether participation in

the funeral procession was mandatory. [SOF, ¶ 38.2.]  In response, Gibson asked "do you work

patrol?" [SOF, ¶ 38.3.]  When Plaintiff stated "yeah, I work patrol," Gibson stated "go F-ing do

---

[5] *Loum v. Houston's Restaurants, Inc.*, 985 F.Supp. 1315, 1320-21 (D. Kan. 1997) (citing *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994)).

[6] *Trujillo v. Univ. of Colo. Health Sciences Ctr.,*157 F.3d 1211, 1214 (10th Cir. 1998) (citing *Harris v. Forklist Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

[7] ECF Doc. 1, Complaint, ¶ 20.

it" and told Plaintiff to get out of his office. [SOF, ¶ 38.4.]  Plaintiff states he turned around to

walk away when he saw a chair go flying. [SOF, ¶ 38.5.]  Plaintiff states that Gibson then got in

his face, pointed to the door, and said "Get the fuck out and go patrol." [SOF, ¶ 38.6.]

Setting aside Plaintiff's apparent dis-interest in attending to a funeral procession for a

fellow patrol deputy's family loss, Gibson does not recall the exchange. [SOF, ¶ 38.7.]  But in no

event does the exchange, as described, reflect on animosity on account of race.  It is well-

established that "[g]eneral harassment if not racial … is not actionable."[8]  Stated differently,

allegations of general harassment cannot support a plaintiff's claim for hostile work environment

racial harassment.[9]  "Federal law 'does not guarantee a utopian workplace, or even a pleasant

one … Personality conflicts between employees are not the business of the federal courts.'"[10]

Here, the record is devoid of evidence to support an inference that Gibson's alleged comments

and actions, as outlined above, stemmed from racial animus.  As such, Plaintiff's first assertion

cannot support his claim for hostile work environment racial harassment.

Second, Plaintiff asserts that the Cherokee County Sheriff's Department "has a history of

white deputies engaging in a pattern and practice of racial discrimination."[11]  In support of the

same, Plaintiff points to a tasing incident that occurred *prior to his employment* between Kidd (a

Caucasian deputy) and Kerns (an African-American deputy).[12] [SOF, ¶ 5.]  According to Kerns,

Kidd was making jokes and saying something about grape kool-aid and watermelon. [SOF, ¶

5.1.]  Kerns was becoming irritated and told Kidd to stop or he would tase him. [SOF, ¶ 5.2.]

Kidd continued making comments and Kerns dry-tased Kidd.[13] [SOF, ¶ 5.3.]  Plaintiff alleges

---

[8] *Loum*, 985 F.Supp. at 1321; *Bolden,* 43 F.3d at 551.
[9] *Wemimo v. Personal Marketing Co.*, No. 97-2544-JWL, 1998 WL 709605, at * 5 (D. Kan. 1998).
[10] *Trujillo*, 157 F.3d at 1214 (citing *Vore v. Indiana Bell Tel. Co.*, 32 F.3d 1161, 1162 (7th Cir. 1994)).
[11] ECF Doc. 1, Complaint, ¶ 21.
[12] ECF Doc. 1, Complaint, ¶ 21.
[13] A dry-tase is a less severe tase whereby the cartridge is removed prior to the tasing. [SOF, ¶ 5.3.1.]

that this event "was well known to Sheriff Groves and others," yet they continued to employ Kidd.[14]

Kerns acknowledges that Plaintiff was not present for the tasing incident.  [SOF, ¶ 5.6.] Patrol Deputy Nick Hartman, who was present for the tasing incident, testified that he is unaware as to whether or not anyone knew about the incident. [SOF, ¶¶ 5.7 – 5.8.]  Likewise, Gibson and Sheriff Groves both testified that they did not learn of the tasing incident until receipt of Plaintiff's charge of discrimination. [SOF, ¶ 5.10.]

The Kidd/Kerns tasing incident is insufficient to evidence "a history of white deputies engaging in a pattern and practice of racial discrimination" involving Plaintiff.   It is hotly disputed by Sheriff Groves that any Kidd/Kerns involvement was described as a racially hostile encounter until receipt of Plaintiff's Charge of Discrimination.  According to both Kerns and Kidd, the two have not had any other incidents since that date and remain friends to this day. [SOF, ¶ 5.4.]  Indeed, Kerns did not want Kidd disciplined or fired for his behavior. [SOF, ¶ 5.5.] This aligns with the statement of Hartman who – when asked why he did not report the tasing incident – advised he thought Kidd and Kerns had a close-knit relationship and it was two friends joking back and forth. [SOF, ¶ 5.9.]

While evidence of prior harassment *may* be considered in evaluating a claim where the plaintiff presents evidence that he knew about the offending behavior,[15] the same cannot hold true where: (1) the event occurred prior to plaintiff's employment; and (2) the individuals involved do not characterize it in the light framed by Plaintiff.  Stated differently, Plaintiff's unsubstantiated assumptions regarding an event he did not witness, was not involved in, and

---

[14] ECF Doc. 1, Complaint, ¶ 21.
[15] *Adcox v. Brennan*, No. 15-cv-9258-JWL, 2017 WL 2405326, at *5 (D. Kan. 2017).

which occurred *prior to his employment*, cannot support his claim for hostile work environment racial harassment.[16]

In further support of Plaintiff's assertion that Cherokee County Sheriff's Department "has a history of white deputies engaging in a pattern and practice of racial discrimination,"[17] Plaintiff states that his co-workers would use the term "white privilege." [SOF, ¶ 25.]  According to Plaintiff, he did not understand what this term meant while he was employed by the Cherokee County Sheriff's Department. [SOF, ¶ 25.1.]  He "found out later what it actually meant" after reading about it on the internet. [SOF, ¶ 25.2.]  He then concluded that the term had been used during his employment in an offensive manner. [SOF, ¶ 25.3.]  The use of the term "white privilege" is not – in and of itself – a racial slur or opprobrious racial comment.  Context is key and Plaintiff fails to provide any.  Such an allegation cannot be considered where Plaintiff admits he was unaware of the alleged "offending behavior" during his employment.[18]

Likewise, Plaintiff alleges that he learned *after his termination* that Hamlin called Wydick's black dog a "nigger." [SOF, ¶¶ 24 – 24.2.]  Plaintiff did not witness this statement; he was told about it by former Deputy Rosenberg. [SOF, ¶ 24.1.]  As Plaintiff was unaware of the alleged "offending behavior" during his employment, this allegation cannot be considered in the context of Plaintiff's hostile work environment claim.[19]

Plaintiff's best claim is that he was subjected to discriminatory conduct via harassing "racial jokes."[20]  Plaintiff states that fellow Patrol Deputy Kidd called him a "boy," said he "needed to pick up trash after the white folk" [SOF, ¶ 39.], and played an offensive YouTube

---

[16] *Suarez v. American Stevedoring, Inc.*, No. 06-CV-6721 (KAM)(RER), 2010 WL 825943, at *2 (E.D.N.Y. 2010) ("Because plaintiff did not commence employment with [defendant] until January 2003, evidence concerning alleged racial hostility at [defendant] before January 2003 is not relevant to plaintiff's hostile work environment claims[.]").

[17] ECF Doc. 1, Complaint, ¶ 21.

[18] *Adcox*, No. 15-cv-9258-JWL, 2017 WL 2405326, at *5.

[19] *Id.*

[20] ECF Doc. 1, Complaint, ¶ 22.

video titled "Racist Mario" in front of him. [SOF, ¶ 40.]  When he learned of the allegations and confirmed, in part, the truth of them, Sheriff Groves terminated Kidd's employment for violation of his code of conduct. [SOF, ¶ 28.]

Simply stated, this is insufficient.  Two racially inappropriate events, even when they implicate racial animosity, do not label the entirety of a work environment as "hostile." "Plaintiff falls far short of establishing the existence of a racially hostile work environment.  His list of grievances, even accepted as true in the light consistent with his version, are insufficient to create a triable issue of fact."[21]

For the Court's consideration, we compare Plaintiff's allegations to those asserted in *Wemimo v. Personal Marketing Co.*[22]  Therein, the U.S. District Court for the District of Kansas stated as follows:

> The record is devoid of evidence which would support an inference that the "time bomb," "worked like a dog," or "hey, you, get back to work" comments stemmed from racial animus.  Thus, these comments cannot support plaintiff's claim.  In fact, the only comment which can be construed as race-based is Mr. Evans' remark to plaintiff that he "sit down and eat potato chips like slavery days."  *Even if Mr. Evans made this remark at every company picnic [every two months], that would be inadequate to meet the "pervasive or severe" prong of Meritor.*[23]

In comparison, Plaintiff alleges discriminatory conduct with no more frequency than that seen in *Wemimo*: one sporadic racial comment and one racially charged video.  No reasonable jury could find these inappropriate events amount to a "steady barrage of opprobrious racial comments.[24] As such, Defendants' Motion for Summary Judgment must be granted as to Plaintiff's Count I race discrimination claim based on a hostile work environment.

---

[21] *Wemimo*, No. 97-2544-JWL, 1998 WL 709605, at * 5.
[22] *Id.*
[23] *Id.* (emphasis added).
[24] *Loum*, 985 F.Supp. at 1321.

**B.    Plaintiff's claim for race discrimination (Count I), is subject to summary judgement as: (1) Plaintiff cannot demonstrate that any delay in his pay raise was due to his race; and (2) Plaintiff's claim for delay in pay raise, failure to promote, denial of equipment, and denial of training, are time barred.**

In Count I, Plaintiff seeks to recover against Defendant BOCC for race discrimination based on an alleged: delay in Plaintiff's pay raise; failure to promote Plaintiff to Detective; denial of equipment; and denial of training.[25]  We address each in turn.  As an overview, we assert that to state a prima facie case of race discrimination, Plaintiff must show that: (1) he is a member of a racial minority; (2) he suffered an adverse employment action; and (3) similarly situated employees were treated differently.[26]  We do not dispute that he is a racial minority. [SOF, ¶ 1.]  Defendants submit however, that Plaintiff cannot establish the second or third requisite elements for a prima face case of race discrimination.  Defendants further submit that all four claims are time barred.[27]

**1.    The timing of Plaintiff's pay raise was based on a pre-planned method of rolling out raises premised upon employee's months of hire.**

Plaintiff asserts that he suffered an adverse employment action sufficient to establish a claim for race discrimination based on the date of his receipt of the across the board 2015 pay increase.[28]  He claims that he was entitled to this raise earlier than April, 2015.[29]  Stated differently, Plaintiff believes he received this raise at a date later than that of other employees due to the color of his skin.  Plaintiff is without any evidence to support this unfounded assertion.

It is undisputed that Sheriff Groves determines who gets pay raises at the Cherokee County Sheriff's Department. [SOF, ¶ 3.4.]  In 2015, the hourly rate for all patrol deputies was

---

[25] ECF Doc. 1 – Complaint, ¶¶ 25 and 30 – 49; Ex. 1, Plaintiff, 217:4 – 8 and 221:3 - 8.

[26] *Miller v. Maddox*, 51 F.Supp.2d 1176, 1188 (D. Kan. 1999) (citing *Trujillo,*157 F.3d at 1212).

[27] For purposes of conciseness, this Motion for Summary Judgment does not address Plaintiff's inability to meet the requisite elements of Plaintiff's race discrimination: failure to promote claim, denial of equipment, or denial training claims.  To be clear, Defendants do not concede that Plaintiff can meet the requisite elements of these claims; they simply argue that the claims are time barred.

[28] ECF Doc. 1, Complaint, ¶ 25.

[29] ECF Doc. 1, Complaint, ¶ 25.

moved to $14.00 per hour. [SOF, ¶ 34.]  The pay increase did not occur across the board at the same time for all patrol deputies; it was done in chronological order based on month of hire. [SOF, ¶ 34.1.]  Plaintiff began working as a full-time Deputy for the Cherokee County Sheriff's Department in the month of August. [SOF, ¶¶ 10 and 37.]  His hourly rate was increased from $12.20 per hour to $14.00 per hour in April, 2015. [SOF, ¶ 37.]

In comparison, Dean Kidd began working as a full-time Deputy in the month of March. [SOF, ¶ 35.]  His hourly rate was increased to $14.00 in December, 2014. [SOF, ¶ 35.] Likewise, Beau Hamlin began working as a full-time Deputy in the month of June. [SOF, ¶ 36.] His hourly rate was increased in March, 2015. [SOF, ¶ 36.]  We provide a summary of the same in the table below.

| Name | Month Employment Commenced | Month/Year Raise Received |
|------|---------------------------|---------------------------|
| Dean Kidd | March | December, 2014 |
| Beau Hamlin | June | March, 2015 |
| Plaintiff | August | April, 2015 |

The foregoing demonstrates that the date of Plaintiff's raise was based not on his race – but on his month of hire.  As such, Plaintiff did not suffer an adverse employment action based on the date of his raise and cannot demonstrate that similarly situated employees were treated differently.  Defendants have stated the legitimate, non-discriminatory reason for the timing of the pay raise being made effective; Plaintiff has never bothered to demonstrate how that reason was suspect or a pretext for race discrimination.

> **2.    Plaintiff's claims for delay in pay raise, as with his failure to promote, denial of equipment, and denial of training claims, are time barred.**

Discrete discriminatory acts (such as termination, failure to promote, denial of transfer, or refusal to hire) are not actionable where time barred.[30]  This is true even when discrete

---

[30] *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113-14, 122 S.Ct. 2061, 2072-73, 153 L.Ed.2d 106 (2002).

discriminatory acts are *related to* acts alleged in timely filed charges because "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act."[31]  Stated differently, "each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment practice.'"[32]  A charge must be filed within the applicable 180 or 300 day time period after the discrete discriminatory act occurred.[33]  While the "time period for filing a charge is subject to equitable doctrines such as tolling or estoppel," such doctrines "are to be applied sparingly."[34]  Generally speaking, a charging party "can only file a charge to cover discrete acts that 'occurred' within the appropriate time period."[35]

*Delayed Pay Raise Claim:*  Plaintiff states he should have received his April, 2015 pay increase when Sheriff Groves "began to give them." [SOF, ¶ 37.1]  According to Sheriff Groves, and as demonstrated by the pay raise provided to Dean Kidd, the first pay increase for calendar year 2015 was effectuated in December, 2014. [SOF ¶¶ 34.2 and 35.]

Construing the facts in the light most favorable to the Plaintiff, we identify December 18, 2014 (the day following the issuance of Plaintiff's December, 2014 paycheck) as when the "clock began to countdown" towards Plaintiff's deadline to file a charge of discrimination alleging a delay in pay raise. [SOF, ¶ 37.2.]  Adding 300 days to that date, we reach October 14, 2015.  As Plaintiff did not file his charge of discrimination until December 18, 2015 [SOF, ¶ 26], Plaintiff's failure to promote claim is time barred.  Summary Judgment must be granted as to Plaintiff's Count I race discrimination claim based on the alleged delay in pay raise.

*Failure to Promote Claim:*  Plaintiff sat for the Cherokee County Sheriff's Department Investigator Test on two separate occasions. [SOF, ¶¶ 30 and 31.]  The first time was on January

---

[31] *Id.*, 536 U.S. at 113, 122 S.Ct. at 2072.
[32] *Id.*, 536 U.S. at 114, 122 S.Ct. at 2073.
[33] *Id.*, 536 U.S. at 113, 122 S.Ct. at 2072.
[34] *Id.*
[35] *Id.*, 536 U.S. at 114, 122 S.Ct. at 2073.

2, 2014, in conjunction with an opening for Detective posted in December, 2013. [SOF, ¶ 30.] The second time was on October 21, 2014, in conjunction with an opening for Detective posted on October 17, 2014. [SOF, ¶ 31.]  Plaintiff was not hired for either position. [SOF, ¶¶ 30.1 and 31.1.]  Beau Hamlin was hired for the second position on December 2, 2014. [SOF, ¶ 31.2.]

Construing the facts in the light most favorable to the Plaintiff, we identify December 3, 2014 (the day following Hamlin's hiring) as when the "clock began to countdown" towards Plaintiff's deadline to file a charge of discrimination alleging failure to promote.  Adding 300 days to that date, we reach September 28, 2015.  As Plaintiff did not file his charge of discrimination until December 18, 2015 [SOF, ¶ 26], Plaintiff's failure to promote claim is time barred.  Summary Judgment must be granted as to Plaintiff's Count I race discrimination claim based on the alleged failure to promote.

*Denial of Equipment Claim and Denial of Training Claim:*  Plaintiff states he was denied emergency lighting equipment in 2014. [SOF, ¶ 32.]  According to Plaintiff, Deputy Justin Noel's request for emergency lighting equipment was granted in 2014. [SOF, ¶ 32.1.]  Plaintiff further states he was denied the opportunity to attend training in 2014. [SOF, ¶ 33.]  According to Plaintiff, the training was approved for other officers. [SOF, ¶ 33.1.]

Construing the facts in the light most favorable to Plaintiff, we identify December 31, 2014 (the last day of 2014) as the latest possible point in 2014 upon which the clock could "begin to countdown" towards Plaintiff's deadline to file a charge of discrimination alleging denial of equipment or training.  Adding 300 days to that date, we reach October 27, 2015.  As Plaintiff did not file his charge of discrimination until December 18, 2015 [SOF, ¶ 26], Plaintiff's claims for denial of equipment and denial of training are time barred.  Summary

Judgment must be granted as to Plaintiff's Count I race discrimination claim based on the alleged denial of equipment and denial of training.

> **C.    Plaintiff's claim for retaliation (Count II), is subject to summary judgement as no causal connection exists between any protected activity and Plaintiff's termination.**

In Count II, Plaintiff seeks to recover against Defendant BOCC for retaliation.[36]  Title VII forbids retaliation against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."[37]

To establish a prima facie case of retaliation, Plaintiff must prove that: (1) he engaged in protected opposition to discrimination; (2) he was subjected to an adverse employment action; and (3) a causal connection existed between the protected activity and the adverse action.[38]  To establish a causal connection, Plaintiff must show that the individual who took the adverse action against him knew of Plaintiff's protected activity.[39]

Plaintiff's deposition testimony points to six separate conversations in support of his allegation that he was retaliated against for engaging in protected opposition to discrimination. In chronological order, those conversations were allegedly held with: (1) Deputy Brian Kerns; (2) Chief Deputy Shane Gibson; (3) Deputy Mike Potter; (4) Chief Investigator Doug Wydick; (5) Sheriff Groves; and (6) Jason Daniels.  Defendants submit that Plaintiff cannot establish the first and/or third requisite elements for a prima facie case of retaliation as to each conversation.

---

[36] ECF Doc. 1, Complaint, ¶¶ 51 – 54.
[37] 42 U.S.C. § 2000e-3(a).
[38] *Kendrick v. Penske Transp. Services, Inc.*, 220 F.3d 1220, 1234 (10th Cir. 2000).
[39] *Moore-Stovall v. Shinseki*, 969 F.Supp.2d 1309, 1328 (D. Kan. 2013) (citing *Montes v. Vail Clinic, Inc.*, 497 F.3d 1160, 1176 (10th Cir. 2007)).

1. **Sheriff Groves did not learn of the alleged racial components of Plaintiff's complaints made by Plaintiff to Deputy Kerns until after the commencement of litigation.**

Deputy Brian Kerns ("Kerns") is an African American male who began working for the Cherokee County Sheriff's Department on February 1, 2010. [SOF, ¶ 3.6.7.]  According to Plaintiff, he spoke with Kerns about "racial jokes" and being treated differently because of his race. [SOF, ¶ 41.]  While Plaintiff cannot recall when that conversation occurred, it is uncontroverted that Kerns resigned from his employment with Cherokee County Sheriff's Department on December 30, 2014, over five months prior to Plaintiff's termination on June 25, 2015. [SOF, ¶¶ 3.6.7, 23, and 41.1.]  Because the alleged complaint was "remote in time,"[40] Plaintiff "must rely on additional evidence beyond temporal proximity to establish causation."[41]

Here, no such evidence exists.  It is uncontroverted that the decision to terminate Plaintiff's employment was made by Sheriff Groves. [SOF, ¶¶ 3.2 – 3.3 and 23.]  Plaintiff has made no showing that Sheriff Groves learned of any statement that Plaintiff made to Kerns.  Rather, Kerns has admitted that he never informed Sheriff Groves of any statements made by Plaintiff to Kerns. [SOF, ¶ 41.2.]  As such, Sheriff Groves did not learn of Plaintiff's alleged conversation with Kerns about "racial jokes" and being treated differently because of his race, until after the commencement of this lawsuit on November 6, 2017. [SOF, ¶ 29.]  Plaintiff cannot establish a causal connection between the alleged protected activity and the adverse action in this matter.

2. **Plaintiff did not engage in protected opposition to discrimination when he "tried to talk" to Chief Deputy Gibson, or when he asked for general advice from Deputy Potter and Chief Investigator Wydick.**

---

[40] *Kendrick*, 220 F.3d at 1234 (Finding plaintiff failed to establish a causal connection between his discharge and the complaints where the complaints were remote in time).
[41] *Downs v. Jostens, Inc.*, 23 F. Supp.3d 1332, 1338 (D. Kan. 2014).

Shane Gibson ("Gibson") is the Chief Deputy of Cherokee County Sheriff's Department and was Plaintiff's direct supervisor. [SOF, ¶ 3.6.2.]  According to Plaintiff, he *tried* to speak with Gibson about race discrimination, but was unsuccessful in doing so. [SOF, ¶ 42.]  Plaintiff states he asked whether Gibson had a moment to speak with him and Gibson responded with something akin to "what?" or "what the fuck do you want?" [SOF, ¶ 42.1.]  Plaintiff states he knew the attempt was failing after Gibson's response and departed Gibson's office thereafter. [SOF, ¶ 42.2.]  Plaintiff cannot recall when the attempted conversation occurred. [SOF, ¶ 42.3.]

Deputy Mike Potter ("Potter) worked with Plaintiff during his employment. [SOF, ¶ 3.6.5.]  According to Plaintiff, in 2014 he asked Potter what to do about problems he was having in the office. [SOF, ¶ 43.]  Plaintiff did not describe to Potter what he perceived the problems in the office to be. [SOF, ¶ 43.1.]   There is no testimony from Plaintiff to indicate that he was approaching Potter on account of anything concerning race.

Doug Wydick ("Wydick") was the Chief Investigator during Plaintiff's employment with Cherokee County Sheriff's Department. [SOF, ¶ 3.6.4.]  According to Plaintiff, he asked Wydick what to do about generalized problems he was having with employees. [SOF, ¶ 44.]  Plaintiff asked this question in general form; he did not go into detail. [SOF, ¶ 44.1.]

"Although 'protected activity' can include voicing informal complaints to supervisors, 'to qualify as protected opposition, the employee must convey to the employer his or her concern that the employer has engaged in an unlawful practice.'"[42]  For example, "[a] vague reference to discrimination and harassment without any indication that this misconduct was motivated by [race] does not constitute protected activity and will not support a retaliation claim."[43]

---

[42] *Nordike v. Verizon Business, Inc.*, No .12-2686-JAR, 2014 WL 4749185, at *8 (D. Kan. Sept. 24, 2014) (internal brackets omitted) (citing *Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1203 (10th Cir. 2008)).
[43] *Nordike*, No .12-2686-JAR, 2014 WL 4749185, at *8 (citing *Hinds*, 523 F.3d 1187, n. 13).

Here, there is no evidence to suggest that Plaintiff conveyed any concern to Gibson, Potter, or Wydick of an unlawful act or omission.  Rather, the record reflects that Plaintiff had intentions to convey such a concern to Gibson, but failed to do so.  The record further reflects that Plaintiff asked Potter and Wydick generally what to do if he was having problems, but provided no detail about the problems he was allegedly having.  This is insufficient.  Based on the foregoing, Plaintiff cannot establish that he engaged in protected opposition to discrimination via his conversations with Gibson, Potter, or Wydick.  Likewise, he cannot establish that a causal connection exists between the alleged protected activity and the adverse action in this matter.

> **3. Plaintiff did not engage in protected opposition to discrimination when he complained to non-employee, Daniels.**

Jason Daniels ("Daniels") is the Chief of Police for Columbus, Kansas; he is not an employee of Cherokee County Sheriff's Department. [SOF, ¶ 4.]  According to Plaintiff, he spoke to Daniels as "a friend" about his mistreatment in the workplace. [SOF, ¶ 47.]

Defendants recognize that Courts have not limited the scope of the opposition clause to complaints made to the employer.[44]  "For instance, it is protected opposition for an employee to contact the police seeking criminal prosecution of a coworker who engaged in a workplace assault motivated by disability, race, or sex[.]"[45]  Defendants dispute however, that a Sheriff's Deputy speaking to another member of law-enforcement as a "friend," fits into this limited exception.  Because: (1) Plaintiff was speaking to Daniels as "a friend," and not in his official capacity; and (2) Daniels is not an employee of Cherokee County Sheriff's Department, Plaintiff was not conveying any concerns of an unlawful practice *to his employer* by talking to Daniels.  Furthermore, there is no evidence to suggest that Plaintiff expected Daniels to take any official

---

[44] EEOC Enforcement Guidance of Retaliation and Related Issues, Notice No. 915.004, Section II(A)(2)(b) (Aug. 25, 2016), available at: https://www1.eeoc.gov//laws/guidance/retaliation-guidance.cfm?renderforprint=1#a._Expansive.

[45] *Id.*

action against Cherokee County Sheriff's Department, or its employees, with respect to Plaintiff's complaints of mistreatment.  Here, it is uncontroverted that the decision to terminate Plaintiff's employment was made by Defendant Sheriff Groves. [SOF, ¶¶ 3.2 – 3.3 and 23.] Sheriff Groves did not learn the specifics of Plaintiff's alleged conversation with Daniels, until after the commencement of this lawsuit on November 6, 2017. [SOF, ¶¶ 29 and 47.1.]  As such, Plaintiff cannot establish a causal connection between the alleged protected activity and the adverse action in this matter.

Defendants note that according to Daniels, he did visit with Sheriff Groves in 2014 regarding the limited issue of Dean Kidd's efforts to seek employment with the City of Columbus; Daniels was unhappy that Kidd had attempted to usurp the City's process when he contacted the chair of the personnel committee to ask why he had not been offered a job. [SOF, ¶ 47.2]  Regardless of the same, there is no evidentiary basis to conclude that Daniels' visit to the Sheriff regarding Dean Kidd in 2014 could be a motivating factor for Plaintiff's termination the following year (mid-2015) without some whiff of casual connection between Chief Daniels, Plaintiff, and the Sheriff.

**4.    Plaintiff cannot establish a causal connection between his alleged complaint to Sheriff Groves and his termination.**

According to Plaintiff, he complained to Sheriff Groves regarding race discrimination sometime between December, 2014 and January, 2015. [SOF, ¶ 45.]  Plaintiff states he told Sheriff Groves that Deputy Dean Kidd had called him a "boy" and said he "needed to pick up trash after the white folk[.]" [SOF, ¶ 45.1.]  Plaintiff further states he told Sheriff Groves that Kidd "won't stop with the jokes" and apparently had an issue with his race. [SOF, ¶ 45.2.] Plaintiff finally alleges he told Sheriff Groves about a tasing incident that had occurred between

Kerns and Kidd. [SOF, ¶ 45.3.]  Plaintiff cannot recall telling Sheriff Groves anything else.

[SOF, ¶ 45.4.]

[**NOTE**: Defendants admit *for purposes of this motion for summary judgment only* that Plaintiff complained to him regarding race discrimination as alleged above.  This admission is made solely to demonstrate that Plaintiff cannot meet the requisite elements of his claim for retaliation regardless of whether or not this point is disputed.  To be clear, Sheriff Groves' deposition testimony expressly disputes that Plaintiff complained to him regarding the conduct of Deputy Dean Kidd[46] and advises that Sheriff Groves did not learn of Plaintiff's allegations regarding Kidd until after the charge of discrimination in this matter was filed.[47]  Likewise, Sheriff Groves did not learn of the tasing incident until after the charge of discrimination in this matter was filed.[48]]

Despite the foregoing, Plaintiff cannot demonstrate a causal connection between his alleged complaint to Sheriff Groves between December, 2014 and January, 2015, and his termination on June 25, 2015. [SOF, ¶¶ 23 and 45.]  Stated differently, if Sheriff Groves had animosity towards Plaintiff based on anything Plaintiff claims to have said to him in December, 2014 or January, 2015, it would be unusual for the Sheriff to keep him employed throughout the first quarter of 2015, and then to roll out the increase in pay to Plaintiff in 2015. [SOF, ¶¶ 37 and 45.]  The decision by Sheriff Groves to terminate Plaintiff in June, 2015, is so remote in time from any alleged communication made by Plaintiff that it undercuts an inference of retaliatory motive.[49]  As such, Plaintiff "must rely on additional evidence beyond temporal proximity to establish causation."[50]

Here, no such evidence exists.  Plaintiff's own deposition testimony provides that he did not have any communication with Sheriff Groves between the time of his complaint and the date of his termination. [SOF, ¶ 48.]  It further provides that Plaintiff did not make any subsequent complaints of race discrimination to any employees of Cherokee County Sheriff's Department

---

[46] Ex. 2, Groves, 208:14 – 17 and 209:9 – 15.
[47] Ex. 2, Groves, 209:3 – 15 and 210:21 – 211:15.
[48] Ex. 2, Groves, 206:19 – 207:16.
[49] *Kendrick*, 220 F.3d at 1234.
[50] *Downs*, 23 F. Supp.3d at 1338.

after speaking with Sheriff Groves. [SOF, ¶ 46.]  As such, Plaintiff cannot point to any statement

or conduct by Sheriff Groves in support of his allegation that Sheriff Grove retaliated against

him for engaging in protected opposition to discrimination.  Rather, the evidence demonstrates

that Plaintiff was terminated by Sheriff Groves for a legitimate and non-discriminatory reason:

poor performance.  We provide an overview of Plaintiff's poor performance herein:

| Date | Event | Overview |
|------|-------|----------|
| Feb. 5, 2014 | Plaintiff was issued his first written performance review. [SOF, ¶ 11.] | The review stated that Plaintiff's "paper service completion had been below average but is recently improving." [SOF, ¶ 11.2.]<br><br>The review stated that Plaintiff "had multiple opportunities for additional work that were not sought out." [SOF, ¶ 11.3.]<br><br>The review stated that Plaintiff "has a difficult time accepting constructive criticism. He should understand when given advice or suggestions, they are given in order to better our agency as a whole." [SOF, ¶ 11.4.]<br><br>The review stated that Plaintiff "can seem to be excessive in asking for equipment, assignment changes, etc." [SOF, ¶ 11.5.]<br><br>At the time of the review, Plaintiff did not make any complaints about his work, co-workers, or work environment. [SOF, ¶ 11.1.] |
| June 21, 2014 | Inaccurate dispatch report to Sheriff Groves | Dispatch reported to Sheriff Groves that Plaintiff was responding to an alarm call; Sheriff Groves had just driven past Plaintiff who was not responding to an alarm call. [SOF, ¶ 12.] |
| July 1, 2014 | Plaintiff was issued his second written performance review. [SOF, ¶ 13.] | The review rated Plaintiff's performance as "below average" for reliability and dependability. [SOF, ¶ 13.2.]<br><br>The review stated that Plaintiff "is not willing to work extra shifts / events when opportunities arise and was reluctant to assist in providing coverage during the Baxter Springs tornado response." [SOF, ¶ 13.4.]<br><br>The review stated that Plaintiff "should recognize the importance of teamwork, which includes helping co-workers when they need time off or pitching in when an event occurs requiring all hands on deck." [SOF, ¶ 13.5.]<br><br>The review rated Plaintiff's performance as "below average" for working relationships. [SOF, ¶ 13.3.]<br><br>The review stated that Plaintiff "struggles with creating strong relationships with co-workers, which does not go towards |

| | | |
|---|---|---|
| | | creating an overall positive work environment." [SOF, ¶ 13.6.]<br><br>The review stated that Plaintiff "needs to work on his relationships with other Sheriff's Officer personnel in each division." [SOF, ¶ 13.7.]<br><br>At the time of the review, Plaintiff did not make any complaints about his work, co-workers, or work environment. [SOF, ¶ 13.1.] |
| July 24, 2014 | Overdue case | Chief Deputy Gibson emailed Plaintiff to advise that case no. 14-0631 was overdue. [SOF, ¶ 14.] |
| Aug. 29, 2014 | The Cherokee County Sheriff's Department received a complaint about a Deputy driving without due regard for safety while running with lights and sirens through Crestline Junction. [SOF, ¶ 15.] | After reviewing Plaintiff's car camera video, it was confirmed that on August 29, 2014, at approximately 11:17 A.M., Plaintiff passed two cars on a hill, in a no passing zone, traveling at over 100 mph; there was an oncoming car just past the crest of the hill. [SOF, ¶ 15.1.]<br><br>After reviewing Plaintiff's car camera video, it was confirmed that on August 29, 2014, at approximately 11:20 A.M., Plaintiff entered the Crestline Junction intersection, with his view obstructed, traveling at 55 mph. [SOF, ¶ 15.2.]<br><br>On September 5, 2014, Plaintiff was issued a written reprimand for his violation of the Rules of Conduct Policy and the Agency Vehicle Driving Policy. [SOF, ¶ 15.3.]<br><br>Prior to September 5, 2014, Plaintiff had been issued more than one verbal warning that he was driving too fast. [SOF, ¶ 15.4.] |
| Nov. 25, 2014 | Complaints about new 12 hour work schedule; insubordinate behavior. | Chief Deputy Gibson called a meeting at the Cherokee County Sheriff's Department; he provided each Deputy with a copy of a new 12 hour work schedule, which was necessary for coverage due to a staff shortage. [SOF, ¶ 16.]<br><br>During the meeting, Plaintiff stated the various reasons the 12 hour schedule was inconvenient for him. [SOF, ¶ 16.1.]<br><br>Plaintiff prematurely departed the meeting against the verbal instructions of Corporal Justin Noel; he appeared extremely agitated. [SOF, ¶ 16.2.]<br><br>Sheriff Groves considered Plaintiff's departure an act of insubordination. [SOF, ¶ 16.3.] |
| Feb. 19, 2015 | Overdue case | Chief Deputy Gibson emailed Plaintiff to advise that case no. 14-1242 was overdue. [SOF, ¶ 17.] |
| May 30, 2015 | The Cherokee County Sheriff's Department received | On June 1, 2015, Sheriff Groves requested that Chief Deputy Gibson locate a video of the incident from May 30, 2015. [SOF, ¶ 18.1.] |

| | a complaint from the Chief of Police of Oswego, Kansas regarding Plaintiff. [SOF, ¶ 18.] | On June 1, 2015, Chief Deputy Gibson reviewed Plaintiff's car camera video and body camera video; he was unable to locate a video of the incident from May 30, 2015. [SOF, ¶ 18.2.]<br><br>On June 4, 2015, Chief Deputy Gibson again tried to locate a video of the incident from May 30, 2015; he found the incident from May 30, 2015 had not been recorded. [SOF, ¶ 18.3.]<br><br>Plaintiff had not reported any problems with either his car camera or his body camera. [SOF, ¶ 18.4.]<br><br>On June 10, 2015, Chief Deputy Gibson located a body camera video of a car stop by Plaintiff on May 24, 2015; the stop had not been recorded on Plaintiff's car camera video. [SOF, ¶ 18.5.] |
|---|---|---|
| June 8, 2015 | Refusal to participate in funeral procession. | Sheriff Groves requested that Plaintiff participate in the funeral procession for a family member of an employee of Cherokee County Sheriff's Department; Plaintiff indicated he did not want to attend. [SOF, ¶ 19.] |
| June 21, 2015 | Failure to respond to a theft call. | At approximately 1:15 P.M., Plaintiff was dispatched to a theft call; he failed to respond. [SOF, ¶ 20.]<br><br>At approximately 1:30 P.M., Plaintiff was seen by Sergeant Stephen Harper ("Sergeant Harper") watching YouTube videos at the Cherokee County Sheriff's Department. [SOF, ¶ 20.1.] |
| N/A | Verbal complaints by co-workers. | During Plaintiff's employment, Sheriff Groves received verbal complaints that Plaintiff would go to the northwest, non-populated part of Cherokee County towards the end of his shift (near where Plaintiff lived in Labette County), to avoid responding to dispatch calls that would have potentially kept him over his shift-time. [SOF, ¶ 21.] |
| N/A | Continued examples of poor performance. | Plaintiff refused to take a police report after Daniels called Cherokee County Sheriff's Department reporting his vehicle had been backed into. [SOF, ¶ 22.4.]<br><br>Plaintiff was directed to serve an individual with a PFA (protection from abuse) at the courthouse on a specific date and time; Plaintiff failed to do so. [SOF, ¶ 22.5.]<br><br>Plaintiff responded to an injury accident on Kansas Highway 7 and failed to take a report. [SOF, ¶ 22.6.]<br><br>Cherokee County Sheriff's Department received a complaint from an employee at the gas station in Weir, Kansas, that Plaintiff was spending a lot of time just hanging out in the store. [SOF, ¶ 22.7.] |

| | | Plaintiff was asked to do a neighborhood canvas arising out of a homicide in Cherokee County; Plaintiff complained about doing it. [SOF, ¶ 22.8.]<br><br>Plaintiff spent too much time in the office on Facebook looking at videos. [SOF, ¶ 22.9.] |
|---|---|---|

We further note that during Plaintiff's employment with the Cherokee County Sheriff's Department, he developed a reputation amongst other deputies for showing poor initiative. [SOF, ¶ 22.]  As stated by Former Deputy Frank Piepho, Plaintiff was "not the most proactive; fairly lazy and looked for ways to avoid doing paperwork." [SOF, ¶ 22.1.]  This was confirmed by Former Deputy Nicholas Hartman who provided that "a lot of people would say that … they thought [Plaintiff] might be lazy or - - or trying to pawn off work onto other deputies." [SOF, ¶ 22.2]  This was further confirmed by Former Deputy Brian Kerns who provided as follows:

> When [Plaintiff] first began to work in the Department, I thought he did a good job and carried his share of the work.  Over time, however, he began to shirk some of his responsibilities and did not carry his load.  It became common knowledge among other Deputies that [Plaintiff] would try to avoid responding to calls, or to complete paperwork, which meant that other Deputies had to take up his slack.

> I understand that [Plaintiff] is alleging that he was discriminated against by Cherokee County because of his race.  I understand that he is alleging that he was not promoted into the property crimes Detective position because of his race, but my race (which I believe is the same as his) did not prevent me from being promoted.

> I understand that he is also alleging he was terminated from employment due to race discrimination.  Based on my knowledge of his work performance, I do not disagree with the decision to terminate [Plaintiff's] employment as a Deputy.  Based upon what I observed, his work performance is what resulted in his termination from employment with the Sheriff's Department, not discrimination due to his race. [SOF, ¶ 22.3.]

The foregoing demonstrates that Plaintiff was terminated by Sheriff Groves on June 25, 2015 for a legitimate and non-discriminatory reason. [SOF, ¶ 23.]   As such, Plaintiff is without

evidence to establish a causal connection between the alleged protected activity and his termination.

Because Plaintiff cannot demonstrate a causal connection between any of the six conversations cited to during Plaintiff's deposition and Plaintiff's termination, the Court should grant Defendants' Motion for Summary Judgment as to Plaintiff's Count II for retaliation.

**D.      Plaintiff's possible workers' compensation retaliation claim (Count II), is subject to summary judgment, as no such cause of action was pleaded or available to Plaintiff.**

In Count II, Plaintiff appears to seek recovery against Defendant BOCC for workers' compensation retaliation ("[Plaintiff's] … decision to pursue a worker's compensation claim were motivating factors in Sheriff Groves' decision to terminate [Plaintiff's] employment.")[51] Plaintiff alleges this is a violation of Section 704 of Title VII, 42 U.S.C. § 2000e-3(a).[52]  He alleges that about a week prior to his termination he "inquired to Sheriff Groves and/or others at the Sheriff's Office about a workers' compensation claim… but got no response."[53]  Title VII does not contemplate a cause of action for workers' compensation retaliation and Plaintiff has not attempted to assert this claim under State law.[54]  To the extent the Court believes that a claim under State law has been made, Defendants note that Plaintiff has failed to comply with the requirements of K.S.A. § 12-105b.  As such, the Court should grant Defendants' Motion for Summary Judgment as to Plaintiff's Count II for workers' compensation retaliation.

**E.      Plaintiff's claims for violation of 42 U.S.C. § 1981 (Count III) and 42 U.S.C. § 1983 (Counts IV and V), are barred by the two-year statute of limitations.**

---

[51] ECF Doc. 1, Complaint, ¶ 53.
[52] ECF Doc. 1, Complaint, ¶ 53.
[53] ECF Doc. 1, Complaint, ¶ 28.
[54] *See* 42 U.S.C. § 2000e-3(a).

In Count III, Plaintiff seeks to recover against both Defendants for alleged harassment and racially discriminatory behavior which impaired and/or deprived him from performing, making, enforcing and/or enjoying the benefits, privileges, terms, and conditions of an alleged employment contract (express or implied), in violation of 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991.[55]   In Counts IV and V, Plaintiff seeks to recover against both Defendants for denial of his procedural and substantive due process rights in violation of 42 U.S.C. § 1983.[56]  As provided by the United States Court of Appeals for the Tenth Circuit in *Boyice v. United Parcel Service, Inc.*:

> we have specifically held with respect to federal civil rights claims asserted in the state of Kansas under §§ 1983 and 1981 that "because both section 1983 and 1981 claims are actions for injury to the rights of another, the appropriate statute of limitations is Kan. Stat. Ann. § 60-513(a)(4)."  K.S.A. 60-513(a)(4) provides for a two year statute of limitations for "an injury to the rights of another."[57]

Here, Sheriff Groves terminated Plaintiff on June 25, 2015. [SOF, ¶ 23.]  As such, June 25, 2015 would be the latest date upon which the statute of limitations for Plaintiff's claims under 42 U.S.C. § 1981 and 42 U.S.C. § 1983 would commence to run.[58]  Based on the two-year statute of limitations, Plaintiff then had until June, 2017, to file suit.  This Court may take judicial notice that Plaintiff filed his pending Complaint on November 6, 2017. [SOF, ¶ 29.]  As such, Plaintiff's claims arising under 42 U.S.C. § 1981 and 1983 are time-barred.  The Court

---

[55] ECF Doc. 1 – Complaint, ¶¶ 56 – 59.

[56] ECF Doc. 1 – Complaint, ¶¶ 62 – 65 and 68 – 72.

[57] *Boyice v. United Parcel Service, Inc.*, No. 96-3072, 1996 WL 421950, at *1 (10th Cir. July 26, 1996) (internal citations omitted); *see also Baker v. Board of Regents of the State of Kan.*, 991 F.2d 628, 630 (10th Cir. 1993); *Edwards v .Boeing Co.*, No. 92-3276, 1993 WL 214566, at *2 (10th Cir. June 18, 1993) ("The appropriate limitations period for actions brought in Kansas under 42 U.S.C. § 1981, is the two-year statute of limitations of K.S.A. §60-513(a)(4).").

[58] *Edwards*, No, 92-3276, 1993 WL 214566, at *2 ("The limitations period governing Section 1981 accrued … at the time of the unlawful act."); *Delaware State College v. Ricks*, 449 U.S. 250, 258-59, 101 S. Ct. 498, 66 L.Ed. 2d 431 (1980); *see also Beck v. City of Muskogee Police Dept.*, 195 F.3d 551, 557 (10th Cir. 1999) ("State statutes of limitations applicable to general personal injury claims supply the limitations periods for § 1983 claims, but federal law governs the time of accrual of §1983 claims. … Since the injury in a §1983 case is the violation of a constitutional right, such claims accrue when the plaintiff knows or should know that his or her constitutional rights have been violated.").

should grant Defendants' Motion for Summary Judgment as to Plaintiff's Counts III, IV and V upon this basis.

## VI.    Conclusion.

For the reasons set forth above, Defendants Board of County Commissioners of Cherokee County and David M. Groves respectfully request that this Court grant summary judgment in their favor and against Plaintiff Brandon L. Johnson on the entirety of Plaintiff's claims against Defendants, and for such other and further relief as the Court deems to be reasonable, appropriate, and just.

Respectfully submitted,

**Case Linden P.C.**

s/Kevin D. Case
Kevin D. Case, KS 14570
Jennifer G. Ahlbrandt, KS 26980
2600 Grand Boulevard, Suite 300
Kansas City, MO  64108
Tel:   (816) 979-1500
Fax:  (816) 979-1501
kevin.case@caselinden.com
jennifer.ahlbrandt@caselinden.com
Attorneys for Defendants

## Certificate of Service

I hereby certify that on August 22, 2019, a true and correct copy of the above and foregoing was served by electronic filing with the Clerk of the Court in the CM/ECF system, which will automatically send email notification of such filing to the following counsel of record:

Christopher J. Lucas
Norris Keplinger Hicks & Welder, L.L.C.
32 Corporate Woods, Suite 750
9225 Indian Creek Parkway
Overland Park, KS  66210
cjl@nkfirm.com
Attorney for Plaintiff

s/Kevin D. Case
Kevin D. Case