**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| **BRANDON L. JOHNSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:17-cv-02644-JAR-GEB** |
| | ) | |
| **CHEROKEE COUNTY BOARD OF** | ) | |
| **COUNTY COMMISSIONERS and** | ) | |
| **DAVID M. GROVES,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' JOINT MOTION
FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT THEREOF**

COMES NOW plaintiff Brandon L. Johnson, by and through the undersigned counsel, pursuant to Fed. R. Civ. P. 56 and D. Kan. Rule 56.1(b), and submits the following response in opposition to the joint motion for summary judgment (Doc. 95) and memorandum in support thereof (Doc. 96) filed by defendants Board of County Commissioners of Cherokee County and David M. Groves in the above-captioned cause. As shown below, while defendants' joint motion outlines many uncontroverted but immaterial facts, numerous facts material to plaintiff's pending claims remain genuinely disputed, thus precluding summary judgment in favor of defendants. Nor, given the disputed material facts, are defendants entitled to judgment as a matter of law. Defendants' joint motion must therefore be denied in its entirety. In support hereof, plaintiff states as follows:

**Response to Defendants' Statement of Uncontroverted Material Facts**

1.  Uncontroverted.

2.  Uncontroverted.

    2.1  Uncontroverted but immaterial.

2.2    Uncontroverted but immaterial.

2.3    Uncontroverted but immaterial.

2.4    Uncontroverted but immaterial.

3.    Uncontroverted.

3.1    Uncontroverted.

3.2    Uncontroverted.

3.3    Uncontroverted.

3.4    Uncontroverted.

3.5    Uncontroverted.

3.5.1    Controverted in part.  Plaintiff concedes that defendants have basically correctly quoted the subject language of Policy No. 27, as enclosed within the quotation marks (except that defendants failed to italicize the words *race*, *national origin*, etc., as they appear in the policy itself).  However, plaintiff controverts defendants' contention that the Cherokee County Sheriff's Department "does not tolerate any form of harassment," inasmuch as it did tolerate the racial harassment to which plaintiff was subjected, as outlined below and in plaintiff's statement of additional material facts, incorporated by reference as though fully set forth herein.

3.5.2    Uncontroverted.

3.5.3    Controverted in part.  Plaintiff concedes that defendants have corrected quoted the subject language of Policy No. 27.  However, plaintiff does not concede that defendants complied with Policy No. 27 and, to this extent, defendants' statement is controverted for the reasons outlined below and in plaintiff's statement of additional material facts, incorporated by reference as though fully set forth herein.

3.6    Controverted in part.  Plaintiff concedes that, between Sheriff Groves' election and the date of plaintiff's termination, Sheriff Groves employed at least thirty individuals as deputies at the Cherokee County Sheriff's Department.  However, plaintiff controverts defendants' statement to the extent that the last page of defendants' Ex. 14 was not contained in Ex. 4

marked at Sheriff Groves' deposition.  *See* **plaintiff's Ex. 14[1]** (which is also Ex. 4, as marked at Sheriff Groves' deposition).  As such the last page of defendants' Ex. 14 contains inadmissible hearsay and has not been properly authenticated.

3.6.1   Controverted in part.  Plaintiff concedes that Terry Clugston is the Undersheriff for the Cherokee County Sheriff's Department. However, plaintiff controverts defendants' statement only to the extent that defendants failed to attach the relevant portions of Clugston's deposition transcript in support of their factual assertion. *See* Rule 56(e).

3.6.2   Uncontroverted.

3.6.3   Uncontroverted.

3.6.4   Controverted in part.  Plaintiff concedes that Doug Wydick was the former Chief Investigator for the Cherokee County Sheriff's Department.  However, defendants' statement is controverted to the extent that defendants failed to attach plaintiff's deposition transcript in support of their factual assertion.  *See* Rule 56(e).

3.6.5   Uncontroverted.

3.6.6   Uncontroverted.

3.6.7   Uncontroverted.

3.6.8   Uncontroverted.

3.6.9   Controverted.  The subject organizational chart is inaccurate to the extent that it fails to reflect the position of "corporal" at the Sheriff's

---

[1] In their summary judgment exhibits, defendants generally included only selected portions of the deposition transcripts, employment files or other documents in question (with the exception of defendants' Exhibit 14, discussed above, in which defendants included more than what was originally included in the deposition exhibit in question). Pursuant to D. Kan. Rule 5.4.5 (b)(3)(B), where appropriate, plaintiff is attaching deposition transcripts or other exhibits in their entirety to this response brief.  Further, in an attempt to keep the summary judgment exhibits between the parties as straightforward as possible, plaintiff is using the same exhibit numbers for many of the same exhibits to which defendants cite, but attaching additional pages or portions of the exhibit in question.  For example, like defendants, plaintiff's Exhibit 2 references Sheriff Groves' deposition transcript, except that plaintiff has attached Sheriff Groves' deposition transcript in its entirety.  Where defendants have attached the entirety of an exhibit (as with defendants' Exhibit 13, the Internal Investigation Report), plaintiff has not attached his own version of the exhibit. Further, for exhibits not already addressed (in whole or part) by defendants, plaintiff is using exhibit numbers starting above 16, the last exhibit number used by defendants.  As a result, plaintiff's exhibits are all numbered, but not consecutively.

Office and where on the chain of command a corporal falls relative to a patrol deputy. *See* **plaintiff's Ex. 2**, Groves, 173/6-174/17. [2]

4.      Controverted in part. Plaintiff concedes that Jason Daniels is the Chief of Police for Columbus, Kansas and that he is not an employee of the Cherokee County Sheriff's Department. However, defendants' statement is controverted to the extent that defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

5.      Uncontroverted.

5.1     Uncontroverted.

5.2     Uncontroverted.

5.3     Uncontroverted.

5.3.1   Uncontroverted.

5.4     Controverted. Following the tasing incident, Kidd continued to subject Deputy Kerns to inappropriate and offensive racial harassment. Specifically, on at least three occasions after the tasing, Kidd displayed a racially inappropriate video to Deputy Kerns on a computer screen at work, while on duty at the Sheriff's Office. On one of these occasions, plaintiff was also present for the video showing. The video was a racist "Mario Cart" video which showed, among other things, a "gorilla guy driving," and the phrase, "Got you nigger." Each time Kidd played the video, Deputy Kerns found it inappropriate and offensive and informed Kidd of his feelings. Kidd merely laughed, however. Notably, Deputy Piepho testified that the video had been shown "numerous times before." *See* **plaintiff's Ex. 7**, Kerns, 42/10-43/5; 29/23-32/16; 33/11-23; 35/23-39/18; 40/2-18; 40/22-42/4; 47/9-20; 48/5-49/5; 49/12-18; 49/22-50/5; 50/10-22; 53/13-17; and 53/25-54/21. *See also* **plaintiff's Ex. 4**, Piepho, 16/5-17/14.

5.5     Controverted. This paragraph is controverted for the same reasons and bases outlined in response to paragraph 5.4 above. Further, plaintiff objects to the declaration of Brian Kerns contained in defendants' Ex. 10 on the basis that it constitutes inadmissible hearsay, lacks proper foundation, and contains speculation. *See* Rule 56(c)(2). In his deposition, Deputy Kerns specifically testified that he did not prepare the declaration, even though he signed it. *See* **plaintiff's Ex. 7**, Kerns, 114/15-115/16. Further, defendants' assertion in this paragraph is immaterial and irrelevant.

---

[2] In citing to specific pages and lines of deposition transcripts in this response, plaintiff uses the slash (/) format outlined above. For example, the citation to **plaintiff's Ex. 2**, Groves, "173/6-174/17," means "at page 173, line 6 through page 174, line 17." By way of further illustration, a citation that reads "33/11-23," means "at page 33, lines 11 through 23."

{0234817.DOCX}

5.6    Uncontroverted.

5.7    Uncontroverted.

5.8    Uncontroverted.

5.9    Uncontroverted but immaterial and irrelevant.

5.10    Controverted.  In his deposition, Chief Daniels specifically testified that, no later than March 2015, he had a meeting with Sheriff Groves in Sheriff Groves' office during which he informed Sheriff Groves about the tasing incident between Kidd and Deputy Kerns.  In response, Sheriff Groves said, among other things, that he would "address it."  *See* **plaintiff's Ex. 16**, Daniels, 11/10-12/16; 13/5-16/23; 20/15-21/19; 26/4-21; 26/5-27/16; 34/8-35/2; 45/2-46/8; 49/11-51/9; and 51/22-52/17.  Plaintiff also testified that, in December 2014 or January 2015, he told Sheriff Groves about the tasing incident between Kidd and Kerns.  *See* **plaintiff's Ex. 1**, Johnson, 140/16-142/3.

6.    Uncontroverted.

6.1    Uncontroverted.

6.1.1    Controverted in part.  Plaintiff concedes only that the form defendants reference respecting his resignation from the Parsons Police Department (Bates page 00125 in defendants' Ex. 9) states, "Officer was offered the opportunity to resign to avoid potential disciplinary or adverse employment or legal action."  However, for the reason outlined below in paragraph 6.1.2, plaintiff does not concede that the language in the referenced form reflects the truth of why he resigned from the Parsons Police Department.  Further, the form is unsigned by plaintiff.

6.1.2    Uncontroverted as to the factual statement asserted by defendants.  However, defendants failed to attach plaintiff's deposition transcript in support of their assertion.  *See* Rule 56(e).

6.2    Uncontroverted but immaterial and irrelevant.

6.3    Uncontroverted but immaterial and irrelevant.

6.4    Uncontroverted but immaterial and irrelevant.

6.5    Uncontroverted but immaterial and irrelevant.

{0234817.DOCX}

6.6    Uncontroverted but immaterial and irrelevant as to the factual statement proffered by defendants.  However, defendants failed to properly cite to plaintiff's deposition transcript in support of their factual assertion.  *See* Rule 56(e).

7.    Uncontroverted.

8.    Uncontroverted.

9.    Controverted in part.  According to the documents cited in support of defendants' assertion (Bates page 000022 in defendants' Ex. 9), plaintiff began working as a part-time deputy at the Sheriff's Office on April 1, 2013, not May 1.  Otherwise, uncontroverted.

10.    Uncontroverted.

11.    Uncontroverted.

11.1    Controverted in part.  Plaintiff concedes only that the written performance review of February 5, 2014, does not memorialize any complaints made by him about his work, co-workers, or work environment.  Otherwise, controverted to the extent that defendants failed to support their assertion with plaintiff's deposition transcript.  *See* Rule 56(e).

11.2    Uncontroverted as to the language in quotation marks.  However, the quoted language does not reflect the entirety of plaintiff's written performance review from February 5, 2014.

11.3    Uncontroverted as to the language in quotation marks.  However, the quoted language does not reflect the entirety of plaintiff's written performance review from February 5, 2014.

11.4    Uncontroverted as to the language in quotation marks.  However, the quoted language does not reflect the entirety of plaintiff's written performance review from February 5, 2014.

11.5    Uncontroverted as to the language in quotation marks.  However, the quoted language does not reflect the entirety of plaintiff's written performance review from February 5, 2014.

12.    Controverted.  The content of Bates page 000041 (in defendants' Ex. 9) contains unsubstantiated hearsay, speculation and lacks proper foundation.  It is therefore objectionable under Rule 56(c)(2).  Furthermore, Sheriff Groves specifically testified that, when he saw plaintiff during the subject incident, plaintiff may well have been engaged in conduct falling within his law enforcement duties.  Sheriff Groves also could not say when he made the handwritten list outlined on Bates page

000041, agreed that he did not bring the listed items to plaintiff's attention, and further agreed that he may well have made the list after plaintiff's termination in order to justify plaintiff's firing. *See* **plaintiff's Ex. 2**, Groves, 165/3-17; 166/6-15; 167/6-13; and 182/11-17.

13.     Uncontroverted.

    13.1   Controverted in part.  Plaintiff concedes that his written performance review of July 1, 2014, does not memorialize any complaints made by him about his work, co-workers, or work environment.  However, plaintiff otherwise controverts defendants' factual assertion to the extent that defendants failed to attach plaintiff's deposition transcript in support of said factual assertion. *See* Rule 56(e).

    13.2   Uncontroverted.  However, defendants' assertion does not reflect the entirety of plaintiff's written performance review from July 1, 2014.

    13.3   Uncontroverted.  However, defendants' assertion does not reflect the entirety of plaintiff's written performance review from July 1, 2014.

    13.4   Controverted in part and uncontroverted in part.  Uncontroverted as to the language in quotation marks.  However, the quoted language does not reflect the entirety of plaintiff's written performance review from July 1, 2014.  Further, Sheriff Groves testified that extra shifts are voluntary, and that, as to the Baxter Springs response, he did not have any personal knowledge about the extent of plaintiff's participation beyond what was written in plaintiff's review.  *See* **plaintiff's Ex. 2**, Groves, 139/11-140/7; and 141/16-21.

    13.5   Uncontroverted as to the language in quotation marks.  However, the quoted language does not reflect the entirety of plaintiff's written performance review from July 1, 2014.

    13.6   Uncontroverted as to the language in quotation marks.  However, the quoted language does not reflect the entirety of plaintiff's written performance review from July 1, 2014.

    13.7   Uncontroverted to the extent that defendants have basically correctly quoted the subject language from the written performance review (except that defendants incorrectly typed "Officer," instead of "Office").  However, the quoted language does not reflect the entirety of plaintiff's written performance review from July 1, 2014.

14.     Controverted in part and uncontroverted in part.  Uncontroverted as to defendants' factual assertion.  Further, the e-mail speaks for itself.  Controverted to the extent that defendants' factual assertion suggests that the e-mail in question concerning

the overdue report formed the basis for plaintiff's termination, as Chief Deputy Gibson testified that it did not. *See* **plaintiff's Ex. 3**, Gibson, 16/1-14; and 111/9-112/14.

15.    Uncontroverted.

    15.1    Uncontroverted.

    15.2    Uncontroverted.

    15.3    Uncontroverted.

    15.4    Controverted.  *See* **plaintiff's Ex. 17**, Johnson interrogatory answers to Groves, at question No. 9, at pp. 8 (they "began accusing me off 'failing' to do my job but no one told me or showed me what I was doing wrong") and 9 ("[w]hile Chief Deputy Gibson lent professional support and advice to other white officers, he refused to do the same for me"). *See also* **plaintiff's Ex. 18**, Johnson interrogatory answers to County, at question No. 10, at pp. 8 and 9 (same as above).

16.    Uncontroverted.

    16.1    Controverted in part and uncontroverted in part.  Uncontroverted to the extent that the cited document (Bates page 000035 in defendants' Ex. 9) speaks for itself and says what it says.  Controverted to the extent that Sheriff Groves never confronted plaintiff with any concerns about plaintiff's behavior during the meeting and never asked plaintiff for his side of the story.  *See* **plaintiff's Ex. 2**, Groves, 171/7-16.

    16.2    Controverted.  The subject organizational chart is inaccurate to the extent that it fails to reflect the position of "corporal" at the Sheriff's Office and where on the chain of command a corporal falls relative to a patrol deputy. *See* **plaintiff's Ex. 2**, Groves, 173/6-174/17.  Further, Sheriff Groves specifically testified that he does not know whether plaintiff heard or did not hear Corporal Noel's instructions and Sheriff Groves acknowledged that there was a room full of people at the time of the meeting in question.  *See* **plaintiff's Ex. 2**, Groves, 177/7-11.

    16.3    Controverted in part.  Plaintiff concedes that Sheriff Groves testified that he thought plaintiff's departure from the subject meeting was an act of insubordination.  However, plaintiff does not conceded that he in fact engaged in insubordination, for the reasons cited above in paragraph 16.2. Further, Sheriff Groves never brought the alleged insubordination to plaintiff's attention to get his side of the story.  *See* **plaintiff's Ex. 2**, Groves, 171/7-16.

{0234817.DOCX}

17.   Controverted in part and uncontroverted in part.  Uncontroverted as to defendants' factual assertion.  Further, the e-mail speaks for itself.  Controverted to the extent that defendants' factual assertion suggests that the e-mail in question concerning the overdue report formed the basis for plaintiff's termination, as Chief Deputy Gibson testified that it did not.  *See* **plaintiff's Ex. 3**, Gibson, 16/1-14; and 111/9-112/14.

18.   Controverted in part.  Plaintiff concedes that the content of Bates page 000034 (in defendants' Ex. 9) states what it states.  However, defendants' factual assertion is controverted for the same reasons outlined in response to paragraph 12 above.  Plaintiff also incorporates the objection outlined in paragraph 12 above as though fully set forth herein.  Further, neither Sheriff Groves nor Chief Deputy Gibson ever confronted plaintiff about the allegations of missing body camera footage to get plaintiff's side of the story or an explanation from plaintiff concerning the alleged missing footage.  *See* **plaintiff's Ex. 2**, Groves, 180/8-181/12.

18.1   Controverted in part.  Plaintiff concedes that the content of Bates page 000034 (in defendants' Ex. 9) states what it states.  However, defendants' factual assertion is controverted to the extent that neither Sheriff Groves nor Chief Deputy Gibson ever confronted plaintiff about the allegations of missing body camera footage to get plaintiff's side of the story or an explanation from plaintiff concerning the alleged missing footage.  *See* **plaintiff's Ex. 2**, Groves, 180/8-181/12.

18.2   Controverted in part.  Plaintiff concedes that the content of Bates page 000034 (in defendants' Ex. 9) states what it states.  However, defendants' factual assertion is controverted to the extent that neither Sheriff Groves nor Chief Deputy Gibson ever confronted plaintiff about the allegations of missing body camera footage to get plaintiff's side of the story or an explanation from plaintiff concerning the alleged missing footage.  *See* **plaintiff's Ex. 2**, Groves, 180/8-181/12.

18.3   Controverted in part.  Plaintiff concedes that the content of Bates page 000034 (in defendants' Ex. 9) states what it states.  However, defendants' factual assertion is controverted to the extent that neither Sheriff Groves nor Chief Deputy Gibson ever confronted plaintiff about the allegations of missing body camera footage to get plaintiff's side of the story or an explanation from plaintiff concerning the alleged missing footage.  *See* **plaintiff's Ex. 2**, Groves, 180/8-181/12.

18.4   Controverted in part.  Plaintiff concedes that the content of Bates page 000034 (in defendants' Ex. 9) states what it states.  However, defendants' factual assertion is controverted to the extent that neither Sheriff Groves nor Chief Deputy Gibson ever confronted plaintiff about the allegations of missing body camera footage to get plaintiff's side of the story or an

explanation from plaintiff concerning the alleged missing footage.  *See* **plaintiff's Ex. 2**, Groves, 180/8-181/12.

18.5    Controverted in part.  Plaintiff concedes that the content of Bates page 000034 (in defendants' Ex. 9) states what it states.  However, defendants' factual assertion is controverted to the extent that neither Sheriff Groves nor Chief Deputy Gibson ever confronted plaintiff about the allegations of missing body camera footage to get plaintiff's side of the story or an explanation from plaintiff concerning the alleged missing footage.  *See* **plaintiff's Ex. 2**, Groves, 180/8-181/12.  Further, Bates page 000034 of defendants' Ex. 9 indicates that the car stop in question was at least partially recorded, and Sheriff Groves testified that he would not have an issue with a patrol deputy turning off a body camera for a purely personal encounter with a citizen.  *See* **plaintiff's Ex. 2**, Groves,178/12-179/21.

19.    Controverted in part.  Plaintiff concedes that Sheriff Groves sent the subject e-mail reflected on Bates page 000252 in defendants' Ex. 9.  However, defendants' factual assertion is otherwise controverted to the extent that defendants failed to attach plaintiff's deposition transcript in support of their factual assertion.  *See* Rule 56(e).

20.    Controverted in part.  Plaintiff concedes that the content of Bates page 000033 (in defendants' Ex. 9) states what it states.  However, defendants' factual assertion is controverted to the extent that neither Sheriff Groves nor Chief Deputy Gibson ever confronted plaintiff about the allegations of not responding to calls to get plaintiff's side of the story or an explanation from plaintiff concerning the alleged missed calls.  *See* **plaintiff's Ex. 2**, Groves, 180/8-181/12.  Further, Sheriff Groves could not say how many times plaintiff allegedly failed to take a call, admitted that he never recorded any such allegation in any of plaintiff's formal evaluations, and also admitted that these allegations stemmed from "chatter" from unidentified and unknown people.  He likewise admitted that there is no prohibition against a deputy patrolling one area of the county verses another.  *See* **plaintiff's Ex. 2**, Groves, 143/21-24; 145/10-146/8; 148/16-150/17; and 151/4-13.

20.1    Controverted in part for the same reasons outlined above in paragraph 20, incorporated by reference, as though fully set forth herein.

21.    Controverted.  Plaintiff objects to defendants' factual assertion herein on the basis that it is unsubstantiated hearsay and lacks proper foundation.  Sheriff Groves specifically testified that he was unable to identify who was making the complaints in question and that it was simply "chatter" made by unidentified and unknown people.  *See* Rule 56(c)(2).  Further, he admitted that there is no prohibition against a deputy patrolling in one area of the county versus another.  *See* **plaintiff's Ex. 2**, Groves, 149/14-150/17.

22.    Controverted.   Defendants' factual assertion in this paragraph is based on unsubstantiated hearsay and opinion testimony and thus lacks proper foundation.

Plaintiff thus objects pursuant to Rule 56(c)(2).  In the cited testimony, Deputy Piepho specifically said that he was offering "opinions" and ultimately he admitted that his opinions were based on assumptions without personal knowledge.  Further, Deputy Hartman admitted in his deposition that he had only heard "hearsay" and "rumors" about plaintiff's work habits without knowing whether there was any validity to the hearsay or rumors.  *See* **plaintiff's Ex. 4**, Piepho, 39/14-43/18.  *See also* **plaintiff's Ex. 5**, Hartman, 36/8-18.

22.1   Controverted.  *See* the response and objection to paragraph 22 above, as it pertains to Deputy Piepho.

22.2   Controverted.  *See* the response and objection to paragraph 22 above, as it pertains to Deputy Hartman.

22.3   Controverted.  Plaintiff objects to the declaration of Brian Kerns contained in defendants' Ex. 10 on the basis that it constitutes inadmissible hearsay, lacks proper foundation, and contains speculation.  *See* Rule 56(c)(2).  In his deposition, Deputy Kerns specifically testified that he did not prepare the declaration at issue, even though he signed it.  Further, Deputy Kerns never spoke with either Sheriff Groves or Chief Deputy Gibson about why plaintiff was terminated and was not told the reason for his termination.  Deputy Kerns gave testimony to this effect *after* he had already signed the declaration at issue which had been prepared for him while defendants were represented by counsel.  *See* **plaintiff's Ex. 7**, Kerns, 92/10-22; and 114/15-115/16.  Finally, defendants' assertion in this paragraph is immaterial and irrelevant.

22.4   Controverted.  The content of Bates page 000041 (in defendants' Ex. 9) contains unsubstantiated hearsay, speculation and lacks proper foundation.  It is therefore objectionable under Rule 56(c)(2).  Furthermore, Sheriff Groves specifically testified that he could not say when he made the handwritten list outlined on Bates page 000041, agreed that he did not bring the listed items to plaintiff's attention, and further agreed that he may well have made the list after plaintiff's termination in order to justify plaintiff's firing.  *See* **plaintiff's Ex. 2**, Groves, 166/6-15; 167/6-13; and 182/11-17.

22.5   Controverted for the same reasons outlined above in response to paragraph 22.4, incorporated by reference as though fully set forth herein.  *See also* **plaintiff's Ex. 2**, Groves, 169/14-25.

22.6   Controverted for the same reasons outlined above in response to paragraph 22.4, incorporated by reference as though fully set forth herein.

22.7   Controverted for the same reasons outlined above in response to paragraph 22.4, incorporated by reference as though fully set forth herein.

{0234817.DOCX}

22.8    Controverted for the same reasons outlined above in response to paragraph 22.4, incorporated by reference as though fully set forth herein.

22.9    Controverted for the same reasons outlined above in response to paragraph 22.4, incorporated by reference as though fully set forth herein.

23.    Uncontroverted.

24.    Uncontroverted.    However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

24.1    Uncontroverted.  However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

24.2    Controverted.  In her deposition, Ms. Rosenberg specifically said that she is not aware whether plaintiff knew about the offensive reference to Wydick's black dog prior to his termination.  She also admitted that plaintiff "may have" been aware of the reference prior to his termination.  *See* **plaintiff's Ex. 6**, Rosenberg, 125/15-126/14.

25.    Uncontroverted.    However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

25.1    Controverted to the extent that defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).  Further, the specific testimony cited by defendants does not support their assertion about plaintiff's testimony.

25.2    Uncontroverted.  However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

25.3    Uncontroverted.  However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

26.    Uncontroverted.

27.    Uncontroverted.

27.1    Uncontroverted.

27.2    Uncontroverted.

27.3    Controverted in part.  Plaintiff concedes that the internal investigation report states that the subject allegations could not be "completely validated."  However, plaintiff controverts this paragraph to the extent that Deputy Kidd did, in fact, call him "boy" and tell him to "pick up trash after

{0234817.DOCX}

the white folk," on the basis of plaintiff's mixed race status. Further, plaintiff complained to Sheriff Groves about Deputy Kidd's repeated harassment in this regard in December 2014 or January 2015. In response (according to plaintiff), Sheriff Groves told plaintiff that he "doesn't care for people who tell on other people," that he "can't deal with" tattle-tales, and that "[i]t should be worked out between you guys." *See* **plaintiff's Ex. 1**, Johnson, 176/14-179/25; and 180/9-183/22. *See also* **plaintiff's Ex. 17**, Johnson interrogatory answers to Groves, at question Nos. 3 and 9. *See also* **plaintiff's Ex. 18**, Johnson interrogatory answers to County, at question Nos. 1 and 10. Further, Sheriff Groves admitted that plaintiff's allegations about Deputy Kidd's inappropriate racial remarks are "consistent" with the allegations against Kidd that were ultimately substantiated in the internal investigation report and that, assuming the inappropriate remarks were actually made, they would have violated Policy No. 27, the workplace harassment policy. *See* **plaintiff's Ex. 2**, Groves, 211/21-213/11; and 225/4-21. Deputy Kerns confirmed in his deposition that plaintiff reported to him that Kidd had been calling him "boy," and saying, "'Hey, boy,' and stuff like that." *See* **plaintiff's Ex. 7**, Kerns, 74/4-12.

27.4    Controverted in part. Plaintiff concedes that the internal investigation report states that the subject allegations could not be "completely validated." However, plaintiff controverts this paragraph to the extent that Deputy Kidd did, in fact, increase his anger and racially discriminatory behavior toward plaintiff following Kidd's failure to get the part-time job with the Columbus Police Department. *See* **plaintiff's Ex. 1**, Johnson, 185/6-188/2; and 189/3-191/1. *See also* **plaintiff's Ex. 17**, Johnson interrogatory answers to Groves, at question Nos. 3 and 9. *See also* **plaintiff's Ex. 18**, Johnson interrogatory answers to County, at question Nos. 1 and 10. Further, the investigation report confirms that "Deputy Kidd said he later spoke with Johnson about what he had spoken to the Chief about," and that "Deputy Kidd . . . did not believe that Johnson had the right to tell the Chief about the incident between him and Kerns." *See* defendants' Ex. 13, Internal Investigation, at 000271.

28.    Uncontroverted in part and controverted in part. Uncontroverted that Deputy Kidd was terminated on January 19, 2016, ostensibly based on the findings of the internal investigation report. Controverted to the extent that defendants' assertion implies that Sheriff Groves was not aware of Deputy Kidd's racially discriminatory behavior prior to the internal investigation in January 2016. *See* responses to paragraphs 5.10 and 27.3 above, incorporated by reference as though fully set forth herein.

29.    Uncontroverted.

30.    Uncontroverted.

30.1    Uncontroverted.

30.2    Uncontroverted.

31.    Uncontroverted.

31.1    Uncontroverted.  However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

31.2    Uncontroverted.

32.    Uncontroverted.    However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

32.1    Uncontroverted.  However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

33.    Uncontroverted.    However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

33.1    Uncontroverted.  However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

34.    Controverted.  *See* defendants' Ex. 12, Hamlin's File, at 002079, indicating that Hamlin got a pay raise to $14.00/hour in December 2014.

34.1    Controverted.    Defendants' assertion is not supported by the cited testimony, as required by Rule 56, subsections (c) and (e).

34.2    Uncontroverted.  However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

35.    Uncontroverted.

36.    Controverted to the extent that Hamlin received an hourly rate increase prior to March 2015.  *See* defendants' Ex. 12, Hamlin's File, at 002079, indicating that Hamlin got a pay raise to $14.00/hour in December 2014.

37.    Uncontroverted.

37.1    Uncontroverted.  However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

37.2    Controverted in part.  Plaintiff concedes only that the cited document, Bates page 001439 in defendants' Ex. 9, speaks for itself.  Otherwise, there is no testimony specifically explaining or substantiating its content.

14

38.    Uncontroverted.    However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

    38.1    Uncontroverted. However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

    38.2    Uncontroverted. However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

    38.3    Uncontroverted. However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

    38.4    Uncontroverted. However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

    38.5    Uncontroverted. However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

    38.6    Controverted in part to the extent that defendants' assertion does not reflect the entirety of the evidence on the hostile and discriminatory exchange that took place between Chief Deputy Gibson and plaintiff. In point of fact, plaintiff testified that Gibson came at him in a physically threatening manner to the point where plaintiff "bladed [himself] actually gun-side away ready for a fight." During this confrontation, plaintiff was "backed up against the bathroom door . . . ready to fight" because "[t]hat's how [Gibson] came at [him]." *See* **plaintiff's Ex. 1**, Johnson, 237/14-238/7; and 239/4-16. Further, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

    38.7    Controverted in part to the extent that defendants' assertion suggests that the subject exchange did not, in fact, take place. Gibson testified that it's "possible" that he and plaintiff had a "communication or conversation" about the funeral in question and that he has "probably" asked plaintiff "What the fuck do you want?" and told him to "Get the fuck out of here" before. Gibson further conceded that, if he had indeed yelled at plaintiff with foul language and leapt out of his chair, as claimed, that this would constitute "hostile inappropriate behavior." *See* **plaintiff's Ex. 3**, Gibson, 54/1-55/4; 134/7-11; and 134/21-135/1. Also, both Deputy Kerns and Chief Daniels testified that plaintiff reported the hostile exchange with Gibson to them. *See* **plaintiff's Ex. 7**, Kerns, 89/8-24. *See also* **plaintiff's Ex. 16**, Daniels, 39/1-40/24.

39.    Uncontroverted.    However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

40.     Uncontroverted.  Further, plaintiff's allegation in this regard was substantiated by defendants' own investigation.  *See* defendants' Ex. 13, Internal Investigation, at 000274.

41.     Uncontroverted.   However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

   41.1   Controverted.  Plaintiff initially testified that he first spoke with Kerns sometime in the summer of 2014 about Deputies Piepho and Kidd making racial remarks against him in the Sheriff's Office.   Plaintiff then remembered that he had become a full-time patrol deputy in August 2013, and thought that his conversation with Kerns may have occurred in late 2013 or early 2014.   Ultimately, however, plaintiff recalled that the conversation with Kerns happened shortly after Deputy Piepho was terminated.   Deputy Piepho testified that he was terminated from the Sheriff's Office on June 27, 2014.   This fact corroborates plaintiff's testimony that he initially spoke with Kerns in the summer of 2014 about racial discrimination occurring in the Sheriff's Office.  *See* **plaintiff's Ex. 1**, Johnson, 141/24-144/2; 146/13-147/4; 147/22-148/23; 153/5-10; 154/25-156/14; 158/2-15; and 158/23-159/6.   *See also* **plaintiff's Ex. 4**, Piepho, 31/14-23; and 77/24-78/1.

   41.2   Controverted in part.  Plaintiff concedes only that Kerns testified that he did not report to Sheriff Groves the fact that Deputy Kidd had played racially offensive videos to him and plaintiff on more than one occasion.  Otherwise, defendants' assertion is controverted inasmuch as the cited testimony does not support the assertion made.  *See* **plaintiff's Ex. 7**, Kerns, 49/12-51/20.

42.     Uncontroverted.   However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

   42.1   Uncontroverted.  However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

   42.2   Uncontroverted.  However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

   42.3   Controverted in part.  Plaintiff concedes that he cannot recall exactly when his attempted conversation with Gibson occurred.   However, plaintiff testified that the attempted conversation occurred sometime after his initial conversation with Deputy Kerns, which would have been in the summer of 2014.  To this extent, defendants' assertion is controverted.  *See* **plaintiff's Ex. 1**, Johnson, 164/18-24.  *See also* response to paragraph 41.1 above.

43.     Uncontroverted.   However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

43.1   Uncontroverted.  However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

44.   Uncontroverted.   However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

44.1   Uncontroverted.  However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

45.   Uncontroverted.   However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

45.1   Uncontroverted.  However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

45.2   Uncontroverted.  However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

45.3   Uncontroverted.  However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

45.4   Controverted.   Plaintiff testified that he had related all that he could remember telling Sheriff Groves "[o]n that specific occasion" and "[a]t that time."  *See* **plaintiff's Ex. 1**, Johnson, 183/18-184/12.  Plaintiff eventually again complained to Sheriff Groves about Deputy Kidd racially harassing him after Kidd failed to get the part-time job at the Columbus Police Department.  At some point between June 11 and June 25, 2015, he also attempted to report Chief Deputy Gibson's assault to Sheriff Groves, but Sheriff Groves dismissed plaintiff's concerns, saying that he did not like "tattletales" and "That's just the way he is," in relation to Gibson's hostile behavior.  *See* **plaintiff's Ex. 17**, Johnson interrogatory answers to Groves, at question Nos. 3 and 9.  *See also* **plaintiff's Ex. 18**, Johnson interrogatory answers to County, at question Nos. 1 and 10.  In any event, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

46.   Uncontroverted.   However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

47.   Uncontroverted.   However, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

47.1   Controverted in part and uncontroverted in part.   Uncontroverted that Sheriff Groves testified that he did not know prior to June 25, 2015, that plaintiff had communicated information about racial harassment within the

Sheriff's Office to Chief Daniels.   Controverted to the extent that defendants' assertion suggests that Sheriff Groves was not aware of the subject harassment prior to plaintiff's termination.  *See* response to paragraph 5.10 above, incorporated by reference as though fully set forth herein.

47.2   Controverted in part and uncontroverted in part.  Uncontroverted that Chief Daniels visited with Sheriff Groves about Daniels' displeasure respecting the manner in which Kidd sought employment at the Columbus Police Department.  Controverted to the extent that defendants' assertion suggests that this is the only topic discussed between Chief Daniels and Sheriff Groves.  *See* response to paragraph 5.10 above, incorporated by reference as though fully set forth herein.

48.   Controverted.  *See* response to paragraph 45.4 above, incorporated by reference as though fully set forth herein.   Further, defendants failed to attach plaintiff's deposition transcript in support of their factual assertion, as required by Rule 56(e).

### **Plaintiff's Statement of Additional Material Facts**

49.   Defendant Cherokee County, Kansas is a Kansas county organized and existing under the laws of the State of Kansas, pursuant to K.S.A. § 18-111.  The County acts by and through the Board of County Commissioners of the County of Cherokee, Kansas, located at 110 W. Maple, Columbus, Kansas 66725.  The Board is a body corporate and politic, organized and existing under the laws of the State of Kansas, pursuant to K.S.A. § 19-101, *et seq*.  Pursuant to K.S.A. §§ 19-103 and 19-105, the powers of the County are exercised by the Board and the Board shall be named in all suits or proceedings brought against the County.  *See* complaint (Doc. 1), at ¶ 2; and answer (Doc. 3), at ¶ 2.

50.   Defendant Sheriff David M. Groves and the other individuals described in plaintiff's complaint were, at all relevant times, agents, employees, and/or servants of Cherokee County.  *See* complaint (Doc. 1), at ¶ 3; and answer (Doc. 3), at ¶ 3.

51.   During the majority of his tenure at the Sheriff's Office, plaintiff worked full time as a patrol deputy, making approximately $14.00 per hour at the time of his ***unlawful*** discharge.

He also had benefits including health insurance, life insurance and a retirement plan. *See* complaint (Doc. 1), at ¶ 13; and answer (Doc. 3), at ¶ 13.

52.     Though plaintiff worked at the Sheriff's Office, at all relevant times, Cherokee County technically employed and paid him. Further, at all relevant times, the County employed (and continues to employ) 15 or more persons. *See* complaint (Doc. 1), at ¶ 14; and answer (Doc. 3), at ¶ 14.

53.     Chief Deputy Shane Gibson, plaintiff's direct supervisor, reported to Sheriff Groves. *See* complaint (Doc. 1), at ¶ 16; and answer (Doc. 3), at ¶ 16.

54.     Pursuant to K.S.A. § 19-805(d), any personnel action taken by Sheriff Groves is and was subject to the "[p]ersonnel policies and procedures established by the [Board] for all county employees other than elected officials," and "any pay plan established by the [Board] for all county employees other than elected officials." *See* complaint (Doc. 1), at ¶ 17; and answer (Doc. 3), at ¶ 17.

55.     Sheriff Groves and others at the Sheriff's Office knew of plaintiff's mixed race status, as plaintiff had told the sheriff and deputies that he had experienced racial discrimination at a previous law enforcement employer. *See* complaint (Doc. 1), at ¶ 18; and answer (Doc. 3), at ¶ 18. *See also* **plaintiff's Ex. 2**, Groves, 104/6-105/18; and 106/5-10.

56.     During his entire tenure at the Sheriff's Office, plaintiff received only one formal written reprimand (on September 5, 2014). Specifically, Chief Deputy Gibson reprimanded plaintiff for speeding in his patrol car to the scene of an emergency—a suicidal individual armed with a gun who lived across the street from Riverton Grade School. *See* complaint (Doc. 1), at ¶ 19; and answer (Doc. 3), at ¶ 19.

{0234817.DOCX}

57.     Cherokee County is an employer within the meaning of Title VII.  *See* complaint (Doc. 1), at ¶ 30; and answer (Doc. 3), at ¶ 30.

58.     Plaintiff, as a mixed race male, is a member of a class of persons protected by Title VII.  *See* complaint (Doc. 1), at ¶ 31; and answer (Doc. 3), at ¶ 31.

59.     In about 2009, before plaintiff's employment at the Sheriff's Office, Sheriff Groves overheard a white deputy, Michael Potter, directing a racially charged word toward Deputy Kerns. *See* **plaintiff's Ex. 2**, Groves, 21/10-24/12.  Sheriff Groves agreed that, in light of the comment made by Deputy Potter toward Deputy Kerns, "somebody could say something that somebody else would find racially offensive" in the future at the Sheriff's Office.  *See* **plaintiff's Ex. 2**, Groves, 30/8-31/10.

60.     Cherokee County Sheriff's Office Workplace Harassment Policy, No. 27 ("Policy No. 27") provides, in part, as follows:

**POLICY:**

*     *     *

No form of harassment is tolerated, including harassment because of, or by inappropriately emphasizing an individual's *race* . . . .

**DEFINITION:**

- ***Harassment, harass, harassed, harassing, harasses***- 1. To irritate or torment persistently.  2. To wear out; exhaust. 3. To impede and exhaust (an enemy) by repeated attacks or raids.

*     *     *

- ***Supervisor*** – A supervisor is any person empowered to make economic decisions, or, decisions affecting the terms, privileges or conditions of employment for other employees under his/her control.

**PROCEDURE:**

{0234817.DOCX}

1.   **Prohibited activity under this policy includes, but is not limited to, the following examples.**

    A.    No employee shall either explicitly or implicitly ridicule, mock, deride, or belittle any person, either directly or indirectly.

    B.    Employees shall not make offensive or derogatory comments to any person, either directly or indirectly.

    C.    No employee shall engage in any conduct which has the purpose or effect of unreasonably interfering with an employee's work performance or creating an intimidating, hostile, or offensive working environment . . . .

2.   **Supervisor's Responsibilities**

    A.    Although all employees shall be responsible for preventing harassment and / or discrimination, supervisors shall be responsible for:

        1.    Counseling all employees on types of behavior prohibited and the department procedures for reporting and resolving complaints of harassment and discrimination;

        2.    Monitoring the work environment on a daily basis for signs that harassment and discrimination may be occurring;

*     *     *

5.   **Retaliation**

*     *     *

    C.    Monitoring to ensure that retaliation does not occur is the responsibility of the Sheriff, supervisors, and the PST.

*See* **plaintiff's Ex. 14** (which is also Ex. 4, as marked at Sheriff Groves' deposition), at Bates pages 001119-20, and 001122.

61.    Sheriff Groves admitted that neither he nor any outside source trains his deputies on the subjects of workplace harassment, racial discrimination within the workplace, or hostile work environment. *See* **plaintiff's Ex. 2**, Groves, 66/12-67/3.

62.    Sheriff Groves admitted that he qualifies as a "supervisor" under Policy No. 27, and that he has a duty to monitor the office on a daily basis to make sure there are no signs of

harassment or discrimination occurring.  He further admitted that he has a responsibility to ensure that retaliation does not occur in the Sheriff's Office.  *See* **plaintiff's Ex. 2**, Groves, 81/23-83/20.

63.     Sheriff Groves does not administer tests to deputies or other Sheriff's Office employees on the subject of workplace harassment; nor does he have training sessions or seminars for deputies or employees to attend on the subject of not engaging in workplace harassment and racial discrimination.  *See* **plaintiff's Ex. 2**, Groves, 88/20-89/14.

64.     Sheriff Groves does not take any affirmative steps to ensure or monitor that racial discrimination is not occurring within the Sheriff's Office.  For example, he never asked plaintiff or Deputy Kerns if anyone was mistreating them and he does not ask employees on a periodic basis whether they are aware of any hostile or offensive behavior in the office.  *See* **plaintiff's Ex. 2**, Groves, 90/10-16; and 91/2-17.  *See also* **plaintiff's Ex. 7**, Kerns, 25/10-26/5.

65.     Cherokee County has an employee handbook that is given to new Sheriff's Office employees by the County's human resource director, Deana Randall.  Among other things, the County's employee handbook has an equal employment opportunity provision.  *See* **plaintiff's Ex. 2**, Groves, 48/15-22; 79/18-80/16; and 100/4-102/13.  *See also* **plaintiff's Ex. 20**, Cherokee County Personnel Policy Handbook, at p. 13.

66.     Between 2012 and May 2019, the Sheriff's Office maintained about 55 employees on staff, including patrol deputies, among others.  Of this number, only about 6 or 7 employees (or about 12% to 13%) constituted minorities, including, African-American or mixed race, Hispanic, and Native American individuals.  From this, an even smaller number or percentage constituted just African-American or mixed race employees.  Thus, the overwhelming majority of staff in the Sheriff's Office are Caucasian or white, including Sheriff Groves and Chief Deputy Gibson.  *See*

**plaintiff's Ex. 2**, Groves, 107/19-108/16; 113/24-114/11; and 115/4-18.  *See also* **plaintiff's Ex. 6**, Rosenberg, 94/9-15.  *See also* **plaintiff's Ex. 7**, Kerns, 24/3-19.

67.    Respecting plaintiff's February 5, 2014, written performance review, Sheriff Groves admitted that plaintiff's ratings ran from very good to good, with some outstanding marks. Her further admitted that there were no below average or unsatisfactory marks.  *See* **plaintiff's Ex. 2**, Groves, 127/19-128/2.  *See also* defendants' Ex. 9, Plaintiff's File, at Bates pp. 000027-29.

68.    Sheriff Groves admitted that, with regard to written performance reviews, no Sheriff's Office employee is ever perfect or outstanding in every category; rather, employees have various weaknesses and strengths.  Plaintiff was no different in this respect.  *See* **plaintiff's Ex. 2**, Groves, 129/20-130/19.

69.    Respecting plaintiff's July 1, 2014, written performance review, it contains good marks, five very good marks, two below average marks, and a couple of outstanding marks. Plaintiff's overall evaluation is "Good," although the report encouraged plaintiff to improve in several areas, including getting work completed in a timely manner.  *See* defendants' Ex. 9, Plaintiff's File, at Bates pp. 000030-31.

70.    Apart from plaintiff, other white deputies in the Sheriff's Office had problems with reports being overdue.  Some white deputies were also late responding to calls and had problems carrying out service of process but were not disciplined through termination.  *See* **plaintiff's Ex. 3**, Gibson, 89/21-90/9.  *See also* **plaintiff's Ex. 4**, Piepho, 62/1-7; and 68/10-70/21.  *See also* **plaintiff's Ex. 6**, Rosenberg, 142/20-144/2.  *See also* **plaintiff's Ex. 7**, Kerns, 119/9-18.

71.    Cherokee County Sheriff's Office Policy No. 23, governing Officer & Employee Discipline & Accountability, provides, among other things, that "[p]rogressive disciplinary measures are generally followed," including counseling, warning, suspension or other remedial

steps such as demotion.  Under this policy, termination is the last resort.  *See* **plaintiff's Ex. 14** (which is also Ex. 4, as marked at Sheriff Groves' deposition), at Bates pages 001108-09 and 001111.  *See also* **plaintiff's Ex. 2**, Groves, 197/2-199/3.

72.     Prior to plaintiff's termination, Sheriff Groves never suspended or demoted plaintiff.  Further, apart from the one written reprimand plaintiff got from Chief Deputy Gibson, Sheriff Groves never presented plaintiff with any other written warning or reprimand documents memorializing work deficiencies.  *See* **plaintiff's Ex. 2**, Groves, 199/4-21; and 200/18-201/9.

73.     During their tenures at the Sheriff's Office, Deputies Kidd and Piepho, both of whom are white, received multiple disciplinary measures, including suspensions and numerous written reprimands, prior to their eventual termination. Deputy Kidd had at least 9 documented instances of work misconduct or written reprimand before his termination.  Deputy Piepho, whom Chief Deputy Gibson supervised, had documented instances of late work, internet surfing, lack of productivity, problems with service, and verbal abuse and harassment of a female employee, among other things, but these issues did not result in his immediate termination.  Deputy Piepho agreed that he was given more opportunities than he "fairly deserved" to correct his workplace behavior before he was ever terminated.  *See* **plaintiff's Ex. 2**, Groves, 233/11-14; 236/12-20; 237/21-239/10; and 240/6-243/23.  *See also* **plaintiff's Ex. 3**, Gibson, 28/11-23.  *See also* **plaintiff's Ex. 4**, Piepho, 62/1-7; 68/10-78/7; and 79/6-80/22.  *See also* **plaintiff's Ex. 11**, Kidd's Employment File.  *See also* **plaintiff's Ex. 22**, Piepho's Employment File.

74.     Sheriff Groves prefers that Sheriff's Office employees work out any differences amongst themselves and by themselves before coming to him.  *See* **plaintiff's Ex. 2**, Groves, 206/8-12.

75.     Sheriff Groves acknowledged that Deputy Kidd had told him that he had applied for the part-time job at the Columbus Police Department.  *See* **plaintiff's Ex. 2**, Groves, 209/16-25.

76.     Beau Hamlin, a white deputy, was selected for the detective position at the Sheriff's Office over plaintiff, even though Hamlin had less years of experience than plaintiff.  *See* **plaintiff's Ex. 2**, Groves, 216/14-217/14; and 246/1-13.  *See also* **plaintiff's Ex. 5**, Hartman, 56/9-21.  *See also* **plaintiff's Ex. 8**, Clugston, 25/21-25.

77.     Contrary to plaintiff's testimony and allegations otherwise, Sheriff Groves denied in his deposition that plaintiff ever complained to him prior to his termination about racial harassment or a hostile work environment perpetrated against him by Deputy Kidd or Chief Deputy Gibson.  *See* **plaintiff's Ex. 2**, Groves, 206/13-18; 208/14-209/15; and 219/7-220/3.

78.     Sheriff Groves had a special circle of favorite deputies at the Sheriff's Office, all of whom were white, including Matt Peters, Beau Hamlin, Shane Gibson, and Terry Clugston, among others.  Deputy Kerns and plaintiff were not part of this circle, however.  Those in the circle got better equipment and patrol cars than others outside the circle.  *See* **plaintiff's Ex. 1**, Johnson, 134/11-136/15.  *See also* **plaintiff's Ex. 5**, Hartman, 41/4-43/23; and 73/19-74/12.  *See also* **plaintiff's Ex. 6**, Rosenberg, 41/12-43/9; and 98/3-101/3.  *See also* **plaintiff's Ex. 17**, Johnson interrogatory answers to Groves, at question No. 9, pp. 7-8.

79.     Chief Deputy Gibson spoke with Sheriff Groves about plaintiff's termination before it actually happened.  *See* **plaintiff's Ex. 3**, Gibson, 114/16-25.

80.     When Sheriff Groves terminated plaintiff on June 25, 2015, he did not give plaintiff a specific reason for his termination but told him "we could discuss it at a later time."  *See* **plaintiff's Ex. 2**, Groves, 69/4-13.  *See also* **plaintiff's Ex. 19**, Groves' interrogatory answers, at

25

No. 16, p. 7.  However, Sheriff Groves thereafter never informed plaintiff, either personally or via-email or other mail or type of communication, about the exact reasons for his termination.  *See* **plaintiff's Ex. 2**, Groves, 194/8-13.

81.     After he terminated plaintiff, Sheriff Groves received a copy of a litigation hold letter which, among other things, asked him to preserve any and all e-mails and other communications or evidence or documents relating to plaintiff's claims in this case.  In response to the letter, Sheriff Groves directed only selected employees, but not all employees, to preserve information relating to the subjects outlined in the letter.  As such, Sheriff Groves acknowledges that it is possible that some information relating to plaintiff's claims was not preserved by the Sheriff's Office.  *See* **plaintiff's Ex. 2**, Groves, 92/1-8; and 93/9-98/3.  *See also See* **plaintiff's Ex. 21**, litigation hold letter.

82.     The tasing incident between Kidd and Kerns was common knowledge both inside and outside the Sheriff's Office before plaintiff's termination.  Deputy Piepho testified that he had heard about it before June 2014.  Deputy Kerns testified that plaintiff and other deputies knew about the tasing incident and that he openly discussed the incident in front of deputies and with Chief Daniels (who already knew about it).    Chief Daniels testified that officers at the Columbus Police Department knew about the incident and that several of them threatened to quit the force if he hired Kidd.  Ms. Blockberger testified that her impression was that "everybody" in the Sheriff's Office knew about it because they talked about it in the office hallways.  *See* **plaintiff's Ex. 1**, Johnson, 137/3-144/2.  *See also* **plaintiff's Ex. 4**, Piepho, 38/6-9.  *See also* **plaintiff's Ex. 6**, Rosenberg, 111/7-112/5; and 118/17-119/25.  *See also* **plaintiff's Ex. 7**, Kerns, 68/8-69/6; 69/15-71/18; 82/15-83/19; 84/13-22; and 101/9-102/16.  *See also* **plaintiff's Ex. 16**, Daniels, 13/5-14/10; 17/12-24; 19/8-20/14; and 49/4-10.

83.     Racial discrimination permeated the Sheriff's Office both before and during plaintiff's tenure of employment there.  Deputy Kidd repeatedly asked Deputy Kerns whether, because he was African-American, he liked "grape Kool-Aid" and "watermelon" and also used the word "nigger" in talking around deputies.  Other deputies, including Matt Peters, made racial statements about drugs being in cars with nice wheel rims driven by minorities.  Beau Hamlin referred to Doug Wydick's black dog as "nigger" in text messages he sent to Wydick.  At least one deputy had a tattoo of a Confederate flag.  Deputy Piepho testified that the racist Mario video was shown "numerous times," and that he used the word, "nigga" in speaking with Deputy Kerns.  Plaintiff testified that Deputy Kidd called him "boy" and told him to pick up trash "after the white folk" on countless occasions in a "continuing nagging, joking thing" whenever they worked together.  Plaintiff also told Sheriff Groves "I don't know why [Deputy Kidd] won't stop with the jokes."  *See* **plaintiff's Ex. 1**, Johnson, 144/12-25; 179/3-25; and 182/25-183/17.  *See also* **plaintiff's Ex. 4**, Piepho, 16/5-17/14; and 22/21-23/10.  *See also* **plaintiff's Ex. 5**, Hartman, 22/13-26/23; 37/10-38/11; 39/3-40/14; and 63/1-64/12.  *See also* **plaintiff's Ex. 6**, Rosenberg, 73/11-75/17; 75/23-76/24; 79/9-83/7; 109/22-110/9; 114/7-116/21; 125/15-126/14; 134/17-136/14; and 137/13-138/19.  *See also* **plaintiff's Ex. 7**, Kerns, 29/23-32/16; 33/11-23; 54/22-56/17; 57/1-58/3; 58/13-60/4; 60/11-62/19; 65/19-67/3; 97/6-98/22; and 100/20-101/3.

84.     Plaintiff found the racial harassment and discrimination to which he was subjected at the Sheriff's Office offensive, severe, abusive, and upsetting.  *See* **plaintiff's Ex. 1**, Johnson, 146/13-147/4; 147/22-148/23; 153/5-10; 154/16-156/14; 158/2-15; and 158/23-160/3.  *See also* **plaintiff's Ex. 7**, Kerns, 42/10-43/22; 45/15-25; 51/4-16; 53/25-54/21; 68/8-69/6; 74/4-75/2; 76/6-9; and 89/8-24.  *See also* **plaintiff's Ex. 17**, Johnson interrogatory answers to Groves, at question

Nos. 3 and 9.  *See also* **plaintiff's Ex. 18**, Johnson interrogatory answers to County, at question

Nos. 1 and 10.

### Statement of the Nature of the Matter Before the Court
### (Per D. Kan. Rule 7.6 (a)(1))

The nature of the matter presently before the court is the joint motion for summary

judgment (Doc. 95) and memorandum in support thereof (Doc. 96) filed by defendants Board of

County Commissioners of Cherokee County and David M. Groves in the above-captioned cause.

For the reasons discussed in this response in opposition, defendants' motion must be denied.

### Concise Statement of the Facts
### (Per D. Kan. Rule 7.6(a)(2))

Plaintiff incorporates by reference, as though fully set forth herein, the factual contentions

outlined in his complaint.  *See* Doc. 1, at ¶¶ 12-28.  Plaintiff also incorporates by reference, as

though fully set forth herein, his statement of additional material facts set forth above.  *See* ¶¶ 49-

84.

### Statement of the Question Presented
### (Per D. Kan. Rule 7.6(a)(3))

The question here presented is whether defendants are entitled to summary judgment

against plaintiff on the entirety of plaintiff's pending claims.  Plaintiff submits that defendants are

not.

### Response to Defendants' Arguments and Authorities
### (Per D. Kan. Rule 7.6(a)(4))

**I.      Summary Judgment Standard**

This court aptly outlined the applicable summary judgment standard in *Robinson v. City of*

*Arkansas City, Kan.*, 896 F.Supp.2d 1020, 1024-25 (D. Kan. 2012), as follows:

> Summary judgment is appropriate if the moving party demonstrates that there is
> "no genuine dispute as to any material fact" and that it is "entitled to judgment as a

matter of law."  ***In applying this standard, courts view the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party***.   A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  In attempting to meet this standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."  The nonmoving party may not simply rest upon its pleadings to satisfy its burden. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."  Rule 56(c)(4) provides that opposing affidavits must be made on personal knowledge and shall set forth such facts as would be admissible in evidence.  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.

*See Robinson*, 896 F.Supp.2d at 1024-25 (emphasis added).

As shown below, viewing the evidence and all reasonable inferences therefrom in the light most favorable to plaintiff (the non-moving party), myriad genuinely disputed issues of material fact remain as to all of plaintiff's pending claims, thus precluding summary judgment in favor of defendants.

## II.    Summary Judgment is Not Warranted on Count I

Initially, plaintiff would note that, at a minimum, defendants' joint motion for summary judgment must be denied to the extent that defendants admitted in their answer that they *unlawfully*

discharged plaintiff on June 25, 2015.  *See* plaintiff's Statement of Additional Material Facts ("SOF")[3], at ¶ 51.

Notwithstanding this admission, plaintiff would also point out that Cherokee County is not entitled to summary judgment under *Bd. of County Comm'rs of County of Lincoln v. Nielander*, 62 P.3d 247 (Kan. 2003), as defendants suggest on page 19 of their memorandum in support.  *See* Doc. 96, at p. 19.  *Nielander* does not support defendants' argument for summary judgment in favor of the County, as that case primarily concerned a dispute between a sheriff and board of county commissioners over who (*i.e.*, the sheriff or the board) had the legal authority to continue the employment of a deputy sheriff.  *See Nielander*, 62 P.3d at 249-50.  The case does not, however, stand for the proposition that a county cannot be held liable in a wrongful discharge employment action such as the present one, even though it is undisputed here that Sheriff Groves has the power to hire and fire his own deputies.  In fact, *Nielander* suggests just the opposite in that it points out that county sheriffs are "subject to follow personnel policies of the county in relation to the county employees under [their] supervision," and that "personnel actions taken by sheriffs are 'subject to' personnel policies, payment plans," and other things established by boards of county commissioners.  *Id*. at 253-54.

Here, there is no question that Cherokee County technically employed plaintiff (not Sheriff Groves), that Sheriff Groves was an agent/servant of the County (as were the other individuals described in the complaint), that plaintiff was subject to the County's employee handbook, and that Sheriff Groves' personnel actions were subject to the personnel policies and procedures established by Cherokee County.  *See* SOF, at ¶¶ 49-50, 52, 54, 57-8, and 65.  Summary judgment in favor of the County on the basis of *Nielander* is thus unwarranted.  *See Hudson v. Leavenworth*

---

[3] Plaintiff will also use the "SOF" abbreviation in referring to any of the numbered paragraphs in his Response to Defendants' Statement of Uncontroverted Material Facts, set forth earlier in this brief.

*County Sheriff's Office*, No. 14-cv-02065-JAR, 2015 U.S. Dist. WL 6738681, at *14 (D. Kan. Nov. 4, 2015) (discussing the three bases for employer liability—(1) where the conduct occurred within the transgressor's scope of employment, (2) where the employer knew, or should have known, about the violation and failed to respond in a reasonable manner, or (3) where the transgressor acted with apparent authority or was aided by the agency relation—the first two of which apply in this case).  *See* SOF, at ¶¶ 5.4, 5.10, 27.3, 27.4, 38.6, 38.7, 45.4, 50, 60-4, and 82-3.

Turning specifically to plaintiff's claim for hostile work environment under count I of the complaint, summary judgment in favor of defendants is likewise unwarranted on the basis that plaintiff's claim purportedly "fails to demonstrate a 'steady barrage of opprobrious racial comments.'"[4]  *See* Doc. 96, at pp. 20-25.  Viewing the evidence and all reasonable inferences therefrom in the light most favorable to plaintiff, and under *current* governing federal law,[5] the facts cited above establish that sufficiently severe and pervasive racial harassment permeated the Sheriff's Office so as to alter the terms and conditions of plaintiff's employment, or, at a minimum, that a genuine factual dispute remains on this point, making summary judgment on plaintiff's hostile work environment claim inappropriate.

In *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957-58 (10th Cir. 2012), the Tenth Circuit outlined the pertinent federal law on hostile work environment claims as follows:

> Under Title VII, it is " 'an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color,

---

[4] Count I of plaintiff's complaint also advances a claim for "racial discrimination" under Title VII but defendants have not specifically sought summary judgment on this claim.  As such, plaintiff's racial discrimination claim remains pending.

[5] In their memorandum, defendants cite to *Loum*, *Trujillo*, and *Wemimo* in discussing the law relative to plaintiff's hostile work environment claim.  *See* Doc. 96, at pp. 20-1.  These cases, all decided in the late 1990s, fail to represent more current federal jurisprudential trends in analyzing hostile work environment claims, as discussed *infra*.  As such, they provide little useful guidance.

religion, sex, or national origin.' " *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (quoting 42 U.S.C. § 2000e–2(a)(1)). "This includes an employee's claims of a hostile work environment based on race or national origin discrimination." *Herrera v. Lufkin Indus., Inc.,* 474 F.3d 675, 680 (10th Cir.2007).

We have recognized that "Title VII does not establish a general civility code for the workplace. Accordingly, the run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces is not the stuff of a Title VII hostile work environment claim." *Morris v. City of Colo. Springs,* 666 F.3d 654, 663–64 (10th Cir.2012) (internal quotes and citations omitted). "To survive summary judgment on a claim alleging a racially hostile work environment, [the plaintiff] must show that a rational jury could find that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment," and that the victim "was targeted for harassment because of [her] race or national origin." *Id.* (brackets and internal quotation marks omitted).

"The applicable test for a hostile work environment has both objective and subjective components. A dual standard asks both whether the plaintiff was offended by the work environment and whether a reasonable person would likewise be offended," and both must be proved. *Id.* at 664 (internal quotes and citations omitted).

"[There] is not, and by its nature cannot be, a mathematically precise test" for a hostile work environment claim. *Harris,* 510 U.S. at 22, 114 S.Ct. 367. Courts determine whether an environment is hostile or abusive by looking at such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23, 114 S.Ct. 367. ***"[T]he severity and pervasiveness evaluation [of a hostile work environment claim] is particularly unsuited for summary judgment because it is quintessentially a question of fact*** *." O'Shea v. Yellow Tech. Servs., Inc.,* 185 F.3d 1093, 1098 (10th Cir.1999) (internal quotation marks omitted); *E.E.O.C. v. PVNF, L.L.C.,* 487 F.3d 790, 798 (10th Cir. 2007) (same).

*See* 684 F.3d at 957-58 (emphasis added). As this court has noted, "'the cumulative weight of . . . several "isolated" racial comments' may give rise to a hostile work environment claim." *Hudson,* 2015 U.S. Dist. WL 6738681, at *12. Further, consideration of "the totality off the circumstances" is warranted in evaluating a hostile work environment claim '"because the very term "environment" indicates that allegedly discriminatory incidents should not be examined in

isolation,' but should be examined in the context in which they occurred." *Stevens v. Water Dist. One of Johnson County*, 561 F.Supp.2d 1224, 1245 (D. Kan. 2008).

In the present matter, under the totality of the circumstances and viewing the evidence in the light most favorable to plaintiff, plaintiff has adduced evidence to establish that racial harassment and discrimination pervaded the workplace at the Sheriff's Office and that it was sufficiently severe, hostile, and abusive to alter the conditions of plaintiff's working environment. Among other things, the evidence shows that plaintiff and Deputy Kerns were the only African-American or mixed race employees in a nearly all white department; that Deputy Kidd and others lodged repeated racial insults (*i.e.*, "boy," "pick up trash after the white folks," "nigger," "grape Kook-Aid," "watermelon," etc.) toward plaintiff and Deputy Kerns (who became so aggravated that he tased Kidd), or said or displayed racially offensive things in their presence (*i.e.*, the racist Mario video, played "numerous" times); that both Deputy Kidd and plaintiff commiserated about the racist behavior, which they found offensive and insulting; that Chief Deputy Gibson cursed at and assaulted plaintiff without provocation; that Sheriff Groves had a duty to monitor the workplace for racial harassment and hostile behavior but failed to do so; that Sheriff Groves knew or should have known that such behavior was rampant in the Sheriff's Office; and that Sheriff Groves failed to stop the behavior, even after plaintiff and Chief Daniels informed him about it in early 2015. *See* SOF, at ¶¶ 5.4, 5.10, 27.3, 27.4, 38.6, 38.7, 45.4, 55, 57-64, 66, 76, 77-8, and 82-4. At a minimum, if not conclusively persuasive by a preponderance of the evidence, this evidence establishes that a genuine factual dispute remains on plaintiff's hostile work environment claim, making summary judgment inappropriate. *See Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1232 (10th Cir. 2015) (genuine issue of material fact existed as to whether alleged racial harassment was sufficiently pervasive so as to alter the terms, conditions, or privileges of employment, precluding

summary judgment on hostile work environment claim); *see also Herrera v. Lufkin Industries, Inc.*, 474 F.3d 675, 683 (10th Cir. 2007) (fact issue existed as to pervasiveness of the racially charged hostility, precluding summary judgment).

Finally, in arguing in favor of summary judgment on count I, defendants submit that plaintiff "cannot demonstrate that any delay in his pay raise was due to his race," and that plaintiff's claims of delayed pay raise, failure to promote, denial of equipment and denial of training are all time-barred. For the reasons discussed above and below, plaintiff submits that summary judgment on count I is nonetheless unwarranted. Moreover, genuine factual issues remain on plaintiff's claims of delayed pay raise, failure to promote, denial of equipment and denial of training. *See* SOF, at ¶¶ 30-37.2, 73, 76, and 78. Nor are these claims time-barred because they are all part and parcel of plaintiff's hostile work environment claim. Federal law is clear that recovery may be had for acts falling outside the applicable 300 day time period for filing a charge of discrimination where the acts "are part of the same actionable hostile work environment practice." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 120, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).

### III.    Summary Judgment is Not Warranted on Count II

Defendants seek summary judgment on plaintiff's claim for retaliation against the County under count II of the complaint. Defendants primarily contend that summary judgment is proper, in this regard, because "no causal connection exists between any protected activity" and plaintiff's termination. *See* Doc. 96, at pp. 29-39. Defendants' motion also fails on this point, as, at a minimum, genuine issues of material fact remain about the cause for plaintiff's termination in view of his complaints to Sheriff Groves about Deputy Kidd's racial harassment and Chief Deputy Gibson's hostile and abusive behavior.

In *Hudson*, this court reviewed the pertinent points of federal law on retaliation claims under Title VII as follows:

> A plaintiff may prove retaliation with direct evidence that "retaliatory animus played a 'motivating part' in the employment decision," or indirectly by using the three-part *McDonnell Douglas* framework.
>
> \*      \*      \*
>
> To establish a prima facie case of retaliation, [a] [p]laintiff must show that (1) he engaged in protected opposition to discrimination; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action.
>
> Protected opposition "can range from filing formal charges to voicing informal complaints." "A plaintiff need not convince the jury that his employer had actually discriminated against him; he need only show that when he engaged in protected opposition, he had a reasonable good-faith belief that the opposed behavior was discriminatory."
>
> \*      \*      \*
>
> . . . To determine whether an employment action is adverse for purposes of a retaliation claim, courts apply the "reasonable employee standard." Under this objective standard, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse." Although courts construe the phrase adverse employment action liberally, the action must amount to "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or ... causing a significant change in benefits." "Mere inconveniences or alterations of job responsibilities do not rise to the level of an adverse employment action."
>
> \*      \*      \*
>
> . . . To satisfy the causation element of his prima facie case, [a] [p]laintiff must show "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." A showing of close temporal proximity between the alleged events, in itself, may satisfy the causation requirement. The Tenth Circuit has held that a one and one-half month period between events may establish causation, while a three-month period, standing alone, is insufficient to establish causation.

*See* 2015 U.S. Dist. WL 6738681, at \*15-7. *See also O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253-55 (10th Cir. 2001) (holding plaintiff presented sufficient evidence to establish an

inference of retaliatory motive and thus a causal connection between his EEOC filing and reduction in hours and ultimate termination).

Here, defendants do not contest that plaintiff engaged in protected opposition to discrimination or that he suffered an adverse employment action (termination). Rather, defendants only contest the causal relationship between plaintiff's protected opposition to discrimination and his termination on June 25, 2015.

Viewing the evidence in the light most favorable to plaintiff, there is more than sufficient evidence to establish that Deputy Kidd and others at the Sheriff's Office subjected plaintiff to racial discrimination and harassment (for the reasons already discussed above); that plaintiff opposed the harassment by complaining about it to Sheriff Groves in December 2014 or January 2015; that plaintiff thereafter further complained to Sheriff Groves about Deputy Kidd's increasingly hostile behavior after Kidd's failure to get the part-time job at the Columbus Police Department (when Sheriff Groves was already aware Kidd had applied for the job in question); that plaintiff attempted to report Chief Deputy Gibson's assault on June 11, 2015, to Sheriff Groves sometime before June 25 but that Sheriff Groves dismissed plaintiff's concerns because he did not like "tattletales" and said, "That's just the way he is" respecting Gibson (who admitted in his deposition that he "may" have conversed with plaintiff about the subject funeral and "probably" cursed at him, as alleged); and that Chief Deputy Gibson spoke with Sheriff Groves about plaintiff's termination before it occurred on June 25, 2015. *See* SOF, at ¶¶ 5.10, 27.3, 27.4, 38.6, 38.7, 45.5, 53, 74, 75, 77, and 79.

Plaintiff's evidence of the above circumstances justifies the inference that Sheriff Groves terminated plaintiff on June 25, 2015, in retaliation for plaintiff's multiple complaints about Deputy Kidd and Chief Deputy Gibson, the last of which plaintiff made *no more than 14 days*

36

*before his termination* and in the context of a workplace where the Sheriff refused to tolerate "tattletales" and wanted employees to "work out any differences amongst themselves."  *See* SOF, at ¶¶ 45.4 and 74.  This inference of retaliatory discharge is further justified by the fact that plaintiff has adduced ample evidence that defendants' proffered reason for his termination—poor work performance—was merely pretextual, inasmuch as Sheriff Groves never told plaintiff why he had been fired, and tolerated poor work performance and infractions from other similarly situated white employees (*i.e.*, Deputies Kidd and Piepho).  Indeed, whereas Sheriff Groves followed progressive disciplinary measures with other white employees, including doling out suspensions and multiple written reprimands, he did nothing of the sort with plaintiff.  Sheriff Groves also largely failed to confront plaintiff about plaintiff's alleged work deficiencies (plaintiff had only *one* formal written reprimand during his tenure with the Sheriff's Office) and admitted that many of his concerns about plaintiff's work performance were based on unsupported assumptions, speculation, and unsubstantiated "chatter" or hearsay.  *See* SOF, at ¶¶ 12, 13.4, 14, 15.4, 16.1-18.5, 20-21, 56, 67-75, and 78-81.

The evidence outlined above thus satisfies the causation element of plaintiff's retaliatory discharge claim or, at a minimum, establishes that genuine issues of material fact remain on this issue, thereby precluding summary judgment in favor of defendants.[6]

### IV.    Summary Judgment is Not Warranted on Counts III, IV, and V

Lastly, defendants contend that they are entitled to summary judgment on plaintiff's claims against both of them under counts III, IV, and V, which respectively allege violation of § 1981 (as

---

[6] Defendants argue on page 39 of their memorandum that plaintiff's claim respecting worker's compensation retaliation fails to state a viable claim under Title VII.  Plaintiff disagrees, as the evidence establishes that defendants treated other similarly situated white deputies differently and discriminated against plaintiff because of his race after he decided to pursue a worker's compensation claim following an on-the-job injury.  Regardless, however, defendants' motion fails as to count II for the reasons already discussed above.

amended by the Civil Rights Act of 1991), violation of § 1983 (procedural due process), and violation of § 1983 (substantive due process). *See* Doc. 96, at pp. 39-41. Defendants contend only that plaintiff's claims, in this respect, are barred by the two-year statute of limitations under K.S.A. § 60-513(a)(4). Defendants are wrong.

Confronted with a similar argument made about similar claims in *Robinson*, this court held:

> The Court will follow the only published court of appeals decision on this issue and apply the four-year statute of limitations. In *Baker*, the Eleventh Circuit determined that even though § 1981 claims against state actors must be brought under § 1983, if the claim is "made possible" by the 1991 amendments to § 1981, it "arises under" a post–1990 enactment and the four-year statute of limitations [under 28 U.S.C. § 1658] applies. Here, the City does not contest that Robinson's claim for discrimination in compensation and classification was not cognizable under the pre–1991 version of § 1981. "[C]laims under § 1981 relying upon discrimination in *contract formation,* which were actionable prior to the 1991 amendment, would be governed by residual state statutes of limitations.... Claims relying upon an employer's *post-formation conduct,* however, would be subject to the four-year statute of limitations under § 1658, because they were made possible by the 1991 amendment." Robinson's claims are based on post-formation conduct, so they are subject to the four-year statute of limitations.

*See* 896 F.Supp.2d at 1041-42.

Notably, plaintiff has advanced post-contract formation claims in counts III, IV, and V of his complaint and all of the unlawful conduct at issue in this matter occurred *after* he was hired at the Sheriff's Office. Under *Robinson*, his claims are thus subject to the four-year statute of limitations outlined in 28 U.S.C. § 1658, and are therefore timely. Defendants' motion for summary judgment on counts III, IV, and V must be denied.

## Conclusion

For all of the above reasons, numerous facts material to plaintiff's pending claims remain genuinely disputed, thus precluding summary judgment in favor of defendants. Nor, given the disputed material facts, are defendants entitled to judgment as a matter of law. Defendants' joint motion must therefore be denied in its entirety.

{0234817.DOCX}

*Respectfully submitted,*

**NORRIS KEPLINGER HICKS & WELDER, L.L.C.**

*/s/ Christopher J. Lucas*
Christopher J. Lucas, #20160
9225 Indian Creek Parkway
Corporate Woods, Bldg. 32, Suite 750
Overland Park, KS 66210
(913) 663-2000/(816) 210-2875 cell
cjl@nkfirm.com
ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of October, 2019, the foregoing was filed and served via the Court's ECF system, which sent notification of the same to the following:

Kevin Case
Jennifer Garver Ahlbrandt
Case Linden P.C.
2600 Grand Boulevard, Suite 300
Kansas City, Missouri  64108
(816) 979-1500/(816) 979-1501 FAX
kevin.case@caselinden.com
jennifer.ahlbrandt@caselinden.com
ATTORNEYS FOR DEFENDANTS

*/s/ Christopher J. Lucas*
Attorney for Plaintiff

{0234817.DOCX}