*BRANDON JOHNSON vs*

*CHEROKEE COUNTY BOARD OF COUNTY COMMISSIONERS, et al.*

---

*DEPOSITION OF BRANDON JOHNSON*

*May 30, 2019*

---

MCR METROPOLITAN COURT REPORTERS
COURT REPORTING + LEGAL VIDEO

mcr@metropolitanreporters.com
www.metropolitanreporters.com
913.317.8800 800.748.7511

OUT-OF-TOWN DEPOSITIONS?
WE'VE GOT YOU COVERED!

DEPOSPAN™
NETWORK OF LOCALLY-OWNED REPORTING AGENCIES

WWW.DEPOSPAN.COM

PLAINTIFF'S EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BRANDON JOHNSON,
Plaintiff,
vs. Case No.
CHEROKEE COUNTY BOARD OF COUNTY 2:17-cv-02644-
COMMISSIONERS and DAVID M. JAR-GEB
GROVES,
Defendants.

VIDEOTAPED DEPOSITION OF BRANDON JOHNSON, the Plaintiff, taken on behalf of the Defendants before Angela R. Corkill, CSR No. 1387, CCR No. 961, pursuant to Notice on the 30th day of May, 2019, at Norris Keplinger Hicks & Welder, LLC, 32 Corporate Woods, Suite 750, 9225 Indian Creek Parkway, Overland Park, Kansas.



APPEARANCES

APPEARING FOR THE PLAINTIFF:

Mr. Christopher J. Lucas
Norris Keplinger Hicks & Welder, LLC
32 Corporate Woods, Suite 750
9225 Indian Creek Parkway
Overland Park, Kansas 66210
913-663-2000
cjl@nkfirm.com

APPEARING FOR THE DEFENDANTS:

Mr. Kevin D. Case
Case Linden, PC
2600 Grand Boulevard, Suite 300
Kansas City, Missouri 64108
816-979-1500
kevin.case@caselinden.com

THE VIDEOGRAPHER:

Mr. Chris Wright



INDEX

WITNESS: PAGE
BRANDON JOHNSON
Examination by Mr. Case 5

EXHIBITS
(None.)



(Deposition commenced at 9:14 a.m.)

THE VIDEOGRAPHER: This is the videotaped deposition of Brandon Johnson, Case No. 2:17-cv-02644-JAR-GEB in the matter of Brandon Johnson versus Cherokee County Board of Commissioners and David M. Graves (sic). This deposition is being held at Norris Keplinger in Overland Park, Kansas, on May 30th, 2019.

My name is Chris Wright from Metropolitan Court Reporters. The reporter is Angie Corkill from Metropolitan. We're going on the record at 9:15 a.m.

Will counsel please state their appearances for the record.

MR. LUCAS: Christopher Lucas on behalf of plaintiff Brandon Johnson who appears in person.

MR. CASE: Kevin Case on behalf of the defendants, the Board of County Commissioners of Cherokee County, Kansas, and Sheriff David Groves.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness?

BRANDON JOHNSON,
being first duly sworn, testified under oath as follows:

EXAMINATION
BY MR. CASE:
Q. Tell us your name.
A. Brandon Johnson.
Q. Where do you live?
A. I live in Parsons, Kansas.
Q. And the street address there?
A. Street address is 22 Locust Drive.
Q. Who lives there with you, if anyone?
A. My five-year-old son Cayden lives with me.
Q. Mr. Johnson, are you presently employed?
A. Currently, no.
Q. Have you been employed since your separation from employment from the sheriff of Cherokee County, Kansas?
A. No.
Q. Have you earned income from any source after your last paycheck from Cherokee County, Kansas?
A. Yes.
Q. From what sources have you earned income since separating from employment from Cherokee County, Kansas?



A. Part time, a friend of mine owns a bar and do security there. It's about one Saturday a month source of income, and then I have a rental property, but it is currently not rented, has not been for about a year.
Q. Any other source of income after leaving Cherokee County's employment?
A. My parents do help.
Q. Any other source?
A. No.
MR. LUCAS: You're going to want to keep your voice up as well, if possible. You're doing fine.
Q. (By Mr. Case) So three sources of income after leaving Cherokee County: part-time position for a bar performing security; rental property; and your parents; true?
A. Yes.
Q. What is the name of the bar where you perform security?
A. Black Saddle Saloon.
Q. Located where?
A. In Caney, Kansas. C-A-N-E-Y, Kansas.
Q. And what income do you earn?
A. It's -- if there's a band, then it is



$100; if it's just normal just activity, then 70, 70 to 80.
Q. And what is the rental property that has been the source of income for you?
A. In the past it was 500 a month.
Q. Is this residential or commercial property?
A. It's residential.
Q. Located where?
A. The address of that is 2010 Appleton, A-P-P-L-E-T-O-N, Parsons, Kansas 67357.
Q. A single-family home?
A. Yes, sir.
Q. And then what is the amount of income you earn from your parents? And I say earn. That you receive from your parents.
A. They just help out whatever the bills would be.
Q. What are your living expenses on a monthly basis in a range?
A. Combined?
Q. Yes.
A. I'd say about -- about 500 a month, maybe a little over.
Q. That's housing, food, transportation



for you and your son?
A. Yes.
Q. Okay. Since separating from employment in Cherokee County, have you been actively seeking employment elsewhere?
A. Yes, several places.
Q. What is the criteria by which you are actively seeking employment?
A. I'm sorry?
Q. What is the criteria for a job that you're seeking? Let's first speak in terms of geographical location. What is the geographical location where you are seeking employment?
A. I am trying to stay around the southeast Kansas area. I can give you a range from about from Parsons. The furthest out was around 60 miles. That would be the radius, so within that 60-mile radius.
Q. And has that been true for your job search for the entire period of time since living Cherokee County?
A. No.
Q. How has the geographical location changed, if it has?
A. The furthest was Cushing, Oklahoma;



PLAINTIFF'S EXHIBIT 1

Page 9

Spring Hill, Kansas; and I'd say that's as far as it reached.
Q. So has your geographical range been reduced or expanded since your original search began?
A. It's starting to expand.
Q. Okay. But has it at its greatest point of expansion been 60 miles from Parsons?
MR. LUCAS: Object only to the extent it may call for speculation. If you know, you may answer.
A. Can you repeat that question, please?
Q. (By Mr. Case) Sure. At any point during your job search after your separation from employment at Cherokee County, what is the largest area that you have been looking? Let me maybe break it down this way. Are you looking outside the State of Kansas?
A. Yeah. I was trying to figure out the furthest. I believe Cushing is the furthest.
Q. Are you still looking at job opportunities in the State of Oklahoma?
A. Yes.
Q. Okay. Are you looking for job opportunities in the State of Missouri?
A. Yes.

Page 10

Q. Are you looking for job opportunities in the State of Kansas?
A. Yes.
Q. Would it be fair to say that you're looking in the location where those states generally intersect?
A. Yes.
Q. Okay. What is the largest community where you have sought employment by actually providing a job application?
A. The largest?
Q. Largest community in terms of population.
A. I don't know. I'm not quite sure of the population of Cushing. It possibly could be.
Q. Have you considered looking in Springfield, Missouri?
A. I believe I've talked to someone in Springfield, Missouri.
Q. Have you actually made any job application for a prospective employer in Springfield?
A. Not a paper application.
Q. Have you made a job application for a prospective employer in Pittsburg, Kansas?

Page 11

A. I have a couple of times, yes.
Q. Have you constrained your job search to a particular field?
A. No.
Q. Have you constrained your job search to a particular industry sector; for instance, retail, manufacturing, public service or something of that kind?
A. Not necessarily, no.
Q. Can you think of any way that you have constrained your job search based upon a certain type of position that you would not entertain if offered a job?
A. No.
MR. LUCAS: I'll object only to the extent that's overbroad, but you may answer.
A. No.
Q. (By Mr. Case) Have you been offered a position that you've applied for since your separation from employment in Cherokee County?
A. Not offered, no.
Q. Your last day of work at Cherokee County was in June of 2015; true?
A. Correct.
Q. Is it your testimony that you have

Page 12

never been able to find full-time employment based upon your job search since that time?
A. It has been difficult to find full-time employment since then.
Q. Have you found full-time employment that was offered to you that you declined to accept?
A. No.
Q. So let me ask that question again. You have never been able to find a full-time job since June of 2015; true?
A. True.
Q. Is there some constraint you have placed on your job search in terms of potential earnings?
A. No.
Q. Is that no?
A. No.
Q. Okay. So in other words, if you were offered a full-time job making minimum wage, you would accept it?
A. Depending on what it was.
Q. What are the factors that would weigh into your decision on whether to accept such a position?
A. At minimum wage?

Page 13

Q. Yes.
A. Location, what exactly you'd be doing. Would it be that far to get to driving, physical limitations. I mean, it would depend on what that job would be at minimum wage.
Q. Have you applied for minimum wage jobs since your separation of employment?
A. I can't recall from all the jobs that I've either inquired or put applications in that have been minimum wage.
Q. Have you been offered a minimum wage job that you have declined to accept?
A. No.
Q. Have you applied for job on a full-time basis in the retail sector?
A. Yes.
Q. Have you applied for full-time jobs in the manufacturing sector?
A. No.
Q. Have you applied for full-time jobs in the public sector?
A. Yes.
Q. Have you applied for full-time jobs in the transportation industry?
A. No.

Page 14

Q. Can you think of a full-time job that you have applied for that might fall within a different industrial sector other than what we've described as retail manufacturing, public or transportation?
A. Applied for?
Q. Yes, sir.
A. No.
Q. Do you have any physical restrictions that are either imposed by a practitioner of the healing arts or self-imposed that constrains your ability to perform a task such as a weight?
A. Self, no.
Q. Okay.
A. Doctor, at this time, no, not that I'm aware of.
Q. Have you had a doctor's restriction since leaving Cherokee County?
A. Yes.
Q. And what is the doctor's restriction that was imposed during this time period; time period being after leaving Cherokee County to the present day?
A. What doctor?
Q. The doctor you had in mind when you said there was a doctor's restriction.

Page 15

A. Well, my back doctor. You need the name? Do you need the name?
Q. Yes, please.
A. Okay. Well, the first one was Dr. Mellion, M-E-L-L-I-O-N, out of Wichita. I believe healing on that was about six weeks -- or six months. And the restrictions were -- I mean, no heavy lifting, no running, jogging, normal things that would mess up your back or potentially reinjure your back.
Doctor Do, D-O, and that's both Kansas City and Wichita, he did surgery on my right knee, right elbow. I'm sorry. Yeah, my right knee, right elbow. And those restrictions were -- at one point they were several months and it was no heavy lifting, those sorts of things. At that point it was whatever the restrictions were, limitations were for performing in law enforcement, so pulling a gun out or getting out of a vehicle or running and chasing down a suspect, those type of restrictions.
Q. So let's first talk about Dr. Mellion. What was the condition that led to your treatment with Dr. Mellion?
A. I had -- it was degenerative disc disease.

Page 16

Q. Okay.
A. Sciatica, herniated disc, and there's several underlying on that specific deal.
Q. That was not a traumatic event, but just degeneration over the passage of time?
MR. LUCAS: Object only to the extent that may call for medical opinion beyond his expertise, lack proper foundation. If you know, you may answer.
A. That was due to an injury.
Q. (By Mr. Case) Okay. And what injury?
A. An injury due to my back, in my back while on the job.
Q. At Cherokee County?
A. Correct.
Q. Is this the tasing --
A. Correct.
Q. -- circumstance? Okay. Okay. And when was that course of treatment concluded? Was that in '15, '16, or is it ongoing?
A. With Dr. Mellion, that ended I want to say mid to late 2016.
Q. Okay. Does Dr. Mellion have a present work restriction that you believe limits your ability

to find replacement employment?
A. No.
Q. Has Dr. Mellion's treatment of you caused you to impose your own constraints on your job search?
A. No.
Q. Okay. Doctor Do, let's turn to that circumstance. Right knee, right elbow, was that treatment for something that you believe was work related?
A. It was.
Q. Okay. And what event or events is the basis for the right knee, right elbow treatment?
A. Same.
Q. Same thing, okay. And have those conditions resolved in your mind?
A. Yes.
Q. Okay. Is there anything about Dr. Do's treatment that causes you to put a constraint on your job search presently?
A. Myself, no.
Q. Okay. Did Dr. Do give you some type of permanent work restriction that you are following arising out of his treatment of the right knee and right elbow conditions?



A. Restriction, no.
Q. Okay. Some other constraint?
A. He's put disability as far as I guess what percentage that you lost -- or I lost in my knee and elbow.
Q. So he gave you a work comp rating, if you know?
A. No, it wasn't a rating. It was a disability percentage from my understanding. That's what was said.
Q. Okay. Does whatever you understand that to be cause you to constrain your job search in any way?
A. After speaking with him?
Q. At any time.
A. No. After what he told me, he said it wouldn't impair me too much, no.
Q. Okay. Does his statement that it would not impair you too much cause you to limit the types of jobs that you are seeking since your separation from employment at Cherokee County?
A. No.
Q. Okay. That's no?
A. No. Sorry.
Q. Your voice tends to --



A. I'm sorry.
Q. -- tail off. So to be clear, there is no constraint that a physician has placed upon you which you are following which has limited your job search since 2016; true?
A. No.
Q. Not true?
A. No. The second doctor after the tasing incident on my back was a Dr. Hsu, S-U-E.
Q. Doctor Hsu?
A. Yeah. I believe it's S-U, S-U, Dr. Hsu. He was at Coffeyville Regional Medical Center. He is now in Tulsa, I believe.
Q. And did Dr. Hsu put a work restriction on you?
A. After the surgery -- well, since he moved I was unable to get a follow-up, so I'm going to have to find a new back doctor.
Q. I didn't ask you that. I'm asking you whether Dr. Hsu placed a work restriction on you.
A. Well, last I met him, then, yes.
Q. Okay. And what is the work restriction that Dr. Hsu placed upon you?
A. It wasn't lifting over 25 pounds.
Q. And how long did that work restriction



endure?
A. I don't know. I haven't been able to see him for him to lift that specific restriction.
Q. Okay. So same question. Is anything that Dr. Hsu imposed upon you by way of a work restriction limiting your own personal job search?
A. It's not currently, no.
Q. So you have not limited your job search to jobs where you will not have to limit -- or not have to lift more than 25 pounds; true?
A. No. But you asked me what my current restrictions were from a doctor that I have not yet seen again because he moved, so that was the answer to your question. I have not been able to follow up with that doctor.
Q. Well, my question is a little bit different.
A. Okay.
Q. I'm asking whether you have yourself subjectively constrained your job search in accordance with any doctor's work restrictions.
A. At this time, no.
Q. Was there a period of time that you did constrain your job search because of any doctor's restriction?

Page 21

A. Yes.
Q. Okay. And what period of time did you impose that constraint upon your job search?
A. Following the restrictions it would have been November, November of '18 up until April of this year for that incident or that surgery.
Q. So is it your testimony that between June of 2015 and April of 2019, that you have limited your job search because of a physical condition?
MR. LUCAS: Object to the form. Misstates the record and his testimony. You may answer.
A. I was healing, yes.
Q. (By Mr. Case) Is there any other reason why you have limited your job search, if you have, from June of 2015 through April of 2019, other than healing from treatments for your back, knee, or elbow?
A. No.
Q. Did you make any applications for employment in calendar year 2015 after you left the employment of Cherokee County?
A. Yes.
Q. In 2016?
A. Yes.

Page 22

Q. 2017?
A. Yes.
Q. 2018?
A. Yes.
Q. This year?
A. One has not completed yet, so I guess, no. No.
Q. How many job applications did you provide to prospective employers in 2015?
A. Two.
Q. How many job applications did you apply -- provide to prospective employers in 2016?
A. I know I can think of one.
Q. Same question calendar year 2017, how many job applications did you provide to employers in 2017?
A. Honestly, without calling or contacting the agencies that either I inquired or called, I couldn't tell you exact dates on those. If you'd like me to guess, I can give you an answer.
MR. LUCAS: Well --
Q. (By Mr. Case) Well --
MR. LUCAS: If you don't know, you don't know.
A. Then I don't know.

Page 23

Q. (By Mr. Case) Do you know whether you provided any job applications to employers in 2017?
A. I don't know.
Q. Did you provide any job applications to employers in 2018?
A. Yes.
Q. How many?
A. Off the top of my head I can think of four.
Q. Who did you provide job applications to in 2018?
A. To be honest, the ones I can think of right now, Parsons P.D., Altamont, Columbus, and then there was -- in '18 there was -- well, it was formerly Green Country Auto Group. I believe it's -- I believe it's Tim Davis now, Chevrolet. Or Tom Davis, I'm sorry.
Q. Tom Davis Chevrolet?
A. I believe it's Tom Davis.
Q. Okay. Who was the first person you made -- or first organization you made application to for employment after your separation from employment at Cherokee County?
A. Columbus.
Q. What position were you applying for?

Page 24

A. One time -- well, two times it was -- the first one was patrol sergeant and then the second was just ordinary patrol.
Q. And that was in 2015?
A. Yes, that was in '15.
Q. Okay. Were you interviewed for either of those positions?
A. Yes.
Q. Were you --
A. The patrol sergeant, yes.
Q. You were interviewed for the patrol sergeant position?
A. Correct, yes.
Q. And not just the regular patrol position?
A. No.
Q. Did I get that right?
A. Yes.
Q. Okay. Who did you interview with?
A. It was a board with their commissioners, the city's commissioners.
Q. Okay. Their personnel committee?
A. Yes.
Q. Okay. And were you offered a position?

A. No.
Q. What was the second organization you applied for a job from after Columbus, City of Columbus?
A. The second organization?
Q. Yeah. Who else? Who was next?
A. In '15?
Q. Yes.
A. That was in '15. Yeah, that was in '15.
Q. You told me that you had made two applications for employers in 2015?
A. Mm-hmm.
Q. Are you telling me that both of those were to the City of Columbus?
A. Yes.
Q. Okay. One was for the patrol sergeant position and one was for the patrol position?
A. Yes.
Q. And you were granted an interview for the patrol sergeant position, but not for the patrol position?
A. Correct.
Q. Did the patrol sergeant position, was that sequentially first?



A. Yes.
Q. What was the employer who came to mind when you identified that you had made application for employment to one employer in 2016?
A. Predominantly it was Columbus again.
Q. Okay. Was it another patrol position?
A. That position was a lieutenant's position.
Q. When you made applications to the City of Columbus in 2015 and in 2016, were you able to perform the essential functions of the job description as you understood them?
A. At that time I applied, yes.
Q. Okay. Can you think of the next employer that you applied for a job from after the City of Columbus positions sequentially?
A. No, not sequentially, no.
Q. Okay. We do know that you have applied in Parsons, Altamont, and with the Green County (sic) Auto Group; correct?
A. Yes.
Q. Were you granted interviews for any of those positions?
A. I had a brief interview with Green Country Tom Davis Auto Group.



Q. What was the position you were applying for?
A. Salesman.
Q. Okay. Were you offered a position?
A. No.
Q. Did you get an interview at Parsons --
A. No.
Q. -- when you made an application?
A. No.
Q. Altamont?
A. No.
Q. And then at any other time with the City of Columbus?
A. No. Total of two there.
Q. Have you put in a job application for a prospective employer who comes to mind that we haven't discussed?
A. Have I put in a job application to someone else? I believe Baxter Springs an application was placed in.
Q. City of Baxter Springs?
A. City of Baxter Springs, Kansas.
Q. What type of position?
A. Patrolman.
Q. And can you think in which year you



would have provided that information?
A. I sure don't know. I'm sorry, I was trying to provide you with the most accurate.
Q. When you made application for the Baxter Springs patrolman position, were you at that point able to perform the essential functions of the job as you understood it?
A. At that time, yes.
Q. Was there a period of time between 2015 and the present day where you stopped seeking work because of a physical condition that you had?
A. Yes.
Q. What periods of time did you stop seeking work?
A. Specific times I don't know. I would have to go back and look at the -- when I had surgery up until the day my restrictions stopped.
Q. Did you have more than one surgery?
A. Yes.
Q. How many surgeries did you have?
A. Total, my back was twice, right elbow, right knee, and most recently was my bicep tear.
Q. You pointed to your left when you said that. Was it your left --
A. I'm sorry, my left, yeah. I had both

Page 29

of them torn. Well, my right, my right.
Q. I'm sorry?
A. My right and my left.
Q. Two back surgeries?
A. Mm-hmm.
Q. One surgery on your right elbow?
A. Yep, yes.
Q. One surgery on your right knee?
A. Yes.
Q. A left bicep tear?
A. Yes.
Q. And a right bicep tear?
A. Yes.
Q. Any other surgeries?
A. The back.
Q. We talked about the back.
A. Oh, you did mention two back?
Q. Yeah. Back, two surgeries?
A. Yes.
Q. Yes?
A. Yes.
Q. Right elbow one time?
A. Yes.
Q. Right knee one time?
A. Yes.

Page 30

Q. Left bicep tear?
A. Yes.
Q. Right bicep tear?
A. That's all, yes.
Q. And are all of those in your estimation work-related surgeries?
A. All of them, no.
Q. Were the bicep tears work related in your mind?
A. Work related? I mean, they came due to my impairment. I would believe so.
Q. That's all I'm asking. Are the other -- the two back surgeries, the right elbow, right knee, do you consider those having been work related as well?
A. They were work related.
Q. When were you first diagnosed with a bicep tear in either the right or left side?
A. Those came right after surgeries, actually both back surgeries. So as I was healing from both back surgeries they tore.
Q. Okay.
A. So my first with Dr. Mellion my right one tore; the second back surgery, Dr. Hsu, left one tore. Back surgery November, this tore January.

Page 31

Q. I'd like to try to nail down more specifically in which order the surgeries came.
A. Okay.
Q. What was the first work-related surgery? Was it a back surgery?
A. No.
Q. What was first?
A. First was the knee, right knee.
Q. Okay. What was second?
A. The right elbow.
Q. What was third?
A. The microdiscectomy laminectomy, back.
Q. One of the back surgeries was next?
A. One of the back, yes.
Q. Okay. And was the other back surgery the next?
A. No. After that back surgery, that first back surgery, that's when my right bicep tear happened.
Q. Okay.
A. Months after.
Q. And then what was the next surgery?
A. It would have been --
Q. It's either another back surgery or the left bicep.

Page 32

A. Yeah. It was my back and then my bicep, my other bicep. It happened I think two months apart, about a month and a half apart.
Q. Do you know in which calendar year your right knee surgery occurred?
A. I do not know, no.
Q. Do you know when your right elbow surgery occurred?
A. That was in calendar year '16.
Q. Okay. How about your first back surgery?
A. I believe that was '17.
Q. How about the right bicep tear?
A. That was during the back.
Q. I'm sorry?
A. That was during my back, the year of my back.
Q. 2017?
A. Yes, sir.
Q. Okay. How about the second back surgery?
A. My second back surgery was last year.
Q. 2018; correct?
A. Yes, sir.
Q. And then the left bicep tear, what

Page 33

year was that?
A. That was actually '19.
Q. This year?
A. Yes, sir.
Q. Okay. You made mention when we were talking about Dr. Hsu that you weren't sure whether the lifting restrictions were still in place. Did I understand that correctly?
A. No. It was the impairment rating, I guess.
Q. Okay. And I think maybe that's where I got lost. My fault. Do you believe that in 2018 you had a work restriction in place from any of your doctors?
A. I don't know.
Q. Okay. Have you from 2018 to the present day constrained your job search because you believe you have a work restriction?
A. No.
Q. Okay. Did you in 2017 believe you had a job restriction that limited your job search?
A. The whole year?
Q. Any point.
A. At any point, yes.
MR. LUCAS: That was 2 -- 2017?

Page 34

MR. CASE: Yes.
Q. (By Mr. Case) And at what part of the year did you limit your job search because of a work restriction?
A. I'd have to see when my surgeries were. I don't remember the dates of my surgeries, so it was during that time.
Q. Okay. Why no job applications to prospective employers in 2019?
A. Healing from my back from the surgery in November.
Q. So you are unable to make job applications because of your recovery from your back surgery?
A. No. Not unable to, but I have not applied.
Q. Okay. What about recovering from your back surgery precludes you from making job applications?
A. Nothing.
Q. Has anyone in the medical field told you that you should not make out job applications because of the recovery from your back surgery?
A. During my first visits in -- well, when I was having my visits with Dr. Hsu, yes.

Page 35

Q. You're telling us that Dr. Hsu advised you that you should not make job applications --
A. Oh, no.
Q. -- to employers?
A. I'm sorry, no. I was thinking of restrictions. I apologize.
Q. So is there a doctor who you will identify for me who has told you that you should not make job applications while you are recovering from your surgeries?
A. I don't know of any who would say that.
Q. Okay. And so can you tell us any other reason, other than what you have already described, why you have not made job applications from January 1st of 2019, to May 30th of 2019?
A. The application currently that I'm filling out is the Parsons P.D. application. Again, from my surgery in November I currently was on the restrictions. I have not followed up. He's since moved. But also this is the election year and another individual and I were talking about county commissioner or county sheriff, running for. That's not -- I can't fill out an application. I can only submit the -- whatever paper that is.

Page 36

Q. Filing fee?
A. Yeah.
Q. And things of that kind?
A. Yes.
Q. Okay. So if I understand, you are considering potentially running for public office yourself?
A. Yes.
Q. In which county?
A. Labette.
Q. Okay. And which position would you consider seeking? Sheriff?
A. Sheriff, and then my district in -- the commissioner, county commissioner.
Q. Okay. So you presently are considering maybe running for Labette County Commission and/or for the office of Labette County Sheriff?
A. Correct.
Q. Okay. Has that influenced in any way the manner by which you have sought other employment in this calendar year?
A. Influenced?
Q. Yes.
A. I would not say influenced, but it has

stalled it, yes.
Q. Okay. And describe to us why your consideration of these political positions has stalled your job search elsewhere.
A. I guess, for example, if I were to apply somewhere and get offered the position and take it, that employer I guess would know it would only be temporary. I really wouldn't want to do that to someone.
So as of now I have one application since the surgery that I'm getting ready to turn in. And six months was in roughly May, about the first or mid part of May, six months after my major back surgery, so that would have been from my understanding since I hadn't had a follow-up when it would be safe. So I've gone ahead and put applications -- have applications at Parsons and then, of course, considered running.
Q. You use the term "be safe". Are you telling us that it was not safe for you in calendar year 2018 to make an application for employment with employers?
A. I did not say that, no.
Q. Okay. What did you mean about being safe as you used that term referencing the six-month



period?
A. Referencing the last visit with Dr. Do into my back.
Q. And what did you mean by that?
A. From my understanding, having screws and rods in your vertebrae you may not even want to attempt any sorts of job for a six-month period after that, that specific surgery.
Q. Were you restricted by your doctor from a job search --
A. No.
Q. -- because of your surgery?
A. No.
Q. So did you limit yourself in a job search because of your surgery?
A. No.
Q. So is there any other reason why you've only made one job application in 2019, other than what you've described?
A. No.
Q. Are there positions that you have considered that are outside of law enforcement, other than the Green County Auto Group position and the board of county commission position in Labette County?



A. Private contracting. It's -- there is a pipeline industry that I've talked to an individual who works with a company. I've -- I've looked around.
Q. Who is the individual who you made mention who might be considering running for public office that you referred to earlier?
A. I -- does that have to be answered?
Q. It does.
A. His name is former sheriff Bobby Sims.
Q. Former sheriff of Labette County?
A. Mm-hmm.
Q. That's yes?
A. Yes.
Q. Okay. Why did you hesitate?
A. There's controversy there between him and the current sheriff and deputies.
Q. In Labette County?
A. Yeah. It just -- I guess to protect him. It's not a well known. He's behind it helping to avoid conflict.
Q. So he's seeking to unseat the current sheriff?
MR. LUCAS: Object only to the extent that may call for speculation. You may answer, if



you understand or know.
A. I don't know what his motives or intentions are.
Q. (By Mr. Case) Okay.
A. Other than to help me.
Q. He's an ally of yours?
A. Yes.
MR. LUCAS: Object.
Q. (By Mr. Case) What's the pipeline industry individual you were mentioning?
A. What is it?
Q. You said you were talking to someone.
A. Or who, who is it?
Q. Well, I'll take the pipeline company and the individual.
A. I couldn't tell you. All I know is he told me exactly what the job entails and who, who it was, I couldn't tell you. I briefly spoke to him.
Q. Okay.
A. He was a friend of Ed's who owns the bar and that's where I talked to him.
Q. Okay. Have you, Mr. Johnson, at any time between 2015 and the present day enlisted the professional services of a job placement organization to assist you in your job search?

Page 41

A. No, but I -- there is some -- there is some company in Independence that does have me in their system and I do believe it's for job searching.
Q. Who is that?
A. I really wish I could remember their name.
Q. How did they come to have your information?
A. I'm not sure. That happened years ago whenever I put my name in somewhere for something.
Q. In the period of time of June of 2015 to the present day --
A. I'm sorry, I didn't mean to interrupt. I wanted to answer your question. I remembered. It was through Montgomery County Sheriff's Office. They went through a job -- I guess a job program or a job placement program and in order for them to pull out -- that's where they pulled applications from, so that's -- I'm sorry, that's where that was.
Q. My question is focused on any efforts that you have undertaken with a job placement organization. Can you think of any job placement organization where you have affirmatively made contact seeking its assistance in finding employment?
A. No.

Page 42

Q. Have you sought the assistance of a recruiting organization or individual to help find a position for you during that same time period of June 2015 to the present day?
A. No.
Q. Is there any reason why you have not enlisted the services of a job placement organization or a professional recruiter to help you in your job search?
A. I honestly never thought of a job recruiter. I don't even know where one of those are. In rural Kansas they may have them. I don't know.
Q. Have you sought any of the services that are offered by the Kansas Department of Labor to assist you in your job search?
A. Have I considered?
Q. No. Have you actually enlisted the services that may be available from the Kansas Department of Labor for a job search?
MR. LUCAS: I'll object to the extent that may lack foundation and assume facts not properly in evidence. You may answer, if you understand.
A. I'm not sure if that's what that place is with Montgomery County Sheriff's Office.

Page 43

Q. (By Mr. Case) Well, you have learned that the Montgomery County Sheriff's Office at some point had data about you; correct?
A. Yes.
Q. I'm asking a different question. I'm asking from June of 2015 through the present day whether you have sought out any of the services that are offered by the Kansas Department of Labor to help you in your job search?
A. No.
MR. LUCAS: Same prior objection.
Q. (By Mr. Case) Okay. Have you consulted with any county resources in Labette County, Cherokee County, or Crawford County to see whether those counties have job search resources that might be deployed for your benefit?
A. I was unaware of any sort of resources like that, whether it be recruiting or anything that you had mentioned previously. I've always done the recruiting myself.
Q. And how did you formulate your approach to finding your next job?
A. I basically tried to stay within what I was trained to do, which was law enforcement, so I've called as many people as I could within that

Page 44

certain area. Then when it got a little difficult, I then started to branch out in other areas and tried to find somewhere within, of course, my limitations as far as healing aspect of it goes.
Q. Anything else that you did that would more completely describe your formulation for finding your next job?
A. Other than self-recruiting, no.
Q. All right.
MR. CASE: I think we've been going at this about an hour. Can we take a quick break?
MR. LUCAS: We have and yes.
THE VIDEOGRAPHER: We're off the record at 10:19 a.m.
(Recess.)
THE VIDEOGRAPHER: Back on the record at 10:30 a.m.
Q. (By Mr. Case) Mr. Johnson, I've placed before you Exhibit 8 which was identified yesterday as your employment application for the Cherokee County Sheriff's Office. Do you agree that that's what that is?
A. Yes, sir.
Q. I'd like to use that as a reference point for some questions. Turn, if you would, to in

Page 45

the bottom right-hand corner page 107 of that exhibit. Are you with me?
A. Yes, sir.
Q. It says you attended grammar school in Parsons and Parsons High School; correct?
A. Yes.
Q. Where were you born?
A. Parsons.
Q. And lived your whole life there?
A. Yes.
Q. Any members of your family in law enforcement?
A. No.
Q. According to your application you started school at Labette County Community College, but did not graduate; true?
A. Correct.
Q. Why not?
A. In the year of '01, late of '01, I guess you could say I was recruited from one of the instructors who was a detective at Parsons at the time. So I went into law enforcement as opposed to finishing school.
Q. What were you studying at Labette County?

Page 46

A. Criminal justice.
Q. Okay. So could you not have continued your education and then gone into law enforcement?
A. I could have, yes.
Q. Okay. You elected though to go straight to the academy?
A. I was convinced to -- well, in the State of Kansas you have to get a job, then they send you off to the academy. So I elected to get the job early, yes.
Q. And what job did you elect to get?
A. That was Parsons Police Department.
Q. Okay. It says that you started there earning $16 an hour; true?
A. Yes. That's what it says here, yes.
Q. Is that true?
A. That's about right. I do not know the exact wage.
Q. I guess what I want to ask is on this same page it says your employer as the Parsons Police Department. Is that where you went after leaving Labette County Community College?
A. Yes.
Q. You went to start work at the Parsons Police Department?

Page 47

A. Yes.
Q. And it says you were employed August 21st of 2007?
A. Oh, I'm sorry. You're talking about No. 3 in the employment?
Q. Yes, sir.
A. Okay. I'm sorry, no. That actually was the second time I had worked at Parsons Police Department.
Q. Okay. So that's what I want to try to --
A. Sorry.
Q. -- understand.
A. Yeah.
Q. When did you leave Labette County Community College?
A. End of the school year in '01.
Q. Okay. That would have been May of '01?
A. Around May of '01.
Q. Okay. And you would have reenrolled in the summer or fall?
A. Correct.
Q. But you elected to work at the Parsons Police Department instead?

Page 48

A. Correct.
Q. Okay. What position did you assume at the Parsons Police Department rather than going back to Labette County?
A. Patrolman.
Q. And that was in what month of which year?
A. It was in August of '02.
Q. So instead of going back to Labette County after concluding the semester in May of '01, you then started work at the Parsons Police Department in 2002?
A. Yes.
Q. Okay. What did you do between May of '01 until you started with Parsons Police Department in 2002?
A. That was during summer break. I was on summer break.
Q. Were you --
A. In between that gap.
Q. Did you go back to Labette County in the fall of 2001?
A. The whole year of '01 I was in Labette County graduating -- or I'm sorry, the end of the school year in May. My dates are all messed up.



PLAINTIFF'S EXHIBIT 1

Q. Yeah. I'm trying to understand --
A. Yeah.
Q. -- the gap.
A. This is --
MR. LUCAS: When you say this --
A. Or I'm sorry. In line No. 3 in reference to Parsons Police Department as previous job employments, this is the second time I had worked at the Parsons Police Department.
Q. (By Mr. Case) So let me ask you this.
A. Yes.
Q. Is it true that the last time you were enrolled in the Labette County Community College was a semester that ended in May of 2001?
A. Yes.
Q. And then you were on summer break in 2001; correct?
A. Yes.
Q. And then what were you doing in the fall of 2001 after summer break concluded?
A. In '01 I was still in that school year. It had to have been still in that school year because the instructor was the lieutenant and that's -- in August is when we went, so summer break was when --



Q. Do you know?
A. Well, no. I don't remember exactly the dates. I can tell you I went through the full school year and then in '02 is when I started in Parsons.
Q. In what month did you start your first positions with the Parsons Police Department?
A. I graduated the academy in October. I want to say it was August of '02. Yeah, August of '02.
MR. LUCAS: Can we go off the record for just 30 seconds?
MR. CASE: Sure.
THE VIDEOGRAPHER: We're off the record at 10:38 a.m.
(Off the record.)
THE VIDEOGRAPHER: Back on the record at 10:39 a.m.
Q. (By Mr. Case) I'm going to back up a little bit, maybe we can get started another way.
A. Yes.
Q. What year did you graduate from high school?
A. 2000.
Q. Graduated from high school in 2000.



And did you graduate in May 2000?
A. It was May, yes, of 2000.
Q. And did you enroll in Labette County Community College for the very next fall semester?
A. No.
Q. Okay.
A. One year I was -- I waited one year and then enrolled.
Q. What did you do in that one year after high school before enrolling at Labette County?
A. It was summer break and I believe I had a part-time job.
Q. Doing what?
A. I was trying to remember. I believe it was some factory in Parsons. It was brief.
Q. So when did you -- do you know what type of work you were doing?
A. They were like a weld, welding company. They did the -- whatever they use in the roads before they start to lay the pavement.
Q. Okay. How long did you work there?
A. It was brief, maybe a month or so.
Q. Okay. And that was after summer break?
A. Yes.



Q. And then when did you first enroll in Labette County Community College?
A. It was that -- that year. I'm assuming it was '02, '02 school year for that school full year.
Q. Well, I'm still in the year 2000, the year you graduated from high school.
A. Mm-hmm.
Q. Okay? So if you graduated from high school in May, had a summer break in 2000 and then went to work for the factory in the fall of 2000, when did you first enroll in Labette County? Was it 2001 or 2002?
A. It had to have been '02.
Q. So what did you do in the calendar year 2001?
A. I don't recall.
Q. Were you employed in any position?
A. I don't recall what job, if any, I had during that break right after school.
Q. So if you graduated in 2000, you're not sure what happened in 2001, but it was in 2002 that you started at Labette County Community College; is that right?
A. Yes.



PLAINTIFF'S EXHIBIT 1

Q. Okay. Where did you live in 2001? Were you living with your parents?
A. Yes.
Q. When did you stop living with your parents?
A. Would a year be okay?
Q. Yeah.
A. I would probably say in '03.
Q. So if you enrolled in Labette County Community College in 2002, how many semesters were you there?
A. Two semesters.
Q. Okay. And it was in your second semester that you've testified that you were recruited for a position at the Parsons Police Department; true?
A. Correct.
Q. Who was the person who recruited you?
A. His name is -- well, at that time Lieutenant Scott Goforth, G-O-F-O-R-T-H, Parsons Police Department.
Q. And when you left Labette County Community College, what was the next endeavor you undertook? Was it going directly to the Parsons Police Department, was it to the academy, or



something else?
A. After I had left it was right to Parsons P.D.
Q. And would that have been in 2002?
A. Yes.
Q. Okay. So by the time you are hired by the Parsons Police Department you have not entered the academy; true?
A. No, I had not entered the academy.
Q. Okay. So you are first an employee of the Parsons Police Department in 2002. How soon after becoming an employee of the Parsons Police Department do you go to the Kansas Law Enforcement Training Center?
A. I was only there for two weeks and I got shipped off, so, yeah, it was August, September, October because I graduated in October of '02.
Q. Kansas Law Enforcement Training Academy is in Hutchinson?
A. Yoder, Kansas.
Q. Okay.
A. They call it Hutchinson, yeah, but it's a small town of Yoder.
Q. Reno County?
A. Yes.



Q. Okay. I'm giving it more credit maybe than I should.
A. Yes, sir.
Q. How long were you at the training academy?
A. I was the last nine-week class, 171 basic.
Q. Nine weeks, okay. So you graduated in October of 2002?
A. Yes, sir.
Q. How did you do?
A. Well, from the way they did their testing I could have failed my final and still passed. So each week they had a test, or a final, and that percentage up until your final final indicated where you were during how they did their testing.
Q. Did you have a class rank?
A. No, not at that time.
Q. Did you graduate with honors?
A. No.
Q. After the nine weeks at Kansas Law Enforcement Training Academy you returned to Parsons; correct?
A. Yes, sir.



Q. Have you ever lived in a place that is not Parsons, Kansas?
A. No.
Q. Other than the nine weeks in Yoder?
A. Other than the nine weeks in Yoder.
Q. Okay. So is it true that when you commenced your work as a graduate of law enforcement training academy in the Parsons Police Department, that was in calendar year 2003?
A. When I graduated?
Q. Yes.
A. Yoder?
Q. Yes.
A. Or I'm sorry, Kansas. When I graduated it was '02, October of '02.
Q. October of '02?
A. Mm-hmm.
Q. And then you returned immediately to Parsons --
A. Yes.
Q. -- to begin your work at the police department there?
A. Yes, sir.
Q. Okay. How long were you at the Parsons Police Department upon your graduation from



PLAINTIFF'S EXHIBIT 1

the Kansas law enforcement training?
A. It was in 2005, I want to say -- I want to say it was August of 2005.
Q. So from October of 2002 until August of 2005?
A. Yes.
Q. Yes?
A. Yes.
Q. Okay. And what was your position during that entire tenure?
A. From '02 to '04, patrolman; '04 to '05 was senior, senior patrolman.
Q. Why did you leave the employment of the Parsons Police Department in August of '05?
A. I resigned due to a racial situation that was there with a Corporal Fausnaught.
MR. LUCAS: Might want to spell that.
A. F-A-U-S-N-U-G-H-T (sic).
Q. (By Mr. Case) Where did you go after the Parsons Police Department resignation?
A. I worked in Erie, E-R-I-E, Erie, Kansas P.D. I'm sorry.
Q. And when did you commence working at the Erie, Kansas Police Department?
A. I don't recall the exact date. It was



several months after resignation of Parsons and that was technically a part-time/full-time job.
Q. Was it in the same year that you resigned, 2005?
A. I believe so.
Q. Okay. So the position you assumed in the Erie, Kansas Police Department was a part-time/full-time patrol position?
A. Correct.
Q. Okay. How long were you there?
A. About a year.
Q. Why did you leave the Erie, Kansas Police Department?
A. It was a very small town. I sought other employment at Coffeyville, Coffeyville Police Department.
Q. So you voluntarily resigned?
A. In Erie?
Q. Yes.
A. Yes.
Q. Who was --
A. They wanted me to -- go ahead. I'm sorry.
Q. Who was your supervisor on the Erie, Kansas Police Department?



A. Chief Dean Kane, D-E-A-N, K-A-N-E.
Q. What did you mean when you said it was a very small town when I asked you why you left?
A. I worked midnights, 12-hour midnights in a town of 1,100 people and -- I mean, I could probably count on one hand how many calls I've had in a year.
Q. You were bored?
A. A little bit, yeah.
Q. Any other reason?
A. No.
Q. When did you leave Erie, Kansas Police Department? Was that in 2006?
A. It had to have been close to there because in '07, '07 I went to Coffeyville. I'm sorry, '06.
Q. '06 you went to Coffeyville?
A. August, August '06.
Q. And what employment did you obtain in Coffeyville in '06?
A. That same, police department patrolman.
Q. How long were you there?
A. From August to August of '07.
Q. Why did you leave in August of '07?



A. We had a flood and it was July in Coffeyville and Coffeyville required a residency requirement and during that time I had to move. The flood had wiped out a lot of the buildings. I'm sorry, houses. So that left me with a little above my pay grade and I had no choice but to come back to Parsons.
Q. And you came back to the Parsons Police Department as a patrolman?
A. Yes, sir.
Q. In what month?
A. I resigned August 18 of '07, and I think that next weekend -- yeah. That Friday I resigned and that Monday I started back in Parsons.
Q. So August of '07?
A. Yes, sir, August of '07.
Q. How long were you at the Parsons Police Department as a patrolman until your position changed or you left?
A. That was August -- or I'm sorry. March of '09.
Q. What happened in March of '09?
A. There was a personal situation as far as -- that was involving me and a report on a suspect and I didn't agree with the upper administration and



PLAINTIFF'S EXHIBIT 1

how they handled it. And there was a disconnect between the upper administration and the lieutenant that -- that they cast it aside, to be completely honest with you. They did do that. And given the limited information he had, I made a choice to go and resign and not deal with it.
Q. Were you going to be fired if you did not resign?
A. No.
Q. Did you resign in protest over something?
A. No.
Q. What was the personal situation involving you and a report on a suspect? What did you mean by that?
A. It was a call. The report that I had gave them I admit could have had a lot -- could have been written different, I guess, a little bit more detail. And someone, I don't know who, had an issue with it. I went the proper steps of dealing with it as far as my immediate supervisor who was Sergeant Brandon Stout. He knew what happened. He basically was there to, you know, this is what happened. We went through the taser instructors. We went through everyone that was involved in -- or who could have



been involved and basically they, the upper administration, just felt different. I don't know. I just didn't want to deal with it.
Q. You've teased me with some details.
A. Sure, yeah.
Q. What was the call?
A. It was a reckless driver. I was going towards a bar and the person almost hit me. There was a car chase. I began to chase the suspect around Parsons. That individual was not from there, from Parsons, so he did not know where to go. He ended up going down a back alley and he -- that alley had a dead end.
So at that point he stopped the vehicle, got out, ran towards another building. He was in fight or flight mode. After the car chase, it was a foot chase. He backed hisself up against the -- a building and at that point it was no more flight, he turned around to fight. So at that point I told him to get on the ground, there was going to be a taser, and he did not do so. And at that point had an aggressive move towards me. I deployed the taser.
Q. Okay. You said the report you gave them someone had an issue with. What do you mean by



that?
A. That's from my understanding what happened, how the whole controversy between me and them happened was somebody took either note or -- I don't know. That's just from my understanding of what happened.
Q. You believe someone in police management --
A. No, no. It was another officer.
Q. Okay. So there was some type of issue with regard to your use of a taser in someone's mind?
A. No. Well, yeah, I guess, from reading the report.
Q. Okay. There was a report written about this event?
A. My report reflecting the call in general, not just the event.
Q. Were you disciplined in some way because of your conduct in responding to this call?
A. No.
Q. But you said you didn't want to deal with it and so you resigned?
A. Yes.
Q. What didn't you --
A. Oh, I'm sorry.



Q. -- want to deal with?
A. There was -- when the initial complaint came in, I guess whoever took whatever about the report happened, there was an investigation and during that investigation there was a suspension and I was placed on administrative suspension. So that was so they could go through everything.
And like I said, during that time the disconnect with their lieutenant and them, he couldn't give me any information. And so I said, Well, I've given you guys all this information. You have your internal guys basically saying there was nothing wrong with anything that had happened, etcetera, so on.
I couldn't tell you what they thought or felt. I just knew that they didn't treat me like I, you know, didn't do anything wrong. They treated me as I was guilty. So I said, Okay, well, if that's the case, here's all the information along with your internal people, and then I resigned.
Q. Did you resign while you were administratively suspended?
A. I believe so.
Q. What was the complaint that was made that was being investigated while you were



PLAINTIFF'S EXHIBIT 1

administratively suspended?
A. It had to have been the use of taser.
Q. Was it an excessive force claim?
A. No. Just the deployment of the taser.
Q. The manner in which you deployed it?
A. Apparently. I guess so.
Q. What's your understanding of what the complaint was?
A. That.
Q. And --
A. Because the suspect actually said he deserved it. I mean, I don't know exactly what had happened and what exactly was the complaint. I mean --
Q. Do you who the complaining party was?
A. For sure, no. From my understanding it was Sherri McGuire.
Q. And who was Sherri McGuire related to this event?
A. She was I believe a corporal on another shift.
Q. Was she present when you deployed your taser?
A. No.
Q. What is your understanding about this



corporal's complaint?
MR. LUCAS: Object only to the extent it's calling for spec -- well, never mind.
A. There -- I'm assuming, without talking to her and knowing anything of what she thought, I don't know, assuming maybe what the details in the report should have stated or should have been added so it made an incomplete picture of what happened.
Q. (By Mr. Case) Okay. So you believe she was complaining about your report of the event?
MR. LUCAS: Object to the extent it calls for speculation.
Q. (By Mr. Case) If you know.
A. I think it was more of a personal issue she tried to take part of, tried to pick it apart.
Q. Okay.
A. Because like I said, my supervisor, who was a sergeant, actually had no issues and was there shortly after everything took place, so...
Q. So why did you resign?
A. That was pretty unfair. The way they handled it was pretty unfair.
Q. You were treated unfairly?
A. Yes, that was pretty unfair.



Q. Upon what basis you were treated unfairly? Did you think your race was a factor?
A. Well, after the new administration had kicked over during my second time there, it was Goforth, who was the deputy chief, and Keele, John Keele as a chief. Goforth was a person of, Try me, you know, I dare you to, or that type of individual. Just respect my authority, period, regardless if I'm right or wrong.
After trying to -- after my supervisor tried to explain it, the taser, everybody who had a part in it he just, you know, had his own two cents about it as opposed to ruin my career or anything like that, trying to talk him out of something he had his mind set to, it was best that I parted ways.
Q. Do you think your race was a basis of you being treated unfairly?
A. He didn't like black people.
Q. So the answer is yes?
A. What he thought I don't know. I'm not going to say one way or the other.
Q. You're saying Goforth did not like black people?
A. That's -- that's -- I don't know.
Q. I misheard you. Were you saying that



it was Goforth that you said did not like black people?
A. From my understanding he didn't.
Q. Okay. And so going back to my original question --
A. Yes.
Q. -- do you think you were treated unfairly because of your race?
A. No, no, I don't think so. I think it had everything to do with the fact that I was right and he was wrong.
Q. And what was Goforth's rank at that time?
A. His rank was deputy chief.
Q. And are you telling us that Deputy Chief Goforth was wrong and you were right?
A. Correct.
Q. Okay. And Deputy Goforth you have come to believe did not like black people?
A. I guess. Like I said, I'm not -- I'm not sure if he does or he doesn't, that's just -- that's the rumor.
Q. But he had treated you unfairly in this circumstance?
A. In that instance, in that situation.

Page 69

Q. Okay. And that's what led to your resignation?
A. That's correct.
Q. Okay. Is this the same Scott Goforth that had recruited you?
A. Yep.
Q. Okay. At this point in time we're now in March of 2009, correct, when you resign?
A. Yes.
Q. Is there anyone that you had worked with in law enforcement from when you first entered law enforcement employment in October of 2002 through March of 2009 that you later worked with at the Cherokee County Sheriff's Office?
A. That I worked with?
Q. So think of all the people you worked with between '02 and '09. Can you think of any coworker who you also later worked with at the Cherokee County Sheriff's Office?
A. No.
Q. After you left the Parsons Police Department having been treated unfairly by Deputy Chief Goforth, where did you work next?
A. I had a very brief -- oh, man, probably five weeks I think I spent at Wilson County

Page 70

Sheriff's Office.
Q. What's the county seat in Wilson County?
A. The seat is Fredonia? Fredonia, Fredonia.
Q. And who was your supervisor at the Wilson County Sheriff's Office?
A. Well, technically it would have been the chief deputy, Jack Lucke.
Q. And why did you leave the Wilson County Sheriff's Office?
A. I had to have surgery on my shoulder which left midnights open and that small agency needed coverage, so they had to replace it.
Q. What was the reason for shoulder surgery?
A. I had injured it when I had worked at the State Hospital. I'm sorry, reverse that. State Hospital then Wilson County. It threw me off with who I worked with part.
Q. So after the Parsons Police Department resignation you went to work for the State Hospital?
A. Yes, in '09, 4 of '09.
Q. And how long were you there?
THE WITNESS: 4 of '09.

Page 71

A. I'm sorry, I was answering.
Q. (By Mr. Case) Okay. Go ahead.
A. I'm sorry, what did you say?
Q. When did you start working at the Parsons Hospital, State Hospital?
A. It was April, April, April of '09.
Q. And how long were you there?
A. Up until I got hired on at the sheriff's office in -- well, no. I'd have to review the application for Wilson County because it was kind of up until that point.
Q. So you were at the State Hospital until you started at Wilson County?
A. No. I was still employed at the State Hospital. Their restrictions, so you'll better understand if you have any other questions before you get to that, their restrictions, if you have any at all, say you can't lift 400 pounds, if there's anything by a doctor stating anything, then you can't work.
Q. Which employer are you talking about?
A. This is State Hospital. So when I was working there when -- after I had gotten surgery, that's when the restrictions -- after I had my restrictions and surgery in -- sorry, so I did get

Page 72

really confused on the dates and times -- or places.
So after the state, that's when I had the restrictions and that's when I began working at Wilson County.
Q. So where were you injured?
A. That injury. Sorry.
Q. Where were you working when you were injured?
A. Yeah. That injury came from the State Hospital.
Q. So while working for the Parsons State Hospital you sustained a shoulder injury?
A. Yes.
Q. And describe the nature of that injury. What were you doing when your shoulder was injured?
A. There was a -- there was a client, we call them clients, resident, that was falling. He was wheelchair bound and he was falling and this was in the shower. And over the wheelchair trying to catch him something happened in my shoulder.
Q. Which shoulder?
A. Would have been my right shoulder.
Q. Okay. So sustained a right shoulder injury --

A. Yes.
Q. -- while at the State Hospital?
A. Correct.
Q. How many months into your employment did that occur?
A. That -- that happened -- I was there about four years. That happened almost three and a half, three, three and a half years in.
Q. Okay. So 2012?
A. That or a little before, '11. I would have to look at the date on the paper.
Q. So you were working at the State Hospital when you obtained employment at the Wilson County Sheriff's Office; true?
A. Yes.
Q. And that was a part-time position?
A. That was a full-time position, just brief.
Q. It was a full-time position that you held for five weeks?
A. About five weeks.
Q. And was it because you sustained your injury while working at the State Hospital that your employment at the Wilson County Sheriff's Office came to an end?



A. Yes, that is correct.
Q. Okay. And what was your position at the Wilson County Sheriff's Office?
A. Deputy.
Q. Patrol deputy?
A. Patrol deputy.
Q. And what was your position at the State Hospital?
A. They call it an MHDDT 1. I guess that's a fancy way of saying direct care.
Q. You were involved with transfers --
A. I was --
Q. -- from bed to bath; yes?
A. Was that my job there at the State Hospital?
Q. Was that a task that you would perform?
A. Yes.
Q. Okay. And when did your employment come to an end at the State Hospital?
A. That happened whenever I got hired on at the sheriff's office at Cherokee.
Q. You were hired part time at the Cherokee County Sheriff's Office in 2013?
A. Correct. Full time. That's when I



quit, I'm sorry. That's when it was.
Q. So you were still working at the hospital when you got hired on at the Cherokee County Sheriff's Office part time; true?
A. Yes.
Q. And then when you were offered a full-time position, your employment at the State Hospital came to an end?
A. Correct.
Q. Okay. Your injury to your right shoulder, that was a work-related injury at the State Hospital; true?
A. Yes.
Q. Okay. And you had a workers' compensation claim?
A. Correct.
Q. Okay. And what was the disability rating, if any, that you had received because of that right shoulder injury?
A. I don't know for sure.
Q. Did you have surgery?
A. Yes.
Q. How many?
A. One.
MR. LUCAS: Did you say one?



A. One.
MR. LUCAS: Okay.
A. Bursectomy.
Q. (By Mr. Case) And did you have a work comp attorney?
A. No.
Q. Who was your work comp doctor?
A. Grantham, Dr. Grantham.
Q. Located where?
A. Four State Ortho in Galena, Kansas.
Q. Doctor Grantham was the surgeon?
A. Yes, sir.
Q. Did you have a work restriction at any point in time?
A. Right after the surgery I did.
Q. And what was the nature of that restriction?
A. It was a lifting restriction over a certain amount of pounds.
Q. Okay. And how long did that lifting restriction endure?
A. I'm not really sure.
Q. Was it a permanent restriction?
A. Not that I'm aware of.
Q. Best way for us to know would be



PLAINTIFF'S EXHIBIT 1

Page 77

actually to probably look at Dr. Grantham's file?
A. Yes.
Q. Okay. Mr. Johnson, would you agree with me that the history of your employment that you've given me from October of 2002 to the point at which you made application for employment with the Cherokee County Sheriff's Office is not the same employment experience that is recited in Exhibit 8, your employment application with that office?
A. Per the application?
Q. Yes, sir.
A. Yes.
Q. Tell me about your employment at the Altamont Police Department.
A. That was a part-time job.
Q. And when in relation to the Wilson County Sheriff's Office were you employed at the Altamont Police Department?
MR. LUCAS: I'm sorry, what was your question?
Q. (By Mr. Case) Yes. When in relationship to your employment at the Wilson County Sheriff's Office were you employed by the Altamont Police Department?
A. Altamont since '11 has always been --

Page 78

maintained a part-time position. It was a PRN, as needed.
Q. So was it before or after Wilson County?
A. Before.
Q. So you commenced employment with Altamont Police Department prior to Wilson County?
A. Correct.
Q. Okay. Can you be more precise in which calendar year you worked for the Wilson County Sheriff's Office for those five weeks?
A. Yeah. That had to have been the calendar year of early '12, I believe.
Q. You did not disclose in your job application with Cherokee County that you had worked for the Parsons Police Department from 2002 to 2005.
A. Correct.
Q. Why not?
A. There was four places in the four that were the recent is what I had put in. I guess the most recent.
Q. So you provided the four most recent in reverse chronological order?
A. Correct. Most recent to the latest with the exception of Wilson.

Page 79

Q. So you --
A. But that he -- Groves knew about that.
THE COURT REPORTER: Sorry?
THE WITNESS: Groves, G-R-O-V-E-S, Groves.
Q. (By Mr. Case) So your intention was to provide the most recent, but you left off the Wilson County Sheriff's Office?
A. Yeah.
Q. Okay.
A. But he knew that.
Q. Okay.
A. Because I told him whenever I filled it out, I said I forgot a brief stint in Wilson County, but he had known and he said not to worry about it.
Q. Let's go back to your first stint at the Parsons Police Department when you resigned because due to a racial situation with Corporal Fausnaught. Okay? What was the racial situation with Corporal Fausnaught?
A. Which one?
Q. How many were there?
A. A lot.
Q. Okay. Did you make a complaint to

Page 80

management about the racial situation with Corporal Fausnaught?
A. There were complaints made, yes.
Q. Okay. Who did you complain to?
A. Anywhere from my immediate supervisors at that time which was Corporal Walter Largent, Sergeant Neil Springer. I didn't have a lieutenant at that time. Assistant Chief John Keele, Chief Gary Baldwin. Everyone knew.
Q. And did the Parsons Police Department fail to remedy your complaints to your satisfaction?
A. Yes.
Q. Is that the reason why you resigned?
A. Ultimately, yes.
Q. Okay. And --
A. The reason was because of him and I, not the department and I.
Q. Well, my question was did the management of the police department satisfy your complaints regarding Corporal Fausnaught?
A. No, no. He -- no.
Q. Okay. And did you resign as a result?
A. Technically, yeah.
Q. Okay. What was Corporal Fausnaught's race?

A. Caucasian?
Q. Do you know?
A. White male. Are you talking about his ethnic compound?
Q. Do you know what his racial identity was?
A. He was a Caucasian male.
Q. Did you make a charge of discrimination against Corporal Fausnaught or the Parsons Police Department?
A. No.
Q. Okay. Your next employment was with Erie, Kansas Police Department where you voluntarily resigned; correct?
A. Yes.
Q. And did you resign because you were bored?
A. I resigned for other employment, but that -- yes, ultimately to go another place bigger and --
Q. And that was the --
A. -- it was bigger.
Q. And that was the Coffeyville Police Department?
A. Yes.


Q. Okay. And then you resigned the Coffeyville Police Department following the circumstances surrounding the flood and the housing issue?
A. Yeah. I had no choice.
Q. Okay.
A. I would have stayed.
Q. Well, you could not find suitable housing; correct?
A. Yeah. I would have liked to have stayed. I'm sorry. Yes, yes.
Q. Okay. Have you ever made application for the Coffeyville Police Department again?
A. Yes.
Q. Okay. After June of 2015?
A. After '15?
Q. Yeah. Meaning after you left Cherokee County.
A. I put one in. I just can't remember when exactly because Independence --
Q. If you don't remember, that's fine.
A. Okay. Yeah.
Q. So let me do this one more time. After June of 2015 when you were terminated from Cherokee County, did you ever reapply to the Parsons


Police Department?
A. Yes.
Q. Okay.
MR. LUCAS: Your question was following his separation termination in June 2015?
MR. CASE: Yeah.
Q. (By Mr. Case) Corporal Fausnaught was gone?
A. Yes.
Q. Okay. Did you ever make application after June of 2015 to return to the Erie, Kansas Police Department?
A. No.
Q. Why not?
A. That's not a place I would like to go to work at.
Q. Why not? Same reason that you left?
A. Yeah.
Q. Okay. Any other reason?
A. No.
Q. Okay.
A. Actually I'm sorry. I did put in an application this year for a part-time position.
Q. At Erie?
A. At Erie.


Q. Police department?
A. Yes. Sorry.
Q. And was your application accepted?
A. Yes.
Q. Have you been interviewed for a position?
A. The chief got into a situation and he resigned along with his sergeant. So they had a situation there, so I don't know how that's going, but I was not given -- when I had turned it in from when that incident happened, no, I was not granted an interview.
Q. Okay. And you're not sure why? No one told you why you --
A. Not exactly.
Q. Did someone tell you roughly why you were not interviewed?
A. I'm assuming it had to do with the fact they had no personnel.
Q. Setting aside an assumption, did anyone notify you why you were not being interviewed for your part-time application?
A. No.
Q. Okay. After June of 2015 is it your testimony that you have made a new application to



PLAINTIFF'S EXHIBIT 1

return to the Coffeyville Police Department in some capacity?
A. Yes.
Q. In what year, which year?
A. I want to say in 2017.
Q. Okay. Were you granted an interview?
A. No.
Q. Do you know why?
A. No.
Q. All right. Parsons Police Department in '07, '09, that was your second time there; correct?
A. Correct.
Q. And that's when you resigned while your administrative -- you were administratively suspended about this tasing issue we've already talked about; correct?
A. Yes.
Q. Okay. What I failed to note is your departure from the Wilson County Sheriff's Office. Was that a voluntary separation from that employment?
A. Correct.
Q. Okay. Resigned that position arising from the shoulder surgery?
A. Correct.



Q. Okay. And Altamont Police Department, you started there in October of '11; correct?
A. Correct.
Q. According to your job application that was a part-time position only?
A. Correct.
Q. And how frequently did you work as a part-time patrol officer at Altamont?
A. Before my injuries it was -- it was frequent. The chief had training and they were down one full-time individual. It slowed down and I had the full-time job at Cherokee and, of course, my injuries. That's when it slowed down.
Q. And I guess what I'm trying to figure out is is the reason why your Altamont Police Department part-time work slowed down because of your shoulder surgery at the hospital?
A. That was a brief deal, but not necessarily.
Q. Okay.
A. I had worked before and after that.
Q. Okay. Okay. If you had not been terminated from the Cherokee County Sheriff's employment, was it your intention in June of 2015 to remain employed there?



A. Yes.
Q. Was it your intention as of June of 2015 had you not been employed to try to advance through the ranks to become a member of management?
A. Yes.
Q. By the time you were employed at the Cherokee County Sheriff's Office you had never been in management in any law enforcement position; true?
A. No.
Q. Is that you agree with me?
A. No, that's not true.
Q. Okay. Where were you in management in a law enforcement position prior to Cherokee County?
A. As senior patrolman in Parsons I was technically absent of either a sergeant or corporal, that fell between my duties as senior to be in charge as management.
Q. So if senior management was not present, since you were the most senior patrol person you would then become the manager?
A. Acting supervisor, yes.
Q. Was there ever a period of time when you were the acting supervisor during that time?
A. Yes.
Q. How many times?



A. To be exact, I do not know.
Q. Can you tell me how long you were a senior patrol officer before you left that position?
A. A little over a year.
Q. So at some point during the course of a year if senior management was not present, you would have then had some managerial responsibilities; true?
A. I became the supervisor, yes.
Q. But only in the absence of others?
A. In the absence of their chain of command at that shift, yes.
Q. You had never been in active management except in the absence of others in a higher chain of command; true?
A. Technically, yeah.
Q. Okay. And the titles that you have held in law enforcement before coming to Cherokee County was either patrol deputy or senior patrol deputy; correct?
A. Deputy, senior patrolman, yes.
Q. Okay.
MR. CASE: Has it been another hour?
MR. LUCAS: Yes. It's up to you if you want to keep going. It's 11 -- well, do you want

to go off the record while we talk? It's up to you.
MR. CASE: If I go another few minutes, then we can take a lunch break. Okay?
MR. LUCAS: It's 11:37, so --
MR. CASE: Okay. Are you good? Okay.
Q. (By Mr. Case) Having now reviewed all of your employers prior to starting as a part-time patrol deputy with Cherokee County, can you think of any individual who you worked with at any of those prior law enforcement employers that you later worked with in Cherokee County?
A. On a full-time basis worked with in the department?
Q. Any basis, part time, full time.
MR. LUCAS: You're asking if there were any coworkers from prior employment for Cherokee County that he later worked with in some capacity at Cherokee County?
Q. (By Mr. Case) Let me ask it again.
MR. LUCAS: I just want to make sure I'm understanding.
A. The second time, but I'm trying --
MR. LUCAS: He's going to ask it again.
Q. (By Mr. Case) I want to make sure



you're with me and we're tracking.
A. Okay.
Q. In October of 2002 after you graduated until 2013 when you were hired in Cherokee County as a part-time employee, think of all of those folks that you worked with in law enforcement. Can you identify anyone from '02 to '12 that you later worked with while you were employed at Cherokee County from 2013 until 2015?
A. I can't recall.
Q. Okay. It sounds like a trick question, it's not intended to be.
A. Well, it was just asked a couple times.
Q. Well, the first time I asked it I only asked you through some of your employers and now that we've covered all of them, I wanted to make sure I was complete. So it sounds like you can't think of anyone in Cherokee County that you may have worked with elsewhere in law enforcement?
A. In Cherokee County that I would have worked with or at Cherokee County that I would have worked with previous to?
Q. Any capacity.
A. At Cherokee County, no. I can't



recall of any that I'm aware of.
Q. Is there any person who prior to working in the Cherokee County Sheriff's Office who you have come to believe was a member of the Ku Klux Klan?
A. Run this by me one more time.
Q. Sure. Between 2002 and 2013, in your prior employment history looking back on it historically do you believe any of your co-employees were a member of the KKK?
A. One I believe was.
Q. Who?
A. Fausnaught.
Q. How did you come to form that belief?
A. Well, of course, it was rumored, hearsay, but it was a very well known and common rumor that he was a part of the Klan when they were I guess active in Weir, Kansas, in Cherokee County.
Q. What is the source of your information?
A. People, rumors, employees that stated that. And he actually never denied it.
Q. Were you present when Fausnaught was asked whether he was a member of the KKK?
A. Yeah.



Q. Okay.
A. One time I remember.
Q. Do you believe that there is any member of the Cherokee County Sheriff's Office who is a member of the KKK?
A. Practicing?
Q. Any basis, former, current, practicing. I'm not sure what that means, but --
A. I'm assuming going to meetings. I have no idea what they do.
Q. You said it, not me.
A. I don't know. I'm assuming being active and seen. I -- I don't know.
Q. You have no information, rumor or otherwise, that any person you worked with at the Cherokee County Sheriff's Office was a member or affiliated with the KKK?
A. I'm not sure about affiliated, but a member, I don't know if anybody is a card-carrying member of the KKK there.
Q. Okay. How about affiliated?
A. That's unknown. I'm not sure.
Q. Do -- have you heard rumor that there's anyone who has been employed with the Cherokee County Sheriff's Office during your



PLAINTIFF'S EXHIBIT 1

Page 93

employment there?
A. During my employment?
Q. Yes.
A. No. I'm unaware of anybody. I don't know.
Q. If I use the term white nationalist, does that term have meaning to you?
A. Could be an underlying thing as -- it's white nationalist.
Q. Was that a yes or no to my question?
A. Does it mean anything to me?
Q. Yes.
A. No.
Q. Do you believe that there was anyone who you worked with at the Cherokee County Sheriff's Office who espoused some belief as to either the superiority of a particular race or the inferiority of another race?
A. I couldn't answer for some of those guys.
Q. I'm not asking you to answer for them.
A. I don't know.
Q. I'm asking whether you personally know because you heard it, saw it yourself that any of your coworkers claim to be affiliated with any

Page 94

organization that advanced the superiority of a particular race or the inferiority of another.
A. Well, claimed to be, no.
Q. Okay.
A. Don't know of any.
Q. Well, even if they didn't claim to be, that you believed them to be.
A. That's where the -- I couldn't speak for all them guys because I would not know. Any of them claim them during my time there, no, they did not actively claim them during my time there.
Q. Did they inactively claim it?
A. Some of the individuals there particularly care for a certain type, yes.
Q. Who do you believe cared for a certain type of race by name at the Cherokee County Sheriff's Office?
A. Beau Hamblin, Dean Kidd, Frank Piepho.
Q. Anyone else?
A. I almost believe Dave Groves.
Q. Anyone else?
A. No, no.
Q. How did you come to form that belief with regard to Beau Hamblin?
A. The way he talks, things he says in

Page 95

reference to race and people and just all around life with race and people.
Q. Okay. Can you be more specific?
A. Well, people around him are -- I'm sorry, other coworkers at the sheriff's office overheard him calling an animal a certain name, it had to do with a certain race. White privilege actually was a term that was thrown around a lot and I actually did hear that a couple times.
Q. What is the name you believe an animal was called?
A. I'm sorry?
Q. You said with regard to Beau Hamilton others had heard an animal called a name.
MR. LUCAS: It's Beau Hamblin, H-A-M --
MR. CASE: What did I say?
MR. LUCAS: You said Hamilton, but not a big deal.
A. He referred to the animal, a dog, a black dog a nigger.
Q. (By Mr. Case) Okay. You did not hear that yourself?
A. No.
Q. This is something that others told you

Page 96

that they had heard him say?
A. That they had overheard him say, correct.
Q. Okay. Who told you that Beau Hamblin had said that?
A. That was Tina Blockburger.
Q. Okay.
A. I'm assuming it's exactly how it sounds, Blockburger.
Q. And anyone else is the source of that information other than Ms. Blockburger?
A. Nick Hartman.
Q. Okay.
A. He would have been a detective at the time, I believe, during that time.
Q. Anyone else?
A. Overheard it?
Q. Told you that they overheard it.
A. The receipt of it was Doug Wydick.
Q. The what?
A. The person who heard it, whose dog it was, was Beau -- or I'm sorry, Doug, Doug, it was Doug's dog, heard it.
Q. So the animal we're talking about is Doug Wydick's animal?

A. Correct.
Q. Okay.
A. He was the chief investigator.
Q. Okay. And it's Beau Hamblin who used the N-word in reference to Mr. Wydick's dog?
A. Correct.
Q. Okay. And your source of that information is Ms. Blockburger and Mr. Hartman?
A. Her boyfriend --
Q. Yes or no.
A. Yes, yes.
Q. Okay. Is anyone else the source of your information of Beau Hamblin's name calling other than Blockburger or Hartman?
A. Name calling, no.
Q. Name calling of the animal.
A. Yeah, yeah. No.
Q. Okay. Now, you also said that Beau Hamblin would use the term white privilege?
A. That was thrown around by quite a few of them actually. I didn't quite get that. I didn't understand what that meant.
Q. Okay. Did you believe it had some offensive meaning?
A. Well, it means white privilege and



later found out what exactly that meant. I never heard of it until then and then I actually found out later what it actually meant.
Q. Who told you later what it meant?
A. Well, after reading what -- what exactly is white -- you know, what is white privilege, and --
Q. So you read something?
A. That and actually having heard and exactly what they had talked about. It was I guess when all the racial tension all over the news kind of happened. You know, they -- a lot of stuff began to come out and that term came out again, white privilege.
Q. So I'm asking you about --
A. So I found out Google, Internet.
Q. So based on something you found on the Internet, you later concluded that white privilege had a meaning that was offensive?
MR. LUCAS: Object to form, misstates testimony. Go ahead.
A. The way they used it, yeah.
Q. (By Mr. Case) Okay. And did you come to that understanding during or after your employment at Cherokee County?



A. It was -- it was after.
Q. Okay. Anything else with regard to Beau Hamblin that was of a racially offensive behavior?
A. Not that I can recall.
Q. Okay. Dean Kidd, you have made statements in your lawsuit, in your charge of discrimination about him; correct?
A. Yes.
Q. Are there other events that are in addition to what is in your charge of discrimination or your lawsuit?
MR. LUCAS: Other events that he found?
Q. (By Mr. Case) Racially offensive.
A. Other events with Dean Kidd?
Q. Yes.
A. Or anyone in the department?
Q. I'm focusing on Dean Kidd.
A. Right now Dean Kidd?
Q. Yeah. I --
A. Other than what is listed?
Q. Right. I guess I could go back -- go at it this way. You did not intentionally omit any racially offensive conduct that you attribute to Dean



Kidd from your charge of discrimination or your lawsuit, did you?
A. Can you reword that for me, please?
Q. Probably can't reword it, but we can probably repeat it.
MR. CASE: Can you take a stab for me?
(Whereupon, the requested portion of the record was read by the reporter.)
A. Did I omit?
Q. (By Mr. Case) Did you leave anything out?
A. No.
Q. Okay.
A. No. Sorry.
Q. Frank Piepho, did you personally witness Mr. Piepho engage in racially offensive behavior?
A. Yes.
Q. What did you personally witness him do?
A. His jokes towards myself.
Q. Okay.
A. Actually that and Brian Kerns.
Q. Jokes to you and Mr. Kerns?
A. Brian Kerns.



PLAINTIFF'S EXHIBIT 1

Q. Okay. Anything besides jokes?
A. With Frank Piepho, not that I can recall, no.
Q. Okay. In your lawsuit you have sued Sheriff Groves for race discrimination and racial harassment; correct?
A. Correct.
Q. Have you intentionally left out any of the allegations regarding Sheriff Groves from your charge of discrimination or your lawsuit?
A. Intentionally?
Q. Yes.
A. No.
Q. Have you unintentionally left out a race discrimination claim against Sheriff Groves from your charge of discrimination or your lawsuit?
MR. LUCAS: I'll object to the form of the question as lacking foundation, calling for speculation. Go ahead, if you understand.
A. I don't recall anything like that, no.
Q. (By Mr. Case) In other words, after you filed your charge of discrimination and lawsuit, you have not recalled a circumstance that was not included in those papers?
MR. LUCAS: Wait. Object to the form.



That's overbroad. You may answer, if you understand.
A. Other than specific wordings of some things, no.
Q. (By Mr. Case) Okay. In other words, there's not an encounter separate from what is already detailed in your charge or the lawsuit that has occurred to you as a separate incident, is there, with regard to Sheriff Groves?
MR. LUCAS: Or his interrogatory answers I assume?
MR. CASE: Or his interrogatory answers.
A. I'd have to look at the papers.
Q. (By Mr. Case) Why don't we do this. Why don't we take our lunch break now, give you some time to take a look at your papers and then we can pick up from there. Okay?
A. Okay.
MR. LUCAS: What do we -- what do you want to do? There is a --
THE VIDEOGRAPHER: Are we going off?
MR. LUCAS: Oh, I'm sorry. Yeah.
MR. CASE: Yes, let's go off the record.
THE VIDEOGRAPHER: We're off the



record 11:58 a.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record at 12:58 p.m.
Q. (By Mr. Case) Mr. Johnson, how did you come to make application for employment at the Cherokee County Sheriff's Office? Had you heard of a vacancy?
A. No. I applied. I applied for the part-time -- for a part-time position.
Q. And where did you go to make application?
A. The sheriff's office in Columbus.
Q. And is that where you obtained the employment application form?
A. Yes.
Q. And did you fill it out there when you received it and turned it in?
A. No. I filled it out at home.
Q. And then brought it back?
A. Yes, sir.
Q. And on the day you brought it back were you interviewed by the sheriff?
A. No, no.
Q. How much time passed before you were



interviewed by the sheriff?
A. I don't recall.
Q. You do recall being interviewed by the sheriff?
A. Yes.
Q. And do you recall being interviewed by anyone else other than the sheriff?
A. In the room was Chief Deputy Gibson, Shane Gibson.
Q. The three of you?
A. Yes.
Q. How did that interview go?
A. Well, I got hired part time.
Q. Did the sheriff offer you a job at the conclusion of that interview?
A. Yes. Yes, he said part time, yes.
Q. Okay. And so by that measure did you consider that a successful interview?
A. Yes.
Q. Okay. What did you discuss during that interview, do you recall?
A. Yeah. He asked about the background of Parsons because he had heard about it. I had to go on telling him about the Fausnaught situation. Other than that, they said that what they were



PLAINTIFF'S EXHIBIT 1

Page 105

needing help on at that time was security at some -- some landfill site that they were closing down in Picher, Oklahoma for, so that was kind of the basis of me getting hired was the security deal, and that's what I did.
Q. Do you recall anything else from that interview other than what you've described?
A. Basic questions, no. I mean, who are you, where are you from, explain yourself.
Q. Any of that strike you as being unusual?
A. Unusual?
Q. Yeah. Out of the ordinary?
A. Not on the questions, no.
Q. Okay. On any other subject matter?
A. Going in and explaining about the Fausnaught deal. It was different.
Q. How so?
A. I guess into what depth I had to go in.
Q. Okay.
A. He said he knew about it, but then asked me to give I guess my version of it.
Q. Okay. Did that make you uncomfortable?

Page 106

A. I don't like to recall -- you know, remember it, no.
Q. Other than that, was it uncomfortable for any other reason?
A. Other than I didn't know him at all.
Q. Okay. How many days elapsed between when you got the blank form, which is before you in Exhibit 8, and before you returned it completed, do you know?
A. No, I don't recall.
Q. Did you read the application?
A. Read it?
Q. Yeah.
A. I filled it out.
Q. But did you read it in full?
A. No.
Q. You didn't read the entire application?
A. No.
Q. Which parts didn't you read?
A. There's not much to it.
Q. Well --
A. I could say I don't recall reading I guess the last paragraph.
Q. You're not saying you didn't, you just

Page 107

don't recall it?
A. No.
Q. You don't recall it?
A. I don't recall that. I mean...
Q. Does that last page contain your signature?
A. The last page, yes.
Q. Okay. And it says Applicant Signature and then that is your signature dated August 17th of 2012; correct?
A. Yes.
Q. The paragraph above your signature contained some description about the position you were applying for. You agree with me on that?
A. Yes.
Q. Did you understand those two paragraphs before you affixed your signature on this document?
A. I thought they were pretty standard in most applications.
Q. You were familiar with language having made other applications for other law enforcement positions?
A. Yes.
Q. The last sentence right before your

Page 108

signature -- actually I guess it's the last two sentences, quote, "I also understand and agree that the terms and conditions of my employment may be changed with or without cause and with or without notice at any time by the office".
You read and you understood that; correct?
MR. LUCAS: Object to the extent that it misstates his testimony. Go ahead.
A. I seen that.
Q. (By Mr. Case) You read and you understood that?
A. Yes.
Q. "I understand that no office representative other than the sheriff and then only when in writing and signed by the sheriff has any authority to enter into an agreement for employment for any specific period of time or to make any agreement contrary to the foregoing."
Did you read and understand that?
A. Yes.
MR. LUCAS: Same prior objection.
Q. (By Mr. Case) That paragraph begins as follows, quote, "In consideration of my employment, I agree to conform to the office's rules

and regulations and I understand that these rules and/or the employee handbook do not form a contract of employment, either expressed or implied, and I agree that my employment and compensation can be terminated with or without cause and with or without notice at any time at either my or the department's option", end quote.
Did I read that correctly?
A. Yes.
Q. You understood and read that prior to affixing your signature; correct?
MR. LUCAS: Object, misstates his testimony.
Q. (By Mr. Case) Did you read that before signing the application?
A. No, no.
Q. Why not?
A. This was basically saying that Kansas is at-will state, right-to-work state. You can be terminated at any point.
Q. I'm not asking you to describe what it is, I'm asking you whether you read it.
A. No, no.
Q. Did you read that?
A. No. I knew what it was. I'm sorry.



The answer is no.
Q. So you didn't read it, but you believed you understood what it was saying?
A. Yes.
Q. How did you know what it was saying if you hadn't read it?
A. Most of them at the end of an application are usually that, that it's basically a right to work, can be terminated at any point with or without contract. So, yes, I did skip over that and I did sign it.
Q. Okay. And by electing not to read it you nevertheless agreed to be bound to it?
A. Correct.
Q. Do you recall during the interview being told what the compensation plan would be expressed in terms of an hourly rate?
A. I believe so, yes.
Q. Were you disappointed to learn that it was going to be $14 an hour?
A. That wasn't what I was hired for. I was hired part time.
Q. Much less?
A. At first I was hired part time.
Q. And how much were you to be paid when



originally hired part time?
A. They said the security detail was ten an hour.
Q. And were you -- did you find that acceptable?
A. I understood it was part time, yeah.
Q. I'm not asking you whether you understood --
A. Yes.
Q. -- the hours, I'm asking you --
A. Yes.
Q. -- whether you found the rate of pay acceptable.
A. Yes.
Q. Okay. Were there any other benefits when you became part time other than the rate of pay?
A. No, no.
Q. So there were no other benefits expressed in the form of vacation; true?
A. Correct.
Q. You need to speak up --
A. Correct.
Q. -- your voice is kind of trailing. No benefits in the form of insurance; true?
A. Correct.



Q. No benefit in the form of retirement; true?
A. Correct.
Q. College tuition reimbursement; true?
A. Yes.
Q. How long did you work on a part-time basis before you were offered the opportunity to become a full-time employee?
A. I'm not -- not sure.
Q. Month, two months?
A. It was within several months, I believe.
Q. Was there any offensive racial conduct that you experienced while you were a part-time employee?
A. None that I experienced.
Q. That's what I'm asking, you.
A. No, none.
Q. Okay. Who was your supervisor as a part-time employee?
A. I'm assuming it still would have been Shane, falls I guess within full time. I don't know. Reserves has their own deal. I'm not sure.
Q. You don't recall who your supervisor was as a part-time employee?



PLAINTIFF'S EXHIBIT 1

Page 113

A. I know the sheriff was for sure, but, I mean, I was out in security which they contracted the sheriff's office to do, so they -- the security company -- whoever it was that was paying for security paid the sheriff's office and in turn sheriff's office paid whoever worked security.
Q. Do you recall there ever being a time either as a part-time employee or a full-time employee being provided access to any of the work rules of the sheriff's office?
A. No.
Q. Do you remember ever being provided access to any of the work rules of the county?
A. No.
Q. Did you ever make inquiry whether there were rules that governed your employment as either a part-time or a full-time employee?
A. No.
Q. Do you recall the process by which your employment changed from a part-time to a full-time employee?
A. I think I inquired. I inquired at one point to switch.
Q. Who did you inquire?
A. That I don't remember who I spoke

Page 114

with. I know I had spoke to Groves a couple of times when he came out to the location I was at.
Q. Okay. And do you recall how you learned that you were going to become a full-time employee?
A. After I'd spoke to him he said that I could go full time.
Q. And do you recall any of the process by which you completed paperwork to become a full-time employee?
A. Do I recall the time?
Q. Yes.
A. No.
Q. Do you recall completing any paperwork --
A. Yes.
Q. -- to become a full-time employee?
A. Yes.
Q. Where did you do that, the location?
A. That was -- that was at the courthouse.
Q. And who were you with at the courthouse when you did any paperwork for purposes of your full-time employment?
A. I believe it was Shane.

Page 115

Q. What is Shane's last name?
A. Gibson.
Q. Okay. Do you recall that?
A. I don't know for sure, but I'm thinking it was Shane.
Q. What do you recall that maybe you did with Shane Gibson at the courthouse?
A. It was just the filling out the standard paperwork, tax forms, retirement, all the things that come with the transition of full -- part time to full time.
Q. And what are all of those things, do you recall?
A. Taxes, the life insurance, would be insurance information.
Q. Where were you in the courthouse?
A. Would be the second floor, far east room.
Q. Ever been in there before?
A. The courthouse?
Q. That room.
A. That room, no.
Q. Was there anyone else present other than you and Shane Gibson?
A. HR, I believe that's her title, I

Page 116

believe.
Q. It was in the HR individual's office?
A. I believe so, yes.
Q. Okay. And do you recall how long you were there?
A. No.
Q. Can you describe the HR individual that was present?
A. No, I do not remember.
Q. Can you describe anything that she said?
A. No.
Q. Can you describe any of the paperwork you left with that day, if anything?
A. Just the information packet that I needed.
Q. Do you recall what was in the information packet?
A. It had copies of some of the things that I signed like a worksheet of here's your -- you know, what you would get off if you were killed on the line of duty or, you know, information on the retirement. That was basically it.
Q. Do you specifically recall everything you received that day?

Page 117

A. Everything?
Q. Yes.
A. Yes. It was just some papers that were in receipt of what I had signed --
Q. How many --
A. -- information of those.
Q. How many pages were there?
A. There's -- I think there's roughly three, three pages, about three.
Q. And what were those three pages?
A. It would be the retirement information, KPERS; it would be the life insurance the county provides; and it was the 1040 -- or I'm sorry, the tax sheet, a copy of the tax sheet.
Q. So you think you left with an insurance policy?
A. Well, it's the life insurance.
Q. You left with life insurance?
A. Life insurance, a piece of paper explaining the life insurance if you were to be killed on duty or what would happen.
Q. Do you know what that document was called?
A. No, no. Life insurance.
Q. So you left with life insurance?

Page 118

A. It's whatever the county provided, minimum life insurance. It's a part of everything that comes with I guess full-time employees for the county.
Q. I'm trying to figure out what this thing was though. Was it a summary of benefits?
A. Yes.
Q. Okay. For life insurance?
A. Correct.
Q. And some type of KPERS document?
A. Explaining what you would pay, what they would pay as far as what the county would pay, what they would match, what it would be, showing graphs on what you would make at 25 years, 30 years, etcetera.
Q. And then you said some type of tax document?
A. I believe it was after you sign whatever taxes that would be going into the state and federal.
Q. Okay. Anything else?
A. No. I don't believe so, no.
Q. And you don't recall what this HR woman said to you; correct?
A. Yes.

Page 119

Q. Can you recreate anything that she said to you on that occasion with any degree of specificity?
MR. LUCAS: Object to the extent it may call for speculation based on his prior testimony. You may answer.
A. Other than the paperwork she was giving for me to sign, no.
Q. (By Mr. Case) Okay. When you became a full-time employee, do you recall there being any portion of your time dedicated to field training?
A. Yes, yes.
Q. Do you recall how long your field training lasted?
A. Shane said since I was certified, how many years that I'd had in, etcetera, that it wouldn't be long. It was only around two weeks.
Q. Do you recall all of the policies that you were trained upon during your field training?
MR. LUCAS: Object to the extent it may assume facts not in evidence. You may answer, if you understand.
A. Policies I was trained on?
Q. (By Mr. Case) We're talking about you, yes.

Page 120

A. No. We didn't cover training on -- Shane did cover training on policies.
Q. I'm asking whether you recall there being any policies that you were trained on during field training.
A. No.
Q. You're shaking your head. Is that a yes or --
A. I said no. I'm sorry.
Q. Okay. Tell me what you recall about the two weeks of field training.
A. Honestly it was just riding around getting to know the county. That's basically it. It wasn't much.
Q. Do you recall -- go ahead.
A. There at the end there was a call that came in and I think the only thing that concluded the FTO was I had to respond to a call by myself and that was it. And then he shadowed me for a second and then kicked me loose.
Q. Who is he?
A. Shane.
Q. So are you telling the jury that your field training, once you became a full-time officer, was riding around in a vehicle with Shane Gibson?

A. Yes.
Q. Had you had any field training when you were a part-time employee?
A. No.
Q. So for two weeks during your first employment as a full-time employee you are doing nothing except being a passenger in Shane Gibson's car?
A. I guess you could put it that way.
Q. I'm not putting words in your mouth, I'm trying to understand. You said it was riding around in a car for a couple weeks?
A. Okay.
Q. Is that accurate?
A. Yes.
Q. Were you talking, one to the other?
A. It wasn't much, but conversations, yes.
Q. What were you talking about?
A. I -- I can't recall that.
Q. Were you talking frequently while you were riding around together for two weeks?
A. No.
Q. So you would just sit silent in Shane Gibson's car for two weeks?



MR. LUCAS: Object, misstates his testimony.
A. No, not silent. The conversations would be brief, short. He's not one I guess that talked to me quite frequently. I don't know.
Q. (By Mr. Case) Was it uncomfortable?
A. Yes.
Q. Did you tell Sheriff Groves that, that you were uncomfortable riding around in Shane Gibson's car for your first two weeks of full-time employment?
A. No.
Q. Why not?
A. I mean, I was uncomfortable, but I was a brand new employee and because we didn't talk that much and it was uncomfortable, I don't think that warranted me bothering the sheriff.
Q. Okay.
A. It wasn't to that level.
Q. So what was the source of discomfort? Was it the fact that you weren't speaking much?
A. No. His demeanor, just the way he was. The fact that -- yeah. I mean, there was no long conversations or, Hey, who are you, get to know you type of -- I guess something I was used to. You know, you would talk, get to know, etcetera. Talk about either past or present or you would get to know other things and it just wasn't like that.



Q. And so what was the source of the discomfort?
A. Being placed in that situation.
Q. I'm -- I'm trying to understand what -- you weren't speaking much as I've come to understand; true?
A. Neither one of us were.
Q. Okay. And -- and is that what made it uncomfortable, being in close proximity in the car and not speaking?
A. Not necessarily that. He just -- he -- how do I explain Shane. He didn't just talk to me. I mean, it was just an uncomfortable type of situation. Not to the degree of, Oh, no, I need to tell somebody, or this is something important. No. It was just awkward. I guess that's the best way, awkward.
Q. And help me understand in all ways it was awkward.
A. By sitting in a car, driving around with your coworker I guess supposed to be learning a little bit of something, but yet not really



conversating too much, but I don't know. I mean, back at the office he would talk to other people.
Q. Did you ask him questions?
A. As when I needed to, yes.
Q. Okay. On what subject matter were you making inquiry of him?
A. At that time I'm sure it was whatever came to mind. I mean, I can't recall every question or what I had asked, but I know that I inquired questions or inquired about things for the county.
Q. But it would be impossible for you to recreate?
A. Oh, I couldn't recall every question.
Q. Okay. Can you recall any of them?
A. I mean, I know I asked simple like, All right, where do we go on here, you know, what do we do on this, and questions I would need to know as far as what I would need to do to run in their computer system with their reports, you know, things like that. That was -- I mean, honestly, it was not a lot of talking. I don't know why.
Q. At the end of that -- was it literally a two-week period?
A. It was not long. The fact that I was already certified from the area and I guess that was



PLAINTIFF'S EXHIBIT 1

okay enough, I guess.
Q. I'm asking about the duration --
A. Yes.
Q. -- of your ride-along.
A. Yes.
Q. Literally two weeks?
A. It wasn't long.
MR. LUCAS: If you remember whether it was two weeks or not.
A. Specifically two weeks?
MR. LUCAS: Yeah.
A. No. I don't recall specifically.
Q. (By Mr. Case) Yeah, that was my specific question.
A. Okay. No.
MR. LUCAS: Make sure you listen to his questions.
Q. (By Mr. Case) Was it 14 days?
A. I don't know. I don't recall.
Q. Okay. Was your first two weeks as a full-time employee involved in any other activity other than riding along with Shane Gibson?
A. No. No, I don't think so.
Q. When you arrived to the sheriff's office, you would immediately go into the vehicle



with Gibson?
A. I would arrive 6:00, that was the shift. We'd arrive at the office or I'd arrive at the office and I'd wait for him to get done with all his morning stuff and then we would go out for FTO.
Q. You said FTL?
A. F-T -- field training.
Q. And you referred to that as what?
A. FTO.
Q. Okay. So you literally would be spending some time in the office before you would depart for the training?
A. Yeah.
Q. What were you doing in the office?
A. Waiting for him.
Q. Were you doing anything else?
A. No.
Q. Literally just sitting, waiting for him to commence the ride-around?
A. At that point, yes.
Q. Okay. Where would you be sitting as your designated place to wait?
A. They had the deputies room. He had his office, so I'd be there.
Q. So you would be in his office?



A. No. The deputies room is next to his office, the deputies room.
Q. Okay. Anyone else there with you?
A. Opposite was usually I think Frank.
Q. What's Frank's last name?
A. Piepho.
Q. And did you get to know Mr. Piepho during these first two weeks?
A. A little bit.
Q. Did you get to know anyone else during those first few weeks?
A. Not really.
Q. Okay.
A. I mean, other than the administrative part of it.
Q. Okay.
A. Usually crossing shifts don't really meet.
Q. Who was the administrative part of it?
A. Sheriff, undersheriff, him.
Q. Who is him?
A. At that point it was Shane. He would have been technically the third individual, but he was training, so it was just the sheriff and undersheriff.



Q. So in your first two weeks you're spending the majority of your time with Shane Gibson; true?
A. Yes.
Q. Who is the next person you're spending any period of time with, if not Mr. Gibson?
A. During that part it was mainly Gibson.
Q. Okay. At the end of your two weeks did you express to anyone that you felt like you were uncomfortable in your integration into the sheriff's department's policies or procedures?
A. No.
Q. Was there a point in time after the two weeks that you felt like you were operating without a full awareness of how the office expected you to work?
A. Did I feel that way?
Q. Yes.
A. Yeah, yes.
Q. When do you mark in time when you first had that feeling?
A. Just kind of shortly after F -- or I'm sorry, field training.
Q. Okay. And how long did it take you to express to someone that sentiment?



PLAINTIFF'S EXHIBIT 1

A. It was a while. I didn't talk that much as far as complaining.
Q. And who did you first express that sentiment to when you did?
A. As far as -- are you asking if I reported it officially? Is that what you're getting at --
Q. No.
A. -- as far as expressing or just who did I say something to?
Q. Who did you first make mention in any way that you felt like you were unfamiliar with workplace expectations?
A. Me and Brian talked a lot, Kerns, Deputy Kerns.
Q. Do I take by that answer that it was Brian Kerns who you first made mention of it? I asked for a name of who you first made --
A. I'm sorry, Brian Kerns, sorry.
Q. Well --
A. Deputy Kerns.
Q. I was just asking you did you express to some person that you felt uncomfortable in your familiarity with office procedures?
A. Deputy Kerns, Brian Kerns, yes.



Q. So I guess the answer is yes and it was Brian Kerns?
A. Yes. Sorry.
Q. Okay. What did he say?
A. What did he say?
Q. Yeah, in response.
A. Just made mention, not complained, about, Hey, you know, I wasn't quite really trained up on this, or, I wasn't quite familiar with this whenever we first started, so I kind of don't know what to do, kind of deal. I mean, he was more helping, I guess.
Q. Okay.
A. Not necessarily I'm an ear, so to speak. I mean, if...
Q. Do you recall on what subject matter you were expressing to Kerns that you felt unaware of what to do? Was it report writing?
A. I know it had a lot to do -- well, yeah, actually I'd say that. A lot to do with the reporting-based system.
Q. Okay.
A. Some of it had to do with the -- I guess you'd call the regional or the county, some of the things around in there. We mainly stuck to the



south side of the county because he did not like to ride up north, so --
Q. Who is he?
A. I'm sorry, Shane. During field training.
Q. Okay.
A. He -- and I guess that was one of the big deals who Kerns was the opposite 12-hour shift, so -- or I'm sorry, the opposite person on the other dayshift, individual, so Frank and Brian. So we would spend most of our time south because he got to choose, he was in charge, so the other deputy would spend it up north.
So I was really familiar -- well, not really familiar, but we spent most of our time south county, not enough time north. So when it came to getting kicked out, you know, I had to familiarize myself almost and I had to buy a Garmin GPS from Best Buy and got myself real familiar with the county that way.
Q. So do I understand you to say that when you were explaining to Brian Kerns about being uncomfortable about being aware of procedures, it had its origin in your field training being primarily in the southern part of the county as opposed to the



northern part?
A. That, computers, yeah.
Q. There was -- you had some discomfort about your familiarity with the computers?
A. Their reporting-based system they used, yes.
Q. Okay. You call it a reporting-based system?
A. Yes. Do all their reports off of it.
Q. And was Kerns able to provide you some assistance on using the reporting-based system, the computer?
A. He helped out.
Q. Okay. With his help were you able to become comfortable with it?
A. It's not really that easy. I mean, it's a system you have to get to know over time. You can train so much, but then you've just got to get familiar with it.
Q. Did you get familiar with it?
A. Over time.
Q. Okay. So you were originally uncomfortable with it, Kerns provided you with some assistance, and then through your own work and time involved with it you became comfortable with it?



PLAINTIFF'S EXHIBIT 1

A. Yeah.
Q. Can you mark at any point in time after your field training, weeks in, months in, when you felt you became comfortable with it?
A. No.
Q. Did it take days, weeks? How long did it take you to get comfortable with the computer system?
A. It took a little while.
Q. Can you be --
A. There was a lot of -- if you want me to put a number time, I would probably say months.
Q. How many months?
MR. LUCAS: If you know.
A. I don't recall.
Q. (By Mr. Case) By the time you were terminated you had developed a familiarity with the computer system; correct?
A. Yes.
Q. And you were comfortable with it; correct?
A. Yes.
Q. Okay. You said you purchased a GPS that helped you get familiar with the county; correct?



A. Yes.
Q. Is that something you thought the county should have purchased for you?
A. They had some in the vehicle. Some guys had some. They were way old, but, yeah.
Q. You think the county should have bought that for you?
A. Yeah.
Q. Did you ask them to reimburse you?
A. No.
Q. Okay. What else about your first several weeks on the job about your performance of the job made you uncomfortable, if anything?
A. It was just real cliquish there.
Q. Okay. Who was in a clique?
A. I'm sorry?
Q. Who was in a clique?
A. Who was in a clique?
Q. Yeah.
A. I don't know if there's really a membership, per se, but I can tell you who hung out the most.
Q. Okay. Who hung out the most?
A. Who hung out the most was Groves, it was Clugston, Gibson, Hamblin, Peters.



Q. And are you suggesting they hung out with each other the most?
A. Yeah. They -- there all were a group that did things a lot.
Q. And are you talking about in the workplace or outside the workplace or both?
A. Both. I mean, you'd find them always either talking or BS-ing or other things like that.
Q. Okay.
A. Socially, yeah, you'd definitely see them out.
Q. So you described the sheriff, the undersheriff --
A. Gibson.
Q. -- as being in a clique, correct, with Gibson, Hamblin, and Peters; correct?
A. That's what I would call it, a clique.
Q. Okay. Was there any other group of people that hung out together in your mind?
A. There was other like corrections and stuff, but we weren't too familiar with corrections, not too familiar, so I wouldn't know.
Q. Okay. So in your opinion there was a clique of the sheriff, the Undersheriff Gibson, Hamblin, and Peters; true?



A. I'd say they'd be a clique, yeah.
Q. Who did you hang out with?
A. The one I felt most comfortable with was Brian.
Q. Okay did you hang out with anyone else?
A. No.
Q. Why not?
A. Good question. I still don't know. I can tell you what I think.
Q. What do you think?
A. I think I wasn't in that clique.
Q. Well, who else --
A. That or white enough. I don't know. I just wasn't that person.
Q. You were the newest employee in the force assigned to the patrol, correct, when you were hired as a full-time employee?
A. Yes.
Q. Who was hired after you?
A. Right after me?
Q. Yes. Who was the next person in?
A. There was some that came back from the academy that I didn't even know were gone.
Q. Do you know the name of the person



PLAINTIFF'S EXHIBIT 1

Page 137

that was hired after you, yes or no?
A. No.
Q. When did you first hear that there had been an event involving Brian Kerns and another employee in which Kerns had tased another employee?
A. When did I first hear about it?
Q. Yes.
A. Me and Kerns had been together for day shift --
Q. Actually looking for a date.
A. Oh, a date, an exact date?
Q. The question was when.
A. When did I first learn?
Q. When did you first learn. That's a "when" question.
A. Yeah. I don't know an exact date.
Q. Okay. Did you learn of that event before you were a part-time employee?
A. No.
Q. Do you believe you learned it when you were a part-time employee?
A. No.
Q. You believe you learned of it when you became full time?
A. I did.

Page 138

Q. Okay. So we at least know it was during your full-time employment?
A. Yes.
Q. Who did you learn of that event from; in other words, who was the source of your first information about it?
A. Brian told me.
Q. Where were you when Brian Kerns first told you of him tasing the other employee?
A. We were sitting in the deputies room.
Q. So it was at work?
A. Oh, yes.
Q. Okay. Who else was present when he told you?
A. It was him and I talking.
Q. No one else present in the office?
A. No. We -- we worked together.
MR. LUCAS: Do you mean in the deputies room or the office?
Q. (By Mr. Case) I want to follow up with that. Where were you when the two of you were discussing this for the first time?
A. In the deputies room.
Q. Okay. And there was no one else in there?

Page 139

A. In the deputies room, no. In the office, I don't -- I don't believe so.
Q. Can you pinpoint because of something Kerns told you how recently the event had occurred?
A. No.
Q. In other words, he didn't say, Hey, this morning I tased this employee, or, Hey, it occurred the day before or the week before or the month before?
A. No. It -- not a time. We were just discussing it as we were doing reports.
Q. Did you form a belief of when it did occur relative to you learning of it?
A. Did I, no, I didn't. I didn't form a belief, no.
Q. When Kerns is telling you about him tasing this employee, did you believe it occurred that very day?
A. No.
Q. Did you ever come to learn when he told you about it how long ago this event had occurred?
A. He only said he was on midnights, when he was working midnights, that that's when it happened.

Page 140

Q. But he didn't tell you which midnight shift it occurred on?
A. No.
Q. He didn't give you a sense whether it occurred within the past week, month, or year?
A. Well, no. Because he was on day shift with me. He was my opposite, north, south.
Q. What I'm trying to get at, Mr. Johnson, is is there any portion of Mr. Kerns' telling you about this event that gave you an impression of how much time had elapsed between the event and when he's telling you that about it?
A. No, I do not.
Q. Okay. That's no?
A. No.
Q. Who did you first tell after you learned about it that Brian Kerns had tased another employee of the sheriff's office?
A. Who did I tell?
Q. Yes.
A. The very first person that was told was Groves.
Q. That's who you told?
A. Whenever I spoke about it.
Q. I want to make sure I understand.

Page 141

After Brian Kerns told you --
A. If you're asking the first person who that story I've ever told to or how it was delivered to me, I guess, the first person was Groves that I -- I ever talked about as far as telling.
Q. So after Brian Kerns told you he had tased another employee, you kept that story in confidence and never told another person about it until you discussed it with Sheriff Groves?
A. Groves is the person that I told in office, yes.
Q. Okay. And when do you claim that you expressed that story to Sheriff Groves?
A. It was whenever I told him or attempted, it was back in December, January, '14, '15. I told him whenever I told him about the issues I had.
Q. You -- can you pinpoint in relation to that time period that you've just testified to, December, January, how much before that time that Brian Kerns told you of it?
A. A matter of months. I wasn't there that long, so...
Q. So if you claim you told the sheriff about it in December of '14 or January of '15, you

Page 142

believe you would have learned of it from Officer Kerns some months prior to December of '14?
A. That I learned of it, yes.
Q. Yes.
A. That I learned of it, yeah.
Q. Yes.
A. Yes. I said. Sorry.
Q. And can you be more precise whether it was in the fall months, the summer months?
A. Of learning?
Q. When you learned about it from Kerns.
A. Well, I mean, it was -- it was shortly after FTO whenever me and Kerns worked together because at that point my newness, I guess, wore off and everybody -- well, certain individuals started in. It was I want to say late -- late summer because Kerns and I were in the deputies room actually talking about what I was complaining about, which was racial jokes that took place.
Q. Which would have been in late summer of '14?
A. Would have been in late summer '14.
Q. So do I understand it to be that it was in the late summer of '14 that the first person you're expressing discomfort with racial jokes was to

Page 143

Brian Kerns?
A. The person I had talked to about it, yeah. I'd asked him how he basically dealt with it, how he was -- he had worked there a period of time before me. I asked him about his encounters, I guess, and he told me all --
That's how the story got brought up was when I told him, I'm like, You know, why do -- for instance, Frank Piepho was the one that kind of started in with the whole racial stuff. And I'm like, You know -- he just kind of spilled it out. And I'm like, You know, why are they okay with doing that, or, Do they ever, you know, get in trouble for doing that.
You know, being a new guy months off of FTO you're a little hesitant at first to -- nervous to approach somebody. And even when I did later, it didn't do any good, but when I had talked to him initially, Kerns, that's what we were talking about and that was about late summer.
Q. You're going to have to speak up.
A. That was about -- about late summer. I was trying to guesstimate the time that I started to FTO to being out on my own to having I guess the newness wear off of me where all the other

Page 144

deputies -- well, some the deputies thought it was okay to actually joke.
Q. I have no quarrel with what -- you're doing it, I just need to be able to hear you, so I just need you to keep your voice up.
A. Oh, okay.
Q. There is a blower --
A. Sorry. I'm -- I was trying to give you time. Sorry.
Q. You're good, you don't need to apologize.
Do I understand that Frank Piepho was the first person who said something that made you uncomfortable of a racial nature?
A. Frank Piepho was the one that started it, yes. He was the opposite dayshift guy at that time when I started, began.
Q. At whatever time the first person that made you uncomfortable with a racial comment was Frank Piepho?
A. The racial comment, yes. It was --
Q. Was there some other person that made you uncomfortable with a racial conduct?
A. Gibson was just uncomfortable, period. That's where everything -- I don't know.

Page 145

Q. Are you attributing your discomfort to Shane Gibson during your field training to race?
A. If you're saying conduct with...
Q. Is there anything that you attribute to Shane Gibson during your two weeks of training with him that you believe was racially motivated?
A. Racially motivated?
Q. That's what I said.
A. Sorry. I'm repeating it and then I'm -- it's for myself, sorry.
Other than being a minority, you are to -- I guess I would talk to somebody, explain -- I was supposed to be doing his job, I guess, FTO-ing, field training. I probably had a lot more to say, be a lot more loose, but when he was around the other guys, the other people, he was a lot more loose or joke, talking. Petty stuff, serious stuff, it didn't matter, whatever. It didn't seem like it followed that way with me.
Q. Okay.
A. Why, I don't know.
Q. Okay.
A. I didn't ask him. All I can know -- all I know is just given the way he was and stuff Brian and I talked about, yeah.

Page 146

Q. So even though you didn't ask him and you don't know, you yourself had interpreted that as a racial motive?
A. That's the way I felt.
Q. Okay. And I'm not arguing, I just want to make sure I understand that you felt there was a racial motive for the way Shane Gibson was treating you during the field training period of roughly two weeks.
A. I mean, what was I doing? I wasn't doing anything else wrong or out of place, but, I mean, you know.
Q. So it sounds like from your first two weeks of training you felt like you were being treated differently because of your race in field training?
A. That was my feeling at first, yes.
Q. Okay. The first person you expressed that sentiment to was Brian Kerns; correct?
A. Person I could relate to, yeah.
Q. It was during a conversation that you're first expressing your sentiments to Brian Kerns making mention of Frank Piepho where he in turn tells you about his tasing incident with a co-employee; correct?

Page 147

A. Yeah.
Q. Okay. And this is late summer and you're in the deputies office?
A. Yeah.
Q. Okay.
A. It would be about there.
Q. Did you make notes of your conversation with Brian Kerns?
A. Note, no. Forgive me if I repeat the second word, please, after what you say. It's only a habit of mine, so I don't want you to think I'm questioning --
Q. No problem.
A. You've said something before and I didn't want you to think I -- so to answer your question, no.
Q. Okay. Did you make notes or keep a diary of all of the events that you found offensive in the workplace there at Cherokee County Sheriff's Office?
A. No.
Q. Okay. So did Brian Kerns give you any advice about your experience that you were relaying to him?
A. Our shared experience or my experience?
Q. Either one.
A. There wasn't really any advice you can give. I mean, just --
Q. I'm asking what he said. Did he give you any advice?
A. No, not advice, no.
Q. Okay.
A. No. Sorry, no.
Q. Other than sharing his experience involving tasing, did he tell you anything else in that conversation in late summer in the deputies office?
A. No.
Q. What do you remember him telling you, if anything, outside the tasing event itself?
A. We just talked about everything all racial. I mean, just the things we experienced, if that's what you mean.
Q. What did he say?
A. Things from what he's been through as far as the tasing incident and how it wouldn't stop, just his story, his accounts of things.
Q. Did he tell you anything, a specific event other than the tasing event that you recall?

Page 148

A. Different things, but -- but, no.
Q. You don't recall a circumstance other than the tasing event that he told you?
A. Other than the things that were said, no.
Q. Sir, I'm trying to find out what the other things he said. Other than the tasing event, can you describe for us of any other event that he described to you in this conversation?
A. And at this time, honestly, I can't recall all of it.
Q. Can you recall any?
A. At this time, no.
Q. Well, sir, this is my last opportunity before jury trial.
A. Sure.
Q. So I need to know. I need you to exhaust your memory on this topic. Can you recall of any other racial event that Brian Kerns described to you other than this tasing event in this conversation?
MR. LUCAS: Number one, are you wanting him to describe what was told about the tasing event?
MR. CASE: No.



MR. LUCAS: Okay.
Q. (By Mr. Case) Setting aside the tasing event, I'm trying to be as clear as possible.
A. Sure. No, I understand. I'm trying to recall everything we've talked about. I mean, at this specific time I am drawing a blank, I guess. I guess in my mind I'm trying to pinpoint something.
Q. Would it be fair to say that there was not a more memorable incident that he reported to you besides the tasing event?
MR. CASE: I'm going to suggest we go off the record, let you have some time to ponder about it. I've got a lot of these incidents to go through and I just want to make sure you've had time to reflect upon it. Let's go off the record.
THE VIDEOGRAPHER: We're off the record at 2:07 p.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record at 2:22 p.m.
Q. (By Mr. Case) Mr. Johnson, we were on the subject matter of your late summer 2014 meeting with Brian Kerns and I was trying to get you to revisit your memory of anything Mr. Kerns may have told you about any other race event, other than the



tasing circumstance. Have you had some time to reflect upon that subject matter?
A. I have, yes.
Q. And do you recall any other event that Brian Kerns described to you, other than that tasing event in that conversation?
A. No. During that conversation, not at this time I cannot recall.
Q. Let me show you Exhibit No. 9. Just leave that right in front of you. Have you seen Exhibit No. 9 before?
A. I think I recall this, yes.
Q. Is this one of the documents that you received from HR when you went to visit with Shane Gibson when you became full time?
A. I don't recall this.
Q. You don't recall seeing this document or are you saying --
A. I don't recall taking it or sending or having it.
Q. When do you recall first seeing this document?
A. I don't -- I don't recall.
Q. But you do believe you've seen it before?



A. Yeah, yes.
Q. Do you believe you've seen it before this lawsuit started?
A. Yes.
Q. Okay. So during your employment you saw this document?
A. Yes.
Q. Okay. It says up at the top of Exhibit No. 9 full-time hire date, August 13 of 2013; correct?
A. Yes.
Q. Does that square with your recollection of when you became a full-time employee?
A. Yes.
Q. Okay. Let me show you Exhibit No. 11, which I don't know whether you've seen that before or not. That's an E-mail in which Sheriff Groves makes note that in August 2013 you're going to become a full-time employee. Do you see that?
A. Yes.
Q. Does that give you some confidence that it, in fact, was in August of 2013 that you became a full-time employee?
A. Yes.
Q. Okay. As I understood your testimony,



PLAINTIFF'S EXHIBIT 1

your first two weeks of full time were field training with Shane Gibson largely in the vehicle in the southern part of the county; correct?
A. Correct.
Q. And then it was in the summer of 2014 that you're having this conversation with Brian Kerns who is the first person you're discussing some racial jokes and events that you've witnessed in the workplace; true?
A. Yes.
Q. Okay. So between August of 2013 and summer of 2014 when you're first having discussions with Brian Kerns, who is the first person you've made mention of these racial events to, almost a year has gone by; true?
A. True.
Q. Okay. Can you pinpoint for us any other person other than Brian Kerns in the summer of 2014 that you would have made mention at an earlier time that you experienced something that was racially upsetting to you in the Cherokee Sheriff -- Cherokee County Sheriff's Office?
A. Experienced something racial?
Q. Yeah.
MR. LUCAS: I'm not sure I understood



the question, but --
Q. (By Mr. Case) Let me take another stab at it. I kind of fumbled the name of my client.
Prior to your summer 2014 conversation with Brian Kerns, had you made mention to any other employee of the Cherokee County Sheriff's Office on an earlier occasion that you had been upset by any racial conduct or comment in that workplace?
A. I had attempted. I attempted. You did say personnel, correct, sheriff's office personnel?
Q. I'm focusing on anyone else you may have spoken to who was employed in the sheriff's office by name.
A. No.
Q. Okay. After the Brian Kerns' conversation in late summer of 2014, can you tell us the name of any other person who you described that you had experienced something that was racially upsetting to you in the sheriff's office?
A. Before that?
Q. No, not before that, after that.
A. Oh, I'm sorry, after. After that, after Brian and -- Brian and I's conversation?
Q. Yeah. Who next, if anyone, would you



have described something that upset you based upon some racial comment or conduct?
A. Or conduct? I -- I attempted to talk to Shane Gibson. That was my direct supervisor.
Q. Okay. And can you pinpoint how long after the Brian Kerns' conversation you made an attempt to talk to Shane Gibson on that subject matter?
A. Going back my dates are not correct as far as looking back at 8 of '13, a year was -- that's actually not the right timing of it, so that was my fault.
Best way to pinpoint that as far as the conversation between Brian and I was whenever Frank Piepho was terminated there. Sorry about that. That brief moment where Frank and I had shared a shift together and then when he left there, Kidd had came in to fill his space. So that -- whenever that -- shortly after being released from FTO and then from there, that's when Brian and I had actually spoke because we had then talked about that. So 8 of '14 probably was not an accurate date of when I talked to him. I was trying to recall to the best of my ability.
Q. So you're now telling us that your



conversation with Brian Kerns did not occur in late summer of 2014, it occurred in some other year?
A. It occurred months after I'd went full time, you know, a couple months after full time. But when you asked for a date, I said late summer. I can only go by at this point to being six years and many, many things have gone by since then. I can only go by what I remember on specific instances and I do recall working a shift with Piepho, experiencing things. He then quit, separated, then Kidd came along and Brian and I. So that was about that time and the sheriff's office would have the records of that, but I knew it was a couple of months after being released.
Q. Okay. Let's start over.
A. I apologize.
Q. Exhibit 9, you've already told us at least once that you agree, pinpoint your full time hire date of August 13th of 2013?
A. Yes.
Q. And you've told us once that for a couple of weeks, give or take, you were with Shane Gibson riding around the southern part of the county?
A. Correct.
Q. So that would take us till the end of



PLAINTIFF'S EXHIBIT 1

Page 157

August?
A. Yes.
Q. Any doubt about that?
A. No.
Q. Okay. Still in 2013?
A. Mm-hmm.
Q. Yes?
A. Yes.
Q. Okay. And you believe it was a couple or several months that went by and some point Frank Piepho is no longer working at the sheriff's office; correct?
A. Yeah. However long that was, yes.
Q. And then Deputy Kidd comes onto the scene to replace Piepho is your belief?
A. Either he came and he was either a -- what they call swing shift or he was there full time. He was one of the two where we had a cross between people, had more people out, so...
Q. And is it your sworn testimony that that helps you describe when your conversation was with Brian Kerns?
A. That's the best of my ability, yes.
Q. Okay. And so --
A. Trying to remember from six years ago,

Page 158

I'm sorry.
Q. Based upon your own testimony where does that put this conversation with Brian Kerns, in which month of which year, do you know?
A. It could have been late year '14. It could have been -- I'm sorry, late year '13, early '14 could have been. I don't know when Frank left. That's the best of my reference point as far as looking at when I was hired. When I was hired, okay, that's when I was hired. Two weeks after I had FTO, yes. I worked with Frank for a period of time and experienced things with him which is, again, why I then contacted him. I'm trying to go by those reference points and trying to remember a date of whether it was cold or hot. I don't know. I mean...
Q. Are you doubting your recollection that it was late summer when you talked with Brian Kerns?
A. I'm just not sure when, if it was summer or winter, not -- not that I didn't talk with him. I did. Being almost a year going by, that's not accurate, no.
Q. When you described to Brian Kerns the circumstances that you had experienced, you were describing to him conduct by Frank Piepho; correct?

Page 159

A. Yes.
Q. Conduct by who else?
A. We had talked about Frank. We had talked about Kidd. We had talked about -- he's in his situation and the experiences he's been through, I don't recall those exact, exact things.
Q. I'm focusing on what you said to him.
A. We talked a lot about Frank Piepho at that time.
Q. Was there anyone else you spoke in greater depth about other than Mr. Piepho?
A. In greater department with Brian?
Q. Correct.
A. We had talked about Kidd.
Q. The time you're talking with Mr. Kerns about Frank Piepho, Mr. Piepho was no longer an employee?
A. No longer an employee.
Q. True?
A. True.
Q. Okay. And so it's when you're talking about Mr. Kidd that Brian Kerns tells you about the tasing incident?
A. No, no. We had -- we had already known it. I had known about the taser incident when

Page 160

I had talked to him. Frank was already gone at that point. Frank was gone. That's when I learned of the taser incident.
Q. Okay, Mr. Johnson, I want to make sure that we're still tracking here because I feel we are not. I have throughout this entire line of questioning been using your initial contact with Brian Kerns as the focus of the subject matter here.
A. Yes.
Q. Because you told me that it was Brian Kerns as the first individual who was employed at the sheriff's office who you had made mention to --
A. Correct.
Q. -- about some events that made you uncomfortable on a racial basis --
A. Correct.
Q. -- as an employee. And you told me that it was during this conversation that you learned from Mr. Kerns that he had tased another employee; correct?
A. Yes.
Q. Okay. So I was just getting you to orient you to a date and you've told us now that it may have been in 2013 or '14 when you're having this initial conversation with Brian Kerns; correct?

Page 161

A. Yeah. I just simply do not know exactly when that date is. I do not recall when that -- that timeframe is.
Q. And I'm not quarrelling with you now on temporal scope, I'm focusing on subject matter.
A. Okay.
Q. And I'm focusing on what you said. You told me that you had made mention to Mr. Kerns on this first occasion that Mr. Piepho had made some uncomfortable race, racial comments in your presence; correct?
A. True.
Q. And at the time you're having this conversation with Brian Kerns, Mr. Piepho is no longer an employee; true?
A. I do believe so, yes.
Q. Okay. But you also told me that you had had as a subject of conversation Deputy Kidd; correct?
A. Him and I discussed him, yes.
Q. And it is in that conversation where you first learned that Brian Kerns had tased someone; correct?
A. Yes.
Q. Okay. There is no prior conversation

Page 162

with Brian Kerns where you learned that Brian Kerns had tased someone?
A. No.
Q. Okay. I think we're back on track --
A. Sorry.
Q. -- hope so. Having now gone through this review of the timeframe, do you have a better sense of how much time had elapsed from when Brian Kerns is telling you that he had tased this co-employee, that the actual tasing had occurred?
A. I don't, no.
Q. Okay. Is there any other employee who you mentioned by name to Brian Kerns in this first conversation that had engaged in something that was racially inappropriate to you other than Mr. Kidd or Mr. Piepho?
A. The only person -- the other person I could talk -- or that I had spoke to was Michael Potter, Mike Potter, Michael Potter.
Q. I'm not asking you who else you spoke to, I'm asking who else you and Mr. Kerns spoke about.
A. Oh, spoke about, I'm sorry. No one else.
Q. Okay. After this Brian Kerns'

Page 163

conversation the next individual in the sequence of individuals that you spoke to about something that may have racially upset you you were beginning to tell me was an attempt you had made to speak to Shane Gibson; correct?
A. I'm trying to follow my times.
Q. Mr. Johnson, let me ask you this. Did you do anything to prepare yourself for this deposition today?
A. I did.
Q. Did you make a review of the timeline of your allegations in order that you would be prepared to give us your best -- your best testimony today?
A. In my mind I thought I did and then I forgot that Frank Piepho was at one point suspended, so somebody else filled his slot which threw my timeline completely off. So at one point Frank was working there. He then got suspended, somebody took his place. It was either Kidd or -- or Kerns. I do believe it was Kerns, I'm not sure. And then Piepho was able to come back and that's what threw my timeline completely off is he was suspended for a little while. So somebody was there, that's why we had the people. It was between Kidd and Kerns, so

Page 164

that's what threw me completely off.
Q. But you --
A. But for the most -- sorry.
Q. You studied up for today's event though?
MR. LUCAS: Well, object to the form, it's argumentative and -- I'll leave it at that.
A. To the best of my ability and recollection after having been so long.
Q. (By Mr. Case) What did you study before today's event?
A. My -- my answers, my interrogatory answers. I tried to basically open up and try to remember as much as I could.
Q. Okay.
A. I knew a lot of questions were going to be coming.
Q. Okay. Am I correct that after this initial conversation with Brian Kerns that your next mention about anything racially upsetting in the workplace was an attempt you had made to engage Shane Gibson on that subject matter?
A. Did I try to talk to Shane Gibson, yes.
Q. When?

Page 165

A. Honestly, at this time right now I do not recall.
Q. Okay.
A. I'm -- yeah.
Q. And when you say it was an attempt that you made, what do you mean by that?
A. I tried to -- I tried to talk to Shane employee-to-boss conversation.
Q. Tell me as best you can recall the words you used in attempting to speak with Mr. Gibson on this subject matter.
A. The exact words I do not know.
Q. Okay. Where were you when you attempted to engage him in some such a conversation?
A. It would have been at the sheriff's office in his office.
Q. Was anyone else present?
A. No.
Q. Was his door open?
A. The side door, the -- in between the deputies room door.
Q. In between what?
A. In between the deputies and his room door.
Q. Okay. So were other people within

Page 166

earshot of you and Shane Gibson, do you know?
A. I don't know.
Q. What were you doing in his office at that point?
A. What?
Q. What were you doing in his office at that point?
A. Attempting to try to talk to him.
Q. And it sounds as if your attempt failed?
A. Correct.
Q. How did you come to that conclusion?
A. After trying to speak to him being a hard person to talk to, he wasn't very receptive with -- with trying to get a problem across.
Q. How did you open up the conversation?
A. Well, sir, do you -- Sir, do you have a minute, can I speak with you? And basically, you know, I don't know if it's a bad day, but it's usually, you know, What, or, What the fuck do you want, or, you know, it's normally kind of that. I mean, that's the general basis of talking to Mr. Gibson, or Shane Gibson. That's normally his introduction.
Q. Do you recall specifically what he

Page 167

said to you?
A. At that time?
Q. Yeah.
A. No.
Q. Okay.
A. I just know those were kind of the -- what he wants.
Q. How long were you there in the office before you concluded that your attempt was failing?
A. Kind of after the first "what do you want". It wasn't long, minutes.
Q. Okay. And then did you depart his office?
A. I did.
Q. Okay. And what is the next circumstance under which you made mention to anyone else in the workplace about anything that you found racially upsetting to you after this failed attempt with Shane Gibson?
A. Mike Potter.
Q. You next spoke to Mike Potter?
A. Michael Porter, Mike Potter.
Q. Okay. How much time elapsed between your failed attempt with Shane Gibson until you went to Michael Potter?

Page 168

A. I don't know.
Q. Do you know in which month of which year you're making this attempt now to Michael Potter?
A. No, no.
Q. Are we --
A. And it was to talk to Mike Potter, not exactly I guess you can say I guess make a complaint. It was more of an advice type of deal with Brian, make an attempt to talk to him, see what I'm supposed to do.
Q. I'm focusing on the timing.
A. Sure.
Q. Do you know which year we're in at this point?
A. '14.
MR. LUCAS: What did you say?
THE WITNESS: 2014.
MR. LUCAS: Keep your voice up.
THE WITNESS: Okay.
Q. (By Mr. Case) So at some point in 2014 you're now individually going to go visit with Michael Potter?
A. Yes.
Q. Okay. And do you actually make



PLAINTIFF'S EXHIBIT 1

Page 169

contact with him?
A. Yes.
Q. And where are you?
A. We were in the conference room.
Q. Who else is present?
A. Nobody was present.
Q. Well, you and Mr. Potter were present?
A. Well, I'm sorry, yes.
Q. Okay. Anyone else besides the two of you?
A. No.
Q. And who called the meeting?
A. I had contacted him.
Q. And how much prior to this meeting did you contact him?
A. Just initially contact him.
Q. The same day?
A. Yes, sir.
Q. And what did you tell him? Need to talk to you?
A. I just kind of asked what do you do or what would you do in a situation like this kind of given I guess the resistance that I experienced thus far.
Q. The point I'm getting at is before you

Page 170

met in the conference room did you tell him that you needed to meet with him for a purpose?
A. Oh, no.
Q. So you just said, Hey, I want to come see you in the conference room?
A. Yeah. He was there. His office really wasn't there, but he was there at that time.
Q. Okay.
A. And I made an attempt to go talk to him.
Q. Okay. So you go into the conference room, he's there and you ask him a question which is what?
A. It was in general basically what do you do if or if I experience if this goes on, blah, you know, what's my next step.
Q. And what is the "blah", what did you tell him?
A. What is the next step.
Q. I want you to recreate for us what you asked him. What would -- tell us the direct quote, if you can give it to us.
A. The direct quote I cannot tell you, but I can tell you it was in reference to what do I do.

Page 171

Q. What do I do about what?
A. Problems I'm having in office.
Q. And what did you describe the problems of the office to be? Did you or did you just generally say, I'm having problems in the office?
A. To him I don't think I did, no.
Q. So you asked Mr. Potter, I'm having some problems in the office, what do I do. What did he say in response?
A. He didn't have a wealth of advice. I guess him and the sheriff didn't get along that great.
Q. So he didn't have a good answer for you?
A. No.
Q. Okay. And what did you do next?
A. I did nothing. I mean...
Q. Okay. How long did you visit with Mr. Potter on that day? Couple minutes?
A. Yeah.
Q. Okay. Who next did you make any attempt to visit with in the Cherokee County Sheriff's Office about anything that was racially upsetting to you? Does this take us now to the December with Dave Groves?

Page 172

A. Yes. I want to say that I actually did make an attempt to also -- thinking about Doug Wydick and asking him a "what if".
Q. Do you think between --
A. And after Michael Potter.
Q. After Potter but before Groves you may recall that you made an attempt with Doug Wydick?
A. And asked him. He was the chief investigator, number three.
Q. Okay. And tell me how that went. Same type of deal with the Potter?
A. No. He was a little bit more informative on what to try to do.
Q. What did you frame the question to him as?
MR. LUCAS: You mean what did he tell him about?
Q. (By Mr. Case) What the conversation was.
A. Issues with employees. I didn't go into great detail with him, I don't believe, at all because the only person that I went into detail with was Groves. But, What if, What do I do in this type of situation. Having still been somewhat new, you know, somewhat, it was kind of hard to talk to

Page 173

anybody. You're kind of scared to lose your job.
I wasn't in that -- I wasn't -- I wasn't where I was comfortable enough talking to Groves or Gibson or Terry. I couldn't just go into that office. I couldn't just go into somebody's -- you know, their room and say, Hey, this is what's going on.
Q. Why not?
A. It didn't work like that. That wasn't the environment that I worked in. At the beginning, yes. I -- you know, I just thought that was the personality of this individual. After that, then, you know, okay. You're working, you don't really work with the sheriff, undersheriff and Gibson. They kind of have their own administrative duties, so you're not really in there. Then as, you know, time progressed and things happened, you know, you kind of learn who your allies or who you can and cannot talk to.
So when I felt comfortable with Potter, I attempted to ask him. After I felt comfortable with Doug, who was somewhat impartial, he really was, he -- I got better information after failed contact with other supervisors. At one point now in December I do go to Groves and try to talk to

Page 174

him, but it just wasn't easy.
Q. Well, let's -- I don't want to skip over Doug Wydick. Do you recall the way you framed what you were approaching Doug Wydick about?
A. No, I don't recall.
Q. Do you recall what he told you in response?
A. It was basically an easy way of trying to go about it, that way.
Q. What did he say to you?
A. He said try.
Q. Try what?
A. Try to go about it, you know, that way. And I told him going about it, you know, since I wasn't part of that -- since I wasn't part of that clique, I wasn't part of that group that was okay to just go in and talk to somebody like that, that -- that's what made it so hard. That's why I guess you're -- you're having a hard time with this.
When I went to these people, these were the people that weren't part of that, so when I asked, I asked in general, general form. What do I do if this happened? Where do I go? Who do I talk to? Because I am not this person or this person and it does involve this person who stays -- who says,

Page 175

Well, nothing will ever happen to me, I stayed the night at -- you know, or, I lived with the undersheriff. And he was correct until he got arrested. I mean, that's the type of people that I was trying to deal with, so --
Q. Mr. Johnson, I need you to focus in on the question. When you framed the question to Doug Wydick, can you recreate for us in the precise words that he used how he responded to you?
A. No. I don't recall the precise, no.
Q. Can you give us the general sentiment that you believe he conveyed to you in response to your statements to him?
A. No, I don't recall.
Q. Okay. Whatever it was that occurred in your exchange with Mr. Wydick, is it true that the next step you went to was to go visit directly with the sheriff?
A. Correct.
Q. He was the next person chronologically that you visited with?
A. Correct.
Q. And is this the time period that you were telling us about a couple breaks ago, or maybe last break, this occurred in December of 2014 or

Page 176

January of 2015?
A. Yes.
Q. Because you would remember the very first occasion where you were in the presence of the sheriff discussing some problems you were having in the office; correct? That would be something you would remember; right?
A. I've -- I've attempted.
MR. LUCAS: Well, object to form. Go ahead.
A. I've attempted, yes, a couple of times and I'm trying to track that specific event right here.
Q. (By Mr. Case) Do you have a better recollection of when you first had a conversation with Sheriff Groves about anything that was racially uncomfortable to you in the workplace other than December of 2014?
A. I had made an attempt to talk to Groves, yes.
Q. When? Do you know when?
A. Yes, I was waiting. My first attempt to talk to Groves was I'd probably say about three quarters of the way of my time there roughly, roughly.

Page 177

Q. So what does that mean?
A. I can recall having just spoke to him. The exact date, I do not know.
Q. Did you make a note anywhere about it to record --
A. Unfortunately, no.
Q. Do you remember what time of year it was?
A. No.
Q. Do you remember which year it was?
A. Remember which year? It -- it was in the '14 year, 2014.
Q. But it was sometime after you spoke with Kerns, Potter, Wydick?
A. Correct.
Q. Okay.
A. No, no. It was before then.
Q. Okay. Tell me when in the chronology.
A. I made an attempt before then, an attempt.
Q. Tell me when in the chronology the attempt occurred.
A. I'd probably say early '14 I'd made an attempt to talk to him over an issue.
Q. Can you tell me when in relation to

Page 178

the Kerns, Potter, Wydick chronology you made your attempt to speak to Sheriff Groves about anything that made you upset regarding race in the workplace?
A. Regarding race?
Q. Yes.
A. Okay. Regarding race it was '14. That was when that was. I thought you were asking when have I ever made an attempt to talk to him.
Q. So with you having the understanding that we've been on the subject matter of discussions about race, when in the chronology between your conversation with Kerns, Potter, and Wydick did you first have a conversation with the sheriff about anything that upset you in the workplace about race?
A. It was after Doug.
Q. Okay. How many days, weeks, or months after your attempt with Doug Wydick did you first have a conversation with Sheriff Groves regarding race?
A. Days, weeks, or months, I do not know, but not long.
Q. Okay. Was it in '14?
A. Late '14.
Q. Was it -- is this the time period you've been -- whether December '14, maybe January of

Page 179

'15?
A. December, January, '14, '15.
Q. Okay. Tell me what leads you into a conversation with the sheriff on this first occasion we're talking about race.
A. What led me in there was having dealt with Kidd, Dean Kidd, and him calling me a boy and basically that I'm supposed to clean up after the white folk, the white folks.
Q. Okay. That's the event that is described in your charge of discrimination and your lawsuit; correct?
A. Yes.
Q. Okay. And when in relation to your meeting with Sheriff Groves had Dean Kidd made such comments to you?
A. It was whenever we would work together. I do not know the exact time, but there's that brief window where I'm sure the schedule could have showed when we did.
Q. He had said these words to you that you took offense to on how many occasions?
A. He made reference to that kind of stuff quite a bit. It was just a continuing nagging, joking thing. I couldn't count how many.

Page 180

Q. Okay. Were these the items that had occurred by the time you were going to go see Mr. Potter or Mr. Wydick?
A. No.
Q. So this is stuff that occurred after your attempt to talk to Mr. Wydick that Dean Kidd is engaging in?
A. Yes.
Q. Okay. So now you're going to the sheriff to express you're upset about that; correct?
A. Correct.
Q. Okay. Where do you go to visit with him? Is it his office?
A. It's his office.
Q. Okay.
MR. LUCAS: You mean Groves?
A. Groves's office.
MR. CASE: What did I say?
MR. LUCAS: Well, you weren't specific. When did you go to -- when you said him --
MR. CASE: I'm sorry.
MR. LUCAS: -- I think you meant Groves.
A. Groves's office.
Q. (By Mr. Case) Yeah. You were going

to the sheriff's office to raise this issue with him; correct?
A. The sheriff's office. Office, yes, his office.
Q. In the sheriff's facility?
A. Yes.
Q. Okay. So did you let him know in advance that you were coming to talk about some stuff?
A. I believe I -- I don't recall exactly making an appointment or just walking in.
Q. Okay. What time of day?
A. I worked days six to two. It had to have been late morning.
Q. Okay. Anyone else present in the facility when you're going in to do this?
A. Undersheriff was normally in his office. Do I know for sure, no.
Q. Did you tape record the conversation?
A. I didn't.
Q. Okay. Did you tape record any of these conversations?
A. I didn't.
Q. Okay.
A. I wished I would have.



Q. Did you confront the sheriff while he was actually in the office or did you have to wait for him to arrive?
A. No. He was in the office.
Q. Okay. Tell me how you opened up the conversation.
A. Well, I -- sir, can I speak to you, basically. Yes, permission. And I proceeded to tell him what was outlined and basically what he told me was that he doesn't care for people who tell on other people. It should be worked out between you guys, you guys are old enough to do it, or something to that effect, and, Tattle-tales I can't deal with. Or people who get other people in trouble or something. And, you know, As far as I'm concerned, they won't work here. Okay. All right.
Q. What was it that you outlined for him?
A. I'm sorry?
Q. You said you told him "what was outlined".
A. Oh, I'm sorry. What I told him, I had an issue with Dean and that I had experienced things before with other people and told him what had happened with Dean.
Q. And what did you tell him?



A. That when we were working one day, Dean had did or said what he said.
Q. What did you tell him?
A. I had said that Dean told me -- called me a boy, referenced to me a boy, and said I needed to pick up trash after the white folk, whatever, you know, that means.
Q. Okay.
A. So --
Q. Did you tell him any other thing that Dean had done that upset you?
A. And I basically said that he had a problem with apparently either this race or my race, whatever. I told him, you know, I don't know why he won't stop with the jokes. The jokes, I can't recall every one of them, sorry. And that's -- that's the answer I got from him.
Q. Okay. Have you now told us everything you recall telling the sheriff on that occasion?
A. On that specific occasion, yes.
Q. Okay. How long did this meeting last?
A. Ten, 15 minutes.
Q. Okay. That's a long time. It took you about a minute to tell me about this interaction.
A. Correct.



Q. Can you recall in any greater detail the back and forth between?
A. Yeah. It was more hesitant. I wasn't quite -- I was not comfortable in going in and telling him that.
Q. You're describing your disposition going in. I'm talking about --
A. During?
Q. -- while you're there can you recall anything else that you said to the sheriff, other than what you've described?
A. At that time, no. No, I can't recall.
Q. Okay. So do you know what, if anything, the sheriff did regarding Dean Kidd in response to your conversation with the sheriff?
A. Do I know?
Q. Yeah.
A. Do I know for a fact, no.
Q. Okay. What did you do next?
A. There was nothing I could do.
Q. Well, you left the sheriff's office?
A. Yes.
Q. Okay. Was your shift done that day?
A. I'm not sure.
Q. Okay. You were able to return to



PLAINTIFF'S EXHIBIT 1

work?
A. Yes.
Q. And continue to work throughout the balance of 2014; correct?
A. Yes.
Q. Who was the next person you visited with, if anyone, about anything that was racially upsetting to you in the workplace, if you did?
A. The person that I had spoke with was Jason Daniels.
Q. Okay. How long after visiting with the sheriff did you visit with Jason Daniels?
A. I don't know. Him and I had EMT class together, we knew each other prior. Well, not prior, but before he became chief of Columbus.
Q. Okay.
A. So I don't know exactly how long.
Q. And so what was your conversation with Jason Daniels if he's the next person you spoke to about anything that upset you in the sheriff's office about race?
A. Absolute specifically, I do not know specifically.
Q. But was it --
A. Generally it was treatment of and how



I was there and he -- we had talked about then going there to Columbus to work.
Q. Okay. So you're telling someone who's employed by a different agency that you feel mistreated in the workplace and the subject matter of you going to work there with him comes up?
A. I talked to a friend, yes.
Q. Is that Jason?
A. Yes.
Q. Okay. I'm focusing on Jason.
A. Yes.
Q. Okay.
A. I talked to him, yes.
Q. Is there anyone else in the Cherokee County Sheriff's Office between the event where you've talked to the sheriff and the date of your termination that you expressed that you had experienced something racially upsetting in the workplace?
A. Anyone else?
Q. Looking for a name.
A. No.
Q. There is mention made in your lawsuit that at some point you became aware that Deputy Kidd had made application for employment with another



police department; correct?
A. Yeah.
Q. What police department was that?
A. That was Columbus.
Q. Okay. And is that where Jason Daniels worked?
A. Correct.
Q. Okay. How did you learn that Kidd was making application for a position at Columbus?
A. I found out later on he had applied there and --
Q. I'm asking how.
A. -- Jason --
Q. Yeah. I'm asking how.
A. Jason told me he had applied.
Q. Okay. And were you competing for a position there at Columbus?
A. No. I didn't apply there, no.
Q. Okay. And when you first learned from Jason that Kidd had made application there, what, if anything, did you say in response?
A. I don't recall. We spoke often.
Q. Okay. At some point did you make mention to Jason or anyone else with that police department that Mr. Kidd had engaged in racially



upsetting behavior at the sheriff's office?
A. Run that by me one more time.
Q. After you learned that Deputy Kidd was a candidate for a position in that police department, did you express to anyone from that same police department --
A. No.
Q. -- or city --
A. No.
MR. LUCAS: Wait, you've got to let him finish his question. You're answering before he finished his question. I want to make sure you're listening to his question carefully. I'm sorry, go ahead.
Q. (By Mr. Case) Can you pinpoint in a month and year when you learned that Kidd was a candidate for a position with Parsons?
MR. LUCAS: You mean Columbus?
A. With Parsons?
Q. (By Mr. Case) I'm sorry, with Columbus.
A. Pinpoint, no.
Q. Was it in 2015?
A. When he applied?
Q. I'm asking you.



PLAINTIFF'S EXHIBIT 1

A. When he put in his application, I don't know.
Q. Okay. Do you recall when you learned from someone in Columbus that he was looking for a job there?
A. It was when I had spoke to Jason.
Q. And when was that?
A. That was the only time.
Q. And when was that?
A. Like I said, we had spoke often. 2015.
Q. Okay. And did you ever express to Jason or anyone in Columbus that Deputy Kidd had engaged in behavior that you found racially upsetting?
A. He said he already knew.
Q. Jason said --
A. Jason said he already knew about keen -- Dean's demeanor and way that he is. He'd already known about Dean.
Q. How did that come up with conversation between you and Jason?
A. Jason brought it up.
Q. Okay. And what did you say to Jason about Dean Kidd's employment at the sheriff's office?



Did you confirm that he had engaged in some racially upsetting behavior?
A. He asked me if I had experienced any racial conduct by Dean and I said, yes, I did.
Q. Okay.
A. But he knew about all the rest of the stuff. He said, Well, I already know about all this stuff, but let me ask you this and --
MR. LUCAS: You mean the tasing?
A. Yeah.
MR. LUCAS: Okay.
A. Yes.
Q. (By Mr. Case) Go ahead.
A. Yes. He -- he knew about the -- the tasing and then he asked me about -- if I had experienced any kind of racial misconduct by Dean and I said yes.
Q. Okay. Is that kind of the end of the subject matter with Jason about Dean?
A. About Dean, yes.
Q. Dean Kidd did not get hired by the city; correct?
A. From my understanding, yes.
Q. And you've come to believe that Dean Kidd treated you as if you had some role in that?



A. Correct.
Q. Okay. Had you expressed to Jason that you had expressed -- that you had experienced something that was racially upsetting in the Cherokee County workspace other than from Dean Kidd?
A. What was that again?
Q. Yeah. You told me that you had told Jason Daniels in response to Jason's question to you whether you had experienced anything of a racial nature from Dean Kidd; right?
A. Yes, he asked me that.
Q. Did he ask whether you had experienced any similar conduct from other employees?
A. No.
Q. So the only thing you told Mr. Daniels about was Dean Kidd?
A. I answered his question on Dean, yes.
Q. Okay. And you didn't volunteer the names of other employees at the sheriff's office who you felt also mistreated you based upon race; true?
A. He -- he already knew. He already knew people and the way they were and what was going on. I don't know how.
Q. So --
A. I didn't, correct.



Q. Do you recall a conversation where Jason told you that he knew that you were being mistreated by others besides Dean Kidd?
A. No. The way that they were.
Q. The way who were?
A. Frank, Dean, the way they were.
Q. Anyone else besides Frank and Dean?
A. He had mentioned some things in reference to Groves.
Q. Okay. What did Jason Daniels say to you about Sheriff Groves that was concerning race?
A. He didn't go into it.
Q. He just gave you an innuendo?
A. Like he had known something, but I guess given his position, wouldn't -- wouldn't go there.
Q. I'm not looking for an interpretation, I'm looking for what he said to you. What did Frank -- what Mr. Daniels say to you --
A. He did not go into it.
Q. Let me finish my question. What did Mr. Daniels tell you about conduct involving Sheriff Groves and race?
A. He didn't go into detail.
Q. He just said, I know some things about



**PLAINTIFF'S EXHIBIT 1**

Page 193

the sheriff and race?
A. Yes.
Q. Direct quote?
A. I wouldn't say word for word, no.
Q. I'm looking for word for word.
A. I cannot recall at this time.
Q. He gave you just some impression that there was something about the sheriff and race?
A. Yeah, yes.
Q. And was it a negative impression?
A. Yes.
Q. And what did you take from that? Did you consider it gossip?
A. No.
Q. You considered it some truthful indication of something negative about the sheriff?
A. I believe it validated what I thought.
Q. And what did you think at that point?
A. At that point?
Q. Yeah.
A. That --
Q. That was being validated.
A. Maybe I had things wrong as far as work environment, as in they were wrong. I wasn't in a healthy environment to work in.

Page 194

Q. Okay. Anything else?
A. No.
Q. And at what month in 2015 are you maybe thinking you have a validation that you may not be in a healthy work environment?
A. It was late. It wasn't cold.
Q. Spring?
A. That's fair.
Q. You were terminated in June?
A. Yeah.
Q. So March, April, May, something like that?
A. Yes.
Q. Okay. Any other communication with Sheriff Groves from this point forward -- we just talked about this Jason Daniels' communication -- where you're attempting to tell him something uncomfortable in the workplace about race before you're terminated?
A. No.
Q. Any other person besides a sheriff in the Cherokee County Sheriff's Office that you're attempting to explain as being upsetting to you about race before you're terminated?
A. I can't recall.

Page 195

Q. Okay. In your transition from part time to full time did you get a rate adjustment?
A. I did.
Q. And you went from what hourly rate to what hourly rate?
A. Ten to 12 I believe it was 23, 25. It was a little --
Q. 12.20?
A. 12.20.
Q. 12.20. Let me show you Exhibit 12 which appears to be a rate change from 12.20 to another. Does that reference of 12.20 --
A. Twelve -- 12.20 to 12 -- or 14.
Q. So you went from $10 an hour to 12.20 when you became full time; correct?
A. Full time, yes.
Q. Do you believe that when you became a full-time employee at $12.20 an hour, that that rate of pay was discriminatory as to you?
A. No.
Q. Okay. Do I understand your allegation to be that because you didn't get an increase from 12.20 to $14 an hour until April of 2015, that that was discriminatory?
A. My opinion, yeah, yes.

Page 196

Q. When do you think you should have been raised from 12.20 to $14 an hour so that it would not have been discriminatory?
A. When the raises were starting to get -- I don't know how you put it. When he began to give them.
Q. And when to your knowledge did the first deputies begin to receive bonuses to $14 an hour? Was it in January of 2015?
A. That's about fair. I would say so. I don't know when the first round or wave of raises were, began. I'm assuming since the budget started over I could have swore it was in December, but...
Q. Okay. Do you personally know the timing that every employee at the sheriff's office got their raise, if they got one in 2015?
A. Each individual one, no.
Q. Okay.
A. I know others had gotten theirs because they had talked about it that weren't there that long or didn't have seniority, so to speak, or whatever.
Q. Who by name do you believe got a raise to $14 an hour prior to you getting yours that you believe is some evidence of discrimination as to you?



PLAINTIFF'S EXHIBIT 1

A. Fourteen or raise, period? Because this --
Q. A raise.
A. Okay. I didn't know if it was --
Q. Who by name do you believe got a raise --
A. I know Matt --
Q. -- earlier in 2015 than your April 2015 raise that you believe is evidence of discrimination?
A. Well, I know the clique, you know, Beau Hamblin, Matt Peters. I think they're the first one that got their raises actually. I was the very sole and last deputy to actually get my raise.
Q. How do you know that?
A. I talked to him and asked him several times during the wave of raises, When was mine coming, where is mine at, when do I get mine. Myself and --
Q. Who is him? Who is him?
A. I'm sorry. David Groves.
Q. Okay.
A. And myself and the office manager were talking about it and others she knew who got raises too. She could see on the pay scale all that



paperwork and all these guys have got their raises and I was the last one still at 12.20 and all these other guys were at 14 or whatever their pay raise is. If they're a sergeant, they got a little more. So everybody got a raise and there I am, still stuck there and we had talked about that. And it was several, several, several months before, you know, I even seen a raise and all I got was, It's coming, it will get there, or whatever.
Q. Okay. Do you personally know the date that every employee of the Cherokee County Sheriff's Office received their raise in calendar year 2015?
A. No.
Q. Okay. Do you personally know whether there were any employees who received their raise in a month that was effective after April of 2015?
A. No.
Q. Is there anyone other than the people who you previously described as being in the clique who, if they received their raise before you, is also evidence of discrimination as to you?
A. No.
Q. Is there -- is it all the people in the clique who received their raises before you that is evidence of discrimination as to you?



A. I believe so.
Q. So if the sheriff --
A. Nepotism, I mean, clique.
Q. So if the sheriff gave himself a raise -- let me change that.
If the sheriff gave the undersheriff a raise before you in 2015, to you that would be evidence of discrimination as to you?
A. That would be a different -- that's the hall way. I mean, that's a different playing field. They're not where we are.
Q. If any patrol deputy got a raise before you, do you think that's discrimination as to you?
A. I think the manner within how the raises came in shows, yeah. Yes, it did do that. I mean, the payroll shows the individuals that got the raises and who they are as compared -- or compared to who -- I mean, the clique, I guess. Yeah.
Q. Give me the name of the patrol deputy who was hired after you who got a raise before you.
A. They implemented the SROs and hired the new ones. I'm trying to remember the ones that came back from the academy while I was still there and then some that came in from the jail and went to



the academy. I believe it was Holly Franklin on deputy from corrections.
Q. I'm looking for a name.
A. Holly Franklin from corrections to deputy.
Q. Holly Franklin?
A. From corrections to deputy.
Q. Again, I'm just asking you to give me the name of a patrol deputy who was hired after you that you believe got a raise prior to you in calendar year 2015.
A. Holly Franklin was hired after me.
Q. Okay.
A. She got a raise.
Q. So this woman got a raise prior to you in calendar year 2015?
A. Yeah.
Q. And when did she get her raise?
A. I'm not sure exactly when. It was before me.
Q. How many months prior to you?
A. From the last round of -- it was around two months.
Q. Do you personally know the methodology by which the sheriff decided how to roll out the



PLAINTIFF'S EXHIBIT 1

raises in 2015?
A. He didn't give one.
Q. I'm asking you whether you personally know what methodology he used.
A. Oh, no.
Q. Okay. Whatever methodology he used, you think he was intending to discriminate against you by delaying yours to the last?
A. I do believe so.
Q. Okay. And you believe you should have received your raise in which month prior to April of 2015 for it not to be discriminatory?
A. It would have been -- I believe it would have been fair in February, the second month after the first.
Q. So you think unless you received your raise by February of 2015, that you have suffered discrimination in the delay of your pay until April?
A. That's -- that's my feeling on it.
Q. That's what you feel?
A. That's my feeling on it.
Q. Okay. Okay. And other than Holly Franklin, you can't think of any other individual who had less seniority who received a pay raise in 2015 prior to you; true?



A. I'm trying to think of all the deputies that came on. I would say, yes.
Q. Okay. Exhibit 13 is a Patrol Division Employee Evaluation form. Do you recall that?
A. Yes, sir. Yes, sir.
Q. Does the second page bear your signature?
A. No.
MR. LUCAS: Third.
Q. (By Mr. Case) Third?
A. Third.
MR. LUCAS: Not to quibble, but --
Q. (By Mr. Case) No, it is third, it's third.
A. Yes.
Q. That's your signature? Do you recall being present when you received this evaluation and affixed your signature to it?
A. Yes.
Q. Who was present?
A. David Groves, Sheriff Groves, and Shane Gibson.
Q. And that was in what month and what year?
A. This was in February.



Q. And how long did the three of you spend time together?
MR. LUCAS: You mean for this particular review?
Q. (By Mr. Case) Yeah.
A. With this?
Q. Yeah.
A. However long it took to read through, see what marking it got and the brief two sentences at the end, five minutes, if that.
Q. Okay. You did not take that opportunity to make mention to those two men that you had experienced anything that made you uncomfortable in the workplace; true?
A. True. At that time, no.
Q. Okay. And that was an election that you made not to do so; true?
A. I'm sorry?
Q. That was an election that you made not to make mention of anything uncomfortable in the workplace?
A. Out of fear, yeah.
Q. And why were you fearful as a patrol deputy in February of 2014? Tell us all of the things you were afraid of.



A. Just their general practice in the way where -- in the conditions that I worked in. Having a problem, trying to address that problem, getting nowhere going to the highest level that you can go to and --
Q. You're --
A. -- having --
Q. Go ahead.
A. And having no result.
Q. So here you are in February of '14 with your bosses present captive to you and you've got their attention. They're focused on you; right?
MR. LUCAS: Object to form. Go ahead.
Q. (By Mr. Case) Just the three of you?
A. Well, yeah.
Q. True?
A. Yeah, they're in the office.
Q. And you are afraid to tell those two men that you have experienced things in the workplace that make you uncomfortable; true?
A. Well, yeah, yeah.
Q. Is that yes?
A. Yes.
Q. Is that a firm yes?
MR. LUCAS: Object to form,



PLAINTIFF'S EXHIBIT 1

argumentative.
A. Uncomfortable, not -- uncomfortable.
Q. (By Mr. Case) In February of 2014 --
A. Kind of began that. That's kind of --
Q. -- how had Sheriff Groves made you uncomfortable?
A. Oh, I'm sorry, '14. Sorry, sorry. I'm sorry.
Q. Are you off on your dates?
A. Sorry. 2/5/14. Sorry.
Q. Yeah.
A. I'm sorry.
Q. These dates matter. On February 2014 tell me everything that Sheriff Groves had done to make you uncomfortable or afraid --
A. I --
Q. -- such that you were --
A. I'm sorry, not that date.
Q. You've got to let me finish.
MR. LUCAS: You've got to let him finish.
A. Oh, I thought -- okay.
Q. (By Mr. Case) As of February 2014 tell me everything that Sheriff Groves had done to make you uncomfortable and afraid such that you



wouldn't disclose to him things that made you uncomfortable in the workplace in that meeting.
A. I got my dates mixed up. I'm sorry.
Q. Go ahead.
A. 2 of '14.
Q. Go ahead.
A. That's my --
Q. Go ahead, answer the question.
A. There's nothing at that point, not too much has gone on. 2 of '14 not much has gone on. That was my mixup on the dates. Sorry.
Q. Things had already gone on to make you uncomfortable?
A. Some -- yes, some things.
Q. You had expressed to me that by February of 2014 you had already had discomfort because of the two weeks you had spent with Shane Gibson; true?
A. Yes, yes.
Q. And you did not express concern to the sheriff with Mr. Gibson right there able to candidly give an evaluation right back to your boss; true?
A. True.
Q. Frank Piepho had already made you uncomfortable with regard to comments that he had



made of a racial nature; true?
A. Yes.
Q. And you did not disclose those to Shane Gibson and Sheriff Groves in this meeting; true?
A. That's correct, true.
Q. You had had by this time some experience with Dean Kidd as well; true?
A. Some, some.
Q. But you did not tell the sheriff or Shane Gibson about some of the things that Dean Kidd had done that made you uncomfortable; true?
A. I was only --
MR. LUCAS: Well --
A. -- six months in. I mean, I -- I mean --
MR. LUCAS: I'll object to the -- wait. Object to the extent that assumes that the uncomfortable conduct had occurred by that point in time. If you know, you may answer.
A. Still being new, no, I did not tell him at that point.
Q. (By Mr. Case) And if Brian Kerns had told you about his own experience with the tasing, you did not raise that in this February 2014 meeting



either?
A. No.
Q. True?
A. True.
Q. Okay. Having now looked at this February 2014 review, does that help you put together a chronology about when these events occurred? Maybe they don't.
A. Maybe what?
Q. Maybe it doesn't.
A. Oh, no.
Q. Okay.
A. Not necessarily, no.
Q. Take a look at Exhibit No. 14. It is an evaluation five months later. This is the one where I was looking at page 2 with your signature. That's your signature on that page?
A. Yes.
Q. Page 2; correct?
A. Correct.
Q. Do you recall this meeting?
A. Yes.
Q. In July of 2015 -- I'm sorry, July of 2014 did you provide Sheriff Groves or Shane Gibson an explanation of everything that was making you



PLAINTIFF'S EXHIBIT 1

uncomfortable in the workplace as of that date in that meeting, yes or no?
A. I don't believe so.
Q. And certainly by July of 2014, based on your prior testimony, you had already spoken to Brian Kerns about what you had experienced with a number of the employees; true?
A. Yeah.
Q. You had expressed some concerns to Mr. Potter by that date?
MR. LUCAS: Well --
Q. (By Mr. Case) I'm asking. Maybe not.
A. I don't believe -- I don't believe by that yet.
Q. Okay. Can you tell us every reason why in July of 2014, now a year into your full-time status, why you would not have told the sheriff and Shane Gibson about Mr. Piepho, Dean Kidd, and anything else you felt uncomfortable of a racial nature experienced to that date?
A. Because they made it that uncomfortable.
Q. And tell the jury who may see this videotape in every way that these two men made you uncomfortable in that meeting.



A. From the start of FTO, Shane, I guess, call it a work relationship, it got off from a slow start to begin with. It was -- again, through talking with Brian we had already discussed the fact of who's -- who to stay away -- or not stay away from, but who you can talk to, who you can't, you know, kind of what goes on. And honestly, just observing some of the things that other deputies have either gone to Shane for or gone to Sheriff Groves for, you know, however some of those would have went on, and it just really wasn't much done.
Again, when he said they should work it amongst themselves, I guess that's a policy that he stayed true to and disregarded just several things. I mean, it really was not a comfortable work environment starting to be at this point a little before and it just went downhill.
Q. Mr. Johnson, you told us that you did not have your meeting with the sheriff until maybe December of 2014 or January 2015; correct?
A. Yeah.
Q. So the statement that you attribute to the sheriff in that December meeting was not known to you in July of 2014; true?
MR. LUCAS: You may be misstating his



testimony, but go ahead.
A. What -- I'm sorry, what statement?
Q. (By Mr. Case) Yeah. Focusing again on the chronology, this is July of 2014; correct?
A. Yeah.
Q. This is a year into your employment, correct, as a full-time employee?
A. 8 of '13.
Q. August of 2013.
A. 8 of '13, yeah.
Q. Yeah. About a year; true?
A. Yeah.
Q. Who had you observed the sheriff interact with that made you feel uncomfortable in July of 2014 such that you couldn't candidly tell the sheriff about anything that made you uncomfortable in the workplace?
A. Specifically times, dates, without going through all that, his demeanor and the way he went in the office and talked to people or expressed his displeasure with somebody or Gibson's displeasure, that one was real bad, but --
Q. Give me a name of who --
MR. LUCAS: Wait a minute. He's --
Q. (By Mr. Case) I'm sorry.



MR. LUCAS: I don't think he's finished.
Q. (By Mr. Case) Okay.
MR. LUCAS: Go ahead.
Q. (By Mr. Case) Go ahead.
A. A specific name?
MR. LUCAS: No. Finish your -- finish your answer, if you were answer -- if you were in the process of answering.
A. Just in general how they conduct themselves when a problem happens. A specific name, at that point I don't know who was on the receiving end of what was going on, but the whole handle it yourself, do it yourself, or work it out yourself type of mentality kind of stuck. And it is what it is if you're this person, and it is what it is if you're not.
If you're in the clique, if you're in some of the names that are mentioned, Beau Hamblin, Shane Gibson, you know, Harper, those people, it went different for them as it did for, for instance, Dakota Smith. He was not a part of that. Nick Erwin, he was not a part of that.
But the way their relationship was with Shane or the undersheriff or the sheriff was



PLAINTIFF'S EXHIBIT 1

different than mine and theirs, Nick's and theirs and Beau and them. I mean, Beau could dart in the office, get the training he wanted, equipment he wanted and that was okay. Me, on the other hand, yeah, I'd be hesitant, fearful, worried. That's what I observed having worked dayshift typing reports in the deputies room looking at people walking by, listening to their conversations in general, all of them, and how they reacted amongst themselves.
Q. (By Mr. Case) So your perception of how the sheriff may be receptive to a statement of racially uncomfortable circumstances was based upon the way you observed the sheriff in the workplace when you had the chance to observe him; fair?
A. I don't know if I'd put it exactly like that.
Q. Well, if it wasn't by observation, how else did you come to some conclusions that he would not be receptive in your annual evaluation to a discussion of those circumstances?
MR. LUCAS: Well, object to the extent that's asked and answered to the extent I think he just told you. So you may answer, if you have anything to add to what you've already said.
A. I guess it's kind of hard to explain



when you're in this situation as opposed to trying to get you to understand. I guess through Kerns' and I's conversation that -- well, conversations that I've had with him starting from when I talked to him. You know, he was my work partner in the dayshift for quite a while and after speaking to him I guess you could say dos and don'ts. Who to talk to, who to don't, you know, that -- forming that sort of guideline or rule, that kicked it off.
Q. (By Mr. Case) Okay.
A. Then, like I said, doing reports or maybe asking something simple or, Hey, I found some equipment that the old sheriff has in the other county, would it be okay if I get it, it's free. At which point, you know, we had the old Crown Vics at that time. They were departing their Crown Vics going to trucks. Free equipment, nice equipment.
Oh, no, you can't do that, you know, we're not allowed to do that. I don't like handouts, da, da, da, da. Other deputies came across, it was okay. It was good. It was fine whatever they did. Like asking for a canine or -- you know, that kind of stuff. It was just different for me to ask anything, period, than it would be those guys or the ordinary guys or me.



Q. Can you provide us a complete list of all of the requests that you made to the sheriff's office that were denied that you believe are examples of you being mistreated because of your race?
A. A list?
Q. Yeah. For instance, you made mention of a canine. Do you believe your request to be put in a position where you would have a canine is an example of you being discriminated against?
A. Can I put it in a list?
Q. Well, the first on the list I'm using is the canine example.
MR. LUCAS: I think, if I may interject, to see if we can make sure we're -- he's asking you if you can list things you asked for and didn't get from your superiors that you attribute to your race. Is that fair?
MR. CASE: It is.
MR. LUCAS: Sort of?
Q. (By Mr. Case) And maybe I can even do this even in a highly summarized form. As I understand your charge of discrimination and the lawsuit, you believe that there was a compensation issue with regard to the timing of your raise in 2015; I also understand that you believe that you



were passed over for a promotion that someone else received; and I also believe that your allegation is that you were terminated and that's indicative of race discrimination; and that the environment was hostile because of racially inappropriate things that were said in the workplace. That's what I understand the crux of your case to be.
A. Okay.
Q. And like your attorney asked my client yesterday, I have to be exhaustive here.
A. Sure.
Q. And I want to make sure that there are not some other terms or conditions that you believe that you're going to testify about in trial that you think is indicative of race discrimination. So that's where I'm getting at.
If those four categories are what is the case, I'll head directly to those and we can move, but I don't want to do that expeditiously and overlook some other term or condition by categorizing them like that and missing something.
A. I understand.
Q. So take, for instance, the canine. Is the fact that you had an idea about being canine certified and affiliated to you an example of you



PLAINTIFF'S EXHIBIT 1

Page 217

being discriminated against?
A. I wouldn't say specifically a canine, no.
Q. Okay. Is there some equipment that you were denied that you believe is an example of discrimination?
A. The lighting equipment, emergency lighting, yes, there was an incident there.
Q. And what is the emergency lighting equipment that you requested that you were denied?
A. They had a light bar on a vehicle, emergency light bar on a vehicle. I requested and found a free one and that became an officer safety issue because the warning power was not there. I worked dayshift. The light bar they had was not great. I found one that was free. I said I'll even pay for it myself to have it installed as long as I can get it. That request, I went there and that's the answer I got, Well, we're not --
Q. Who --
A. Groves, David Groves.
Q. Okay. Sheriff Groves denied that request?
A. He said, I -- I'm not one for handouts, and this, that and the other.

Page 218

Q. Is that what he said?
A. But then gave Justin Noel the okay to get all the stuff he needed free and he actually went and requested it for free, donations, that were handouts for things and I didn't understand why.
Q. Okay. And without an explanation of why, you concluded that you were treated differently because of your race?
A. I felt that was different, yes.
Q. Well, separate from your feelings, I mean, is it your allegation that this is --
A. Yes.
Q. -- evidence of you being treated because of your race?
A. Yes.
Q. Okay. When did you make the emergency light bar request?
A. There was a couple of them later after I had gotten Frank Piepho's car.
Q. Looking for a date.
A. Yeah. Without seeing when he was terminated, I do -- I can't recall at this time.
Q. You would associate Frank Piepho's termination with when you made the emergency light bar request to Sheriff Groves?

Page 219

A. That's when I made the request for that vehicle, for that car. I got a Crown Vic when it was first issued.
Q. I think you're maybe thinking out loud here.
A. I'm sorry.
Q. Do you know the date that you made the request to Sheriff Groves?
A. Specific dates on those, no.
Q. Can you pin it down to a year?
A. '14.
Q. And can you tell me when the request was denied? Same year?
A. '14.
Q. And can you tell me when you believe Justin Noel made a request?
A. No.
Q. Were you present when Justin Noel made the request to Sheriff Groves?
A. No, not when they talked.
Q. How did you come to learn that Justin Noel had made a request for an emergency light bar that was granted?
A. Well, equipment, he spoke about it. He talked about it.

Page 220

Q. So Justin Noel is your source of information that his request for an emergency light bar was granted?
A. Yes. His -- he had spoke on his equipment, came from him.
Q. Okay. And other than from Justin Noel, do you have any other information about who had granted Justin's request from -- for the same emergency light bar that you had been denied?
A. Well, not emergent -- that specific emergency light bar. Emergency equipment, light bar, etcetera, he got -- it wasn't quite the same thing, but it was close to. I -- I didn't know how specific you wanted. He said himself he got approved by David Groves.
Q. Okay. So it's Mr. Noel who told you that Groves approved Noel to get some emergency equipment?
A. Free emergency equipment, yes.
Q. Okay. And do you know in what calendar year that occurred?
A. '14.
Q. Okay. Is there any other component to this emergency lighting equipment that you had requested, other than what we've discussed?

Page 221

A. After -- after I -- after I got denied and how I got denied, no, I did not go any further.
Q. Okay. Is there any other equipment that you believe others received that you did not that is indicative of you being mistreated because of your race?
A. There was training available that I was unable to go to.
Q. Okay. Tell me the training you believe you were unable to receive because of race discrimination?
A. I don't know the name of the program, but it was put on by Quapaw marshals.
Q. In what year?
A. And it was -- '14.
Q. Okay.
A. Hamblin, Beau Hamblin was able to go, no problem, no issues. Other training -- I know other training -- excuse me -- I know other training was approved for other officers that was not.
Q. When did you make request for the same training that Beau requested you were denied and he was authorized?
A. It came out that same time, whenever that training event happened. It was all the '14,

Page 222

2014 timeframe.
Q. Who do you claim you made a request of to attend the training that Beau Hamblin was able to attend, but you were not?
A. That training went through Shane Gibson.
Q. Is it your testimony that you made a request of Shane Gibson?
A. To Shane Gibson, yes.
Q. Okay. Is it your testimony that you personally observed Beau Hamblin making the similar request to Shane Gibson?
A. No, I didn't observe him.
Q. Okay. Do you know who Beau Hamblin made a request to to go to this training?
A. No.
Q. But you know he went and you didn't?
A. Correct.
Q. And you believe that that is indicative of you being mistreated because of your race?
A. It had to be one of the three that were up there, yes.
Q. What do you mean by that?
A. The --

Page 223

Q. I'm not following you.
A. I'm sorry. The sheriff, undersheriff, or Shane Gibson, the three in the hallway, the three administrators.
Q. You requested only of Shane Gibson; true?
A. Correct.
Q. And you don't know who Beau Hamblin made request of?
A. Correct.
Q. Do you know who Beau Hamblin received approval from personally?
A. It had to be Shane Gibson. That's the only person the training went through.
Q. You were not present when Mr. Gibson --
A. No.
Q. -- though gave --
A. No, I was not.
Q. -- approval? Okay. But you have concluded that it was the same person who you requested from?
A. They said that's who training had went through, yes.
Q. Okay. Okay. And what was the subject

Page 224

matter of this training?
A. That was a -- like a shoot/don't-shoot-type scenario where they used real guns, simunition rounds.
Q. Okay. And where was it held?
A. Quapaw Nation put it on. It was in --
Q. Oh, sure.
A. -- Oklahoma. It was Oklahoma.
Q. Okay. An Indian nation?
A. Yes.
MR. LUCAS: I'm not familiar.
Q. (By Mr. Case) When you first said it, I thought you said something else, but now that you said it again --
A. Sorry.
Q. It's in --
A. Oklahoma, northern Oklahoma.
Q. Okay. Fair enough. Any other training other than what you've described?
A. None that I can think of right now.
Q. Okay. Okay. Was there any other equipment, uniform, training, or thing that you believe others received that you did not because of your race?
A. At this moment, no. No.

Page 225

Q. Okay. In the two months after your July evaluation that's before you, I believe that's Exhibit 14?
A. 14.
Q. Okay. There is a reprimand about your operation of a vehicle in relationship to a route through Crestline Junction. Do you remember that?
A. Yes.
Q. Okay. Did you sign that?
A. Yes.
Q. Okay. You disagreed with it though?
A. Correct.
Q. Okay.
MR. LUCAS: Did you make reference already?
MR. CASE: Exhibit 15.
MR. LUCAS: That's what I -- okay.
Q. (By Mr. Case) And was Exhibit 15 provided to you in a meeting with Shane Gibson?
A. Was a copy.
Q. Is that where you signed this?
A. That is where I signed this.
Q. I understand the circumstances that you've described in your discovery responses that there was apparently a suspect with a gun in

Page 226

proximity to maybe a public school?
A. A public school and a day care center.
Q. Okay.
A. He was a marine suffering from posttraumatic stress.
Q. Okay. You would agree, though, that at all times the safe operation of your motor vehicle is expected?
A. Absolutely.
Q. Okay. Other than this reprimand that went in your file, there was no other action taken against you other than this with regard to that event; true?
A. Yes.
Q. Okay. I just want to make sure you took a look at that. I was reading from it.
MR. CASE: Let's take a break.
THE VIDEOGRAPHER: We're off the record at 4:11 p.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record at 4:21 p.m.
Q. (By Mr. Case) I'm trying to figure out what my last question was. Oh, I presented you Exhibit No. 15. Mr. Johnson, is it your testimony

Page 227

that during your employment with the sheriff's office that you knew nothing about the standard operating procedures and guideline manual as set forth in Exhibit 4?
A. Know nothing about?
Q. Yeah.
A. I knew about policy and procedure, yes.
Q. Okay. Did you have access to Exhibit No. 4 while you were employed there in the sheriff's office?
A. Yes.
Q. Let me show you Exhibit 4A which was previously marked as the Personnel Handbook for Cherokee County. Did you have access to Exhibit 4A while you were employed there at Cherokee County?
A. Yes.
Q. In -- this next document I'm going to show you Exhibit 28. Can you identify that document?
A. Looks like a picture of a screen shot of a phone conversation or message.
Q. Have you seen that before this lawsuit?
A. Yes.
Q. Where did you first see Exhibit 28?

Page 228

MR. LUCAS: Well --
A. Yesterday.
Q. (By Mr. Case) Okay.
MR. LUCAS: You'd asked him had he seen it before this lawsuit. Do you mean before filing the lawsuit or -- or before -- did you mean before his deposition?
MR. CASE: I'll follow up on that.
MR. LUCAS: Okay.
Q. (By Mr. Case) Before -- before -- had you seen Exhibit 28 while you were employed at Cherokee County Sheriff's Office?
A. No.
Q. Okay. When is the first time you ever saw Exhibit 28?
A. I don't recall how long ago.
Q. Was it before you retained counsel?
A. No.
Q. Do you know what it has to do with your lawsuit?
A. No.
Q. Sorry?
A. No.
Q. Do you know who the Ethan is that is referred to there?

Page 229

A. Do I personally know him, no.
Q. Do you know Ethans who worked at the Cherokee County Sheriff's Office?
A. No, sir.
Q. Okay. Do you believe that's the defendant in this case, the sheriff that's referred to there?
A. Honestly, yes.
Q. Okay. And how did you come to have that belief?
A. This is a Snapchat screen shot. From my understanding there was an Ethan who supposedly worked there that was denying -- this apparently was another Ethan that was in his group names that he could snap. Apparently this Ethan got this by mistake. This Ethan is not, I guess, homosexual. I don't know. There was from a Dusty Walton. That's where this screen shot came from.
Q. How did you get this?
A. I took a picture of it.
Q. You took a picture of what?
A. His phone.
Q. Whose phone?
A. Dusty's phone.
Q. Dusty -- last name?

Page 230

A. Dusty Walton.
Q. Okay. And who is Dusty Walton?
A. He was a worker that went -- at that time he was trimming trees for a company that was at that point in my area or neighborhood and I had met with him there. He ended up being from Cherokee County and the conversation took off from there.
Q. And Dusty Walton apparently told you that he had received an inadvertent communication or that Ethan had received it?
A. His friend Ethan did and it's gone around Cherokee County and then that's who it was from. It was, quote, big talk, I guess. Then I did at one point -- or Mr. Groves, Sheriff Groves at one point did actually have a Snapchat account. Shortly after this it was then gone, so I don't know.
Q. Do you know who the Ethan who inadvertently received this, what his last name was?
A. I don't.
Q. Okay. So you don't know whether this is a true Snapchat account for my client, Dave Groves, correct, but you believe it may be?
A. I mean, my Snapchat screen looks exactly like this would, but, no, I don't for a fact.
Q. I mean, could you set up a Snapchat

Page 231

account under the name Dave Groves?
A. Yeah.
Q. Do you know?
A. Yeah.
Q. Okay. So if someone wanted to be mischievous, they could create a Snapchat account in anyone's name; true?
A. Correct.
Q. And as you're sitting here today this person named Dusty Walton showed you the actual phone where this appears; true?
A. Not the actual phone that it came off of, no.
Q. Okay. So what did Dusty Walton have in his hand that -- I assume it's he -- that you took a photo of?
A. His, his phone.
Q. So --
A. His phone.
Q. -- this is your photograph of Dusty Walton's phone which contained a photo that someone named Ethan received from a Dave Groves?
A. No. This is a printout of a -- a screen -- not a screen. Printout of a phone of a screen shot.

Page 232

Q. Who --
A. Not -- not my phone.
Q. I thought you said you took a photo.
A. Of a screen shot.
Q. You took a --
A. This isn't my phone.
Q. I understand. I understand that. So let's turn our attention from whose phone it is.
A. Okay.
Q. You took a photo of something; correct?
A. I can't remember if it was forwarded to someplace or not. I don't recall how I got ahold of this exactly. I can't remember if it was a screen shot or picture of a screen shot or the message itself or -- no, this isn't my phone.
Q. When did Dusty Walton come to you to tell you he had something of interest regarding this Dave Groves?
A. Dusty was trimming trees, summer. I don't recall what year. It was warm. I guess, I don't know, it could have been spring. It could have been late fall. I don't recall. He --
Q. Go ahead.
A. That -- I can't recall the exact date.



PLAINTIFF'S EXHIBIT 1

Q. Before or after you were terminated from employment?
A. This, this was after.
Q. Okay. So it was after June of 215; correct? After June of 2015?
A. Oh, yes.
Q. Okay. And do you know in which calendar year after June of 2015 you were having this communication with Dusty Walton?
A. No. No, I do not recall.
Q. You --
A. When -- when --
Q. You gave it to your attorneys; yes?
A. I'm sorry?
Q. You gave it to your attorneys?
A. The photo?
Q. Exhibit 28.
A. Yes.
Q. Okay. And did you believe that Exhibit 28 had some relevance to your lawsuit?
MR. LUCAS: Well, object to the extent that may call for a legal conclusion.
Q. (By Mr. Case) Do you --
MR. LUCAS: Beyond that, you may answer.



Q. (By Mr. Case) Do you think it mattered to your lawsuit?
A. At the time I was under the belief that maybe Mr. Groves and his credibility, so to speak, was an issue.
Q. Okay. And do you think if this was Dave Groves, that this would impact his credibility in some way?
A. Impact his credibility?
Q. Yeah.
A. Ethically, yeah.
Q. Okay. How?
A. If I were married and possibly having sent something like this to someone.
Q. So --
A. Maybe it had an impact political. Maybe it had a more impact somewhere else.
Q. Okay. So you thought it might have some impact on his relationship with his wife; true?
A. His credibility, period.
Q. Okay. And --
A. And in order to tell the truth.
Q. How so?
A. Was it him? Was it not him? Did he deny it that he didn't? I -- just in general.



Q. Let's play this out. Let's assume that this Dave Groves is the Sheriff Groves, the elected sheriff of Cherokee County. How does that matter to his credibility in your mind?
A. Telling the truth.
Q. What about that? How is anything in Exhibit No. 28 indicative of Sheriff Groves telling the truth or not telling the truth?
A. I don't know. Admitting to it; not admitting to it. I'm answering the best of what you're asking.
Q. Okay.
A. It could in many ways; it couldn't in many ways. I -- either, or.
Q. It sounds like you're not sure whether it's relevant or not?
A. No.
Q. I guess the way I want to handle this once and for all is do you intend at trial if asked about this exhibit to say that you believe that this from your personal knowledge is a communication from my client?
MR. LUCAS: Well, I'll only object to the extent the form of the question if asked at trial. He can answer whether he believes it right now.



A. If I believe --
Q. (By Mr. Case) You don't personally know whether that originated from Sheriff Groves?
A. Correct.
Q. You believe there's been some rumor in the community that this exhibit has been published throughout the community?
A. Rumor?
Q. Yes.
A. Yes.
Q. Who else have you spoken to who believes they have seen Exhibit 28?
A. Oh, I haven't spoken to anybody. The person who told me was Dusty.
Q. Okay. And who did Dusty say had known about this -- I think you called it a Snapchat?
A. Yes, it's a Snapchat message. Ethan, his friend Ethan.
Q. Okay. And we'd have to talk to Dusty to find out what Ethan's last name is?
A. Correct.
Q. You don't know Ethan's last name?
A. Not his last name.
Q. Okay. Have you ever spoken to Ethan



PLAINTIFF'S EXHIBIT 1

about this?
A. No.
Q. Okay. Okay. Would you agree with me that there's nothing in Exhibit 28 that makes reference to anything bearing upon race?
A. No.
Q. You agree with me?
A. Oh, yes. There's no race, yes.
Q. Okay. Okay. In your allegations you make reference to an occasion in which one of your coworkers, I believe it was maybe her sister who passed away?
A. Yes, sir.
Q. And there was an E-mail sent out about participating in the funeral procession. Do you recall that?
A. Yes, sir.
Q. You attribute to Chief Deputy Gibson directing foul language to you on that subject matter; correct?
A. Yes, sir.
Q. You say that he directed foul language and threats at you. What was the threat he made to you regarding this subject matter, this funeral subject matter?



A. Threats as in physically coming at me, threatening me in a manner where I would have to -- you know, I bladed myself actually gun-side away ready for a fight actually.
Q. Okay. So when you say threat, you mean he was physically aggressive with you?
A. Yes.
Q. Okay. Was there a verbal threat that he made to you?
A. It was really heated. Word for word, complete word for word, I remember going to him. He was -- I don't know, asking a simple question, Can I ask about an E-mail? All the E-mail said was just have long sleeves and ties and car is washed.
Q. Okay.
A. It didn't have a directive from the sheriff that it was mandatory. I asked my direct supervisor what it was about, if it was necessary. You know, funerals make me uncomfortable. I don't even attend my own family's, that's how uncomfortable they make me.
I attempted to talk to Shane about that and basically when I said hello -- What the fuck do you want. And I don't know what was going on. So I went on with explaining what I needed or what I was



asking him and he basically said, you know, Do you work patrol? Yeah, I work patrol. You know, go F-ing do it and basically get out of my office.
Q. Okay.
A. And with things in my hand I turned around, got ready to walk out. Next thing I know, chair goes flying. He comes out that -- that fast where I -- at that point I was backed up against the bathroom door and then I turned around to, you know, get ready to fight. That's how he came at me.
Q. And how did that event end?
A. That ended with him getting in my face and him pointing to the door saying, Get the fuck out and go patrol.
Q. And was that the end of it?
A. I left, yeah.
Q. Okay. You say in your interrogatory answers that in relation to Deputy Kidd failing to get the job at the Columbus Police Department, that Deputy Kidd talked often with Sheriff Groves and Chief Deputy Gibson. They were part of the, quote, "old white boys club, so to speak, a group from which I was excluded while employed at the Cherokee County Sheriff's Office".
Who used the term old white boys club,



if someone other than you?
A. It was mainly from the sheriff's office.
Q. I mean, did you hear others refer to a subset of the sheriff's office as being part of a, quote, old white boys club?
A. No. They never labeled that old white boys club, no.
Q. Those words were yours?
A. Those -- that's what I called the clique, old -- you know, old boys, old white boys, good old boys, that type of phrasing.
Q. One piece of the raise issue that I overlooked and I want to address, you said that in your interrogatory answers that prior to 2015 during my tenure in the sheriff's office, I never even received a cost of living adjustment raise. Do you recall that allegation?
A. There never was a COLA raise.
Q. Okay. So when you say that "prior to 2015 during my tenure at the sheriff's office, I never even received a cost of living adjustment raise", are you suggesting that you believe someone else did?
A. I knew other deputies got paid more



PLAINTIFF'S EXHIBIT 1

Page 241

than I did and we all supposedly started out at the same level, tier level, whatever you want to call it. I don't know how that happened if I'm still stuck at 12.20.
Q. Okay. By name do you know who was paid more than you that you attribute as being race discrimination?
A. Dean got paid more.
Q. Anyone else?
A. Now that I -- not that I can think of, no.
Q. Dean had been employed though --
A. Not that I know -- like know of, seen the paperwork.
Q. Okay. Fair enough. Dean had been employed by the prior sheriff, correct, to your knowledge?
A. I believe so.
Q. So at least in years of service to the Cherokee County Sheriff's Office he had more experience to the organization, true, compared to you?
A. Yeah.
Q. Okay. You suggest it was in early 2015 that a sergeant detective position opened up at

Page 242

the sheriff's office and that three people applied for this position, you, Kidd, and Beau Hamblin?
A. Right.
Q. Do you know the process by which the sheriff's office made the decision to fill that position? Do you know the criteria they used?
A. It was posted on the board that anyone with two years minimum law enforcement experience was able to apply.
Q. Okay. And you were able to apply?
A. I was. Dean had already worked six months and then he was back on the road. Beau Hamblin, he had just graduated the academy and had seven months on the road, but he had worked in dispatch before. But law enforcement experience they told me was road. From my understanding, road experience.
Q. I think maybe you're --
A. I applied --
Q. -- answering a question I didn't ask. I'm asking whether you were one of three people who applied.
A. Correct.
Q. Okay. There's nothing that prohibited you from applying; correct?

Page 243

A. No.
Q. Do you know the criteria that was used to select the position to be filled?
A. What the basis they used, no.
Q. Okay. Who did you interview with for that position?
A. Chief Investigator Doug Wydick, Groves, Clugston, Terry Clugston.
Q. Tell me why in 2015 you were applying for that sergeant detective position?
A. I'm sorry, why?
Q. Tell me why you applied.
A. I was approached by Doug Wydick to -- he asked if I would be interested in applying for detective. After he explained kind of what it entailed, I said yes.
Q. Okay. And did you believe you were qualified for the position?
A. He approached me because I was the only -- his opinion -- let me rephrase that.
Q. I'm asking you.
A. Yeah. Yes.
Q. There was a written test?
A. (Witness nods.)
Q. Yes?

Page 244

A. Yes, sir.
Q. And did you pass the test?
A. Yes, sir.
Q. Did the other candidates pass the test?
A. Only Beau took the test other -- out of the three of us Beau is the only other person that took the test. I guess he passed. Dean didn't take it. He was on some medical leave.
Q. Did you score highest on the test?
A. It was not a scorable from what they told me. It wasn't a scorable test.
Q. My question --
A. It was either pass or fail.
Q. Okay. Tell me about the test that you say was either a pass or fail and not scorable.
A. That's what they -- they told me, it was pass or fail. It was just a question-based test on knowledge.
Q. Okay.
A. Law enforcement knowledge.
Q. You did not see the test answers given by Beau Hamblin?
A. I did not.
Q. And you believe you did well in your



PLAINTIFF'S EXHIBIT 1

Page 245

in-person interview; correct?
A. Yes. I was told I did well both in test and interview.
Q. Okay. And who told you that?
A. Doug Wydick. And when I asked Groves, Sheriff Groves when we were awaiting decision, I was -- that's who told me.
Q. Sheriff Groves complimented you on your interview and your test?
A. No. I got the information on passing through Wydick -- or Wydick and Groves who told me I passed the test.
Q. Okay. And who told you you did well in your in-person interview?
A. Wydick.
Q. Okay. And how long was your interview?
A. They had a series of ten questions asked and answered, 40 seconds maybe for the question. Depending on how your answer was, I think it was about ten.
Q. So the entire --
A. About ten, 15 minutes.
Q. Okay. Were you as uncomfortable in the interview as you were in any one of your prior

Page 246

reviews in 2014?
A. No. I was more -- a little more comfortable in that position because Doug was there and I had already spoken to Doug and he in a way was rooting for me to get the position. But I did not and after asking why I was told by the sheriff we -- we weren't playing checkers, we're playing chess, and we're moving people where we see them later on. And basically I went to ask, Did I test well, interview well? Yes, yes. Why didn't I get it? I put 14 years, etcetera. This guy has seven months out of the academy.
Q. How many years of dispatching experience did Beau Hamblin have?
A. I think about two or three before he switched to road.
Q. Okay. And what do you know about his prior law enforcement experience before that?
A. It was just dispatch.
Q. Okay. That's your understanding?
A. That's what he said, yes.
Q. Okay. So you asked Mr. Hamblin about his prior experience?
A. Yes.
Q. Okay.

Page 247

A. Well, I didn't ask, it was a topic of who was getting the job. It came out that's what he had before switching.
Q. Okay. Do you know whether Mr. Hamblin had any other political connections with the committee?
A. What committee?
Q. That interviewed, I'm sorry, the hiring committee.
A. Political?
Q. Yeah.
A. I don't know at that point he ran for city council of Galena and Groves helped him through that or not. Other than that.
Q. Was he on the city council?
A. Yeah.
Q. Okay.
A. Yes.
Q. Okay. You report that after your termination and you made application for the City of Columbus, that Police Chief Jason Daniels told you that Sheriff Groves, in relation to your separation, that you had not, quote, meshed well with the deputies. Do you recall that?
A. Yes.

Page 248

Q. Okay. When did that statement from Police Chief Jason Daniels occur? First of all, was that in person?
A. Yes, yes.
Q. Okay. And was anyone else present?
A. No.
Q. Okay. And where were you when the two of you were speaking?
A. It was in his -- his office, Jason's office.
Q. Okay. And in your application for employment there at the City of Columbus did you have to go before a hiring committee? Well, were you supposed to?
A. I applied several times and -- I mean, I've applied four, five times.
Q. Okay.
A. Several different positions, lieutenant, sergeant. But, yes, two times I did.
Q. And do you have any indication from anyone at the City of Columbus what's precluding you from getting a job there? Has anyone told you that on behalf of the City of Columbus --
A. Currently right now?
Q. Yeah.

Page 249

A. This lawsuit.
Q. You think this lawsuit is holding that up?
A. There's been rumor that this lawsuit is one factor.
Q. Okay. And who is the source of that rumor?
A. It's been talked that Jason -- Mike, I'm sorry, Mike Shields from Altamont said the commissioners had caught wind of it.
Q. Okay. So you think --
A. That -- that was one thing that raised an eyebrow supposedly or they kind of -- Well, what's going on.
Q. Did the subject matter of your lawsuit come up in any of your interviews?
A. The subject matter?
Q. Yeah.
A. Oh, no.
Q. Okay. You say here that "Sheriff Groves did not identify any misconduct or poor performance on my part as to why I was fired".
I assume you mean he didn't tell Police Chief Daniels that; correct?
A. During dismissal.

Page 250

Q. So let me show you. It's this paragraph here I'm asking you about.
MR. LUCAS: Here, I've got a copy. I think he's asking about that.
I think he just said during his dismissal meaning when Sheriff Groves terminated him. But maybe I'm wrong.
Q. (By Mr. Case) Okay. Maybe I'm reading this wrong.
A. We're on different -- which --
Q. You say here in this paragraph, "After my termination I applied for an officer job with the City of Columbus".
A. Correct.
Q. "Unfortunately I was not hired for the job".
A. Correct.
Q. "Columbus Police Chief Jason Daniels told me that he had spoken with Sheriff Groves and that Sheriff Groves reported that I had not, quote, meshed, end quote, well with the deputies".
A. Correct.
Q. "Sheriff Groves did not, however, identify any misconduct or poor performance on my part as to why I was fired."

Page 251

I read that to mean that Police Chief Daniels said merely that the sheriff had said you didn't mesh well, but did not identify any misconduct or poor performance on your part; correct?
A. That's correct.
Q. Okay. Would you have expected Sheriff Groves to tell such detail to the police chief?
A. In a reference check for a job? I would hope that information that would be either detrimental to a potential future employer would be good information to know about a person who's applying.
Q. I guess what I'm saying, are you being critical of Sheriff Groves for not essentially disclosing reasons for your separation to a prospective employer?
A. Meaning he didn't give me any indication on why or that I did something wrong.
Q. I'm not asking about --
A. No, no, no.
Q. -- Sheriff Groves to you, I'm saying --
A. And that's what I told him. He never gave me a reason on why, never indicated why or anything.

Page 252

Q. Are you saying here that what Police Chief Daniels said was that Sheriff Groves never gave Daniels any misconduct or poor performance on your?
A. Oh --
Q. This paragraph is after --
A. -- I'm sorry. This is -- this is -- that's all Jason Daniels. Or I'm sorry, Police Chief Daniels.
Q. I know. So this paragraph deals with after your termination you're recounting a conversation that you've had with Police Chief Daniels?
A. Correct.
Q. Okay. And as I understand this, what Police Chief Daniels told you was that Sheriff Groves said you didn't mesh, but that Sheriff Groves had not told Chief Daniels the identity of any misconduct or poor performance on your part; correct?
A. Correct.
Q. What I'm asking is are you being critical of Sheriff Groves in any way if he failed to tell Police Chief Daniels about any misconduct or poor performance on your part?
A. Am I being critical?
Q. Yes.

Page 253

A. No.
Q. I mean, Sheriff Groves has testified that he did not tell you of reasons for your dismissal; correct?
A. He told me nothing.
Q. And that's what he testified under oath yesterday; correct?
A. Yes, sir.
Q. And so would you have expected Sheriff Groves to tell Police Chief Daniels something about misconduct or poor performance?
A. Expected, I don't know. That's two super -- department heads talking. I don't know.
Q. Okay. Is Sheriff Groves' failure to tell Police Chief Daniels about misconduct or poor performance an example that you believe of Sheriff Groves discriminating against you based on your race?
MR. LUCAS: Object to the form. It's vague and confusing and overbroad. But you may answer, if you understand it.
A. Based on my -- no.
Q. (By Mr. Case) Okay. We had sought access to your tax returns. Your interrogatory answer provided that you were looking for those and that you will provide them as you might locate them?

Page 254

A. Yeah. I had issues with the computer.
Q. You're still willing to provide those tax returns; correct?
A. Yes.
Q. Okay. And that is something you'll agree to supplement without me doing more work to get them?
A. Agreed.
Q. Okay. Is there any notation that you have made on any of your social media accounts which publicizes the reasons for your lawsuit against Cherokee County or the sheriff?
A. No.
Q. Okay. Same thing with regard to Snapchat or Instagram, is there anything that you have placed in social media about your lawsuit?
A. Nothing.
Q. Okay. Do you believe, Mr. Johnson, that Sheriff Groves or anyone employed by the county has intentionally thwarted your effort to get reemployed in law enforcement?
A. Do I think that?
Q. Well, I guess it's more than a belief. I mean, can you identify by name someone that you believe is trying to negatively influence your

Page 255

ability to get replacement employment in law enforcement?
A. I cannot say for sure without asking people.
Q. Other than Police Chief Daniels from Columbus Police Department, has any of your prospective employers told you that a negative reference from Cherokee County or the sheriff's office caused you not to be offered a position?
A. There were negative references from the sheriff's office and other -- Altamont.
Q. Well, that's part of my question. I'm asking whether anyone has informed you that because of a reference provided by the County of Cherokee or the sheriff's office that you have not received a job offer.
A. Mike Shields stated that there was.
Q. Okay. And Mike Shields said that who, what organization did not give you a job offer because of a reference from Cherokee County?
A. The Altamont Police Department. He was a chief and Groves gave the bad reference.
Q. And do you know what the, quote, bad reference was?
A. Word for word, no.

Page 256

Q. Okay. Do you have what Mr. Shields told you was the bad reference, even if not word for word?
A. Just other than it wasn't a good reference.
Q. Could it have been --
A. To what extent --
Q. Could have the reference been that you were not eligible for reemployment with the sheriff's office? Could it have been as simple as that?
MR. LUCAS: Calls for speculation.
Q. (By Mr. Case) If you know.
A. Yeah. He -- no. He basically had commented on the fact that it had a little more to do with maybe a personal conversation as opposed to the basic questions one would ask.
Q. Okay. I'm trying to wrap up here so as to be close to a commitment I made as to timing. We spent a lot of time asking about some of the racially upsetting behavior that you claim you suffered while employed at the sheriff's department. We've taken several breaks. Can you think of any event and an employee of the sheriff's department associated in that event in greater detail other than what we've already discussed?

Page 257

A. In greater detail at this time, no.
Q. Is there an employee of the sheriff's department who upon further reflection that you believe engaged in racially inappropriate conduct that we have not discussed?
A. No.
Q. Are you in 2019, as of January 1, ready, willing and able to return to full-time employment in law enforcement in the State of Kansas?
A. Yes.
MR. CASE: Counsel, let me take a quick break and I may be able to wrap up.
MR. LUCAS: Okay. Fair enough. Off the record.
THE VIDEOGRAPHER: Off the record at 5:08 p.m.
(Recess.)
THE VIDEOGRAPHER: We're back on the record at 5:12 p.m.
Q. (By Mr. Case) When you applied for the sergeant detective position, was there a pay increase associated with that?
A. Yes.
Q. From what pay to what pay?
A. I believe it was around 14 to 16.25.

Page 258

Q. You would have been at 14 and it would have gone to 16.25, if hired?
A. If hired, if it was in that timeframe. I believe it was within the timeframe.
Q. Was Terry Clugston, Junior, someone who treated you unfairly?
A. Yeah, yes.
Q. Okay. Did Douglas W. Wydick treat you unfairly?
A. No.
Q. When you were terminated, you had not first made a written report of injury regarding the event in which you were tased and developed soreness to your right elbow; correct?
A. A written one, no.
Q. Okay. The event of that injury occurred like on June 2nd of 2015; correct?
A. I believe so.
Q. Okay. You had not between June 2nd of 2015 and your termination date been to the doctor, had you?
A. I had a doctor's appointment that -- that day I got hurt. I was going to go see the doctor. That got cancelled. I got ordered to stay after to finish the Robinson report, the incident

Page 259

that happened. Since I was the reporting officer I was ordered to stay and finish it, so I missed my doctor's appointment.
Q. And was that the doctor's appointment because of the event or --
A. Yes.
Q. -- was it any preexisting doctor's appointment?
A. No. I called in to go see my doctor.
Q. Okay. So you wanted to get treatment on the very day you were hurt; correct?
A. I was going to go see him about it, yes.
Q. Okay. Was it an emergent appointment in your mind?
A. Urgent.
Q. Okay.
A. Yes.
Q. And did you reschedule that appointment to be seen the next day, yes or no?
A. No.
Q. Okay. And is there anything that precluded you from seeing your doctor on any day after June 2nd up until prior to your termination?
A. No. I think it was either a Friday or

Page 260

weekend scheduling something, but I got in as soon as I could.
Q. And do you recall how soon after you missed the appointment on June 2nd that you first actually saw a doctor regarding your injury?
A. I don't recall at this time how soon after the 2nd.
Q. But would you agree with me it was not until after your termination?
A. In reference to the injuries, I don't -- I don't believe so.
Q. So you agree with me or disagree with me?
A. Yeah. No, I disagree with you on that.
Q. Okay. And let me clear this up. You believe you did see a doctor regarding your workplace injury?
A. Yes.
Q. Before you were terminated --
A. Correct.
Q. -- regarding the June 2nd event?
A. Sorry. Correct.
Q. Do you claim that you were terminated in part because you were pursuing a workplace injury?

A. They frowned upon injuries. I had injured my ankle looking for a suspect that was in the woods and --
Q. I'm asking a different question.
A. I understand. Can you ask it again, please?
Q. Sure. It's a good thing for employers not to have injuries in the workplace; correct?
A. Yeah.
Q. Do you claim that your employment came to an end in part because you were pursuing a claim for workers' compensation?
A. I couldn't tell you.
Q. After your termination Sheriff Groves assisted in completing the written documentation to get you your compensation claim initiated and pursued?
A. Yes.
Q. True?
A. True.
Q. And have you received medical care to treat all of the injuries that you believe arose from this event, a work-related injury?
A. Yes.
Q. Okay. Did you have legal counsel to



help you pursue that claim?
A. Yes.
Q. And who was that?
A. Kayla.
Q. Spigarelli?
A. Spigarelli, yep.
MR. LUCAS: Who else has the name Kayla?
MR. CASE: Right.
Q. (By Mr. Case) Okay. And is your work comp claim still open for you to receive the medical you may need for ongoing treatment?
A. No.
Q. Okay. Do you believe your work comp claim has been resolved and all of the medical care associated with it?
A. Yes.
Q. Okay. There is no ongoing treatment that you need to make you as whole as possible after receiving your benefits from work comp; true?
A. Correct, true.
Q. Okay. When, as part of your job applications, do you intend to tell employers who may consider hiring you for law enforcement that you have some work impairment that would preclude you from



doing the full range of duties that you believe are inherent in the patrol deputy position?
MR. LUCAS: I'll object to the extent that contains improper assumptions and arguments. I don't -- misstates his prior testimony. You may answer.
Q. (By Mr. Case) Let me try again. I think counsel's point is well taken.
If you are asked to participate in a fitness-for-duty exam and you are asked your own personal opinion about whether you have any physical constraints, focusing on your physical condition as a result of this June 2015 event, would you intend to say that you have some constraint?
A. I would be honest, yes.
Q. Okay. And what would be that constraint?
A. Well, I guess I wouldn't say constraint. I guess I would say injuries. It would all depend on what I would have to do, what physical limitation would there be for me to -- to have. I guess I need to know specific. I mean, twisting...
Q. You have been employed with several different agencies as a patrol deputy?
A. Yes.



Q. Thinking of all of the essential functions of those positions, is there some task that you would self-identify as being problematic for you because of the physical condition you find yourself in now that your work comp treatment has come to an end?
A. No.
Q. As you're sitting here you believe you could do all of the essential functions of a patrol duty job, if offered to you?
A. I believe so.
Q. It seems like you're hesitating a little bit about that.
A. You know what you're told by the doctor. You know, they say you're good, be careful, but you could still do it, so...
Q. Would it be fair to say that in your own mind you could do the essential functions of a patrol deputy position so long as you could tolerate it?
MR. LUCAS: Object to the extent that's overbroad and vague. That would be true for anybody, but go ahead.
A. I'd have some concerns.
Q. (By Mr. Case) Okay.



PLAINTIFF'S EXHIBIT 1

Page 265

A. Over just the belt.
Q. I'm sorry?
A. Just the belt, the duty belt. I would ask to wear weightbearing on my shoulders instead of my hips.
Q. Okay.
A. I mean --
Q. Can you think of any other accommodation you would ask for if --
A. No.
Q. -- offered a patrol duty position today?
A. No, sir.
MR. CASE: Counsel, pass the witness.
MR. LUCAS: We reserve our questions. We will read and sign.
THE VIDEOGRAPHER: We're off the record at 5:24 p.m.
MR. LUCAS: Well, do you want to make a record real quick? You've made reference to exhibits. These were obviously marked at the deposition of Sheriff Groves and maybe that's all we need to say. None were -- none were remarked here.
MR. CASE: True.
MR. LUCAS: Correct?

Page 266

MR. CASE: I think we'll just note on the record that the exhibits we've been referring to today are same deposition exhibits that were used in Sheriff Groves' deposition.
MR. LUCAS: Correct. I don't recall you marking any new ones. That's my --
MR. CASE: Didn't do it.
MR. LUCAS: Okay. That's all I want to put on the record.
MR. CASE: Okay. Thank you. Thanks, Counsel.
THE VIDEOGRAPHER: Off the record at 5:25 p.m.
(Deposition concluded at 5:25 p.m.)

Page 267

______________________
BRANDON JOHNSON

Subscribed and Sworn to before me this ____ day of ____________, 2019.

______________________
Notary Public

County of ______________

State of ______________

BRANDON JOHNSON vs. CHEROKEE COUNTY BOARD OF COUNTY COMMISSIONERS and DAVID M. GROVES

Page 268

ERRATA SHEET

RE: BRANDON JOHNSON vs. CHEROKEE COUNTY BOARD OF COUNTY COMMISSIONERS and DAVID M. GROVES

DEPOSITION OF: BRANDON JOHNSON

| PG/LN NO. | CORRECTION | REASON FOR CHANGE |
|---|---|---|
| :_______ | :_______________ | :______________________ |
| :_______ | :_______________ | :______________________ |
| :_______ | :_______________ | :______________________ |
| :_______ | :_______________ | :______________________ |
| :_______ | :_______________ | :______________________ |
| :_______ | :_______________ | :______________________ |
| :_______ | :_______________ | :______________________ |
| :_______ | :_______________ | :______________________ |
| :_______ | :_______________ | :______________________ |
| :_______ | :_______________ | :______________________ |
| :_______ | :_______________ | :______________________ |
| :_______ | :_______________ | :______________________ |
| :_______ | :_______________ | :______________________ |
| :_______ | :_______________ | :______________________ |

_______ I certify that I have read my deposition in the above case and I request that no changes be made.
_______ I certify that I have read my deposition in the above case and I request that the above changes be made.

SIGNATURE OF DEPONENT:
______________________

DATED:
__________________



PLAINTIFF'S EXHIBIT 1

C E R T I F I C A T E

I, ANGELA R. CORKILL, a Certified Court Reporter, do hereby certify:

That prior to being examined the witness was by me duly sworn;

That said deposition was taken down by me in shorthand at the time and place hereinbefore stated and was thereafter reduced to writing under my direction;

That I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested in the action.

The original transcript is in the custody of:

Mr. Kevin D. Case
Case Linden, PC
2600 Grand Boulevard, Suite 300
Kansas City, Missouri 64108

WITNESS my hand and seal this 13th day of June, 2019.

______________________________
ANGELA R. CORKILL
CSR No. 1387, CCR No. 961

BRANDON JOHNSON vs. CHEROKEE COUNTY BOARD OF COUNTY COMMISSIONERS and DAVID M. GROVES



PLAINTIFF'S EXHIBIT 1