## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

BRANDON JOHNSON,

       Plaintiff,

       v.

CHEROKEE COUNTY BOARD OF COUNTY
COMMISSIONERS AND DAVID M.
GROVES,

       Defendants.

Case No.  02:17-CV-2644-JAR

## MEMORANDUM AND ORDER

Plaintiff Brandon Johnson brings suit against Defendants Cherokee County Board of County Commissioners and Sheriff David M. Groves.  He asserts claims for racial discrimination, a hostile work environment, and retaliation under Title VII.  Plaintiff also brings claims under 42 U.S.C. §§ 1981 and 1983.  Defendants seek summary judgment on all claims (Doc. 95).  Plaintiff's Motion to Amend the Pretrial Order is also before the Court (Doc. 128).  For the reasons stated in more detail below, the Court denies in part and grants in part Defendants' motion.  In addition, the Court denies Plaintiff's Motion to Amend.

## I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine issue of material fact

---

[1]Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2]*City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the nonmoving party."[3] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[4] An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6] Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[7] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[8] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9] To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript[,] or a specific exhibit incorporated therein."[10] The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[11]

---

[3]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[4]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5]*Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

[7]*Anderson*, 477 U.S. at 256.

[8]*Id.*; *accord Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[9]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[10]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

[11]*Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

Finally, summary judgment is not a "disfavored procedural shortcut;" on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[12]  In responding to a motion for summary judgment, "a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial."[13]

## II.    Uncontroverted Facts[14]

Plaintiff Brandon Johnson brings suit against two Defendants: (1) the Board of County Commissioners of Cherokee County ("the Board"), and (2) Sheriff David M. Groves.  Plaintiff worked at the Cherokee County Sheriff's Department ("the Sheriff's Department"), but Cherokee County, Kansas employed and paid him.  Cherokee County acts by and through the Board.  Sheriff Groves was an agent, employee, or servant of Cherokee County.  Cherokee County is an employer within the meaning of Title VII.

### Plaintiff's Initial Employment, Chain of Command, and Pay Increase

Plaintiff is of mixed race.  His ancestry is both African-American and Caucasian.  On August 17, 2012, Plaintiff applied for employment with the Sheriff's Department.  On March 28, 2013, Sheriff Groves hired Plaintiff.

Shane Gibson is the Chief Deputy for the Sheriff's Department.  Gibson was Plaintiff's direct supervisor.  Gibson reported to Sheriff Groves.

For 2015, the hourly rate for all patrol deputies was raised to $14.00 per hour.  Sheriff Groves testified that the pay increase did not apply to all deputies at the same time but that it was

---

[12]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[13]*Conaway v. Smith,* 853 F.2d 789, 794 (10th Cir. 1988).

[14]The facts are uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff as the nonmoving party.

done based on the month of hire.  The first pay increase was effectuated in December 2014.

Deputy Dean Kidd began working full-time in March, and his hourly rate increased in December

2014.  Deputy Beau Hamlin began working full-time in June, and his hourly rate increased in

March 2015.[15]  Plaintiff began working full-time in August at an hourly rate of $12.20.  In April

2015, his hourly rate increased to $14.00.

**Plaintiff's Work History**

On April 1, 2013, Plaintiff began working part-time as a patrol deputy.  Approximately

four months later, on August 13, 2013, Sheriff Groves moved Plaintiff to a full-time deputy

position.

On January 2, 2014, Plaintiff sat for the Sheriff's Department Investigator Test for the

first time for an opening for a Detective position.  He was not hired for this position.  Dean Kidd

received it.

On February 5, 2014, Plaintiff was issued his first written performance review.  He

generally received ratings from good to very good, with some outstanding marks.  He did not

receive any below average or unsatisfactory marks.  Some typewritten comments included that

his "paper service completion had been below average but is recently improving;" he "had

multiple opportunities for additional work that were not sought out;" he "has a difficult time

accepting constructive criticism;" and "can seem to be excessive in asking for equipment,

assignment changes, etc. ...."[16]

Plaintiff's second written performance review was on July 1, 2014.  In this review, he

received a number of good marks, five very good marks, two below average marks, and a couple

---

[15]Hamlin also received a pay increase in December 2014, but the evidence demonstrates that this pay increase was due to a change in position.

[16]Doc. 97 at 5–6.

of outstanding marks. Plaintiff's overall evaluation was good. His below average marks were for "reliability and dependability" and working relationships. Some typewritten comments included that he "was not willing to work extra shifts" and that "[d]espite having interactive skills that allow him to engage the public in a positive way, [he] struggles with creating strong relationships with co-workers, which does not go towards creating an overall positive work environment."[17] The review noted that Plaintiff needed to "work on his relationships with other Sheriff's Office personnel in each division" and to "recognize the importance of teamwork."[18]

Plaintiff received one formal written reprimand on September 5, 2014, based on an incident that occurred on August 29, 2014. On that date, the Sheriff's Department received a complaint about a deputy driving without due regard for safety while running with his lights and sirens. After reviewing Plaintiff's car camera video, it was confirmed that Plaintiff passed two cars on a hill in a no passing zone while traveling over 100 miles per hour, and that there was an oncoming car just past the crest of the hill. The camera also indicated that he entered an intersection, at 55 miles per hour, with his view obstructed. The Sheriff's Office issued a written reprimand for violating the Rules of Conduct Policy and the Agency Vehicle Driving Policy.

On October 21, 2014, Plaintiff sat a second time for the Sheriff's Department Investigator Test for an opening for a Detective position. He was not hired for this position. Beau Hamlin received it.

On May 30, 2015, the Sheriff's Department received a complaint from the Chief of Police of Oswego, Kansas regarding Plaintiff. On June 1, Sheriff Groves requested that Gibson locate video of the May 30 incident. On both June 1 and June 4, Gibson looked for the video on

---

[17]*Id.* at 7–8.

[18]*Id.* at 8.

Plaintiff's car camera and body camera. He found that the May 30 video had not been recorded. Plaintiff had not reported any problems with either recording device. Nobody asked Plaintiff about the incident or the missing videos.

On June 8, 2015, Sheriff Groves requested by email that Plaintiff participate in a funeral procession for a family member of the Sheriff's Department. Plaintiff indicated that he did not want to attend. Plaintiff testified that he went to Gibson, after receiving the email, to speak with him about it. Plaintiff states that when he said, "Hello," Gibson responded with, "What the fuck do you want?" When Plaintiff asked Gibson if participation in the funeral procession was mandatory, he states that Gibson responded with, "Do you work patrol?" After Plaintiff responded yes, Gibson then stated, "Go F-ing do it" and to get out of his office. Plaintiff states that when he turned around to leave, he saw a chair go flying. He testified that Gibson got in his face and said, "Get the fuck out and go patrol." Gibson does not recall this exchange.

On June 10, 2015, Gibson located a body camera video of a car stop by Plaintiff on May 24, 2015. The stop was not fully recorded on Plaintiff's car camera video. Neither Gibson nor Sheriff Groves spoke to Plaintiff about this incident.

On June 21, 2015, Plaintiff was dispatched to a theft call at 1:15 p.m. Plaintiff did not respond. At approximately 1:30 p.m., Sergeant Harper saw Plaintiff watching YouTube videos at the Sheriff's Department.

Gibson and Sheriff Groves spoke to each other about Plaintiff's termination before it happened. On June 25, 2015, Sheriff Groves terminated Plaintiff. He did not give Plaintiff a specific reason for his termination but told Plaintiff that they "could discuss it at a later time." Sheriff Groves never informed Plaintiff, through any type of communication, the exact reasons for Plaintiff's termination.

### Racial Incidents Before and During Plaintiff's Employment

During Plaintiff's employment, he worked with Deputy Dean Kidd. Prior to Plaintiff's employment, Kidd was involved in a tasing incident with Brian Kerns, another African-American deputy employed with the Cherokee County Sheriff's Department.[19] Kidd was making jokes and said something about drinking grape kool-aid and eating watermelon. Kerns became irritated and told Kidd to stop or he would tase him. Kidd continued to make comments, and Kerns dry-tased Kidd.[20] Gibson was unaware of the tasing incident until Plaintiff filed a Charge of Discrimination.

Plaintiff testified that Kidd called him a "boy" and told him that he "needed to pick up trash after the white folk." In addition, Kidd played a racist Mario Cart YouTube video at work in front of Plaintiff. In this video, it shows a "gorilla guy driving," and the voiceover uses the phrase, "got you nigger." Kidd also showed the video to Kerns several times. Kerns told Kidd that it was not funny and was inappropriate. Kidd merely laughed.

Plaintiff states that he was told by a former deputy of the Sheriff's Department that Deputy Beau Hamlin called another employee's black dog a "nigger." Plaintiff did not hear or witness this event.[21] Plaintiff also states that his co-workers would use the term "white privilege." He states that he did not understand what the term meant while he was employed with the Sheriff's Department, but he found out later what it meant. Plaintiff believes that the term had been used during his employment in an offensive manner.

---

[19]Kerns worked with Plaintiff for approximately 20 months. Kerns worked for the Sheriff's Department between February 1, 2010 through December 30, 2014, when he resigned. He was rehired on June 23, 2015, and he works part-time.

[20]A dry-tase is a less severe tase because the cartridge is removed prior to tasing.

[21]It is unclear whether Plaintiff learned of this incident prior to the end of his employment. Viewing the facts in the light most favorable to Plaintiff, the Court will construe the incident as if it occurred and Plaintiff learned of it prior to his termination.

### Plaintiff's Discussions with Others about Work Place Issues

During Plaintiff's employment, he spoke with Kerns about "racial jokes" and being treated differently because of his race. Plaintiff does not specifically recall when he spoke with Kerns, but he believes that he spoke with him in the summer of 2014. Kerns never spoke to Sheriff Groves about the racial incidents or any of Plaintiff's statements to Kerns.

In 2014, Plaintiff spoke with Deputy Mike Potter about problems in the office. Plaintiff did not describe to Potter what the problems were. Plaintiff also spoke to Chief Investigator Doug Wydick regarding what to do about problems he was having with employees. Plaintiff did not go into detail, and he only asked in general form.

Plaintiff testified that he tried to speak with Deputy Gibson about racial discrimination but was unsuccessful in doing so because when he asked Gibson whether he had a moment to speak, Gibson responded with something akin to "what?" or "what the fuck do you want?" Plaintiff left Gibson's office when he knew that his attempt failed. He cannot recall when this attempted conversation took place.

Plaintiff testified that he complained to Sheriff Groves about race discrimination sometime between December 2014 and January 2015.[22] Plaintiff states that he told Sheriff Groves that Kidd had called him a "boy" and said that he "needed to pick up trash after the white folk." Plaintiff also testified that he told Sheriff Groves that Kidd would not stop with the jokes and had an issue with his race. In addition, Plaintiff stated that he told Sheriff Groves about the tasing incident between Kidd and Kerns. After speaking with Sheriff Groves, Plaintiff does not

---

[22]Sheriff Groves testified that Plaintiff did not complain to him about racial discrimination. Defendants state that they admit for purposes of the summary judgment motion that Plaintiff complained to Sheriff Groves. In addition, the facts are construed in the light most favorable to Plaintiff.

recall making any subsequent complaints of race discrimination to any employees of the Sheriff's Department.

Plaintiff also spoke to a non-employee, Jason Daniels, about his mistreatment in the workplace. Daniels is the Chief of Police for Columbus, Kansas. Sheriff Groves did not know prior to June 25, 2015 (after Plaintiff's termination) that Plaintiff had communicated information about racial harassment to Daniels. Sheriff Groves and Daniels, however, did speak in late 2014 or early 2015, about Kidd's reputation for being racist and the tasing incident between Kidd and Kerns. Daniels also spoke to Sheriff Groves about Kidd's efforts to seek employment with the City of Columbus because Daniels was unhappy with the manner in which Kidd attempted to seek employment.

### Similarly Situated Employees

Deputy Dean Kidd and Deputy Frank Piepho, both of whom are Caucasian, received multiple disciplinary measures prior to their terminations, including suspensions and numerous written reprimands. Kidd had at least nine documented instances of work misconduct or written reprimands before his termination. Piepho was written up for verbal abuse and harassment of a female co-worker, but that write-up did not result in his immediate termination.

### Events Occurring after Plaintiff's Termination

On December 18, 2015, Plaintiff filed a Charge of Discrimination with both the Kansas Human Rights Commission ("KHRC") and the Equal Employment Opportunity Commission ("EEOC"). Upon receipt of Plaintiff's charge, the Sheriff's Department conducted an internal investigation into the allegations. This investigation revealed that a tasing incident occurred between Kidd and Kerns prior to Plaintiff's employment. It also revealed that Kidd displayed an inappropriate video in front of Plaintiff. On January 19, 2016, Kidd was terminated based on the

findings of the Sheriff's Department's internal investigation that he engaged in racial discrimination/harassment while at work.

Plaintiff filed this lawsuit on November 6, 2017, asserting five claims. Under Count I, he alleges a hostile work environment and discrimination based on his race under Title VII. In Count II, he brings a retaliation claim under Title VII. Under Count III, he brings a racial discrimination claim pursuant to 42 U.S.C. § 1981. In Counts IV and V, he asserts substantive and procedural due process claims pursuant to § 1983. Defendants seek summary judgment on all claims.

## III.    Discussion

As an initial matter, Defendants contend that the Board cannot be held liable for Plaintiff's asserted claims. They contend that the Board merely facilitates the funding of the Sheriff's Department and Sheriff Groves has the sole discretion over the Sheriff's Department. The parties agree that Sheriff Groves was acting as an agent of Cherokee County and that Cherokee County technically employed Plaintiff.

A sheriff's department acts as an agent for the county, and the sheriff's department is an office through which a county may act.[23] To bring suit against the county, Kansas law requires that the county be sued in the name of the board of the county commissioners.[24] Additionally, in a Title VII lawsuit, a plaintiff must sue his employer.[25]

---

[23]*Blume v. Meneley*, 283 F. Supp. 2d 1171, 1175 (D. Kan. 2003) (citing *Bd. of Cty. Comm'rs of Cty. of Lincoln, Kan. v. Nielander*, 62 P.3d 247, 251 (Kan. 2003)).

[24]K.S.A. § 19-105 (stating that "[i]n all suits or proceedings by or against a county, the name in which the county shall sue or be sued shall be 'The board of county commissioners of the county of ____ . . . .'"). *See also Brown v. Sedgwick Cty. Sheriff's Office*, 513 F. App'x 706, 707–08 (10th Cir. 2013) (citing *Hopkins v. State*, 702 P.2d 311, 316 (1985); K.S.A. § 19-105) (noting that the board of county commissioners is the appropriate defendant for claims against the county's subunits, including the sheriff's office).

[25]*See* 42 U.S.C. 2000e-2(a)(1) (stating that an "employer" must not discriminate an individual); *see also Haynes v. Williams*, 88 F.3d 898, 901 (10th Cir. 1996) (noting that "statutory liability is appropriately borne by employers, not individual supervisors").

In a recent Title VII lawsuit for sex discrimination against a sheriff's office, the District of Kansas found that the county's board of commissioners was a proper defendant when the plaintiff sued the county sheriff's department and functionally sued the county.[26]  The court stated:

> Because plaintiff must name his employer as a defendant in a Title VII lawsuit and the Kansas statute directs him to sue the board of county commissioners in any suit brought against the county, the court concludes that plaintiff properly has named the Board . . . as a defendant in this lawsuit.[27]

Similarly, in this case, Plaintiff's suit against the Board functions as one against Cherokee County, acting through the Sheriff's Department.  Thus, the Board is a proper defendant.

## A.    Racial Discrimination

### 1.    Hostile Work Environment Racial Harassment

Plaintiff brings a hostile work environment claim based on racial harassment under Title VII.  To survive summary judgment on a hostile work environment claim, a plaintiff must show that he was discriminated against because of his membership in a protected class, and that the discrimination was "sufficiently severe or pervasive such that it altered the terms or conditions of [his] employment and created an abusive working environment."[28]  A hostile work environment must be both objectively and subjectively offensive.[29]  To determine whether an environment is hostile, courts must consider all "circumstances including the frequency of the discriminatory

---

[26]*Appleby v. Bd. of Cty. Comm'rs of Douglas Cty., Kan.*, No. 17-2101-DDC, 2018 WL 3659395, at *13 (D. Kan. Aug. 2, 2018) (finding that the board of commissioners was the properly-named defendant in a suit against the sheriff's office and stating that the Kansas statute directed the plaintiff to sue the county in the name of the board of the commissioners); *see also Vaughan v. Ellis Cty.*, No. 13-2283-CM, 2014 WL 910125, at *2 (D. Kan. Mar. 10, 2014) (noting that the plaintiff had no choice but to name the board of county commissioners when the plaintiff brought suit against the county sheriff and county under K.S.A. § 19-105).

[27]*Appleby*, 2018 WL 3659395, at *13 (citations omitted).

[28]*Medina v. Income Support Div., N.M.*, 413 F.3d 1131, 1134 (10th Cir. 2005).

[29]*Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1219 (10th Cir. 2003).

conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's work performance."[30]

In addition, a plaintiff must be able to point to "more than a few isolated incidents of racial enmity."[31]  While the severity and pervasiveness inquiry "is particularly unsuited for summary judgment because it is quintessentially a question of fact,"[32] the Tenth Circuit has affirmed summary judgments granted partially based on the severity and pervasiveness requirement.[33]  "[M]ere snubs, unjust criticisms, and discourteous conduct are not actionable; to establish a hostile work environment, [a] plaintiff must show that the alleged harassment is excessive, opprobrious, and more than casual conversation."[34]

Defendants argue that summary judgment in their favor is warranted because there is insufficient evidence demonstrating a steady barrage of offensive racial comments.  However, the Court agrees with Plaintiff that there is a genuine factual dispute over whether the alleged harassment was pervasive or severe enough to create a hostile work environment.

When considering a hostile work environment claim, the court looks "at both specific hostility targeting Plaintiff as well as the general work atmosphere."[35]  Here, Plaintiff directs the Court to multiple instances of conduct that, in combination, a reasonable jury could find

---

[30]*Id.* at 1219 (citation omitted).

[31]*Lewis v. Standard Motor Prods., Inc.*, 203 F. Supp. 2d 1228, 1235 (D. Kan. 2002).

[32]*Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 958 (10th Cir. 2012) (citation omitted).

[33]*See, e.g.*, *Morris v. City of Colo. Springs*, 666 F.3d 654, 665–66 (10th Cir. 2012); *Faragalla v. Douglas Cty. Sch. Dist.*, 411 F. App'x 140, 153–54 (10th Cir. 2011); *Nettle v. Cent. Okla. Am. Indian Health Council, Inc.*, 334 F. App'x 914, 921–26 (10th Cir. 2009).

[34]*Stewart v. Bd. of Comm'rs for Shawnee Cty., Kan.*, 216 F. Supp. 2d 1265, 1280 (D. Kan. 2002) (citing *Garcia-Paz v. Swift Textiles, Inc.*, 873 F. Supp. 547, 561–62 (D. Kan. 1995)).

[35]*McGowan v. All Star Maintenance, Inc.*, 273 F.3d 917, 925 (10th Cir. 2001); *see also Hernandez v. Valley View Hosp. Ass'n,*, 684 F.3d 950, 959 (10th Cir. 2012) (noting *McGowan's* holding that "comments not directed at plaintiff, including a supervisor who called another worker the n-word, were relevant to the evaluation of hostile work environment claim.").

constitute a hostile work environment.  Specifically, Plaintiff's co-worker, Kidd, played a racist video game in front of him containing the word "nigger."  The use of the term "nigger" is particularly offensive.[36]  Although it is unclear how often the game was played in front of Plaintiff, it is undisputed that Kidd also played it several times in front of another African-American employee, Kerns, who told Kidd that the game was offensive.  Additionally, Plaintiff has presented evidence that racially discriminatory incidents occurred between Kidd and Kerns; these incidents included statements about grape kool-aid and watermelon and Kerns tased Kidd due to his continual and repeated comments that day.[37]  Plaintiff has also directed the Court to evidence that another deputy called a black dog a "nigger."

Furthermore, Plaintiff includes evidence that Kidd called Plaintiff a "boy" and told him to pick up trash after the white folk.[38]  It is unclear how many times Kidd directed racial remarks toward Plaintiff, but Plaintiff testified that Kidd's comments occurred whenever they worked together and it was a continuing, nagging thing.  There is also evidence that Gibson cursed at and assaulted Plaintiff without provocation.  Although a hostile work environment must be based on racial animus, "facially neutral abusive conduct can support a finding of racial animus sufficient to sustain a hostile work environment claim when that conduct is viewed in the context of other, overtly racially-discriminatory conduct."[39]

---

[36]*Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1145 (10th Cir. 2007) (citing cases and noting that the use of an unambiguous racial epithet, such as "nigger," is particularly offensive to African-Americans and is indicative of more severe harassment).

[37]The evidence demonstrates that this event occurred prior to Plaintiff's employment, but it appears that the racially-charged atmosphere continued throughout and during Plaintiff's employment.

[38]The Court notes that after Plaintiff's complaint to the KHRC/EEOC, the Sheriff's Department performed an investigation into the allegations and substantiated certain racial incidents that led to Kidd's termination.

[39]*Hernandez*, 684 F.3d at 960 (alterations omitted) (citing *O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1097 (10th Cir. 1999)).

In sum, there are questions of fact as to the severity and pervasiveness of the conduct and these questions are generally unsuited for summary judgment determination. Thus, the Court denies Defendants' request for summary judgment on Plaintiff's hostile work environment claim.

### 2. Discrete Discrimination Claims

Under Count I, Plaintiff also brings discrete discrimination claims. Defendants argue that four discrete discrimination claims, occurring throughout Plaintiff's employment, are time barred. These claims include: (1) a pay raise delay, (2) a failure to promote Plaintiff to Detective, (3) a denial of equipment, and (4) a denial of training.

In Plaintiff's response, he asserts that Defendants do not specifically assert summary judgment on his racial discrimination claim. It appears Plaintiff is referring to the fact that Defendants do not discuss Plaintiff's termination as a discrete discrimination claim. He is correct. Thus, the Court will not address Plaintiff's discriminatory termination claim, and Defendants are not entitled to summary judgment on this discrete claim.

Defendants do, however, request summary judgment on Plaintiff's four other discrete discrimination claims, noted above. Plaintiff fails to specifically address the substance of Defendants' argument. Instead, Plaintiff simply states that these instances are part and parcel of his hostile work environment claim. To the extent that Plaintiff brings these incidents as part of his hostile work environment claim, the information can be considered for that purpose.[40]

To the extent Plaintiff brings these as discrete discrimination claims, a plaintiff alleging a violation of Title VII must file an administrative charge with the EEOC within 300 days of the

---

[40]Defendants appear to concede this point, as well.

challenged action.[41]  Where a plaintiff pursues multiple claims based on discrete discriminatory acts, the limitations period will begin to run for each individual act from the date on which the underlying act occurs.[42]  The timely filing of an administrative charge is akin to a statute of limitations, and a claim is barred if it is not filed within those time limits.[43]  Plaintiff fails to respond to Defendants' argument on this point, thus, he fails to substantively demonstrate that any of the discrete incidents fell within the 300 days of filing his EECO charge.[44]  Accordingly, Defendants are entitled to summary judgment on these four discrete discrimination claims.

## B.      Retaliation (Count II)

### 1.      Retaliation on the Basis of Race

Plaintiff's second claim is for retaliation.  The plaintiff bears the ultimate burden of proving that his employer intentionally discriminated against him,[45] but may do so "through either direct evidence or circumstantial evidence that creates an inference of intentional discrimination."[46]  Where the plaintiff seeks to use circumstantial evidence to show discriminatory intent, as here, the court applies the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*.[47]  Under that framework, the plaintiff must establish a prima facie case of retaliation by demonstrating: (1) that he engaged in protected opposition to

---

[41]*See Davidson v. Am. Online, Inc.*, 337 F.3d 1179, 1183 (10th Cir. 2003); *Fulcher v. City of Wichita*, No. 06-2095-EFM, 2009 WL 6832587, at *2 (D. Kan. Sept. 11, 2009) ("In a deferral state such as Kansas, a Title VII claimant must file his discrimination charge within 300 days of the alleged act.").

[42]*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).

[43]*Id.* at 109.

[44]In this case, Plaintiff filed his KHRC charge on December 18, 2015.  For a discrete discriminatory incident to be timely, it must have occurred within the previous 300 days of filing the charge.

[45]*Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015) (citing *Riser v. QEP Energy*, 776 F.3d 1191, 1199 (10th Cir. 2015); *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008)).

[46]*Bennett*, 792 F.3d at 1266 (citing *Riser*, 776 F.3d at 1199).

[47]411 U.S. 792 (1973); *C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1336 (D. Kan. 2008) (citing *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1211 (10th Cir. 2008)).

discrimination; (2) that a reasonable person would have found the challenged action materially adverse; and (3) that there is a causal connection between the protected activity and the materially adverse action.[48]  The plaintiff's burden of establishing a prima facie case is "not onerous."[49]

If the plaintiff establishes a prima facie case, the burden shifts to the employer to offer a legitimate non-retaliatory reason for the adverse employment action.[50]  If the employer is able to offer a legitimate non-retaliatory reason, the burden shifts back to the plaintiff to show that the employer's stated reason is a pretext for discrimination.[51]  "A plaintiff demonstrates pretext by showing that the employer's proffered explanation is unworthy of credence."[52]  "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."[53]  Despite the shifting framework, the ultimate burden of persuasion remains with the plaintiff.[54]

### a.     Prima Facie Case

The elements of a prima facie case for retaliation are: (1) the employee engaged in protected opposition to discrimination, (2) the employee suffered an adverse action during or

---

[48]*C.T.*, 562 F. Supp. 2d at 1336 (citing *Somoza*, 513 F.3d at 1212).

[49]*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1216 (10th Cir. 2013) (citing *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005)).

[50]*McDonnell Douglas*, 411 U.S. at 802.

[51]*Id.* at 804.

[52]*Berry v. Mission Group Kan., Inc.*, 463 F. App'x 759, 766 (10th Cir. 2012) (quoting *Jaramillo v. Colo. Judicial Dep't.*, 427 F.3d 1303, 1309 (10th Cir. 2005)).

[53]*Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1266–67 (10th Cir. 2015) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

[54]*Richardson v. Blue Cross/Blue Shield of Kan., Inc.*, 196 F. Supp. 2d 1174, 1181 (D. Kan. 2002) (citations omitted).

after the protected opposition that a reasonable employee would have found materially adverse, and (3) a causal connection exists between the protected activity and the materially adverse action.[55] Defendants argue that Plaintiff cannot show that he engaged in protected opposition to discrimination or show a causal connection between any protected opposition and his termination.

The Court first addresses whether Plaintiff engaged in protected opposition to discrimination. "Although no magic words are required, to qualify as protected opposition the employee must convey to the employer his or her concern that the employer has engaged in a practice made unlawful by [Title VII]."[56] "Protected opposition can range from filing formal charges to voicing informal complaints to supervisors."[57] "A vague reference to discrimination and harassment without any indication that this misconduct was motivated by [race] does not constitute protected activity and will not support a retaliation claim."[58]

Plaintiff argues that he engaged in protected opposition when: (1) he spoke with Sheriff Groves about racial harassment in December 2014 or January 2015; (2) he further complained to Sheriff Groves about Kidd's hostile behavior after Kidd failed to get the part-time job at the Columbus Police Department;[59] and (3) he attempted to complain about a June 11 incident between him and Gibson.[60]

---

[55]*Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202 (10th Cir. 2008); *McGowan v. City of Eufala*, 472 F.3d 736, 741 (10th Cir. 2006).

[56]*Hinds*, 523 F.3d at 1203.

[57]*Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004).

[58]*Hinds*, 523 F.3d at 1203, n. 13 (bracket and citation omitted).

[59]Plaintiff provides no timeframe as to when he made this statement. However, viewing the evidence in the light most favorable to Plaintiff, the Court will accept this contention.

[60]Plaintiff states that Defendants do not contest that he engaged in protected opposition to discrimination. The record demonstrates otherwise. Defendants argue in their motion that Plaintiff relied on six instances of protected opposition in his deposition, and with the exception of one, they do not constitute protected opposition. These include: (1) when Plaintiff spoke to Kerns about racial discrimination; (2) when Plaintiff tried to speak to

Plaintiff's third contention cannot be considered protected opposition to discrimination. First, Plaintiff did not actually report anything because he states that he *attempted* to report an incident regarding Gibson to Sheriff Groves. In addition, there is no evidence that Gibson's actions related to Plaintiff's race or that Plaintiff made any mention of racial issues to Sheriff Groves about Gibson. Thus, Plaintiff's attempted report to Sheriff Groves cannot be considered protected opposition to racial discrimination. Plaintiff's first and second contentions, however, are considered protected opposition to discrimination.

Plaintiff was terminated and thus he suffered an adverse employment action. Defendants argue, however, that Plaintiff cannot establish a causal connection between any protected activity and his termination. An employee claiming retaliation must demonstrate a causal connection between the protected activity and the adverse action. The Tenth Circuit has found a causal connection exists between an employee's protected activity and a materially adverse action "where the plaintiff presents evidence of circumstances that justify an inference of retaliatory motive."[61] Courts typically consider "protected conduct closely followed by adverse action" as sufficient evidence.[62] However, when enough time elapses between the protected conduct and the adverse action, a court requires "additional evidence beyond temporal proximity to establish causation."[63] When analyzing the additional evidence, courts can consider all the proffered

---

Gibson; (3) when Plaintiff spoke with Potter about workplace issues; (4) when Plaintiff spoke to Wydick about problems at work; (5) when Plaintiff spoke with Sheriff Groves in late 2014 or early 2015; and (6) when Plaintiff spoke with Daniels, a non-employee about racial issues. With the exception of the conversation between Plaintiff and Sheriff Groves, Plaintiff fails to address any of these instances in his response and instead relies upon the three instances identified above. Thus, the Court finds that Plaintiff concedes that Defendants' referenced incidents are not considered protected opposition to discrimination.

[61]*Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1091 (10th Cir. 2007).

[62]*Id.*

[63]*Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999); *see e.g., Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1228 (10th Cir. 2006) (holding one and one-half months establishes causation while three months is too long and does not).

evidence of retaliatory motive, which includes pretext evidence.[64]  Although pretext evidence "is typically considered during the third phase of the *McDonnell Douglas* inquiry," courts can also consider it "in the prima facie stage of a retaliation claim."[65]

In this case, Plaintiff's protected activity of speaking to Sheriff Groves in December 2014 or January 2015 occurred approximately five to six months prior to his termination on June 25, 2015.[66]  Thus, the timing is insufficient to demonstrate a causal connection.[67]  Plaintiff must point the Court to additional evidence that would support the inference that Plaintiff was terminated due to his complaints about racial discrimination.

Plaintiff asserts that the inference of retaliatory discharge is justified because there is evidence that Defendants' proffered reason for his termination—poor work performance—is pretextual.  Plaintiff directs the Court to evidence of similarly situated individuals, both of whom are white, that received far more poor performance reviews and written reprimands.  It is uncontroverted that both Kidd and Piepho received multiple disciplinary measures, including suspensions and numerous written reprimands, prior to their eventual terminations.  Kidd had at least nine documented instances of work misconduct or written reprimands.  Piepho also had multiple reprimands and was written up for verbal abuse and harassment of a female co-worker that did not result in his termination.  Although both individuals were ultimately terminated like Plaintiff, they experienced striking differences prior to their termination compared to Plaintiff.

---

[64]*Xia v. Salazar*, 503 F. App'x 577, 580 (10th Cir. 2012) (citing *Anderson*, 181 F.3d at 1179).

[65]*Proctor v. United States Parcel Serv.*, 502 F. 3d 1200, 1209 (10th Cir. 2007); *EEOC v. PVNF, L.L.C.*, 487 F.3d 790, 800 n.5 (10th Cir. 2007).

[66]Plaintiff asserts that the instance in which he attempted to complain to Sheriff Groves about Gibson's behavior occurred only 14 days prior to his termination.  The Court, however, previously determined that this instance is not protected opposition to racial discrimination as Plaintiff did *not* speak to Sheriff Groves about any racial discrimination, or anything related to Gibson's behavior, at that time.

[67]*See Proctor*, 502 F.3d at 1208 (noting that "[f]our months is too large a time gap to establish a causal connection.") (citations omitted).

Specifically, Kidd and Piepho's conduct was tolerated far longer than Plaintiff's, although they showed a greater degree of poor performance, and they received numerous written reprimands and warnings. This raises a question of fact as to why Plaintiff, who is African-American and complained of racial issues, was not similarly treated. Thus, through Plaintiff's evidence of pretext, Plaintiff meets his burden of establishing a causal connection in his prima facie case of retaliation.

### b. Legitimate Reason for Plaintiff's Termination

Defendants' proffered reason for terminating Plaintiff for poor work performance has support in the record. His two performance reviews in 2014 included several below average marks regarding reliability, dependability, and willingness to work extra events. In addition, in the month preceding his termination, Sheriff Groves received a complaint from another law enforcement agency regarding Plaintiff. Approximately one week after this complaint, Sheriff Groves requested that Plaintiff participate in a funeral procession of a family member of the Sheriff's Department, and Plaintiff stated that he did not want to do it. Furthermore, approximately two weeks later, Plaintiff failed to respond to a theft call on June 21, 2015. These are valid, non-retaliatory reasons for Plaintiff's termination.

### c. Pretext

Plaintiff contends that Defendants' reason of poor performance is pretextual because Sheriff Groves did not give him a reason for his termination, generally failed to confront Plaintiff about his alleged work deficiencies, and tolerated poor work performance from other white employees. It is undisputed that Sheriff Groves did not give Plaintiff a reason for his termination and never subsequently informed Plaintiff of the reason. Here, in this litigation, Sheriff Groves asserts that Plaintiff's termination was due to poor performance.

In addition, it is undisputed that Sheriff Groves did not address Plaintiff's performance issues with Plaintiff prior to his termination. There were several incidents occurring the month prior to Plaintiff's termination that were the basis for Plaintiff's termination, but these issues were not addressed with Plaintiff or brought to his attention. In addition, no written reprimands or warnings were issued for these incidents. Although Plaintiff's reviews included several "below average" marks and certain performance issues were noted, his last review occurred approximately one year prior to his termination. In addition, his performance reviews were overall good. Furthermore, Plaintiff's only written reprimand occurred in September 2014, approximately nine months prior to Plaintiff's termination. Thus, it appears from October 2014 through June 25, 2015, there were no apparent performance issues brought to Plaintiff's attention or documented in a written performance review, reprimand, or warning.[68]

In addition, as noted and discussed above, Plaintiff presents evidence of similarly situated individuals who were treated differently.[69] These individuals received numerous written warnings and reprimands prior to their terminations. Viewing all this evidence together, and in the light most favorable to Plaintiff, the Court concludes there is a genuine issue of fact as to whether Defendants' stated reason for termination was legitimate or pretext for retaliation against Plaintiff due to his complaints of racial discrimination. Accordingly, Defendants' motion for summary judgment on Plaintiff's claim for retaliation based on a complaint of racial discrimination is denied.

### 2. Retaliation on Basis of Workers Compensation Claim

---

[68]Defendants include evidence of an incident in November 2014 where Plaintiff walked out of a meeting and that Sheriff Groves viewed this act as insubordination. However, Sheriff Groves was not present at the meeting, and there is no evidence that anybody spoke to Plaintiff about this incident or that it was documented as problematic.

[69]One of the individuals is Kidd, who is the individual responsible for the majority of the racial discriminatory behavior.

Defendants argue that, to the extent Plaintiff attempts to bring a claim for workers compensation retaliation, he fails to do so. Plaintiff fails to substantively address Defendants' contention. Plaintiff simply states in a footnote that he disagrees with Defendants' contention by stating that Defendants discriminated against him on the basis of race after he decided to pursue a worker's compensation claim. Thus, the Court grants summary judgment in Defendants' favor as to any workers' compensation retaliation claim.

### C.      Section 1981 Racial Discrimination Claim (Count III)

For Plaintiff's third claim, he states that Defendants discriminated against and harassed him on the basis of his race in violation of 42 U.S.C. § 1981. Defendants argue that Plaintiff's claim is barred by the statute of limitations. In addition, Defendants assert, that summary judgment is proper on Plaintiff's § 1981 claim because Plaintiff failed to allege a violation by and through § 1983. Defendants raised Plaintiff's failure to properly allege his § 1981 claim in their reply brief. Thus, the Court issued an order, pursuant to Fed. R. Civ. P. 56(f), allowing Plaintiff time to file a sur-reply to address this contention.[70]

Plaintiff filed a sur-reply and a Motion to Amend Pretrial Order. In Plaintiff's sur-reply, he acknowledges that his § 1981 claim needs to be brought through § 1983. He argues, however, that Defendants had sufficient notice of his claim in the Complaint and Pretrial Order. In his Motion to Amend, he seeks the Court's permission to amend the Pretrial Order to assert his § 1981 claim by and through § 1983.

### 1.      Statute of Limitations

---

[70]Doc. 126.

A § 1981 claim based on post-contract formation is governed by the four-year statute of limitations contained in 28 U.S.C. § 1658.[71]  Section 1981, however, by itself "does not provide a vehicle for remedying racial discrimination and retaliation in cases brought against state actors. Rather, "§ 1983 'provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor.'"[72]  Thus, when bringing a § 1981 claim against a governmental entity, it must be brought by and through § 1983 and is governed by a four-year statute of limitations.  The question now is whether Plaintiff should be allowed to amend his claim and bring it pursuant to § 1983.

### 2.     Amendment of Pretrial Order

Plaintiff categorized his claim in his Complaint and in the Pretrial Order as one under § 1981.  He did not reference § 1983 with regard to this claim.  Plaintiff has now filed a Motion to Amend Pretrial Order.[73]  He seeks the Court's permission to amend the Pretrial Order to assert this claim by and through § 1983.  He contends that manifest injustice will result because the Court will likely grant summary judgment against him on his § 1981 claim.

Defendants assert that there will not be manifest injustice if Plaintiff is not allowed to amend.  Instead, Defendants contend that they will be prejudiced if the Court allows it.  They

---

[71]*Jones v. R.R. Donnelly & Sons*, 541 U.S. 369, 382 (2004) (noting that a cause of action that arose under an Act of Congress enacted subsequent to December 1, 1990 would be governed by the four-year statute of limitations in 28 U.S.C. § 1658).  Defendants originally argued that a two-year statute of limitations governed Plaintiff's claim.  In Defendants' reply, they contend that even if a four-year statute of limitations is applicable, Plaintiff's claim is still barred because he failed to plead it through § 1983.

[72]*Hannah v. Cowlishaw*, 628 F. App'x 629, 632 (10th Cir. 2016) (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735 (1989)) (citation omitted).  The District of Kansas also previously found that a § 1981 claim based on post-contract formation, brought through § 1983, against a municipality is subject to a four-year statute of limitations.  *Robinson v. City of Ark. City, Kan.*, 896 F. Supp. 2d 1020, 1041 (D. Kan. 2012).

[73]Doc. 128.  The Court expedited briefing on this motion.  Defendants filed a response, but Plaintiff did not file a reply although allowed to do so.

contend that Plaintiff has definitively known of the issue since before the Pretrial Order was entered and Plaintiff's request is untimely.

The Court may modify a final pretrial order "only to prevent manifest injustice."[74] The party moving to modify the pretrial order bears the burden of demonstrating the applicability of manifest injustice.[75] Courts look to the following factors to determine whether to amend or modify a pretrial order: "(1) prejudice or surprise to the party opposing trial of the issue; (2) the ability of that party to cure any prejudice; (3) disruption to the orderly and efficient trial of the case by inclusion of the new issue; (4) bad faith by the party seeking to modify the order."[76]

With respect to these elements, the Court finds that they do not weigh in favor of amending the Pretrial Order. Plaintiff states that that it is unclear how § 1981 claims should be pled. The Court disagrees. The requirement that § 1981 claims be pled through § 1983 against state actors is not new. Indeed, it has been the law in this circuit for approximately fourteen years.[77] Approximately eight years ago, the District of Kansas also recognized this proposition.[78]

In this case, Plaintiff made no attempt to allege a § 1981 claim, by and through § 1983, until this Court's Order requiring a sur-reply to Defendants' argument in their reply brief that Plaintiff did not allege a § 1981 claim properly. Plaintiff asserts that he could not have filed a sur-reply, but he could have requested leave to do so and did not until the Court requested a sur-reply. Moreover, he had the chance to allege the claim properly in the Pretrial Order as the

---

[74]Fed. R. Civ. P. 16(e); *accord* D. Kan. Rule 16.2(b) (recognizing that the final pretrial order "will control the subsequent course of the action unless modified by consent of the parties and court, or by an order of the court to prevent manifest injustice.").

[75]*Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1222 (10th Cir. 2000).

[76]*Id.*

[77]*See Brown v. Keystone Learning Servs.*, 2020 WL 633213, at *8 (10th Cir. 2020) (noting the holding in *Bolden v. City of Topeka, Kan.*, 441 F.3d 1129, 1136-37 (10th Cir. 2006) that "§ 1983 is the 'exclusive federal remedy' for § 1981 actions against state actors.").

[78]*Robinson v. City of Ark. City, Kan.*, 896 F. Supp. 2d 1020, 1041–42 (D. Kan. 2012).

Pretrial Order was entered approximately one month after Defendants' reply was filed. Plaintiff made no effort to assert his § 1981 claim through § 1983 at that time even though the parties engaged in an almost month-long exchange of the Pretrial Order. The parties submitted three proposed Pretrial Orders to Judge Birzer and had two phone conferences. In every proposed Pretrial Order, Defendants asserted the defense that Plaintiff failed to allege his § 1981 claim by and through § 1983. The final Pretrial Order was entered on November 27, 2019. Over three months later, Plaintiff now seeks permission to amend. Plaintiff does not proceed *pro se* and controlling precedent has existed for over a decade that requires a § 1981 claim to be brought through § 1983.[79] This factor does not support amendment to the Pretrial Order.

In addition, Plaintiff contends that Defendants have been on notice of his claim due to his allegations in his subsequent claims (Counts IV and V) for procedural due process and substantive due process violations. He states that his Complaint incorporated by reference all of his preceding allegations. In addition, he asserts that his claims (Counts VI and V) in the Pretrial Order explicitly state that they are brought under § 1983 for the purpose of enforcing rights guaranteed to Plaintiff under § 1981. Defendants disagree that they have been on notice.

---

[79] *See also Brown v. Keystone Learning Servs.*, 2018 WL 6042592, at *9–10 (D. Kan. Nov. 19, 2018). In *Brown*, the defendant asserted on summary judgment that the plaintiff failed to allege his § 1981 claim through § 1983. *Id.* at *9. In response, the plaintiff stated that this technicality did not warrant dismissal and he should be allowed to amend the pretrial order. *Id.* This Court found that the plaintiff failed to address the manifest injustice factors, the plaintiff was not pro se, *Bolden* had been controlling precedent for more than a decade, and the plaintiff could not show good cause for his counsel's failure to properly plead the claim. *Id.* at *10. Thus, the Court did not allow the plaintiff to amend the pretrial order. *Id.*

The Court recognizes that the Tenth Circuit in *Bolden* found that the district court applied the law with "too heavy a hand," and the § 1981 claim could have escaped dismissal but for the technicality for pleading it through § 1983. *Bolden*, 441 F.3d at 1334. The Court finds the circumstances in this case entirely different from the circumstances in *Bolden*. The *Bolden* decision was issued approximately fourteen years ago, Plaintiff does not proceed pro se, and Plaintiff did not attempt to assert his § 1981 claim through § 1983 until two weeks ago although his case was filed in 2017. Furthermore, the *Brown* decision, addressing issues very similar to this case, was issued approximately one year prior to the parties' briefing in this case.

The Court notes that there is a difference between claims brought under § 1983 and a §1981 racial discrimination claim brought by and through § 1983. Although Plaintiff states that he is bringing his § 1983 substantive and procedural due process claims through § 1981, substantive and procedural due process claims are not required to be brought through § 1981. Thus, the fact that he pled these claims in the Pretrial Order by and through § 1981 does not indicate that he intended to plead his stated § 1981 claim in the same manner. Indeed, it demonstrates otherwise, and Defendants were not on notice.

Plaintiff also contends that Defendants' defense will be no different. Defendants do not respond to this assertion. A § 1981 claim brought by and through § 1983 is "restricted by the doctrines limiting § 1983 claims."[80] Generally, there must be a custom or policy by the municipality that inflicted the injury.[81] Neither party has addressed the restrictions § 1983 would impose on Plaintiff's § 1981 claim as the claim was not pled in this manner. The Court will not speculate as to how it would impact Plaintiff's § 1981 claim, or any defenses, other than to state the scope of trial would potentially change. Furthermore, trial is scheduled in three months, and discovery has long closed.

In sum, Plaintiff does not demonstrate that manifest injustice will result if he is not allowed to amend the Pretrial Order. Thus, the Court denies Plaintiff's request. Plaintiff failed to bring his § 1981 claim by and through § 1983. Defendants are entitled to summary judgment on this claim.

### D. Section 1983 Procedural and Substantive Due Process Claims (Counts IV, V)

---

[80]*Bolden*, 441 F.3d at 1135.

[81]*Id.* (citing *Monell v. Dep't of Soc. Servs. of New York*, 436 U.S. 658, 694 (1978)).

Plaintiff's final two claims arise under 42 U.S.C. § 1983. He claims that Defendants violated his procedural and substantive due process rights. Defendants argue that these claims are barred by the two-year statute of limitations.

Generally, the statute of limitations for claims brought under 42 U.S.C. § 1983 are governed by the personal injury statutes for the state in which the federal district court sits.[82] In Kansas, the statute of limitations period for personal injury actions is two years.[83] While state law provides the statute of limitations period, federal law determines the date on which the claim accrues and the statute begins to run.[84] A § 1983 claim accrues "when the plaintiff knows or has reason to know of the injury which is the basis of the action."[85]

Here, every act complained about by Plaintiff occurred on or before June 25, 2015. Plaintiff filed suit on November 6, 2017. Thus, Plaintiff's § 1983 procedural and substantive due process claims are untimely and barred by the statute of limitations. Accordingly, the Court grants Defendants summary judgment on these two claims.

### E.  Conclusion

In sum, the Court finds that there are genuine issues of material fact with regard to Plaintiff's hostile work environment claim and retaliation claim based on a complaint of racial discrimination. Defendants failed to ask for summary judgment on Plaintiff's discriminatory termination claim, so that claim remains as well. Plaintiff's discrete discrimination claims are

---

[82]*Mondragon v. Thompson*, 519 F.3d 1078, 1082 (10th Cir. 2008) (citing *Wilson v. Garcia*, 471 U.S. 261, 269 (1985)); *Graham v. Taylor*, 640 F. App'x 766, 768 (10th Cir. 2016). As noted above, there is a difference between a claim (and the statute of limitations) brought under § 1983 and a §1981 claim brought by and through § 1983.

[83]K.S.A. § 60-513(a)(4).

[84]*Mondragon*, 519 F.3d at 1082 (citing *Wallace v. Kato*, 549 U.S. 384 (2007)); *Graham*, 640 F. App'x at 768–69.

[85]*Baker v. Bd. of Regents*, 991 F.2d 628, 632 (10th Cir. 1993) (citations omitted).

time-barred, and Defendants are granted summary judgment on these claims.  To the extent

Plaintiff brought a worker's compensation retaliation claim, Defendants are entitled to summary

judgment, and this claim is dismissed.  Defendants are also granted summary judgment on

Plaintiff's § 1981 racial discrimination claim.  Finally, Plaintiff's § 1983 claims of substantive

and procedural due process are dismissed because they are barred by the statute of limitations.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendants' Motion for

Summary Judgment (Doc. 95) is **granted in part and denied in part**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Amend Pretrial Order (Doc.

128) is **denied**.

**IT IS SO ORDERED.**

Dated: March 20, 2020

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE